## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KAPPA ALPHA THETA FRATERNITY, INC.; KAPPA KAPPA GAMMA FRATERNITY; SIGMA CHI; SIGMA ALPHA EPSILON; SIGMA ALPHA EPSILON—MASSACHUSETTS GAMMA; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3, | : : : : : : : : | Civil Action No. _____ |
|  | : | |
| Plaintiffs, | : : | |
| v. | : : | **JURY TRIAL DEMANDED** |
|  | : | |
| HARVARD UNIVERSITY; PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | : : : | |
|  | : | |
| Defendants. | : | |
| _____ | : | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs bring this action to obtain, among other relief, a declaratory judgment that

Defendants Harvard University and President and Fellows of Harvard College (together,

"Defendants" or "Harvard") are violating Title IX of the Education Amendments of 1972, 20

U.S.C. § 1681 *et seq.*, and the regulations and policies thereunder, *see* 34 C.F.R. § 106 *et seq.*

(together, "Title IX"), and are coercively interfering with Plaintiffs' right to equal protection of

the laws in violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H,

11I, by engaging in sex discrimination and gender stereotyping in adopting and enforcing a

student-conduct policy that punishes Harvard undergraduates who join single-sex social

organizations (the "Sanctions Policy").  Harvard's Sanctions Policy harms the organizational

Plaintiffs and their members, including the individual Plaintiffs, by intentionally and improperly

discriminating on the basis of sex.  The Policy should be declared unlawful and enjoined.

1

**INTRODUCTION**

1.      Through a new student-conduct policy that punishes undergraduates who join single-sex social organizations, Harvard succeeded, perversely, in eliminating nearly every women's social organization previously available to female students at Harvard.  In response to Harvard's Sanctions Policy, nearly all of Harvard undergraduates' all-female social clubs—their once vibrant sororities, their women's final clubs, and The Seneca, whose mission is to create opportunities, resources, and sustainable networks for women in social, educational, and professional environments— closed their doors or renounced their proud status as *women's* social organizations and became *co-ed* social organizations.  To do so, the former sororities had to sever their links with the national organizations that supported them and helped to broaden their networks.  To be sure, the Sanctions Policy has also seriously harmed Harvard undergraduates' fraternities and all-male final clubs and their members.  But women and their former all-female social clubs have suffered the most.  More women than men belonged to single-sex social organizations.  More women than men lost access to places they once called their own.

2.      Harvard's Sanctions Policy, announced in May 2016 and first formally applicable to the class of 2021, punishes undergraduate students who join any "unrecognized" single-sex social organization whose members consist primarily of Harvard undergraduates, even if the organization lacks any formal affiliation with Harvard.  In adopting and implementing the Sanctions Policy, Harvard has consistently singled out three sets of organizations—fraternities, sororities, and final clubs.  Though these organizations draw their membership from Harvard's undergraduate student body, they are off-campus and entirely private.  Nonetheless, under the Sanctions Policy, any student who joins one of these forbidden social organizations may not hold a leadership position in any on-campus student organization, captain any athletic team, or

compete for any post-graduate fellowship that requires an institutional endorsement, like the prestigious Rhodes, Marshall, and Mitchell Scholarships.  These opportunities remain available to other Harvard undergraduates who are not members of an unrecognized single-sex social organization.

3.      It is now the official policy of Harvard University to punish any woman who joins an all-female group for no other reason than that it is all-female and to punish any man who joins an all-male group for no other reason than that it is all-male.  Unrecognized single-sex social organizations are the only kind of organizations that Harvard punishes students for joining.  A Harvard undergraduate could join the American Nazi Party, or could create an off-campus undergraduate chapter of the Ku Klux Klan, without running afoul of the Sanctions Policy or any other Harvard student-conduct policy.  Those groups may be heinous, but they are co-ed, so under Harvard's rules, its students may belong without any threat of sanction.  But Harvard punishes students for joining sororities, fraternities, and final clubs because they are single-sex even though they are private, off-campus, and unaffiliated with Harvard.

4.      The Harvard undergraduate sorority chapters could not both comply with Harvard's Sanctions Policy and remain local chapters of their national sorority organizations. The founding principle and purpose of the national sororities, to lift and empower women, requires that their sorority chapters be women-only.  To avoid the punishments imposed by Harvard's Sanctions Policy, the women in Harvard undergraduates' sororities were compelled either to resign or take alumnae status.  For nearly all of the sororities the end result was the same:  Once each chapter had no members, it was forced to close.  Harvard, through its Sanctions Policy, took something of tremendous value from the women in the undergraduate sororities.  Those women lost access to the oversight, resources, networks, knowledge, and

connections that came from being part of a national sorority. They lost access to the broader sorority community that extended far beyond Harvard's borders.

5.      By its terms, Harvard's Sanctions Policy applies not only to students who join sororities, fraternities, and final clubs, but also to those who join single-sex singing groups, service organizations, religious groups, and advocacy organizations that Harvard views as "unrecognized." Last spring Harvard administrators contacted the Radcliffe Choral Society, a traditionally all-female singing group, and the Harvard Glee Club, a traditionally all-male singing group, to inform them that they would lose Harvard "recognition" (and thus their members would be subject to the Sanctions Policy), unless they went co-ed. Not wanting their singers to miss out on the opportunity to captain an athletic team or pursue a Rhodes Scholarship, these singing groups went co-ed.

6.      It doesn't stop there. Students now could face punishment for joining the Harvard undergraduate chapter of the Knights of Columbus, the world's largest Catholic fraternal service organization, which is all-male, or Harvard's undergraduate chapter of the Daughters of Isabella, a charitable and sororal organization of Catholic women, which is all-female. Those organizations fall within the Sanctions Policy's explicit terms. They are, in Harvard's words, "unrecognized," "single-gender," "social organizations."

7.      If all of this seems hard to justify, it is. Harvard's rationale for the Sanctions Policy has been a moving target. Harvard originally said that male students should be punished for joining men's groups because those groups are responsible for a disproportionate share of sexual assaults at Harvard and contribute to racism, sexism, classism, and homophobia. Harvard said that men's groups are places of "deeply misogynistic attitudes" that "participat[e] in and perpetuat[e] . . . social structures that discriminate based on . . . race, class, and sexual

orientation." Then Harvard said that male students should be punished for joining men's groups because the existence of all-male organizations makes women "second class citizens" and "restrict[s] women's liberties." Next Harvard said that students should be punished for joining *any* single-sex group—for the first time including women's groups—because single-sex groups are contrary to Harvard's commitment to diversity and inclusion. Harvard administrators compared students who join and advocate for single-sex social clubs like sororities and fraternities to the southern whites who perpetrated racial segregation in the Jim Crow South, and to Harvard's own prior administrators who long excluded women from the college. According to at least one Harvard administrator, allowing students to join single-sex organizations would "institutionalize segregation," and Harvard's Sanctions Policy is necessary because "[s]eparate is not equal."

8.    The common thread that ties together all of Harvard's ever-shifting justifications for the Sanctions Policy is sexism. Harvard's views that all-male organizations cause sexual assault *because* they are all-male, and that there is no value to all-female or all-male organizations, are sexist in the extreme. No objective evidence has ever shown that the single-sex nature of all-male organizations increases sexual assaults at Harvard. To the contrary, nearly all sexual assaults at Harvard (87%) occur in the co-ed dorms run by Harvard. Harvard's view that all-male clubs—because they are all-male—are misogynistic, racist, homophobic, and classist, is also sexist. So is Harvard's view that men's organizations—because they are men's organizations—dispense privilege and advantage that otherwise would not be dispensed were they co-ed. There is nothing intrinsic to being a man, or joining a men's social club, that causes any of these harms. Yet Harvard has consistently asserted that students should be punished for joining all-male organizations—*any* all-male organizations—because men's organizations have

these negative characteristics.  Nor is there anything intrinsic to being a woman, or joining a women's social club, that causes any harm.  Harvard's claims that single-sex organizations subordinate women, or harm Harvard's commitment to diversity or inclusion, are also sexist. Single-sex organizations, all-male and all-female alike, can and do contribute greatly to diversity and inclusion by creating spaces where students can come together to lift up and empower each other.  That is why so many of Harvard's affinity groups are single-sex.

9.      Even as Harvard has disparaged men who join men's groups, it has marginalized women who join women's groups.  Privately, Harvard administrators told members of all-female groups that they were "collateral damage" in Harvard's dogged effort to punish men for joining men's groups.  One Harvard administrator said that "sororities have no value" at Harvard.  At one point, Harvard administrators told members of all-female groups that as long as their governing documents said they were willing to let men join, Harvard would turn a blind eye if they remained single-sex in practice.  At another point, Harvard proposed a "bridge" program that would allow sororities and all-female final clubs to maintain their "gender focus" for an additional 3-5 years (a proposal Harvard later revoked).  As one group of undergraduate women put it in an op-ed, Harvard's "consistent refrain" has been "'it's a shame' that Harvard must eliminate women's groups through sanctions or to otherwise deal with the behaviors of men."[1]

10.     Harvard's Sanctions Policy seeks to dictate the sex of people with whom men and women may associate and the gender norms to which men and women must conform.  Harvard believes that men who join men's organizations and women who join women's organizations are morally deficient and should be punished.  Indeed, the Dean of Harvard College Rakesh Khurana

---

[1] Guest post by 23 undergraduate women, *Do Not Punish Harvard Women for Men's Behavior: Vote Yes to the Lewis Motion*, Bits and Pieces (Nov. 6, 2017), http://bit.ly/2MDeqX2.

and Harvard's former President Drew Faust have both said that the reason Harvard will not allow members of single-sex organizations to become student leaders, captain athletic teams, or compete for post-graduate fellowships is that students who join single-sex organizations do not represent Harvard's "core institutional values."

11.     Although the Sanctions Policy only formally applies starting with the class of 2021, Harvard has engaged in an aggressive campaign of intimidation, threats, and coercion against all students who join single-sex organizations and advocate for their continued existence. Harvard has suggested that students who join single-sex organizations could be expelled. Harvard has also singled out students who join single-sex organizations for scathing criticism in university-wide letters, emails, reports, and media articles.  Harvard has threatened to deny future professional opportunities beyond those specified in the Sanctions Policy.  Coaches and professors have also been implementing a de facto version of the Sanctions Policy against students in classes graduating before 2021.  Harvard's pressure campaign against students who join single-sex organizations has caused several single-sex organizations to close and intimidated many students who favor single-sex organizations into silence.

12.     Harvard's Sanctions Policy intentionally and improperly discriminates on the basis of sex in violation of Title IX and the U.S. Constitution's Equal Protection Clause, as applicable to Harvard through the Massachusetts Civil Rights Act.

13.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  It is an expansive civil rights statute with "a sweep as broad as its language." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982).  "'Discrimination' is a term that covers a

wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005).  Any "intentional unequal treatment" on the basis of sex is discrimination under Title IX, *id.*, as is any "deni[al] [of] equal access to an institution's resources and opportunities," *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999).

14.     Title IX has long recognized the important role of single-sex organizations in college life.  In 1974, two years after enacting Title IX, Congress amended the statute specifically to exempt single-sex college social organizations from its reach.  Congress singled out sororities and fraternities for special protection because Congress recognized the key role these single-sex groups can play in student development, especially the way they can help women.  Senator Birch Bayh of Indiana, "the author and prime Senate sponsor of Title IX," stated in support of the 1974 amendment: "Fraternities and sororities have been a tradition in the country for over 200 years.  Greek organizations . . . must not be destroyed in a misdirected effort to apply Title IX."  120 Cong. Rec. 39,992-93 (1974) (statement of Sen. Bayh).

15.     Congress enacted Title IX in 1972, just eight years after enacting Title VII of the Civil Rights Act of 1964 to eradicate sex discrimination in the workplace.  *See* 42 U.S.C. § 2000e-2(a)(1).  Like Title IX, Title VII's prohibition on sex discrimination means that employers may not "rel[y] upon sex-based considerations" or take gender into account when making decisions.  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239, 241-42 (1989) (plurality opinion).  Title IX follows Title VII's approach to sex-based discrimination.  Courts apply Title VII case law to Title IX cases "by analogy."  *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 540 (1st Cir. 1995); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896-97 (1st Cir. 1988); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting)

(endorsing the use of Title VII case law to explain discrimination in other statutes).  If anything, Title IX's prohibitions on sex discrimination are broader than Title VII's.  *Jackson*, 544 U.S. at 175.

16.    Title IX means what it says:  it bars discrimination "on the basis of sex."  If a person is subject to differential treatment because of his or her sex, that person is the victim of sex discrimination.  *See City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978).  It is *per se* sex discrimination and it is flatly unlawful.

17.    Title IX also prohibits associational discrimination—that is, punishing a person on the basis of the sex of those with whom that person associates.  Two federal courts of appeals recently concluded *en banc* that Title VII prohibits discrimination based on a person's association with persons of the same sex.  *See Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 124-25 (2d Cir. 2018) (en banc) ("[T]he prohibition on associational discrimination applies with equal force to all the classes protected by Title VII, including sex."); *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 349 (7th Cir. 2017) (en banc) (same).  Those holdings apply just as strongly to Title IX by analogy.

18.    Title IX also prohibits discrimination on the basis of sex stereotypes, in two forms.  First, a school may not discriminate on the basis of its own biased assumptions about how men and women are.  Assumptions that men are more likely to engage in sexual violence, or that women are emotional or passive or lack men's work ethic, are forbidden sex stereotypes of this sort.  Discrimination on the basis of these sorts of stereotypes is always forbidden.  *Manhart*, 435 U.S. at 708.  That is because not all women, and not all men, conform to stereotypes about women and men in general.  Discriminating against an individual woman or man because of

something that is assumed to be true of women or men in general is sex discrimination.  *See id.*
at 709.

19.     Second, a school may not discriminate on the basis of its beliefs about how men
and women ought to behave as men and women.  Discriminating against someone because that
person does not walk, talk, or dress like a stereotypical man or woman is sex stereotyping of this
sort.  *Price Waterhouse*, 490 U.S. at 250-51 (plurality opinion).  So is discriminating against a
person because he or she chooses to join a single-sex rather than co-ed social club in college, in
defiance of stereotypes about how "modern" men and women should behave.  *See Whitaker By
Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048-49 (7th Cir.
2017).

20.     And Title IX bars institutions from making decisions tainted by bias against
individuals of a particular sex.  When an institution forms a policy tainted by bias, that bias taints
its every application.  *See, e.g.*, *Doe v. Columbia Univ.*, 831 F.3d 46, 58-59 (2d Cir. 2016).   If,
but for the sex-discriminatory intentions of the officials who contributed to a decision, a person
would not be subject to differential treatment, he or she is the victim of prohibited sex
discrimination.  *See id.*; *see also Jackson*, 544 U.S. at 179, 179 n.3 (holding that men who are
"indirect victim[s]" of sex discrimination against women may sue under Title IX and vice-versa).

21.     Harvard's Sanctions Policy violates Title IX for each and every one of these
reasons.  It is *per se* sex discrimination because it singles out women and men for punishment
because of their sex.  It is associational discrimination because it punishes women and men based
on the sex of those with whom they associate.  It is sex-stereotype discrimination because it
relies on unlawful generalizations about how women and men are, and is designed to further
Harvard's own stereotypical and biased ideas about how ideal women and men ought to behave.

Finally, the Sanctions Policy is the product of anti-male bias, but for which women and men at Harvard would not face punishment for joining the organizations of their choice.

22.     Harvard's Sanctions Policy also violates the Massachusetts Civil Rights Act, which provides a cause of action against any person who "by threats, intimidation or coercion" interferes with, or attempts to interfere with, another person's enjoyment of any right secured by the U.S. Constitution, including its equal protection guarantee.  Mass. Gen. Laws ch. 12, §§ 11H, 11I.  The Equal Protection Clause protects women's and men's right to be free from gender discrimination absent "an 'exceedingly persuasive justification'" for disparate treatment.  *United States v. Virginia*, 518 U.S. 515, 531 (1996).  "[O]fficial action that closes a door or denies opportunity to women (or to men)" must be "carefully inspected."  *Id.* at 532.  Disparate treatment on the basis of sex stereotypes is unconstitutional.  *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 726-730 (1982) (maintenance of single-sex nursing school as compensation for assumed prior discrimination rejected as perpetuating sex stereotypes); *Virginia*, 518 U.S. at 534-46 (benign justification in defense of a categorical exclusion does not block inquiries into actual purposes of and factual support for the exclusion).  Harvard's Sanctions Policy violates the Equal Protection Clause via the Massachusetts Civil Rights Act because it denies Harvard students' right to be free from sex discrimination without an exceedingly persuasive justification.

23.     Because Harvard's Sanctions Policy harms Plaintiffs in violations of Title IX and the Equal Protection Clause applicable to Harvard through the Massachusetts Civil Rights Act, the Court should declare that the Sanctions Policy is unlawful and enjoin its enforcement.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).  This action arises under a federal cause of action, Title IX of the Education

Amendments of 1972, 20 U.S.C. § 1681, *et seq.*  The Court has supplemental jurisdiction over the Massachusetts Civil Rights Act claim under 28 U.S.C § 1367.

25.     Venue is proper in this district under 28 U.S.C. § 1391.  Defendants reside in this judicial district, and a substantial part of the events giving rise to this action occurred here.

## PARTIES

26.     Plaintiff Kappa Alpha Theta Fraternity, Inc. (KAΘ), commonly known as Theta, is the nation's second largest sorority with more than 250,000 total initiated members, spread among 147 college chapters at colleges and universities across the United States and Canada, and more than 200 alumnae chapters and groups.  It is a not-for-profit Indiana corporation headquartered in Indianapolis, Indiana.  Founded in 1870 at Indiana Asbury (now DePauw University) in Greencastle, Indiana, Theta is the first Greek-letter fraternity for women.  Theta's founders were among the first women to be admitted to DePauw as full college students.  They helped lead the way for women's groups and for women in higher education.  Through Theta, young women were able to establish support networks on their campuses.

27.     A leading women's group, Theta's ideas and programs have often been on the cutting edge.  Thetas are known for leading in their communities and on their campuses.  The first women admitted to the honor society Phi Beta Kappa were Thetas.  Theta was the first women's Greek organization at four Ivy League universities (Cornell, Princeton, Yale, and Harvard), and at Michigan, Vanderbilt, Baylor, and Stanford, among many other schools.  A Theta chapter was established for Harvard undergraduates in 1993.

28.     Thetas are known for being leaders and pioneers in all fields of endeavor, from athletics to aerospace, from law to literature, from music to medicine.  Nancy Kassebaum was the first woman to chair a major U.S. Senate committee.  Adelaide MacDonald Sinclair was the first female deputy director of the United Nations International Children's Emergency Fund

(UNICEF).  Julia Morgan was the first woman to study architecture at and graduate from the École des Beaux-Arts in Paris, then the premier school of architecture in the world, as well as the first woman licensed as an architect in California.  Marie-Claire Kirkland Strover was the first woman elected to the National Assembly of Quebec, the first woman appointed a cabinet minister in Quebec, the first woman appointed acting premier, and the first female judge to serve in the Quebec Provincial Court.  Jean Hanmer Pearson was among the first women to land in Antarctica in 1969.  Jill Strickland Ruckelshaus was a founding member of the National Women's Political Caucus.  Laura Bush, Melinda Gates, Cindy McCain, Lynne Cheney, and Kerri Strug likewise all pledged Theta, as did Senators Claire McCaskill and Elizabeth Warren.

29.     On July 15, 2018, Theta's Zeta Xi Chapter, its chapter for Harvard undergraduates, relinquished its charter.  The disestablishment of Zeta Xi was "a direct result of sanctions placed by Harvard administrators on single-gender Greek organizations, sanctions that render sorority members ineligible for scholarships and fellowships and bar them from serving in other campus leadership positions."  As Theta explained, "[b]y forcing women to make an impossible choice—between holding leadership positions and applying for scholarships and fellowships or being members of communities specifically designed to support and empower college women to have those aspirations—Harvard's administrators placed our chapter in an untenable situation."  "Harvard's sanctions have made it impossible for Zeta Xi to continue operations as an active Theta chapter.  While closing the chapter is not a path we would have chosen, we support Zeta Xi members' right to access academic and leadership opportunities available to Harvard students."  Zeta Xi would seek to reclaim its charter if Harvard's Sanctions Policy were rescinded.

30.     Before its closure, the women of Zeta Xi were successful academically, athletically, and extracurricularly at Harvard.  They won prestigious postgraduate fellowships, captained Harvard athletic teams, and served in leadership roles in recognized student groups.

31.     Plaintiff Kappa Kappa Gamma (ΚΚΓ), commonly known as Kappa or KKG, is one of the nation's oldest and largest sororities, with more than 280,000 initiated members (including approximately 210,000 living alumnae), 144 active collegiate chapters, and more than 240 alumnae associations.  It was founded as a women's fraternity in 1870 at Monmouth College in Monmouth, Illinois, by six women who believed women should have the same opportunities as men.  Kappa's headquarters are located in Dublin, Ohio.

32.     Kappa's alumnae members have been successful in a diverse variety of disciplines, including fashion, literature, politics, business, and media.  Alumnae members include Virginia Marie Rometty, the current chairwoman, president, and CEO of IBM, and the first woman to head the company.  Kate Spade was the co-founder, designer, and namesake of the designer brand Kate Spade New York.  Whitney Wolfe Herd is the founder and CEO of the dating app Bumble, and a co-founder of the dating app Tinder.  Former actress and Duchess of Sussex Meghan Markle pledged Kappa, as did actress Ashley Judd, Pulitzer-prize winning poet Phyllis McGinley, and Senators Shelley Moore Capito and Kirsten Gillibrand.  Kappa's members routinely go on to similarly distinguished careers.

33.     On January 8, 2018, Kappa indefinitely suspended operations of Eta Theta Chapter, its chapter for Harvard undergraduates.  Eta Theta was the first of the undergraduate sorority chapters at Harvard to disaffiliate from its national organization.  Some members of Eta Theta Chapter formed a gender-neutral social club called The Fleur-de-Lis, the formation of which was "the culmination of numerous discussions spanning the last two or so years within

14

Harvard's Chapter of Kappa Kappa Gamma and with the administration." In a statement issued after implementation of the Sanctions Policy but prior to Eta Theta's suspension, Kappa expressed that "[w]e are profoundly disappointed in Harvard's decision and will continue to affirm our belief in the power of the sorority experience and in the supportive, empowering community we provide for women." Eta Theta would seek to reclaim its charter if Harvard's Sanctions Policy were rescinded.

34.     Before its closure, the women of Eta Theta were successful academically, athletically, and extracurricularly at Harvard. They won prestigious postgraduate fellowships, captained Harvard athletic teams, and served in leadership roles in recognized student groups.

35.     Plaintiff Sigma Chi (ΣΧ) is the nation's largest fraternity, with roughly 17,000 undergraduate members, over 250,000 living alumni members, and more than 342,654 members initiated since its founding. Sigma Chi has 236 undergraduate and 132 alumni chapters, as well as 9 colonies at colleges and universities across the United States and Canada. Founded at Miami University in Oxford, Ohio on June 28, 1855, its headquarters is located in Evanston, Illinois. Sigma Chi's creed for its members is "to make [their] college, the Sigma Chi Fraternity, and [their] own chapter more honored by all men and women and more beloved and honestly respected by our own brothers."

36.     Members of Sigma Chi have been leaders in multiple industries, including the military, sports, entertainment, business, and politics. Notable alumni include former U.S. President Grover Cleveland; the billionaire philanthropists Jon M. Huntsman and Robert C. McNair; NFL quarterback Drew Brees; former NFL player, coach, and three-time Super Bowl champion Mike Ditka; current chairman of the Democratic National Committee and former Secretary of the U.S. Department of Labor Tom Perez; former U.S. Supreme Court Justice Frank

Murphy; actors Brad Pitt and Woody Harrelson; golfer Adam Scott; and Walt Disney Company
CEO Ron Miller.  There are currently twelve U.S. Senators and Congressmen who are also
alumni members of Sigma Chi:  Lamar Alexander, Bob Corker, Mike Enzi, Ruben Gallego (a
Harvard alumnus), John Garamendi, Garret Graves, Steny Hoyer, Mark Meadows, Steven
Palazzo, Todd Rokita, Bill Shuster, and Roger Williams.

37.     Sigma Chi members have been successful academically, athletically, and
extracurricularly at Harvard.  They won prestigious postgraduate fellowships, captained Harvard
athletic teams, and serve in leadership roles in other recognized student groups.

38.     Sigma Chi's current members at Harvard are similarly qualified to hold leadership
positions in Harvard organizations, captain athletic teams, and compete for prestigious
postgraduate scholarships.  But because of Harvard's Sanctions Policy, Sigma Chi's members in
the class of 2021 and after are denied access to these opportunities solely on the basis of their
membership in Sigma Chi.

39.     Sigma Chi draws members from students at Harvard University.  Harvard's
Sanctions Policy has harmed Sigma Chi's ability to recruit new members from Harvard.  Sigma
Chi is also harmed financially by Harvard's Sanctions Policy because Sigma Chi must spend
more resources recruiting and has fewer dues-paying members than it otherwise would.

40.     Plaintiff Sigma Alpha Epsilon (ΣAE), commonly known as SAE, is the nation's
second largest fraternity, with more than 239,158 living alumni in the Fraternity, and more than
334,727 initiated members since its founding in 1856.  SAE has 212 chapters and 9 colonies at
colleges and universities across the United States.  Founded at the University of Alabama on
March 9, 1856, its national headquarters is on the campus of Northwestern University in
Evanston, Illinois.  SAE's mission statement is "to promote the highest standards of friendship,

scholarship and service for our members based upon the ideals set forth by our Founders and as specifically enunciated in ['The True Gentleman.']"

41.     Members of SAE have been leaders in the arts, politics, sports, and media.  Its notable members include former U.S. President William McKinley, former U.S. Treasury Secretary Henry M. Paulson, golfer Bobby Jones, Super Bowl-winning NFL coach Pete Carroll, Hall of Fame NFL quarterback Troy Aikman, the prohibition agent Eliot Ness, the father of modern rocketry Robert H. Goddard, and author William Faulkner.  Eight U.S. Senators and Congressmen were also members of SAE:  Johnny Isakson, Andy Barr, Mike Bishop, Jim Costa, Drew Ferguson, Adam Kinzinger, Austin Scott, and Brad Wenstrup.

42.     Plaintiff Sigma Alpha Epsilon—Massachusetts Gamma ("Mass Gamma") is the Harvard undergraduate chapter of SAE for students at Harvard.  Mass Gamma operated at Harvard from 1893 until 1980 when the chapter began a two-decade hiatus.  It was brought back for students at Harvard by five undergraduates in 2001 and rapidly rose to become one of the strongest SAE chapters in the nation.  Currently, there are 37 active brothers in the chapter and over 450 living alumni.

43.     Mass Gamma members have been successful academically, athletically, and extracurricularly at Harvard.  They have won prestigious postgraduate fellowships, captained Harvard athletic teams, and served in leadership roles in other recognized student groups.

44.     Mass Gamma's current members are similarly qualified to hold leadership positions in Harvard organizations, captain athletic teams, and compete for prestigious postgraduate scholarships.  But because of Harvard's Sanctions Policy, Mass Gamma's members in the class of 2021 and after are denied access to these opportunities solely on the basis of their membership in Mass Gamma.

45.     Mass Gamma draws its membership from students at Harvard University. Harvard's Sanctions Policy has harmed Mass Gamma's ability to recruit new members. Mass Gamma's ability to survive as a self-sustaining organization dedicated to its fundamental ideals and core mission is fundamentally harmed by Harvard's Sanctions Policy. Mass Gamma is also harmed financially by Harvard's Sanctions Policy because Mass Gamma must spend more resources recruiting and has fewer dues-paying members than it otherwise would.

46.     Plaintiff John Doe 1 is a student at Harvard College. He is a member of an all-male organization that Harvard considers an "unrecognized single-gender social organization." John Doe 1 is subject to the Sanctions Policy.[2]

47.     The Sanctions Policy has harmed John Doe 1's access to professional opportunities. Before joining a single-sex organization, John Doe 1 was a member of a Harvard-recognized student organization, "Club A." John Doe 1 was considering applying for a leadership position in Club A. At the same time, however, John Doe 1 decided that he wanted to join a single-sex organization. John Doe 1 thought that joining a single-sex organization would help him feel more at home at Harvard (and so far it has). In making the decision, however, John Doe 1 felt like he could not further pursue a leadership position in Club A. The Sanctions Policy forced John Doe 1 to choose between membership in a group that would help him to feel at home at Harvard, and a leadership position in Club A, another organization that John Doe 1 cared about.

48.     The Sanctions Policy has also eliminated at least one of the benefits of John Doe 1's Harvard education. In addition to John Doe 1's membership in Club A, he was also an

_____

[2] Plaintiffs John Doe 1, John Doe 2, and John Doe 3 will file a contemporaneous motion for leave to file pseudonymously.

active member of a different Harvard-recognized student organization, "Club B." It was a club John Doe 1 had a sincere and strong passion for. Unfortunately, the president of the club graduated. John Doe 1 would have taken over, but he worried that if he became president while also a member of a single-sex organization, he would be punished under the Sanctions Policy. As a result, no one took over Club B's leadership and Club B has not been active on campus since. It seems likely that it will continue to be inactive. It hurts John Doe 1 that Club B disappeared because of the Sanctions Policy. Club B was one of the best parts of John Doe 1's Harvard education.

49.     The Sanctions Policy has also harmed John Doe 1's personal reputation. Through the Sanctions Policy, Harvard College has singled John Doe 1 out for social stigma and embarrassment. Harvard's justifications for the Sanctions Policy, that men's organizations are responsible for sexual assaults at Harvard and perpetrate various forms of bigotry, are widely known in the Harvard University community. Other students and members of the Harvard Community think less of John Doe 1 because he is subject to the Sanctions Policy. The Sanctions Policy has caused John Doe 1 serious emotional and psychic harm.

50.     Plaintiff John Doe 2 is a student at Harvard College. He is a member of an all-male organization that Harvard considers an "unrecognized single-gender social organization." John Doe 2 is subject to the Sanctions Policy.

51.     The Sanctions Policy has harmed John Doe 2's access to professional opportunities. John Doe 2 is a member of at least one Harvard-recognized student organization. He would like to hold a leadership position in that organization. There is a strong likelihood that he would obtain a leadership position if he were allowed to hold one. But because of the Sanctions Policy, John Doe 2 is categorically ineligible to hold a leadership position. The

inability to hold a leadership position in that student organization has materially harmed John Doe 2's access to future professional opportunities.

52.     The Sanctions Policy has also harmed John Doe 2's personal reputation.  Through the Sanctions Policy, Harvard College has singled John Doe 2 out for social stigma and embarrassment.  Harvard's justifications for the Sanctions Policy, that men's organizations are responsible for sexual assaults at Harvard and perpetrate various forms of bigotry, are widely known in the Harvard University community.  Other students and members of the Harvard Community think less of John Doe 2 because he is subject to the Sanctions Policy.  The Sanctions Policy has caused John Doe 2 serious emotional and psychic harm.

53.     Plaintiff John Doe 3 is an upperclassman at Harvard College.  John Doe 3 has been a member of an all-male organization that Harvard considers an "unrecognized single-gender social organization" for two years, and has served in leadership roles within the organization.  As an upperclassman, John Doe 3 is not formally subject to the Sanctions Policy.  Nevertheless, the Sanctions Policy has harmed him.  He has been personally stigmatized because of his identity as a member and leader of a single-sex organization.

54.     The Sanctions Policy has also impacted John Doe 3's ability to lead and participate in his single-sex organization.  There is a growing sense that members of single-sex organizations in general are "bad," and morale within John Doe 3's organization is lower as a result.  In the course of John Doe 3's membership in the organization, he has been responsible for recruitment, retention, and fundraising.  The Sanctions Policy has made each of those responsibilities, and particularly recruitment, more difficult.  John Doe 3 has had to raise additional funds to address the impact of the Sanctions Policy on his organization.

55.     Defendant Harvard University is an institution of higher education located in Cambridge, Massachusetts.  Defendant Harvard University is a corporation incorporated and with a principal place of business in Massachusetts.

56.     Defendant President and Fellows of Harvard College, also known as the "Harvard Corporation," is Harvard University's governing board.  Through the university charter, the President and Fellows of Harvard College perform the role generally associated with a board of trustees.  Defendant President and Fellows of Harvard College governs Harvard University.

57.     Harvard College is a component of Harvard University that offers undergraduate, graduate, professional, and research programs in the fields of arts, science, medicine, business, design, and public health.

58.     Harvard College is overseen by the President of Harvard University and the Dean of Harvard College.  The President and Dean exercise delegated authority from the President and Fellows of Harvard College, including the authority to formulate disciplinary policies.

59.     Defendant Harvard University is a recipient of Federal financial assistance. Despite an endowment of approximately $39.2 billion, Harvard accepts substantial direct financial assistance from the Federal government through, among other things, grants and loans. In 2010, Harvard accepted more than $6.6 million in such grants and loans.  In 2011, Harvard accepted more than $11.9 million in such grants and loans.  In 2012, Harvard accepted more than $20.9 million in such grants and loans.  In 2013, Harvard accepted more than $13.4 million in such grants and loans.

60.     Harvard also receives an enormous amount of Federal financial assistance in the form of federal research funds.  According to the National Science Foundation's Higher Education Research and Development Survey, Harvard has received over $500 million in federal

research dollars every year for the last five fiscal years.  Harvard also has received substantial

direct financial assistance from the Federal government in 2018 and will further receive

substantial direct financial assistance from the Federal government in 2019.  Harvard also

accepts substantial indirect Federal financial assistance by, among other things, enrolling

students who pay, in part, with Federal financial aid directly distributed to those students.

61.     As a recipient of Federal financial assistance, Harvard University, and all of its

programs and activities, which includes Harvard College, are subject to Title IX of the Education

Amendments of 1972, 20 U.S.C. § 1681 *et. seq.*

## STATEMENT

| | | |
|---|---|---|
| A. | Harvard's History of Discrimination Against Women | 23 |
| B. | Harvard's Social Landscape Before the Sanctions Policy | 24 |
| | 1. The Fraternities and Sororities | 26 |
| | 2. The Male Final Clubs | 27 |
| | 3. The Female Final Clubs | 29 |
| | 4. Other Single-Sex Organizations at Harvard | 30 |
| | 5. The Proven Benefits of Single-Sex Environments | 31 |
| C. | Harvard's Development and Adoption of the Sanctions Policy | 34 |
| | 1. 2014-15:  The Sanctions Policy's Anti-Male Origins | 34 |
| | 2. 2015-16: Harvard's Expansion to Attack Men's and Women's Groups | 36 |
| |    a. The Announcement of the Sanctions Policy | 46 |
| |    b. Women's Protests Against the Sanctions Policy | 48 |
| | 3. 2016-17: Faculty Members' Opposition to the Sanctions Policy | 51 |
| |    a. The First Faculty Motion Opposing the Sanctions Policy | 52 |
| |    b. Shifting Justifications for the Sanctions Policy | 53 |
| |    c. Preliminary Report of the Faculty Committee | 56 |
| | 4. 2017-18: Harvard's Decision to Retain the Sanctions Policy | 57 |
| |    a. Final Report of the Faculty Committee | 58 |
| |    b. Faculty Vote on a Renewed Motion to Reverse the Policy | 60 |
| |    c. The Harvard Corporation Intervenes to Lock In the Policy | 61 |
| | 5. Summer 2018: The Sanctions Policy Eliminates the Women's Groups | 63 |

62.     Harvard's Sanctions Policy is the product of a multi-year saga, involving numerous meetings, reports, interviews, emails, and letters; shifting and amorphous justifications; and continuous and evolving efforts on the part of Harvard to make the Sanctions Policy internally coherent in the face of serious questions concerning its legality.  Harvard's hostility to single-sex organizations traces at least as far back as the early 1980s, when Harvard decided that it would no longer recognize certain single-sex groups.  But 2014 is when the Sanctions Policy began to develop in earnest.

**A.      Harvard's History of Discrimination Against Women**

63.     Harvard was founded in 1636 as a single-sex educational institution.  It fought hard to remain so, even well into the 19th century, as most other major educational institutions in the United States became coeducational.

64.     When Harvard finally agreed to educate women, it did so by creating a separate, single-sex institution.  In 1894, Harvard agreed to the chartering of Radcliffe College, allowing women to be taught by Harvard faculty and granted Radcliffe degrees, for the first time—but in classrooms separate from men.  During this period Radcliffe had no faculty; it existed only as an administrative entity.

65.     In 1943, Harvard reached a wartime agreement that allowed Radcliffe students to fill empty spaces in male classrooms.  But there was a catch—even then, Harvard limited the number of women students on its campus by allowing only one woman to enroll at Radcliffe for every four Harvard men.  This quota remained in place in 1963, when Harvard University began to award its female students Harvard and Radcliffe degrees for the first time.

66.     Women remained in the minority at Harvard by design.  Harvard continued to enforce its 4:1 quota.  Women were excluded from certain laboratories and libraries.  Women

were significantly underrepresented in Harvard's faculty as well as its student body.  As of 1970, there were no tenured women in the Faculty of Arts and Sciences; by 1975, there were only nine.

67.     Harvard softened its quota in the 1970s, so that there could be as many as two female students for every five male students.  As the number of women grew at Harvard, many of Radcliffe's women-led extracurricular activities declined.  Throughout the 1970s, as Drew Faust has noted, "as women joined the *Crimson* and the Harvard yearbook staff, Radcliffe's publications weakened or disappeared.  And many central aspects of Harvard undergraduate life still remained closed to women."

68.     In 1999, Radcliffe finally merged with Harvard, and in 2007, women finally reached numerical parity—but the need for women-only social spaces remained.  In that context, women's groups that began at Radcliffe, and that remained single-sex organizations, became an important part of campus life at Harvard.  For example, the Radcliffe Union of Students, the Radcliffe Choral Society, and the Radcliffe Pitches, a female a cappella singing group, remained and preserved the Radcliffe name.  Two women's athletic teams still compete under the Radcliffe name: varsity crew and the women's rugby union.  These organizations added to, rather than replaced, a diverse group of student social groups and other extracurricular activities.

**B.     Harvard's Social Landscape Before the Sanctions Policy**

69.     A visitor to Harvard in the fall of 2014 would have found a vibrant social landscape.  Undergraduate men and women could join a profusion of organizations catering to a broad range of tastes and causes, including a mix of single-sex and co-ed singing groups, comedy troupes, political groups, service organizations, and social clubs.  These groups truly covered the waterfront.  If a student had an interest, Harvard had a club dedicated to it.  Harvard had a Breakdancing club, a club for Socialists, a Geological society, a British Club, and even a BDSM club called "Munch."  There were hundreds.

24

70.     Among the organizations a 2014 Harvard student could join were purely social clubs—sororities, fraternities, and so-called "final clubs." Social clubs are among Harvard's oldest organizations. They have been part of Harvard's undergraduate social fabric for hundreds of years. They are embedded in its history and even chronicled in its university archives.

71.     A century ago when Harvard was all male, the college had clubs for freshmen, clubs for sophomores, and then the "final" clubs, which were the last social groups a student at Harvard College could join. Today the appellation is archaic; only the final clubs remain. In addition to the men's final clubs, which trace their roots as far back as 1791, women's and co-ed final clubs have also more recently emerged. Harvard students have also historically belonged to sororities and fraternities, and the early 1990s saw a reemergence of Greek organizations.

72.     Harvard does not officially "recognize" final clubs or Greek organizations, but many flourish on private property outside of the University's gates. Because they are unrecognized, these groups have none of the unique privileges that come from University recognition. They cannot put up posters on Harvard's campus, reserve campus rooms or space, or use College space for storage. They may not send messages over Harvard House email lists, list their memberships in the yearbook, or apply for University funding. These organizations are independent and private associations. While their members, as undergraduates and alums of the college, are part of the Harvard community, the clubs themselves are wholly independent.

73.     As of 2014 there were 21 unrecognized sororities, fraternities, and final clubs that counted Harvard College students as members. With an undergraduate population of 6,700, these social organizations had a membership of approximately 1,580. Nearly one in four Harvard students was a member of a sorority, fraternity, or final club, a proportion similar to other leading educational institutions.

| Harvard's Fraternities, Sororities, and Final Clubs as of 2014 (with year of founding) | |
|---|---|
| Men's Organizations | Women's Organizations |
| **Final Clubs**<br>Porcellian (1791)<br>Fly (1836)<br>A.D. (1836)<br>Delphic (1846)<br>Spee (1852)<br>Phoenix-SK (1895)<br>Owl (1896)<br>Fox (1898)<br><br>**Fraternities**<br>Sigma Chi (1989)<br>Sigma Alpha Epsilon (2001)<br>Alpha Epsilon Pi (2001)<br>Kappa Sigma (2014) | **Final Clubs**<br>Bee (1991)<br>Isis / IC (2000)<br>Pleiades (2002)<br>Sablière (2002)<br>La Vie (2008)<br><br>**Sororities**<br>Kappa Alpha Theta (1993)<br>Delta Gamma (1994)<br>Kappa Kappa Gamma (2003)<br>Alpha Phi (2013) |

### 1.    The Fraternities and Sororities

74.    Fraternities and sororities began a new era of Greek life in Cambridge for students at Harvard in the fall of 1989, when an enterprising young male Harvard undergraduate set out to form the first fraternity for Harvard students in decades.  It was not easy.  The administration was opposed to the formation of fraternities, and the Dean of Students threatened to have him expelled.  But he pressed ahead anyway and found others willing to join.  Thus was founded the chapter for Harvard students of Sigma Chi.  For those who joined that first class, the fraternity proved to be the source of "many rich conversations and cherished memories."  As its founder would later put it, "[t]here was something about being in the company of men, and men alone, that enabled us to speak openly and honestly about what was on our minds."

75.      Four years later, in 1993, a group of female Harvard students founded a chapter of Kappa Alpha Theta, the first sorority for undergraduates at Harvard.  Delta Gamma followed in 1994.  Kappa Kappa Gamma was founded in 2003.  By 2011, sororities had established a firm foothold at Harvard and welcomed the largest rush class in Harvard history, with 268 undergraduates rushing the three women's organizations.  That same year the sororities Kappa Kappa Gamma and Kappa Alpha Theta, and the fraternity Sigma Alpha Epsilon, all acquired off-campus social spaces.

76.      In 2013, the sorority Alpha Phi opened a chapter for Harvard undergraduates. More fraternities also followed Sigma Chi's founding.  As of 2014, students had come together to form chapters of the Fraternities Delta Kappa Epsilon, Sigma Alpha Epsilon, Kappa Sigma, and Alpha Epsilon Pi.

### 2.      The Male Final Clubs

77.      There were eight traditionally male final clubs.  They were, with their year of founding:  the A.D. (1836), the Delphic (1846), the Fly (1836), the Fox (1898), the Owl (1896), the Phoenix-SK (1895), the Porcellian (1791), and the Spee (1852).

78.      Each of the clubs has a unique history and traditions.  Final clubs have been essential to the formation of countless close friendships, and have helped shape the lives of their members, who are often leaders in all aspects of society and include famous writers, politicians, and even Harvard presidents.  Over the centuries, up until the advent of the Sanctions Policy, the final clubs have engendered deep alumni loyalty and support for Harvard itself.

79.      An exemplar is the Fly Club.  The Fly Club has been at Harvard for 180 years. Founded in 1836 as a literary society by the editors of the student publication the *Harvardiana*, the Fly became a chapter of Alpha Delta Phi fraternity the following year.  In 1910 the club severed ties with Alpha Delta Phi and became independent.  The club counts Theodore

Roosevelt, Franklin Delano Roosevelt, Oliver Wendell Holmes, Jr., and other distinguished citizens among its alumni.  To get a sense of just how long the Fly Club has been in Cambridge, the Fly Club's house at Two Holyoke Place, built in 1896, predates the nearest Harvard-owned structure by over thirty years.

80.     Notwithstanding its longevity, the Fly has evolved as Harvard has evolved.  As the demographics of Harvard College have changed, so has membership in the Fly, resulting in a diversity that reflects the racial, ethnic, religious, political, geographic, and socio-economic profile of the college as it exists today.  The Fly Club, like all of the final clubs, fraternities, and sororities, does not discriminate on the basis of race, color, religion, creed, sexual orientation, gender identity, national origin, ancestry, age, veteran status, disability, genetic information, or military service.  The Fly's commitment to financial aid allows any student to accept election, regardless of his personal or family income.

81.     Nearly all of the male final clubs began as local chapters of national college fraternities that at some point broke their ties with the national organizations.  The Fox and Porcellian Clubs are exceptions as they were created by Harvard undergraduate students without involvement beyond Cambridge.  The emphasis of all the clubs has always been on a spirit of fellowship, loyalty, and fraternal comradery.

82.     The men's final clubs developed as eating clubs preparing and serving meals to their members and have never provided residential housing for their members.  Some of the final clubs allow guests and have parties, but not all.  Several of the final clubs only allow the presence of guests of either gender in the clubhouse on rare special occasions.  The inter-generational involvement of graduate members is very important to several of the clubs.  Life-

long friendships are forged spanning the generations of all graduate members. The men's final clubs own their own properties and are fully independent of Harvard.

83.     Today, the final clubs, sororities, and fraternities in Cambridge are as diverse, in terms of race, class, and ethnicity, as Harvard itself. Several, if not all, of the final clubs have need-blind financial policies when considering their incoming members and programs to provide financial relief in various forms to those undergraduate members who require assistance.

84.     Unlike Greek recruitment in the spring, the final clubs recruit new members from the sophomore class during the fall semester. Each club reaches out to interested sophomores through a series of events called "punches," which they hold separately. There is a coordinated schedule leading into November when each club votes separately and privately on those they would like to have join them. Each club usually accepts approximately a dozen to twenty new members each year. Thus, each club has an undergraduate cohort of about 36-60 students.

### 3.     The Female Final Clubs

85.     In the 1990s, with an increasing number of women making up the undergraduate population, Harvard women saw the value of final clubs in men's lives and began to form final clubs of their own. The first of these was the Bee Club, founded in 1991 and named after a "sewing bee" formed by Cambridge women during the Civil War. The Bee Club was formed to be a supportive and empowering space for women. This served as a welcome parallel to the men's clubs. The Fly and Porcellian clubs encouraged and supported the Bee's founding. The Bee has recently entered into a reciprocal membership with a men's club (see below).

86.     Other women's final clubs followed nearly a decade after the Bee. In 2000, Isis emerged, now named the IC Club, followed in 2002 by the Pleiades (named for the seven sisters of Greek mythology) and the Sablière Society, and then in 2008 by La Vie Club (as in Edith Piaf's "La Vie en Rose"), and the Exister Society (the "X Club") in 2017.

### 4.   Other Single-Sex Organizations at Harvard

87.     In addition to the social clubs, Harvard has historically been home to a number of officially "recognized" single-sex organizations.  For example, the Asian American Brotherhood, founded in 1999, is a traditionally all-male club that seeks to promote intercultural understanding and social activism at Harvard and beyond.  The Harvard Black Men's Forum, originally founded in the 1970s, was revitalized in 1999 by a group of undergraduates to create a safe space for black men on Harvard's campus.  There are as many or more woman-only organizations at Harvard as well—for example, the all-woman Asian American Women's Association, the Women's Leadership Project, and the South Asian Women's Collective.

88.     The Harvard Glee Club, founded in 1858, was (until recently) an all-male singing ensemble, and is among America's oldest collegiate choruses.  Its counterpart, the Radcliffe Choral Society, founded in 1899, was (until recently) a similarly all-female ensemble.  The Krokodiloes, formed in 1946, is an a cappella group of twelve undergraduate men who sing close-harmony popular songs and perform at colleges and around the world.  The female counterpart to the "Kroks" is the Radcliffe Pitches, founded in 1975.  Harvard is also home to other single-sex and co-ed a cappella and choral groups.

89.     When Radcliffe began integrating more with Harvard, in the early 1970s the Harvard Glee Club and the Radcliffe Choral Society were merged into a single, co-ed chorus.  In 1974, after complaints from Radcliffe alumnae, the Radcliffe Choral Society regained its independence and stature as a female-only group.  Harvard has now required the two groups to go co-ed once again.

90.     Harvard also provides its own social and civic spaces.  For example, it is home to a Women's Center, the mission of which is to raise "awareness of women's and gender issues, developing women's leadership, and celebrating women who challenge, motivate, and inspire."

91.     There are also some unrecognized single-sex religious organizations available to Harvard undergraduates, most notably the Harvard Knights of Columbus and the Harvard Daughters of Isabella.  The Harvard Knights is an all-male chapter of the world's largest Catholic family fraternal service organization.  The Daughters of Isabella is a charitable and sororal organization of Catholic women who come together in spiritual sisterhood to grow in faith and prayer, to uphold the teachings of the Catholic Church, and to contribute to the common good of humanity.

92.     In response to the Sanctions Policy, several of these groups in recent months have altered their by-laws to become gender-neutral or co-ed.  On information and belief, Harvard has told some of these organizations that as long as they change their bylaws to become formally gender-neutral, they need not actually go co-ed and may remain single-sex.  However, Harvard has not stated this position publicly, and presumably, can subject these students to sanctions for belonging to single-sex organizations in the future if it withdraws its informal approval.

### 5.     The Proven Benefits of Single-Sex Environments

93.     It is no surprise that single-sex organizations have thrived at Harvard for so many years.  Single-sex social organizations represent a traditional source of stability and community in college life.  They meet many of the social and cultural needs of students.  They provide a surrogate family for students away from home and offer students an opportunity to grow with peers who share common values, problems, and goals.  Members of all-male and all-female organizations feel that the single-sex nature of the groups is important to the cohesive atmosphere that the organizations provide.

94.     A 2014 Gallup survey of more than 30,000 college graduates across the United States found that students who were members of fraternities or sororities experienced notable long-term benefits linked to their fraternity and sorority membership.  These students were more

31

likely to be "thriving" in their well-being and engaged at work than college graduates who did

not join a fraternity or sorority.  The survey found that fraternity and sorority members were

more likely than other students to find fulfillment in daily work and interactions, to have strong

social relationships and access to the resources people need, to feel financially secure, to be

physically healthy, and to take part in a true community.[3]

95.    Single-sex environments are associated with a myriad of developmental and other

benefits, particularly for young women.  Many educational researchers have found that single-

sex education contributes to academic achievement at all levels for women.[4]  There "is a body of

research carried out since the late 1960's which shows that graduates of women's colleges are

more likely to become achievers than are the women graduates of coeducational institutions."[5]

As an example, in the 1970s, graduates of women's colleges were more than twice as likely than

graduates of co-ed colleges to enter medical school or to obtain a natural science or other

doctoral degree.[6]

---

[3] *See* Gallup, *Fraternities and Sororities: Understanding Life Outcomes* (2014), http://bit.ly/2zLKwYi.

[4] *See, e.g.*, Marvin Bressler & Peter Wendell, *The Sex Composition of Selective Colleges and Gender Differences in Career Aspirations*, 51 J. Higher Educ. 650, 662 (1980); Mikyong Kim & Rodolfo Alvarez, *Women-Only Colleges: Some Unanticipated Consequences*, 66 J. Higher Educ. 641 (1995); Daryl G. Smith et al., *Paths to Success: Factors Related to the Impact of Women's Colleges*, 66 J. Higher Educ. 245 (1995).

[5] M. Elizabeth Tidball, *Women's Colleges: Exceptional Conditions, Not Exceptional Talent, Produce High Achievers*, *in Educating the Majority: Women Challenge Traditions in Higher Education* 157, 160 (Carol S. Pearson et al. eds., 1989); *see also* Kim, *supra* note 4, at 661-62 (citing findings that attending a women's college "has a positive effect on students' academic ability" and that such colleges "may provide a long-term foundation for higher proportions of career achievers" as compared to co-ed colleges).

[6] *See, e.g.*, M. Elizabeth Tidball & Vera Kistiakowsky, *Baccalaureate Origins of American Scientists and Scholars*, 193 Sci. 646 (1976); M. Elizabeth Tidball, *Baccalaureate Origins of Entrants into American Medical Schools*, 56 J. Higher Educ. 385 (1985); M. Elizabeth Tidball, *Baccalaureate Origins of Recent Natural Science Doctorates*, 57 J. Higher Educ. 606 (1986).

96.     Studies have found that women in single-sex schools at both the secondary and college levels have higher levels of self-esteem and a greater sense of personal control.[7] Exposure to single-sex environments can even positively influence a woman's interest in nontraditional or male-dominated careers—one study concluded that "the opportunity to interact in a single-sex environment is important at some stage of a young woman's life, if she is to develop nontraditional interests."[8]  Significantly, the benefits of having participated in a single-sex environment persist even after the woman has graduated or otherwise left the environment.[9]

97.     These benefits are not limited just to women—single-sex environments can be beneficial to men as well.  One study found that both males and females attending single-sex schools were more likely to attend four-year colleges and to consider applying to graduate schools than their co-ed high school counterparts.[10]

98.     Notwithstanding the well-documented benefits of single-sex environments, particularly for women, Harvard implemented the Sanctions Policy, thus effectively forbidding Harvard students from taking advantage of the unique benefits afforded by single-sex organizations.

---

[7] *See, e.g.*, Valerie E. Lee & Anthony S. Bryk, *Effects of Single-Sex Secondary Schools on Student Achievement and Attitudes*, 78 J. Educ. Psychol. 381 (1986).

[8] *See* Mona I. Rubenfeld & Faith D. Gilroy, *Relationship Between College Women's Occupational Interests and a Single-Sex Environment*, 40 Career Dev. Q. 64, 70 (1991); *see also* Lawrence G. Stowe, *Should Physics Classes Be Single Sex?*, 29 Physics Tchr. 380 (1991) (concluding that single-sex high school physics classes had a "statistically significant, positive influence upon girls' interest in physics-related careers, while mixed-sex classes may have had a slight negative influence").

[9] *See* Valerie E. Lee & Helen M. Marks, *Sustained Effects of the Single-Sex Secondary School Experience on Attitudes, Behaviors, and Values in College*, 82 J. Educ. Psychol. 578 (1990).

[10] *See id.*

C.      **Harvard's Development and Adoption of the Sanctions Policy**

1.      **2014-15:  The Sanctions Policy's Anti-Male Origins**

99.      The relationship between Harvard, the final clubs, and the sororities and fraternities was basically cordial for several decades until the summer of 2014.  That summer, in July 2014, Khurana became dean of Harvard College.

100.      The opening salvo in the formation of the Sanctions Policy was an October 6, 2014 meeting between Khurana and the student and graduate leaders of the Harvard undergraduate social clubs.  Between 30 and 40 affiliates of final clubs and other unrecognized social organizations, including The Seneca and the Hasty Pudding Club, attended the meeting. The meeting was a semiannual ritual, a gathering where the Dean would check in with the clubs to ensure that they were aware of general information about University policies and bylaws.

101.      No one expected the October 6, 2014 meeting to be much different from the past. Khurana had sat in on a meeting with the final clubs in the spring of 2014, before his appointment as Dean, and that meeting had been productive and otherwise uneventful.

102.      Instead of the run-of-the-mill meeting club leaders expected, Khurana opened with questions directly aimed at Harvard's social scene and inclusivity.  The gathering turned out to be a more than hour-long discussion that touched on gender and diversity issues.  The meeting was uncomfortable and at times confrontational.  Ultimately, Khurana's message appeared to be that he was dissatisfied with the state of Harvard's social scene—it was, in his eyes, too exclusive and insufficiently diverse.  He exhorted organization leaders to do better.

103.      The remainder of the fall semester passed uneventfully.  That winter, Harvard's four sororities saw record-breaking turnout and collectively accepted 215 women.  Delta Kappa Epsilon fraternity also opened a chapter for Harvard undergraduates in early 2015.

104.     On May 4, 2015, Khurana held a meeting with the graduate leaders of Harvard's all-male final clubs.  This meeting, like the fall meeting, was billed as a typical meeting to ensure the groups were abreast of the College's alcohol and sexual assault policies.

105.     At that meeting, Khurana told the final club leaders that Harvard had already decided that the clubs would go co-ed and that it was just a matter of his helping each of them to decide how soon.  There were a number of questions at the meeting about why.

106.     Khurana said that the reason was the upcoming report by the Harvard Task Force on Sexual Assault Prevention.  About a year before the meeting, in April 2014, members of an unofficial group, Our Harvard Can Do Better, had filed a complaint with the Department of Education's Office for Civil Rights, which is charged with enforcing Title IX.  The complaint alleged that Harvard was in violation of several Title IX requirements, including a failure to discipline the all-male final clubs, which the complaint described as hostile spaces and "major site[s] of sexual violence."  The same day that the existence of the complaint became public in April 2014, President Faust formed a Task Force on the Prevention of Sexual Assault to study sexual assault on Harvard's campus and to recommend ways to reduce the rate of sexual assault.

107.     Khurana cited the Title IX investigation as the reason Harvard needed to eliminate the all-male clubs.  Khurana said that the University risked losing federal funding if it did not act.  Khurana waved a sheet of typescript in the air that he claimed contained accounts of sexual assault.  Khurana said that the papers in his hand were very embarrassing to the clubs and that he could not guarantee that they would not be leaked.  But, Khurana said, if the clubs became co-ed—systematically and soon—that would help the situation.  It was an unmistakable threat.

108.    Of the thousands of federal Title IX investigations conducted since the statute's enactment in 1972, none has ever resulted in a finding that a school needed to make single-sex groups go co-ed.

109.    Khurana was asked why the leaders of women's organizations and fraternities had not been invited to the meeting.  Khurana had only invited the graduate officers of the men's final clubs.  Khurana claimed that women had been invited but declined to attend because they were too intimidated by the men.

110.    Khurana subsequently held multiple meetings with various graduate and undergraduate representatives of all-male final clubs through the spring and summer of 2015.  In these meetings, Khurana made it clear that Harvard's official position was that the all-male final clubs needed to accept female members.  No representatives of sororities or all-female final clubs were included in any of these meetings.

### 2.    2015-16: Harvard's Expansion to Attack Men's and Women's Groups

111.    The following academic year, in September 2015, then-President Faust said in an interview with *The Crimson* that she and Khurana were weighing options to address issues of exclusivity, sexual assault, and alcohol use that she associated with the final clubs.  She also said in that interview that a major reason that the clubs needed to go co-ed was because the clubs "dispense privilege and advantage."  As the *New York Times* reported:  "Faust suggested that problems with sexual assault and alcohol were related to the privileged, all-male environment" of final clubs.

112.    Faust's interviews coincided with a renewed pressure campaign by Khurana for the final clubs to admit women.  Khurana met on several occasions with the graduate and undergraduate officers of the clubs.  In those meetings, he suggested that Harvard has the power

to prohibit its undergraduates from belonging to single-gender social organizations, including to the point of expelling undergraduates who did so.  It was another unmistakable threat.

113.    On September 11, 2015, the Porcellian sent Khurana a letter in anticipation of a meeting on September 17.  That letter noted that "no allegation of sexual assault or anything remotely like it has ever been made against the Porcellian Club" and expressed the club's unequivocal commitment to the health and safety of all students.  The letter also noted that the existence of single-sex social clubs does not preclude the existence of co-ed clubs as well, and that both types of clubs can make valuable contributions to a diverse, vibrant campus.  "The fact that . . . women's clubs have prospered strongly suggests that they serve a purpose in the overall mosaic of undergraduate life, as do, we believe, the male final clubs.  We would respectfully suggest that our dialogue with you be expanded to include representatives of the women's final clubs."

114.    On September 17, 2015, Khurana held a meeting with representatives of the men's final clubs, along with representatives from the Hasty Pudding Theatricals.  There were no representatives from either women's clubs, sororities, or fraternities.  No undergraduate officers of any of the final clubs were invited to attend the meeting either, and none attended.  Only graduate leaders of the clubs attended.

115.    Khurana repeated many of the same points he had made in the meetings in the spring.  Khurana again stated that the question was not *whether* the clubs would be required to go co-ed, but *when*.  When pressed for more specificity, Khurana referred to the upcoming release of the report by the Task Force on Sexual Assault.  Khurana said that a report would be issued in the next couple of weeks with very specific data about sexual assault and that the report was

expected to be very unfavorable to Harvard. Khurana's words were that "there will be a sobering set of findings in the next few weeks."

116.     When asked why representatives of women's final clubs and sororities had not been invited to the meetings, Khurana replied that the women had said they did not want to meet with the men. One attendee said that was inconsistent with his club's conversations with representatives of women's final clubs. When asked why fraternities had not been invited to the meetings, Khurana said they needed to be dealt with differently. When asked why the men's final clubs were being singled out, Khurana said that he was "not aware of incidents [of sexual assault] in other spaces."

117.     The Porcellian again wrote a letter to Khurana on October 1, 2015, explaining that "there are members of the governing boards of the University who are conflating the issues of gender equity, sexual assault and exclusivity. These fiduciaries may be inclined to take a 'blunt instrument' approach (the analogy discussed was Sarbanes Oxley) to the existence of male final clubs at Harvard. It has become apparent that many of these individuals do not take into account any differentiation within the group of male final clubs." The letter noted that the Porcellian does not host parties in the Club for non-members and reiterated that "[t]he Porcellian Club and its members, both undergraduate and graduate, have no tolerance for any behavior that risks the physical safety or mental well-being of any member of the College community or any other person."

118.     In yet another meeting with a final club on October 1, 2015, Khurana reportedly said that all-male final clubs are inconsistent with the mission of the College. According to an attendee, that conclusion seemed to be primarily the result of Harvard's concern about the "climate of sexual misconduct" documented in a survey of 27 colleges and universities

completed by the American Association of Universities.  Although Khurana claimed that the primary issue was sexual assault, he also called the clubs inequitable "opportunity platforms" that give their members advantages that may not be available to others.

119.    On October 19, 2015, the undergraduate members of the Fox Club sent a confidential letter to the club's graduate members, informing them that the club would begin accepting women, effective immediately.  The letter spent multiple pages—under the heading "Harvard Has Forced Our Hand"—explaining the "tremendous pressure" Harvard had applied to the final clubs to go co-ed.  The letter stated "that Harvard is unfairly scapegoating the final clubs for Harvard's poor performance on sexual assault issues."  But "[a]s distasteful as the pressure Harvard has applied on the final clubs may be, it is also real."  The letter stated that the Fox Club's undergraduate members believed that if the Fox Club did not go co-ed immediately, "our individual reputations and careers, as well as the reputation, autonomy and existence of the Fox Club going forward, are at serious risk."

120.    The winter of 2016 saw another record number of Harvard women seek to join sororities, with 280 women seeking to join a sorority.

121.    In March 2016, the University's Task Force on Sexual Assault Prevention released a report accusing the historically male final clubs of "deeply misogynistic attitudes" and calling on Harvard to formulate "a plan to address the problems presented by Final Clubs." Citing data from a University-wide sexual misconduct survey conducted in 2015 in tandem with the Association of American Universities, the report argued that single-sex final clubs significantly contribute to campus sexual assault.  On the basis of these findings, the task force urged "a strong response from Harvard."

122.     The report documented numerous problems that contribute to sexual assault at Harvard, but Harvard has not addressed the other issues nearly as aggressively.

123.     The report noted that most (87%) sexual assaults of Harvard undergraduates occur in student dormitories, which are co-ed and run by Harvard itself, but that final clubs are the second-most reported location for sexual assaults.  The report stated that female students who "participate" in final clubs are more likely to be sexually assaulted than their peers who did not participate in the clubs.  The survey on which the report was based did not clarify what "participate" meant, so the task force was left to make educated guesses.  The task force's report implied that the final clubs' ties to sexual assault were due to high rates of alcohol consumption at final club events and the clubs' purported "deeply misogynistic attitudes, reflected by the long-standing refusal of many [c]lubs to admit women as members."  The report also included anecdotes describing final club parties where attractive women were the only non-club members, "party themes depicting women as sexual objects," and "competition among [all-male final club] members for sexual conquests."  The report made no distinctions among the various final clubs even though not all of the male final clubs even allow guests on their property.

124.     The 20-page report included more than three pages of "Further Observations on the Final Clubs" devoted exclusively to qualitative and quantitative analysis of the clubs' purported role on Harvard's campus.  The report described final clubs as emblematic of "sexual entitlement," troubling areas of potential alcohol abuse and sexual assault, and "vestige[s] of gender inequity" on Harvard's campus.  Though the report said Harvard's sexual assault problem was not "solely or even principally a byproduct of the activities and influence of Final Clubs," it stated that combatting sexual assault at Harvard "must include" proposals to address the clubs. "In our view, the very structure of the Clubs—men in positions of power engaging with women

on unequal and too often on very sexual terms—speaks tellingly to the work ahead of us if we are to create an environment where all students, of all genders, can thrive."

125.    The report emphasized one data point in particular: 47 percent.  According to the report, 47-percent of female Harvard seniors "participating" in the final clubs reported "experiencing nonconsensual sexual contact since entering college."  That figure was higher than the 31-percent of female Harvard seniors overall who had experienced nonconsensual sexual contact since entering college.  The report stated that the 47-percent figure "suggests that a Harvard College woman is half again more likely to experience sexual assault if she is involved with a Club than the average female Harvard College Senior."

126.    In a letter to the editor of the *Wall Street Journal*, University Spokesperson Jeff Neal emphasized the importance of the 47 percent statistic, stating that "[w]hile the data shows there is no single cause of sexual assault, it is clear that the social dynamics fostered by single-gender social organizations warrant our sustained attention."

127.    Faust wrote in an email to Harvard affiliates on March 8, 2016:  "The clear and powerful call for the University to address issues presented by final clubs relates not only to sexual assault but also to the implications of gender discrimination, gender assumptions, privilege, and exclusivity on our campus."

128.    In response to the Task Force Report, the Porcellian commissioned a professional statistical analyst to evaluate its statistical reasoning.  The analyst, Jora Stixrud, an economist at Welch Consulting with a PhD in Economics from the University of Chicago and a specialist in applied econometrics, issued an analysis detailing flaws in the Task Force report.

129.    Stixrud's analysis focused on two figures central to the task force's recommendations: "47 percent" and "at least 15 percent."  As noted above, 47-percent

represented the percent of female College seniors "participating in the Final Clubs" who reported

experiencing "nonconsensual sexual contact" during their undergraduate years. "At least 15

percent" represented the percent of women reporting "nonconsensual penetration involving

physical force" who said the incident occurred at a space used by a single-gender social

organization that was not a fraternity or a sorority.

130.    Stixrud wrote, in relevant part: "this survey does not contain any data that would

allow an analyst to support the recommendations of the Task Force that pertain to Final Clubs."

"The 47% figure does not provide any meaningful information about whether there is any

relationship between Final Clubs and nonconsensual sexual contact," and "[t]he 15% figure also

provides no reliable statistical information as to what percent of those reporting nonconsensual

sexual contact may have experienced an incident at a Final Club."[11]

131.    *Atlantic* editor Caitlin Flanagan wrote in a *Washington Post* op-ed that "the task

force report burns with moral indignation that its evidence does not warrant." She explained:

> Consider a single statistic:  47 percent of female seniors who reported
> participating in final club events also reported having nonconsensual sexual
> contact during their years in college.  But that act, we discover — if we track
> down the appendices and fall down a rabbit hole of illogic — could have
> happened at the hands of a nonmember, in a location unrelated to a final club and
> before the victim even participated in a club event.  In fact, the club whose event
> she attended could have been an all-women's final club.  It would be almost
> impossible to concoct a more meaningless statistic.  Moreover, the report casually
> mentions that the "vast majority" — 87 percent — of all sexual assaults against
> women occur in dorms.  These are spaces over which the university has complete
> jurisdiction, so its failure to reduce assaults constitutes a far graver institutional
> error than its inability to police the final clubs.

132.    On March 29, 2016, Khurana held a confidential two-hour meeting with the

undergraduate leaders of the male and female final clubs.  The meeting was the first between

---

[11] Jora Stixrud, *The AAU Sexual Assault Survey Data Cannot Substantiate Claims Regarding Harvard Final Clubs* (2016), http://bit.ly/2o3Qtu7.

undergraduate club leadership and Harvard following the release of the Task Force Report. An emailed invitation from Assistant Dean of Student Life David R. Friedrich billed the meeting as an "important opportunity for continued dialogue particularly in light of the recent report of the University Task Force on Sexual Assault." Before the meeting, Friedrich emailed undergraduate leadership "kindly ask[ing]" them to read two documents: the Task Force's report and an *Inside Higher Ed* article headlined "A Rare Focus on All-Male Groups" (the "Article").

133. The Article lauded Harvard's report. It also emphasized that the problem the report identified was problematic *male* behavior. The Article stated that "Harvard singled out its final clubs as especially dangerous places for women. Victims' advocates and researchers argue more colleges should take a similarly hard look at fraternities." One person interviewed for the Article said that "Harvard's focus on final clubs and other single-sex private organizations may stem from a discrimination complaint filed against the university in 2013."

134. At the conclusion of the March 29, 2016 meeting with the undergraduate leaders of the male and female final clubs, Khurana ordered the clubs to go co-ed by April 15, 2016.

135. After the meeting with the final clubs, Khurana held a separate meeting with leaders of Harvard's unrecognized sororities and fraternities. That meeting was the first time that Khurana met with the leadership of sororities and fraternities on Harvard's campus throughout the entire process of formulating the Sanctions Policy. Khurana did not issue a deadline on a co-ed decision to the Greek organizations. Khurana stated that the difference between the problems raised by Greek organizations and men's final clubs was "night and day."

136. On April 6, 2016, Deans Khurana, Emelyn A. dela Peña, and Friedrich held another meeting with undergraduate leaders of the sororities and fraternities. The student leaders sought to address the administration's concerns about Greek organizations, and left the meeting

with the impression that the administration wanted to work cooperatively with them to address any potential issues of inclusivity, gender equity, and sexual assault.  Sorority and fraternity members quickly collaborated to develop a written proposal, titled "Building a Better Harvard," that was intended to serve as an action plan for how they would address the administration's concerns going forward.  Greek leadership emailed this proposal to Khurana, dela Peña, and Friedrich on April 15, 2016.  None of the administrators ever responded.

137.    On April 6, 2016, in an interview with *The Crimson*, William F. Lee, the Harvard Corporation's senior fellow, stated: "[that the clubs] are basically determining membership on the basis of gender only or some other exclusive basis are things that we need to consider and to decide whether they are consistent with the values of the University.  [Khurana] has reported regularly to the Corporation, I have worked with him directly."

138.    On April 13, 2016, Khurana wrote to *The Crimson*: "The College has for many months made it clear that the behaviors and attitudes espoused by unrecognized single gender social organizations at Harvard College remain at odds with the aspirations of the 21st century society to which the College hopes and expects our students will contribute."

139.    On April 13, 2016, Khurana held a tense meeting with undergraduate and graduate leaders of Harvard's final clubs that lasted almost three hours.  Khurana suggested for the first time that he could consider barring undergraduate members of final clubs from holding leadership positions—such as team captaincies—and receiving fellowships.  Khurana also reiterated his April 15 deadline for the clubs to inform him whether they planned to go co-ed.

140.    On April 15, 2016, the Porcellian wrote a letter to Khurana declining to go co-ed by the deadline.  The letter explained that the Porcellian's single-sex nature "is an important aspect of our institution, as it is of the women's clubs and some of the other men's final clubs"

and that "there is no moral or intellectual inconsistency in tolerance for single-sex organizations and their acceptance within the context of the larger coed experience of the College."  The letter expressed "concern[] that Harvard continues to conflate its reservations about men's and women's single-sex organizations with the different and much broader issue of sexual misconduct, distracting its community from a critical challenge."  The letter also expressed frustration at Harvard's "[r]epeated misuse of the data" in a false attempt to blame final clubs for sexual assault, an act that "not only defames innocent undergraduates and their male and female single-sex social organizations, it distracts the public and the student body from the fact established by the survey that the vast majority of sexual assaults occur on Harvard property under Harvard control."

141.    On April 26, 2016, *The Crimson* released an open letter written by the Graduate President of the Fly Club that stated in part that Khurana had "twice, in separate meetings with representatives of the thirteen final clubs, identified himself as an 'employee' operating under specific instructions from his 'employer' (his words) to impose coed membership on single-gender student social organizations that exist independent of the university."

142.    On May 4, 2016, two leaders of Harvard's historically female final clubs penned an editorial in *The Crimson* titled "Harvard Can't Achieve Safety and Equity for Women If It Ignores Their Voices."  In it they wrote, "Harvard's administration has engaged the male clubs' leadership for over a year about the changing social landscape on campus, only bringing us, their female peers, into the conversation this past fall."  They went on to state:  "In the past few months, the female clubs have tried to work with Harvard's administration to ensure that both men's and women's clubs transition safely and that women do not become collateral damage in the transition.  Harvard has given us no indication it understands these concerns."

143.    In further comments to *The Crimson* on May 5, 2016, one of the Op-Ed writers continued:  "In the past couple of months when we have finally been brought into this conversation, we feel as though we are not being listened to."  She continued:  "[T]he issue is not that they didn't involve us two years ago.  It's not that they didn't involve us five years ago.  The issue is that when they did choose to involve us . . . we feel that we have not been listened to despite the pretense of 'Oh, we're having a meeting and would love your input.'"

144.    In response to the charge that Harvard's administrators had failed to consult or take into account the interests of women's organizations, Faust later told *The Crimson*, "I'm sorry they feel that they haven't had enough voice.  I hope that they come to feel that their concerns and their, I think, different status and different roles on the campus will be attended to as we move forward."

### a.        The Announcement of the Sanctions Policy

145.    On May 6, 2016, Khurana wrote an open letter to President Faust recommending that, beginning in the fall of 2017, new students who join unrecognized single-gender social organizations not be permitted to hold leadership positions in recognized student organizations and on athletic teams.[12]

146.    In his letter to Faust, Khurana compared the Sanctions Policy to Harvard's decision to finally end its discriminatory policies against women in the 1970s.  The letter explained that single-sex organizations are "antiquated barriers to women's full participation in the University's academic and extracurricular opportunities" and that such organizations perpetuate a "disempowering and exclusionary" culture that is "untenable in the 21st century."

---

[12] Letter from Rakesh Khurana, Dean, Harvard Coll., to Drew Gilpin Faust, President, Harvard Univ. (May 6, 2016), http://bit.ly/2o6eeC1.

Continued Khurana, "Ultimately, all of these unrecognized single-gender social organizations are at odds with Harvard College's educational philosophy and its commitment to a diverse living and learning experience." Khurana went on to state that "the [gender] discriminatory membership policies of these organizations have led to the perpetuation of spaces that are rife with power imbalances. The most entrenched of these spaces send an unambiguous message that they are the exclusive preserves of men. In their recruitment practices and through their extensive resources and access to networks of power, these organizations propagate exclusionary values that undermine those of the larger Harvard College community." Khurana also stated that single-sex organizations "undermine Harvard's campus culture" and that "their fundamental principles are antithetical to our institutional values." He concluded by stating that "we . . . expect leaders of our athletic teams, our recognized student groups, and those seeking a Dean's endorsement to share in the College's responsibility of fostering a non-discriminatory culture at Harvard."[13] Little mention was made of the now-discredited Task Force statistics.

147.    In an email to undergraduates later that day (May 6, 2016), President Faust endorsed Khurana's recommendation.[14] In her email, Faust also compared the Sanctions Policy to Harvard's decisions to end its own discriminatory policies against women and minorities. She stated that to "make progress" Harvard needed to "address deeply rooted gender attitudes, and the related issues of sexual misconduct, points underscored by the work of the Task Force on the Prevention of Sexual Assault." She wrote that "fraternities, sororities, and final clubs . . . enact[] forms of privilege and exclusion at odds with our deepest values." "They encourage a form of self-segregation that undermines the promise offered by Harvard's diverse student body." She

---

[13] *Id.*

[14] Letter from Drew Gilpin Faust, President, Harvard Univ., to Rakesh Khurana, Dean, Harvard Coll. (May 6, 2016), http://bit.ly/2BFTHh7.

thus endorsed the Sanctions Policy because "[c]aptains of intercollegiate sports teams and leaders of organizations funded, sponsored, or recognized by Harvard College in a very real sense represent the College.  They benefit from its resources.  They operate under its name. Especially as it seeks to break down structural barriers to an effectively inclusive campus, the College is right to ensure that the areas in which it provides resources and endorsement advance and reinforce its values of non-discrimination."[15]

### b.        Women's Protests Against the Sanctions Policy

148.     Khurana and Faust's May 6, 2016 announcement came at the start of Harvard's reading period, the tense one-week period prior to final examinations.

149.     Sorority and fraternity members were completely blindsided by Khurana's announcement.  Khurana had previously expressed to them at the March 29 meeting that he needed to present a *recommendation* on single-sex organizations to the rest of the administration by *the end* of May 2016, so they did not anticipate the administration taking such drastic action so quickly.  On May 8, 2016, fraternity and sorority undergraduate leadership again met with Khurana to express their objections to the policy and confusion about their path going forward, but it was not a productive meeting.

150.     On May 9, 2016, members of the final clubs, fraternities, and sororities spoke out against the decision and urged Harvard to reconsider.  National Greek organizations, representing sororities and fraternities nationwide, similarly urged Harvard to reconsider in a joint statement issued the same day.  Francisco Lugo of the National Association of Latino Fraternal Organizations wrote that culturally-based fraternities and sororities, composed of underrepresented minority students, would also be punished by Harvard's policy.  "[I]f Harvard

---

[15] *Id.*

is seeking to make campus more inclusive and equitable, removing opportunities for these students goes directly against that goal," Lugo wrote.

151.    On May 10, 2016, the Monday after Harvard announced the policy—in the heart of reading period, and normally an exceptionally difficult time to persuade students to come out of their rooms—hundreds of Harvard women gathered outside Massachusetts Hall in one of the largest protests in Harvard Yard (the University's traditional center) in recent memory.  More than 200 women rallied in front of Massachusetts Hall against the sanctions.  An estimated 250 participants marched from Massachusetts Hall, past the bronze statue of John Harvard, and through Harvard Yard to decry the inclusion of all-female groups in the new rules.

152.    A sorority leader who helped organize the protest told *The Crimson*, "[b]y removing . . . spaces for women, Harvard is making our campus less safe for women."  "The College may have discussed this extensively with the male organizations, but they have only included female organizations as an afterthought."  She also stated that Harvard's policy had "taken away our place to speak openly about women's issues and actively empower each other and other women, and in doing so, they effectively turn back the clock on all of our progress."

153.    In a letter dated May 11, 2016, former Dean of Harvard College and self-described "Harvard lifer" Harry R. Lewis issued a pointed critique of Khurana's attempts to curb unrecognized single-gender social life.  In his letter to Khurana, Lewis wrote that "by asserting, for the first time, such broad authority over Harvard students' off-campus associations, the good you may achieve will in the long run be eclipsed by the bad: a College culture of fear and anxiety about nonconformity."  Continued Lewis:  "I am surprised in particular by the implication that the Dean could unseat the presidents of (for example) the *Crimson*, the Democratic Club, and the Right to Life Club, even though they had violated no rule voted by the Faculty, because their

membership in *other* clubs allegedly demonstrated their lack of fealty to Harvard's core values."
Lewis also wrote that though "[t]he year began with much publicity over reports of linkage
between Final Clubs and sexual assault," the administration had "abandoned the moral high
ground by broadening the focus from sexual assault at some clubs to the discriminatory
membership policies of a large number of clubs, many of them otherwise innocuous."  Lewis
concluded his letter by noting that "[b]y reaching into the private associations of Harvard
students and declaring some of them to be, in essence, 'suppressive persons' because of their
nonconformity, you are, I fear, passing from creating community to molding a monoculture, in
which people of whom we have every reason to be proud are afraid to do or say things that are
lawful and generally considered harmless."[16]

154.    On May 26, 2016, Former University President Lawrence H. Summers also came
out against the Sanctions Policy.  Despite taking issue with aspects of final club culture,
Summers said sanctions are a step too far.  "If I had a child at Harvard, I would strongly
discourage my child from being a member of a final club," Summers said.  But, he continued,
"the idea that we would condition fellowship letters or the opportunity to be elected by one's
peers as captain of a football team on agreement with certain values is inconsistent with the
central values of an academic institution."

155.    In emails obtained by *The Crimson*, The Seneca told its members that Friedrich
had assured the group in a May 2016 meeting that removing gender requirements from its charter
and bylaws would allow the club to "continue to operate as it always has."  "Like Women in
Business or Latinas Unidas, although men may apply, our membership can be made up wholly of

---

[16] Letter from Harry R. Lewis, Professor, Harvard Univ., to Rakesh Khurana, Dean, Harvard
Coll. (May 11, 2016), http://bit.ly/2LjQSSp.

women without incurring the sanctions of the administration's new policy," then-co-presidents of The Seneca Avni Nahar '17 and Fran F. Swanson '17 wrote at the time.  In August 2016, The Seneca announced it would go gender-neutral.

156.    On August 30, 2016, Harvard administrators met with undergraduate and national sorority representatives, at which point they were told by an administrator that sororities have "no value" on Harvard's campus.  Another administrator quickly backtracked on that statement, stating that sororities do have value and that the administration would seek to recreate that value through Harvard-approved groups.  Additionally, administrators reiterated the promise made to The Seneca, stating that the governing documents of sororities needed to permit co-ed membership but that the administration would not follow up to determine if sororities were actually co-ed in practice.  However, unlike The Seneca (which has no broader parent organization), making such a change to the governing documents would force sororities to disaffiliate from their national organizations.  Nearly all of Harvard's sororities have now either shut down or disaffiliated from the national organization to go co-ed.

### 3.    2016-17: Faculty Members' Opposition to the Sanctions Policy

157.    In September 2016, Khurana announced the formation of the single-gender policy enforcement committee, tasked with implementing the College's new policy penalizing unrecognized single-gender social groups.

158.    On September 21, 2016, Faust penned an op-ed in *The Crimson* entitled "Claiming Full Citizenship."  In the op-ed Faust stated that male-only organizations make women "second-class citizen[s]."  She thus concluded that "[t]he policy on single-gender social organizations Harvard College announced last May is intended as another step in the long and historic movement to ensure that opportunities central to Harvard undergraduate life are not limited by accident of birth, but open to every student."

51

159.    On November 3, 2016, Faust told *The Crimson* in an interview that the Sanctions Policy "was meant more to marginalize the power, the social power of these [men's] groups.  To undermine the kinds of circumstances that lead women to line up outside of clubs on Friday nights hoping to be chosen on the basis of their outfits, appearance, whatever."  "We designed an answer that seemed to be the best option," Faust said.  "Responding to the prevalent critique that the penalties infringe on students' freedom of association, Faust countered that all-male organizations restrict women's liberties," *The Crimson* wrote.  "Freedom of association is a concept that was used widely in the white South to combat Brown v. Board, to combat the Civil Rights Act.  It's an argument that has been used to sustain and support discrimination," Faust said.  "It gives me chills to see it used in this instance as a defense of what I see as exclusionary policies on the part of organizations in the College."

### a.      The First Faculty Motion Opposing the Sanctions Policy

160.    In the Spring of 2016, Professor Lewis made a motion to the faculty that the faculty reverse the Sanctions Policy.  As a former Dean, Lewis knows Harvard's arcane procedures.  He argued that Harvard's administration lacked the authority unilaterally to change its disciplinary code without the consent of the faculty.  Lewis, along with eleven other professors in the Faculty of Arts and Sciences, submitted a motion ("the Lewis Motion") resolving that "Harvard College shall not discriminate against students on the basis of organizations they join," a proposal that if passed would stand in opposition to the College's sanctions against students involved in final clubs or Greek life.  The professors argued that the College should not penalize students for their involvement in "political parties with which they affiliate, nor social, political or other affinity groups they join, as long as those organizations, parties, or groups have not been judged to be illegal."

161.    Some of the biggest names at Harvard—among them Steven Pinker (Johnstone Family Professor of Psychology) and Helen Vendler (A. Kingsley Porter University Professor)—strongly backed the motion.  As Vendler told *The Crimson*, "I find the tactics of the administration loathsome, and I mean to have that word quoted."

162.    On December 6, 2016, the faculty held a tense meeting with the ultimate intention of voting on the Lewis Motion; President Faust used a procedural maneuver to end the meeting abruptly without a vote, effectively postponing voting on the motion by another month.

163.    In response to the Lewis Motion, Khurana agreed to form a faculty committee to consider revising (and possibly reversing) the Sanctions Policy.  On January 25, 2017, Khurana announced the formation of a faculty committee to consider whether the Sanctions Policy could be improved, either by changing aspects of its existing structure or through some broader revision.

164.    On January 30, 2017, in response to the formation of the faculty committee, the Lewis Motion was withdrawn.  "If the policy is reaffirmed without adequate revision, however, I expect that the motion, or one similar to it, will be reintroduced," Lewis wrote.

### b.    Shifting Justifications for the Sanctions Policy

165.    On February 17, 2017, the "Implementation Committee" that Khurana had separately commissioned to produce recommendations on implementation of the Sanctions Policy released a 46-page report that, among other things, called for the creation of a new category of recognized social groups on campus, granting sororities and female final clubs an extended timeline to become co-ed, and significantly expanding the number of fellowships barred to members of final clubs and Greek organizations.  Khurana emailed the report to the student body shortly thereafter and wrote that he was accepting nearly all of the committee's recommendations.  Under the recommendations, students, starting with the class of

2021, who seek leadership positions, captaincies, or fellowships will have to sign a written statement affirming their commitment to "nondiscrimination on the basis of characteristics of 'intrinsic identity,' including gender." Students will also have to affirm that they do not currently belong to a single-gender final club or Greek organization, did not belong to one in the past year, and will not belong to one the year after their tenure in a leadership position or athletic captaincy ends. The committee recommended that the Honor Council investigate students who violate the policy by "falsely affirming compliance," though the report emphasized that students should "not perceive the policy as intrusive or punitive."

166.    In comments to *The Crimson*, Khurana said the report was "a powerful statement of our aspirations . . . as we create a nondiscriminatory undergraduate experience." "I think all of us recognize that Harvard is hard to get into," Khurana said. "You shouldn't have to get into it over and over again."

167.    On March 27, 2017, *The Crimson* published a "news analysis" entitled "With Sanctions Goal, Admins Shift from Sexual Assault Prevention." *The Crimson* reported:

> The committee tasked with formulating the recommendations [for how to enforce the Sanctions Policy] wrote, in no uncertain terms, that sexual assault did not loom large in the policy's formation. "While that behavior and the environment that encourages it are wholly unacceptable, they are not the sole nor even the primary reason for the policy," the report reads. Particularly, the committee took issue with what they called "press reports and claims by students and members of [final clubs and Greek organizations] that the intent of the policy was to address sexual assault."
>
> In a March [2017] interview, asked specifically whether incorporating the issue of sexual assault into the policy development was a mistake, Khurana insisted gender equity had always been central to the policy's formation. "I think that this policy has been and has been since the beginning really rooted in the idea that we need an undergraduate experience that is free from gender discrimination," Khurana said. Pressed specifically on the issue of sexual assault, Khurana said "I do believe gender equity across our academic, social environments help contribute to a better student culture, a better Harvard culture, that reduces the

54

likelihood that people's bodily integrity is violated."

168.    On March 28, 2017, Friedrich stated that traditionally all-female final clubs and sororities would be allowed to retain their "gender focus" for the next few years—and potentially beyond that period—while complying with the College's policy penalizing single-gender social groups.  Friedrich clarified, however, that any groups' gender-focused mission should exist simultaneously with "substantive advancement toward full inclusion," including gender inclusivity.

169.    On April 1, 2017, in response to these comments, Professor Lewis wrote that he was "surprise[d] that the University would adopt an implementation plan that so plainly discriminated against men's organizations."  Continued Lewis:  "Whatever the asymmetry between the experience of men and women at Harvard, I am surprised that the University would so starkly state that all men's organizations are worthless and intolerable but women's organizations can be useful and will be tolerated, having in its recent pronouncements focused exclusively on nondiscrimination as the rationale for the policy.  It's a very odd idea—gender discrimination in furtherance of gender nondiscrimination."

170.    On April 14, 2017, in an interview with *The Crimson*, President Faust said that the College's penalties on members of single-gender social organizations could just be the beginning of a broader effort to reduce the social influence of final clubs and Greek organizations if the current policy does not do so adequately.  "As we said when we issued the policy in the first place, it might turn out to be an interim step if we felt that the policy had not succeeded in addressing the concerns about exclusion and hierarchy, both gender and other forms of hierarchy that the current arrangement with single-gender student organizations has reified on the campus."

171.    In a May 24, 2017 profile of Khurana, published by *The Crimson*, he stated that he "believes Harvard's mission necessitates a campus that is 'open to everyone'—one free, in his view, from social groups that discriminate based on gender."

### c.    Preliminary Report of the Faculty Committee

172.    On July 5, 2017, the faculty committee Khurana formed in response to the Lewis Motion released a set of "preliminary" recommendations in the form of a 22-page report on the sanctions.  The committee recommended that the College go further than the then-existing sanctions proposal.  Specifically, it recommended that the College forbid students from joining all "fraternities, sororities, and similar organizations"—including co-ed groups—with the goal of phasing out the organizations entirely by May 2022.

173.    The report stated:  "Our main reservation about the stated goal of the policy was whether the focus on ending gender segregation and discrimination is too narrow."  "[I]f all of these organizations adopted gender-neutral membership in a timely fashion, there would remain a myriad of practices of these organizations that go against the educational mission and principles espoused by Harvard University."

174.    The committee found that fraternities and sororities also needed to be eliminated because such groups are "of concern in their participation in and perpetuation of social structures that discriminate based on gender, race, class, and sexual orientation.  In order to move beyond the gendered and exclusive club system that has persisted—and even expanded—over time, a new paradigm is needed, one that is rooted in an appreciation of diversity, commitment to inclusivity, and positive contributions to the social experience for all students."

175.    The report conceded:  "[t]o be sure, many students who are members of the USGSOs report a profound sense of belonging.  For them, their organization offers a place where they feel 'at home' at Harvard, sheltered from the typical stresses of academic life.  They report

56

making steadfast friends."  But, the report concluded "[t]heir sense of belonging . . . comes at the expense of the exclusion of the vast majority of Harvard undergraduates.  Of course, that is the definition of selective-membership clubs: some belong, some don't.  However, it is the invidious manner in which such clubs form their memberships and generate their guest lists (in the case of those that host parties) that makes them incompatible with the goals and standards of Harvard University."

176.    *The Crimson* later discovered that the committee's decision to officially recommend the most severe option—to ban all single-sex groups—received only seven votes from the 27-member committee.  Two other options—one suggesting a new committee to oversee the social groups, another proposing a ban of all organizations that discriminate on the basis of sex, race, or socioeconomic status—gained 12 and 11 votes, respectively.  Not every member of the committee was present at the vote.

177.    On August 16, 2017, an email to the Harvard faculty announced that the committee would consult with faculty and students before releasing a final revised report on September 25, 2017.

178.    Following the faculty committee report, Professor Lewis re-introduced a faculty motion signed by 21 professors, stating that Harvard shall not "discipline, penalize, or otherwise sanction students" for joining "any lawful organization" (the "Second Lewis Motion").

### 4.    2017-18: Harvard's Decision to Retain the Sanctions Policy

179.    In the midst of the faculty wrangling over the sanctions policies, between the Spring and Fall of 2017 many single-gender social organizations began going co-ed.  In early April 2017, Alpha Epsilon Pi announced it would disaffiliate from its national fraternity and form a new, gender-neutral social group.  The all-female final club the Bee and the all-male final club Delphic announced that they would share membership and a clubhouse, forming the

Delphic-Bee Club.  Kappa Sigma fraternity disaffiliated from its national organization and formed a new, co-ed social group called the KS.

180.    Faust, meanwhile, continued to shift the focus of the Sanctions Policy from its original justification—sexual assault by all-male organizations—to a new focus on discrimination, inclusivity, and opportunity.  On September 11, 2017, Faust stated in an interview with *The Harvard Gazette* that "[a] very important agenda item for me throughout my presidency has been expanding access" and that "[t]he single-gender social organizations are antithetical to much of that, in that they separate people out into small subgroups, and I think diminish the opportunity for students to take full advantage of what the diverse population of this campus can mean—and how it is such an important aspect of the educational experience.  So we have been striving to address the issues of discrimination and separatism that characterize those organizations and, as you know, developed a policy about a year and a half ago that was meant to push those organizations more to the margins of undergraduate social life."

### a.    Final Report of the Faculty Committee

181.    On September 29, 2017, the faculty committee that had "preliminarily" recommended Harvard ban membership in social groups two months before (in July) issued its "final" recommendations.  Its final report watered down its initial proposal, suggesting that Harvard consider the ban as one of multiple ways to reshape social life.  In its final report, the committee suggested three separate paths forward for Harvard undergraduate social life: maintain the current penalties on membership in single-gender social groups, ban membership altogether in unrecognized single-gender social groups, or consider a set of "some other possible solutions."  Gone from the committee's report was its recommendation to ban membership in both coeducational and single-gender groups.  The committee instead suggested that Harvard consider only banning membership in single-gender groups that the College does not recognize.

182.    The Final Report had several noteworthy explanations and justifications for the Sanctions Policy.  The Final Report stated that single-sex organizations needed to be banned, but not racial or cultural affinity groups, because unlike single-sex organizations "the purpose of affinity groups such as the [Black Men's Forum] and [the Asian American Women's Association] is to lift up a group, not to form a power hierarchy of inclusion versus exclusion, as currently practiced by the final clubs and to some extent the other [single-sex organizations]."

183.    In response to the argument that "women's clubs can counter the influence of the all-male clubs" the Report stated: "We believe that this 'separate but equal' approach is problematic. . . . [single-sex] clubs institutionalize problematic gender and class dynamics.  Such dynamics will not be ameliorated by adding more discriminatory groups in which students do not engage with each other as equals.  They, too, run counter to the College's educational and residential philosophy."

184.    In a minority report to the committee's final report, professor of psychology Jason Mitchell observed that "many colleagues feel that the rationale for sanctioning [single-sex] membership has morphed from an initial focus on sexual assault, to later concerns about gender-based discrimination, and most recently, to issues of inclusion, belonging, and privilege."  Mitchell further wrote that "[s]ome of my colleagues have decided that these shifts in rationale reflect some form of political expediency ('let's keep making different arguments until the Faculty buy one of them')."  He continued: "Many of us believe firmly that despite its shifting rationales, the College is 'really' trying to address problems specific to the all-male Final clubs. . . . Indeed, it is hard not to perceive a direct line connecting the Final Report in March 2016 of President Faust's Task Force on the Prevention of Sexual Assault to the announcement two months later of the first sanctions policy."  The problem, observed Mitchell, with seeking to

punish students who join certain final clubs but framing the issue as "opposition to gender-based discrimination" is that "this approach has created something of a dragnet, which threatens to sweep in student groups that many of us feel are not much of a problem (or, at least, not nearly as much of a problem as the all-male Final clubs); fraternal organizations or without houses in which to host parties and womens' Final clubs, not to mention the Hasty Pudding, [which] do not really seem to be at the root of campus ills."  Mitchell concluded: "The policies of sanctioning [single-sex club] membership surely comprise extraordinary measures: they make extraordinary and unprecedented claims on the private, off-campus lives of our students; implementing them will require a radical reimagining (for many of us) of the relationship between the faculty and its students' private lives; and they seem (to many of us) to contravene other values that ought to characterize a liberal institution committed to free inquiry and personal transformation.  One index of just how extraordinary these policies seem is the amount of time spent by the . . . Committee on the question of whether the various sanctions policies are even *legal*.  Such policies will take us into uncharted places."

### b.      Faculty Vote on a Renewed Motion to Reverse the Policy

185.    On November 6, 2017—the night before the Faculty was scheduled to vote on the Second Lewis Motion—a group of 23 undergraduate women penned a guest post on Professor Lewis's blog remarking that Harvard's policies were motivated by sexism and are "astonishingly paternalistic" toward women.[17]  The guest post exhorted the Harvard Faculty:  "Do Not Punish Harvard Women for Men's Behavior: Vote Yes to the Lewis Motion."  It opened as follows:

> It is astonishingly paternalistic for Harvard to threaten the support groups of hundreds of women in the name of ridding the university of elite men's clubs.

---

[17] Guest post by 23 undergraduate women, *Do Not Punish Harvard Women for Men's Behavior: Vote Yes to the Lewis Motion*, Bits and Pieces (Nov. 6, 2017), http://bit.ly/2MDeqX2.

This should spark outrage among faculty, administrators, and students, but instead has, among many, merely sparked a "what a shame" reaction. "What a shame" that the sororities and women's groups doing good on our campus, empowering women, providing desperately needed support for women, leading charitable fundraisers, and contributing so significantly to women's mental health "have to go." The premise has been that women must not be allowed to join groups without men—for their own good—because it is the only way to "get at" men's final clubs. An underlying justification has been that women must be protected from making bad social decisions such as waiting in line to get into men's final club parties. Banning women's off- campus groups **is not and has never been** about opening women's support or friendship groups to men, in order to end some supposed form of discrimination against men. The consistent refrain of "it's a shame" that Harvard must eliminate women's groups through sanctions or to otherwise deal with the behaviors of men is outrageous and unconscionable. **Make no mistake—this is sexism—as it has existed in the past but now in more insidious form, as it is now clothed in anti-discrimination verbiage and purported rationale.** This point has been previously made, but women's protests, begging for Harvard to hear them, marching in unity, have been met with the response that women groups are unfortunate collateral damage for a more noble cause—this cause of protecting them. This is egregious. How can it be tolerated?

186.    On November 7, 2017, the Faculty voted down the Second Lewis Motion, 90-130.

187.    In addition to Professor Lewis, University Professor Helen Vendler spoke out against the Sanctions Policy. In her remarks immediately preceding the faculty vote, she stated that "although I too dislike aspects of the finals clubs, the proposed policy of student punishment is not a solution." Among other problems with the Sanctions Policy, Vendler noted that "[t]he proposed sanctions have been fostered with such incoherence of purpose and such an absence of convincing data that no self-respecting administration could back them, and no self-respecting intellectual could ratify them."

         **c.**        **The Harvard Corporation Intervenes to Lock In the Policy**

188.    On December 5, 2017, Faust along with William F. Lee, the Senior Fellow of the Harvard Corporation, wrote a letter to the Harvard Community announcing that the Harvard Corporation voted to put into place the original sanctions that would prevent members of single-sex organizations from obtaining certain scholarships or holding leadership positions. The letter

read in part: "the University must act.  The final clubs in particular are a product of another era, a time when Harvard's student body was all male, culturally homogeneous, and overwhelmingly white and affluent."  "In continuing the existing policy, the Corporation recognizes that its most direct focus is on eliminating the allocation of social opportunities on the basis of gender."

189.    The formal vote by the Corporation—the University's highest governing body— to adopt the policy constituted a "historic intervention into undergraduate social life . . . meant to ensure the policy will remain in effect under the tenure of Harvard's next president, who will take office in July 2018."  "With the vote, not only did the Corporation—the University's highest governing body—reshape the future of Harvard's social clubs, but it also plunged into an ongoing debate about who gets to mold undergraduate life at the College."

190.    On January 8, 2018, Kappa Kappa Gamma's chapter for Harvard undergraduates disaffiliated from its national organization and some of its members formed a new co-ed social club called the Fleur-de-Lis because of the Sanctions Policy.

191.    On February 5, 2018, *The Crimson* reported that interest in sororities fell by nearly 66 percent.



192.    On February 9, 2018, the Editorial Board of *The Crimson* penned an op-ed noting that, by withholding access to leadership positions and graduate fellowships, "[t]he sanctions on single-gender social groups, which were recently affirmed in a vote by the Harvard Corporation, carry severe consequences."  Stating that the enforcement policy for the sanctions remained unclear, the Editorial continued that, with respect to those seeking to join fraternities and sororities "we worry that current freshmen do not realize the gravity of the punishment they are voluntarily taking on."

193.    On March 1, 2018, *The Crimson* reported that Harvard had canceled a proposed "bridge" program that would have allowed traditionally all-female final clubs and sororities a longer period of time to go gender-neutral in the final enforcement plan for its social group policy.[18]  *The Crimson* also reported that the Administrative Board—which also handles other matters of academic discipline at the College—would enforce the College's penalties on members of single-gender social groups.

### 5.    Summer 2018: The Sanctions Policy Eliminates the Women's Groups

194.    Harvard has now created a multi-tier framework pursuant to which formerly-unrecognized student organizations may apply for "recognition" from Harvard.  A precondition to even the lowest form of recognition, however, is that an organization be "formally" co-ed.

195.    Nearly all of Harvard's unrecognized women's organizations shut down or went co-ed as a result of Harvard's Sanctions Policy.

196.    Days ago, a handful of members and student alumnae of the Cambridge chapter of Alpha Phi came together to reactivate the Iota Tau chapter.  But the chapter is but a shadow of

---

[18] Caroline S. Engelmayer & Michael E. Xie, *College Cancels 'Bridge' Program for All-Female Social Groups*, The Harvard Crimson (Mar. 1, 2018), http://bit.ly/2NfLa65.

the vibrant organization that once existed.  It now stands as the lone all-female social

organization at Harvard.

## CLAIMS FOR RELIEF

### COUNT I
### *PER SE* DISPARATE TREATMENT DISCRIMINATION
### (Violation of 20 U.S.C. § 1681 *et. seq.*)

197.    Plaintiffs re-allege each and every allegation in paragraphs 1 through 196 above

as if fully set forth herein.

198.    Harvard's Sanctions Policy violates Title IX because it is *per se* disparate-

treatment discrimination.  It fails the Supreme Court's "simple" test for sex discrimination:

"whether the evidence shows 'treatment of a person in a manner which but for that person's sex

would be different.'"  *Manhart*, 435 U.S. at 711 (citation omitted).  The analysis here is simple:

But for her sex, a woman could join a sorority; but for his sex, a man could join a fraternity.

Harvard's policy is *per se* sex discrimination under the Supreme Court's precedent.  Just as it

would be *per se* sex discrimination for Harvard to mandate that students only marry people of the

opposite sex, it is *per se* sex discrimination for  Harvard to instruct them only to join clubs that

include members of the opposite sex.

199.    Harvard's Sanctions Policy is *per se* sex discrimination even though it does not

discriminate against *all* men or women, but only against those who join single-sex organizations.

Discrimination against a subset of a class is actionable when based on a protected

characteristic.  *See Connecticut v. Teal*, 457 U.S. 440, 442 (1982).

200.    Harvard's Sanctions Policy is *per se* sex discrimination even though it

discriminates against both men and women.  Harvard's discrimination against women is no less

sex discrimination just because Harvard has also decided to discriminate against men in a similar

way.  Each side of the policy is separately and independently sex discrimination.  Harvard's

policy of punishing men for joining all-male organizations is sex discrimination, as is its policy

of punishing women for joining all-female organizations.  In each case, the policy requires

inquiry into the sex of the person to determine whether he or she warrants punishment.  That

makes the policy *per se* discrimination "on the basis of sex" under controlling precedents.

### COUNT II
### ASSOCIATIONAL DISCRIMINATION ON THE BASIS OF SEX
### (Violation of 20 U.S.C. § 1681 *et. seq.*)

201.    Plaintiffs re-allege each and every allegation in paragraphs 1 through 196 above

as if fully set forth herein.

202.    Harvard's Sanctions Policy violates Title IX because it is associational

discrimination.  In the race context, "discrimination on the basis of racial affiliation and

association is a form of racial discrimination."  *Bob Jones Univ. v. United States*, 461 U.S. 574,

605 (1983).  Thus, a plaintiff claiming discrimination based upon an interracial marriage

"alleges, by definition, that he has been discriminated against because of his race."  *Parr v.

Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986); *see also Holcomb v.

Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (same); *Floyd v. Amite Cty. Sch. Dist.*, 581 F.3d

244, 249 (5th Cir. 2009) (interracial friendship); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103,

1118 (9th Cir. 2004) (interracial friendships or associations); *Tetro v. Elliott Popham Pontiac,

Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 994-95 (6th Cir. 1999) (biracial child).

203.    Two federal courts of appeals have held *en banc* that Title VII bars associational

discrimination on the basis of sex.  *See Zarda*, 883 F.3d at 124-25 (2d Cir. 2018) (en banc);

*Hively*, 853 F.3d at 349 (7th Cir. 2017) (en banc) (same).  This Circuit applies Title VII

precedents to Title IX claims "by analogy."  *Hot, Sexy & Safer Prods.*, 68 F.3d at 540.

204.     Harvard's Sanctions Policy punishes students because they associate with individuals of a particular sex.  That is necessarily discrimination on the basis of sex:  But for the sex of those with whom a student chooses to associate, that student would not be punished.  Because Harvard's Sanctions Policy metes out its punishment based on the sex of both the student who joins the forbidden organization and the other members of the forbidden organization, Harvard's Sanctions Policy is sex discrimination twice over.

## COUNT III
## SEX-STEREOTYPING
### (Violation of 20 U.S.C. § 1681 *et. seq.*)

205.     Plaintiffs re-allege each and every allegation in paragraphs 1 through 196 above as if fully set forth herein.

206.     Under Title IX, "sex based discrimination can be based on sex stereotypes." *Harrington v. City of Attleboro*, 172 F. Supp. 3d 337, 344 (D. Mass. 2016) (citing *Lipsett*, 864 F.2d at 905–06).

207.     Harvard's Sanctions Policy violates Title IX because it impermissibly discriminates against men and women on the basis of stereotypes about how men and women intrinsically behave and how men and women ought to behave.  Both kinds of sex stereotyping violate Title IX.  *See Manhart*, 435 U.S. at 711 (descriptive sex stereotyping is unlawful); *Price Waterhouse*, 490 U.S. at 250–51 (plurality opinion) (prescriptive sex stereotyping is unlawful).

208.     Harvard administrators and committees made numerous statements showing that the Sanctions Policy resulted from stereotypes about how they believe men and women behave in single-sex environments.  Harvard expressed the view that men who join all-male organizations are prone to sexual violence and promote and engage in bigotry.  Harvard expressed the view that women who join all-female organizations do so only as a way of coping

with exclusion from all-male organizations, and that such organizations have no unique value. The anti-male stereotypes that led Harvard to adopt the Sanctions Policy in the first place—that men in all-male organizations have "misogynistic attitudes" and engage in sexual violence— show that Harvard formulated its policy on the basis of negative stereotypes about men who join single-sex organizations.

209.     Similarly, Harvard administrators and committees made numerous statements showing that the Sanctions Policy is the result of beliefs about how men and women should behave in order to be "good" men and women.  Harvard expressed the view that men and women who join single-sex organizations do not act like modern men and women, exhibiting "behaviors and attitudes . . . at odds with the aspirations of the 21st century society to which the College hopes and expects our students will contribute."

**COUNT IV**
**DISCRIMINATION ON THE BASIS OF ANTI-MALE BIAS**
**(Violation of 20 U.S.C. § 1681 *et. seq.*)**

210.     Plaintiffs re-allege each and every allegation in paragraphs 1 through 196 above as if fully set forth herein.

211.     Under Title IX, an action motivated in part by discrimination on the basis of sex constitutes prohibited intentional sex-based discrimination.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013) (noting that in the Title VII context sex-based discrimination only needs to constitute one of a defendant's improper motives to be actionable).

212.     Harvard's Sanctions Policy violates Title IX because it was intended to disproportionately negatively affect certain male students in the Harvard University community for no other reason than because they are men who choose to socialize with men.

213.    Harvard's decision to enact the Sanctions Policy was based, at least initially, on the report of the Task Force on the Prevention of Sexual Assault, which exhibited anti-male bias. Despite survey results showing that nearly all of Harvard's campus sexual assaults happened in co-ed student dormitories run by Harvard itself, the report spent several pages discussing student-reported anecdotes of sexist behavior by the final clubs which the report blamed on "deeply misogynistic attitudes, reflected in the long-standing refusal of many [c]lubs to admit women as members." This language implied that all-male groups that do not admit women are necessarily "misogynistic," though all-female groups are generally considered empowering rather than anti-male. The report also failed to distinguish between the all-male final clubs, at least one of which does not allow women in its clubhouse. Additionally, the report recommended that the clubs become co-ed, presumably on the sex-based and stereotypical theory that women would be a civilizing influence on the all-male clubs (despite the evidence that most campus sexual assaults happened in co-ed dorms).

214.    A considerable public record supports the inference that Harvard enacted its Sanctions Policy specifically to eliminate men's organizations out of bias against men. Harvard contended that men's organizations make women "second-class citizen[s]," "not equal," and lower on a "hierarchy" than men. Harvard argued that men's organizations "dispense privilege and advantage" and "perpetuat[e] . . . spaces that are rife with power imbalances." Harvard asserted that the purpose of the sanctions was to "marginalize the power, the social power of these groups."

215.    Harvard stated on multiple occasions that all-male organizations are "unsafe" and create an undue risk of sexual assault. One Harvard committee asserted that all-male organizations are places of "deeply misogynistic attitudes." Another Harvard committee asserted

that all-male organizations "participat[e] in and perpetuat[e] . . . social structures that discriminate based on . . . race, class, and sexual orientation." Those arguments—explicitly linking the single-sex character of all-male organizations to a raft of negative characteristics further give rise to the reasonable inference that Harvard acted out of bias against men.

216.    Further evidence that Harvard acted in order to eliminate men's organizations arises from Harvard's emphasis on preserving women's groups even as it sought to phase out all-male groups. At various points in the process of developing the Sanctions Policy, Harvard sought to permit women's groups to continue to exist in various forms while simultaneously demanding that all men's groups immediately go co-ed, changing course only after Harry Lewis and others pointed out that this was obvious sex discrimination. Harvard's ultimate decision to ban women's groups thus looks like pretext designed to conceal its chief aim of discriminatorily disbanding men's groups.

217.    Additional evidence that Harvard acted out of anti-male bias arises from the unusual procedures Harvard used in developing and adopting the Sanctions Policy. "Departures from the normal procedural sequence" are "evidence that improper purposes are playing a role." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). In addition to what is described above, Harvard unusually left the faculty, which controls the student handbook, out of the deliberations. Moreover, Harvard's shifting explanations for its policy— first sexual assault, then the deleterious effects of men's organizations, then the deleterious effects of single-sex organizations generally—also contribute to the inference that discriminatory motives were the real reason for the policy. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (holding that pretextual justifications for a challenged action can also give rise to an inference of illicit motive).

218.     Based on the foregoing, Harvard formulated its Sanctions Policy in a manner that was biased against men.  From the outset, Harvard intended to eliminate all-male organizations because of their all-male character.  Perversely, Harvard ended up harming women at least as much as men in its attempt to destroy all-male organizations.

## COUNT V
## VIOLATION OF MASSACHUSETTS CIVIL RIGHTS ACT
## (Mass. Gen. L. Ch. 12, §§ 11I)

219.     Plaintiffs re-allege each and every allegation in paragraphs 1 through 196 above as if fully set forth herein.

220.     The Massachusetts Civil Rights Act authorizes a private plaintiff to seek compensatory damages and injunctive relief against anyone who interferes with the plaintiff's exercise of constitutional rights.  The statute provides a cause of action:

> [w]henever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth.

Mass. Gen. Laws ch. 12, §§ 11H, 11I.  To establish a claim under the act, "a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." *Currier v. Nat'l Bd. of Med. Exam'rs*, 965 N.E.2d 829, 837-38 (Mass. 2012).  Unlike its federal counterpart, 42 U.S.C. § 1983, the Massachusetts Civil Rights Act does not require a party to show that a *government actor* deprived the plaintiff of a constitutional right.  *Sena v. Commonwealth*, 629 N.E.2d 986, 993 (Mass. 1994).

221.     Harvard violated the Massachusetts Civil Rights Act by violating Plaintiffs' rights under the Fourteenth Amendment's Equal Protection Clause.  That Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S.

Const. amend. XIV, § 1.  The Equal Protection Clause protects women's (and men's) right to be

free from gender discrimination absent "an 'exceedingly persuasive justification'" for disparate

treatment.  *Virginia*, 518 U.S. at 531.  "[O]fficial action that closes a door or denies opportunity

to women (or to men)" must be "carefully inspected."  *Id.* at 532.  Disparate treatment on the

basis of sex stereotypes, for example, is unconstitutional.  *See Miss. Univ. for Women*, 458 U.S.

at 726-730; *Virginia*, 518 U.S. at 534-46.  To be constitutional, a sex-discriminatory policy must

substantially relate to an important interest.

222.     Harvard has violated the Massachusetts Civil Rights Act by attempting to

interfere and actually interfering with Plaintiffs' constitutional right to be free from sex

discrimination.  Harvard has succeeded in shutting down several single-sex organizations, and

has threatened students with punishment for joining the single-sex organizations that remain.

Harvard has acted through threats, intimidation, and coercion, especially by threatening

substantial harm to Plaintiffs' future professional opportunities and professional reputations by

withholding valuable opportunities and sowing a culture of fear and intimidation in the Harvard

University community.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask for the following relief as to all counts:

a.     A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C.

§ 2201, that Harvard's Sanctions Policy violates Title IX of the Education Amendments of 1972,

20 U.S.C. § 1681 *et seq.*;

b.     A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C.

§ 2201, that Harvard's Sanctions Policy violates the Massachusetts Civil Rights Act, Mass. Gen.

Laws ch. 12, §§ 11H, 11I;

c.     A permanent injunction prohibiting Harvard from enforcing its Sanctions Policy;

d.      Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable

legal authority; and

e.      Such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action of all triable issues.


Dated:  December 3, 2018                            Respectfully submitted,


                                                   **ARNOLD & PORTER**
                                                   **  KAYE SCHOLER LLP**


                                        By:   */s/ John A. Freedman*
                                              R. Stanton Jones*
                                              John A. Freedman (BBO # 629778)
                                              Andrew T. Tutt*
                                              601 Massachusetts Ave., NW
                                              Washington, DC 20001
                                              (202) 942-5000
                                              stanton.jones@arnoldporter.com
                                              john.freedman@arnoldporter.com
                                              andrew.tutt@arnoldporter.com

                                              Sara L. Shudofsky*
                                              Ada Añon*
                                              250 West 55th Street
                                              New York, NY 10019
                                              (212) 836-8000
                                              sara.shudofsky@arnoldporter.com
                                              ada.anon@arnoldporter.com

                                              Alexa D. Jones*
                                              370 Seventeenth Street, Suite 4400
                                              Denver, CO  80202
                                              (303) 863-1000
                                              alexa.jones@arnoldporter.com

                                              *Counsel for Plaintiffs*

                                              * Motions for pro hac vice admission forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document will be served on the Defendants in accordance with Fed. R. Civ. P. 4.

*/s/ John A. Freedman*
John A. Freedman (BBO # 629778)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
john.freedman@arnoldporter.com