UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KAPPA ALPHA THETA FRATERNITY, INC.; KAPPA KAPPA GAMMA FRATERNITY; SIGMA CHI; SIGMA ALPHA EPSILON; SIGMA ALPHA EPSILON--MASSACHUSETTS GAMMA; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3, | : : : : : : : | |
| Plaintiffs, | : : | Civil Action No. 18-cv-12485-NMG |
| v. | : : : | **Oral Argument Requested** |
| HARVARD UNIVERSITY; PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | : : : : | |
| Defendants. | : : | |

**DEFENDANT PRESIDENT AND FELLOWS OF HARVARD COLLEGE'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION TO DISMISS THE COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................1

BACKGROUND ......................................................................................................2
    I.     FACTUAL BACKGROUND ..........................................................2
    II.    PROCEDURAL BACKGROUND ....................................................4

LEGAL STANDARD ..............................................................................................5

ARGUMENT ...........................................................................................................6
    I.     THE CLAIMS BY THE ORGANIZATIONAL PLAINTIFFS AND
          JOHN DOE 3 SHOULD BE DISMISSED BECAUSE THOSE
          PLAINTIFFS LACK STANDING. ..................................................6
          A.    Organizational Plaintiffs Lack Standing To Sue On Their
                 Members' Behalf. .............................................................6
          B.    John Doe 3 Does Not Have Standing Because The Complaint Fails
                 To Allege Injury To Him As Opposed To His Organization.......................9
    II.    THE COMPLAINT DOES NOT STATE A CLAIM UNDER TITLE IX. ..........10
          A.    The Complaint Does Not State A Claim For Per Se Sex
                 Discrimination. ..............................................................11
          B.    The Complaint Does Not State A Claim For Associational
                 Discrimination. ..............................................................12
          C.    The Complaint Does Not State A Claim For Sex Stereotyping .................14
          D.    The Complaint Does Not State A Claim For Anti-Male Bias. .................15
    III.   THE MCRA CLAIM SHOULD BE DISMISSED. ...............................16
          A.    The Complaint Fails To Allege Threats, Intimidation, Or Coercion. ........17
          B.    The Complaint Fails To Allege An Equal Protection Violation. ...............19

CONCLUSION ......................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Allen v. Wright,*
  468 U.S. 737 (1984) ...................................................................................9, 10

*Aulson v. Blanchard,*
  83 F.3d 1 (1st Cir. 1996) ...................................................................................6

*Bally v. Northeastern Univ.,*
  403 Mass. 713 (1989) .....................................................................8, 17, 18, 19

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte,*
  481 U.S. 537 (1987) .........................................................................................20

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .........................................................................................16

*Blum v. Holder,*
  744 F.3d 790 (1st Cir. 2014) ........................................................................5, 6

*City of Los Angeles Dep't of Water & Power v. Manhart,*
  435 U.S. 702 (1978) ...................................................................................15, 16

*Cleaves v. City of Chicago,*
  68 F. Supp. 2d 963 (N.D. Ill. 1999) ...............................................................11

*Coll. of Dental Surgeons of P.R. v. Conn. Gen. Life Ins. Co.,*
  585 F.3d 33 (1st Cir. 2009) ...............................................................................8

*Cumpiano v. Banco Santander P.R.,*
  902 F.2d 148 (1st Cir. 1990) ...........................................................................11

*Cunningham v. Nat'l City Bank,*
  588 F.3d 49 (1st Cir. 2009) ...............................................................................5

*Currier v. Nat'l Bd. of Med. Exam'rs,*
  462 Mass. 1 (2012) ...........................................................................................17

*Doe v. Boyertown Area Sch. Dist.,*
  897 F.3d 518 (3d Cir. 2018) ............................................................................11

*Domino's Pizza v. McDonald,*
  546 U.S. 470 (2006) ...........................................................................................6

*Floyd v. Amite Cnty. Sch. Dist.,*
  581 F.3d 244 (5th Cir. 2009) ..........................................................................13

*Frazier v. Fairhaven Sch. Comm.*,
    276 F.3d 52 (1st Cir. 2002) ...................................................................13

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
    528 U.S. 167 (2000) ...........................................................................7

*Fudge v. Penthouse Int'l, Ltd.*,
    840 F.2d 1012 (1st Cir. 1988) ..............................................................4

*Harrington v. City of Attleboro*,
    172 F. Supp. 3d 337 (D. Mass. 2016) ..................................................15

*Hively v. Ivy Tech Cmty. Coll. of Ind.*,
    853 F.3d 339 (7th Cir. 2017) ...............................................................13

*Horsemen's Benev. & Protective Ass'n, Inc. v. State Racing Comm'n*,
    403 Mass. 692 (1989) .........................................................................19

*Jespersen v. Harrah's Operating Co.*,
    444 F.3d 1104 (9th Cir. 2006) (en banc) ..............................................14

*Johnson v. Town of Duxbury*,
    2018 WL 5269989 (D. Mass. Oct. 23, 2018) .........................................18

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) .........................................................................6, 7

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................9

*Moose Lodge No. 107 v. Irvis*,
    407 U.S. 163 (1972) ..........................................................................10

*N.H. Motor Transp. Ass'n v. Rowe*,
    448 F.3d 66 (1st Cir. 2006) ..................................................................8

*Nungesser v. Columbia University*,
    244 F. Supp. 3d 345 (S.D.N.Y. 2017) ..................................................14

*O'Connell v. Chasdi*,
    400 Mass. 686 (1987) .........................................................................17

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998) ...........................................................................11

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
    280 F.3d 278 (3d Cir. 2002) ..................................................................8

*Pagan v. Calderon*,
    448 F.3d 16 (1st Cir. 2006)..................................................................9, 10

*Pennington v. S. Motion, Inc.*,
    2017 WL 3897166 (N.D. Miss. Sept. 6, 2017) .......................................13

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989)...............................................................................15

*Rinsky v. Trs. of Boston Univ.*,
    2010 WL 5437289 (D. Mass. Dec. 27, 2010) .......................................19

*Rizzo v. Goode*,
    423 U.S. 362 (1976)...............................................................................10

*Schaer v. Brandeis University*,
    432 Mass. 474 (2000) ............................................................................20

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996)....................................................................4

*Singleton v. Wulff*,
    428 U.S. 106 (1976).................................................................................7

*Strang v. Marsh*,
    602 F. Supp. 1565 (D.R.I. 1985)..............................................................7

*Town of Norwood v. FERC*,
    202 F.3d 392 (1st Cir. 2000)....................................................................8

*United States v. Metro. Dist. Comm'n*,
    147 F.R.D. 1 (D. Mass. 1993)...................................................................8

*Webster v. Motorola, Inc.*,
    418 Mass. 425 (1994) ............................................................................18

*Zarda v. Altitude Express, Inc.*,
    883 F.3d 100 (2d Cir. 2018)............................................................12, 13

**Statutes**

20 U.S.C. § 1681 *et seq.*..........................................................................5, 10

Mass. Gen. Laws ch. 12, §§ 11H, 11I.........................................................5

**Other Authorities**

Harvard College, *Handbook for Students 2018-2019*, https://handbook.
    fas.harvard.edu/book/policy-regarding-undergraduate-organizations .......................4

## <u>INTRODUCTION</u>

In furtherance of its educational mission, Defendant President and Fellows of Harvard College ("Harvard") makes available certain opportunities to its undergraduate students beyond the pursuit of a degree. Harvard sponsors athletic teams; it selects whom to endorse for competitive fellowships such as the Rhodes Scholarship; and it recognizes student organizations, allowing them access to Harvard resources and funding. After many months of deliberation and consultation, with input from the highest levels of the University, Harvard developed a policy regarding student eligibility for those endorsements and leadership opportunities in recognized student organizations and athletic teams that is aligned with Harvard's core values of non-discrimination and inclusion—values essential to Harvard's pedagogical objectives and its institutional mission. Harvard decided that, in the future, these opportunities would be available only to students who elected not to join an unrecognized social organization that limits student membership based on gender. The policy was adopted on a prospective basis to ensure notice to any students applying to Harvard who would be affected by the policy. The policy, once implemented, applied to all students regardless of a student's gender.

Plaintiffs here—five single-gender fraternities or sororities and three John Doe members of unrecognized single-gender organizations at Harvard—have brought suit challenging Harvard's policy. Plaintiffs allege that Harvard's entirely *sex-neutral* policy somehow discriminates on the basis of sex in violation of Title IX and interferes with students' equal protection rights by way of "threats, intimidation, and coercion" in violation of the Massachusetts Civil Rights Act ("MCRA"). These novel claims have no statutory or legal foundation of any kind.

First, neither the organizational Plaintiffs nor John Doe 3 has standing. The

organizational Plaintiffs raise speculative allegations that their *members* have experienced threats and discrimination, but they fail to establish any basis (such as third-party or associational standing) for suing on behalf of their members and not themselves. The Complaint also fails to allege that John Doe 3 suffered any cognizable injury himself.

Second, with respect to any plaintiffs who are able to establish standing, the Complaint fails to state any claim of either sex discrimination or a violation of the MCRA. Most fundamentally, Plaintiffs' per se discrimination claim fails because Harvard's policy is wholly sex-neutral—the policy treats men and women equally. Plaintiffs' claims of associational discrimination, sex-stereotyping, and anti-male bias likewise should be dismissed, because the Complaint fails to plausibly allege that Harvard based its policy on any bias against men, or against women, or against associations between people of the same sex.

Finally, the Court should dismiss the claim under the MCRA. Plaintiffs allege that Harvard's policy interferes with their Fourteenth Amendment equal protection rights, but, as a matter of law, Harvard's policy neither constitutes a "threat, intimidation, or coercion" under the MCRA, nor interferes with Plaintiffs' right to equal protection.

In short, Harvard's policy is a measured and lawful response: Harvard controls its own resources and endorsements, and students preserve the ability to join organizations of their own choosing. This Court should reject Plaintiffs' invitation to expand the laws to create a new kind of lawsuit that Congress did not create and no court has countenanced.

## BACKGROUND

## I. FACTUAL BACKGROUND[1]

On May 6, 2016, after extensive consideration about the experiences Harvard seeks for

---

[1] Harvard takes as true the factual allegations in the Complaint solely for purposes of this motion.

its students and the values it seeks to promote, Harvard announced a policy decision that a limited set of extracurricular opportunities should go to students whose decisions reflect the University's aspirations for inclusivity. Harvard decided not to extend those benefits to students who, after being informed of Harvard's policy, chose to join an unrecognized single-gender social organization. Dkt. No. 1 ("Compl.") ¶¶ 145, 147. To be clear, as Plaintiffs acknowledge, no one is prohibited from joining any organization—students who wish to join these organizations remain free to do so. Nor is any organization governed by the policy. The policy applies only to Harvard students, and indeed, only to those students who elect to be members of single-gender social organizations.

The policy also applied only prospectively. Announced in May 2016, it went into effect beginning with students matriculating in the fall of 2017. Thus, it affected only students who would be fully aware of the policy before deciding to apply to or attend Harvard. *See id.* ¶ 145. Any student who preferred a campus with a different organizational structure, in which single-gender social organizations are more fully integrated into the campus life, has always had complete freedom to select a college or university offering those opportunities.

The policy, which is still in effect, provides in full:

The College views a commitment to non-discrimination as essential to its pedagogical objects and institutional mission. It has adopted the following policies with regard to unrecognized-single-gender social organizations:

1. For students matriculating in the fall of 2017 and thereafter: any such students who become members of unrecognized single-gender social organizations will not be eligible to hold leadership positions in recognized student organizations or athletic teams.

2. For students matriculating in the fall of 2017 and thereafter: any such students who become members of unrecognized single-gender social organizations will not be eligible to receive College-Administered

fellowships.[2]

"College-Administered" fellowships are those that require applicants to obtain their university's endorsement.  *See* Compl. ¶ 2.

Notably, students who join unrecognized single-gender social organizations remain in good standing and are not subject to any disciplinary action by virtue of their decision.  Instead, the policy recognizes that students who seek the endorsement and support of Harvard itself, or seek to serve as leaders of Harvard-recognized organizations or captains of the College's athletic teams, should not at the same time be members of groups that make determinations about Harvard-student membership on the basis of gender.  Every student subject to this policy retains the freedom to choose membership in a single-gender social organization over access to certain privileges and resources provided by Harvard, and the consequences of that choice are made clear before any student chooses to enroll.

## II.  PROCEDURAL BACKGROUND

More than 18 months after Harvard announced the policy and more than a year after the first students subject to the policy matriculated, eight Plaintiffs filed this lawsuit.  Five ("the organizational Plaintiffs") are fraternities or sororities:  Sigma Chi and Sigma Alpha Epsilon ("SAE") are national fraternities that still have members at Harvard.  Compl. ¶¶ 35-41.  Sigma Alpha Epsilon—Massachusetts Gamma ("Mass Gamma") is SAE's local chapter.  *Id.* ¶¶ 42-45.  Kappa Alpha Theta Fraternity, Inc. ("Theta") and Kappa Kappa Gamma Fraternity ("Kappa") are national sororities whose Harvard chapters have closed, allegedly as a result of Harvard's

---

[2] The policy is implicitly incorporated into the Complaint because it is "integral" to Plaintiffs' claims.  *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996); *see also Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1014-15 (1st Cir. 1988) (considering magazine attached to defendant's motion to dismiss because the article was "central to" plaintiffs' libel claims).  The policy is printed verbatim in Harvard's undergraduate student handbook, which is available on Harvard's website.  *See* Harvard College, *Handbook for Students 2018-2019*, https://handbook.fas.harvard.edu/book/policy-regarding-undergraduate-organizations.

policy. *Id.* ¶¶ 26-34. John Does 1 and 2 are members of all-male organizations at Harvard who allege that they would like to hold leadership positions on campus but are ineligible to do so because of the policy. *Id.* ¶¶ 46-52. Finally, John Doe 3 is a member of an all-male organization who, as an upperclassman, is not even subject to the policy, but who alleges that the policy has hindered his efforts to recruit members and raise money for his organization. *Id.* ¶¶ 53-54.

Counts I through IV of the Complaint posit claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. ("Title IX"). Plaintiffs allege "per se disparate-treatment discrimination" (Count I); associational discrimination because the policy allegedly "punishes students because they associate with individuals of a particular sex" (Count II); sex-stereotyping (Count III); and that the policy is motivated by an "anti-male bias" (Count IV). Compl. ¶¶ 212-218. Count V arises under the MCRA, Mass. Gen. Laws ch. 12, §§ 11H, 11I, and alleges that Harvard's policy interferes with Plaintiffs' Fourteenth Amendment right to be free from unlawful sex discrimination by way of threats, intimidation, or coercion. Compl. ¶¶ 219-222.

## LEGAL STANDARD

To survive dismissal under Rule 12(b)(1), Plaintiffs must allege sufficient facts to establish this Court's subject-matter jurisdiction over their claims. *See Blum v. Holder*, 744 F.3d 790, 795 (1st Cir. 2014). Among other things, and as relevant here, each Plaintiff must "establish that [it has] standing to sue," *i.e.*, that it has suffered an "injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* at 796. The "threatened injury must be certainly impending to constitute injury in fact"; "[a]llegations of possible future injury" are not sufficient. *Id.*

To state a claim under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Cunningham v. Nat'l City Bank*, 588 F.3d 49, 52 (1st Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[B]ald assertions, unsupported conclusions, periphrastic circumlocutions, and the like need not be credited." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996).

## ARGUMENT

### I. THE CLAIMS BY THE ORGANIZATIONAL PLAINTIFFS AND JOHN DOE 3 SHOULD BE DISMISSED BECAUSE THOSE PLAINTIFFS LACK STANDING.

The organizational Plaintiffs lack standing to sue on their members' behalf, and John Doe 3 has not alleged any cognizable injury to himself. Thus, the Court should dismiss the claims on behalf of these Plaintiffs under Rule 12(b)(1).

#### A. Organizational Plaintiffs Lack Standing To Sue On Their Members' Behalf.

The organizational Plaintiffs assert rights only on behalf of their members, not on behalf of themselves.[3] This is clear from the Complaint, which refers to discrimination against "men and women," "students," and "male students"—not discrimination against *organizations*, which are not subject to Harvard's policy. *See* Compl. ¶¶ 198, 204, 207, 212, 221. In the discrimination context, as in the law generally, "[i]njured parties usually will be the best proponents of their own rights," and "third parties are not normally entitled to step into their shoes." *Domino's Pizza v. McDonald*, 546 U.S. 470, 479 (2006) (internal quotation marks omitted). To sue on behalf of their members, therefore, the organizational Plaintiffs must establish third-party or associational standing. They have not done so.

---

[3] Nor could the organizational Plaintiffs sue on their own behalf. Standing requires, among other things, that the challenged action cause the plaintiffs' injury. *Blum*, 744 F.3d at 796. In this case, the harm the fraternities and sororities allege is caused not by Harvard's policy, which does not prohibit any student from being a member of those groups, but rather by the actions of any students who choose not to be members of the groups.

Outside certain narrow categories not at issue here, the Supreme Court "ha[s] not looked favorably upon third-party standing." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Moreover, even when it has permitted third-party standing, the third party must show that something hinders the person who possesses the right from asserting it himself and that the plaintiff has a "close relationship" with that person, justifying the plaintiff to step in. *Id.* at 130-31; *see Singleton v. Wulff*, 428 U.S. 106, 114-15 (1976). The organizational Plaintiffs cannot meet this standard. First, there is nothing preventing students who are, or would like to be, members of a fraternity or sorority from alleging these claims in their own right. Indeed, three such individuals are already suing, as John Does 1-3. Second, none of the entities alleges a close relationship with Harvard students; indeed, the national sorority Plaintiffs affirmatively allege that they have *no relationship* with current Harvard students subject to the policy, as the local chapters have closed. Compl. ¶¶ 29, 33. For these reasons, the organizational Plaintiffs have not and cannot establish third-party standing.

Nor can they establish associational standing. To sue on behalf of its members, an association must show that (i) its members would otherwise have standing to sue in their own right, (ii) the interests the association seeks to protect are germane to its purpose, and (iii) neither the claims asserted nor the relief requested requires the individual members' participation in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000).

The two sorority plaintiffs cannot satisfy the first requirement. They do not allege that they have members with standing to sue in their own right as they no longer have members at Harvard. Compl. ¶¶ 29, 33; *see Strang v. Marsh*, 602 F. Supp. 1565, 1573 (D.R.I. 1985) (organization could not establish associational standing because it "ha[d] no members").[4] Nor do

---

[4] Notably, the sole remaining active sorority at Harvard is not a plaintiff. Compl. ¶ 196.

any of the organizational plaintiffs satisfy the germaneness requirement. The organizations are

social clubs, not vehicles for advocacy. The Complaint does not allege that they serve the kind

of "representational function" necessary for associational standing. *Town of Norwood v. FERC*,

202 F.3d 392, 407 (1st Cir. 2000) (denying associational standing because the interests served by

the lawsuit were not germane to the organization's purpose). A fraternity is not a group that

"exists mainly to protect its members' interests." *Coll. of Dental Surgeons of P.R. v. Conn. Gen.

Life Ins. Co.*, 585 F.3d 33, 40-41 (1st Cir. 2009). Rather, the Complaint alleges that the

organizational Plaintiffs' purpose is to serve as supportive communities and encourage their

members to seek the highest standards of friendship, scholarship, and service. *See* Compl. ¶¶ 33,

35, 40, 74-76. Advocating for their members to be permitted to hold leadership positions in

other organizations is not germane to this purpose. *See United States v. Metro. Dist. Comm'n*,

147 F.R.D. 1, 6 (D. Mass. 1993) (plaintiff did not have associational standing to challenge

sewage-disposal plan because "[t]he interests of protecting water quality are not germane to [its]

corporate purposes").

    Finally, Plaintiffs cannot show that this case can be litigated without requiring the

members' participation. To succeed on the MCRA claim, for example, the organizations would

need to show that their members were threatened, intimidated, or coerced by Harvard's policy.

*Bally v. Northeastern Univ.,* 403 Mass. 713, 719-20 (1989). This will require the intensive

participation of the individual members, likely in the form of depositions and witness testimony;

associational standing is therefore inappropriate. *See N.H. Motor Transp. Ass'n v. Rowe*, 448

F.3d 66, 72 (1st Cir. 2006) ("Representational standing is inappropriate if adjudicating the merits

of an association's claim requires the court to engage in a fact-intensive-individual inquiry.");

*see also Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 286-87 (3d Cir.

2002) (associational standing allowed if proof as to member circumstances is "limited," but not "for claims requiring a fact-intensive-individual inquiry").

Because the organizational Plaintiffs lack any proper basis for standing, this Court lacks jurisdiction over their claims, and the organizations must be dismissed from this case.

### B. John Doe 3 Does Not Have Standing Because The Complaint Fails To Allege Injury To Him As Opposed To His Organization.

John Doe 3 claims no cognizable injury to himself at all. As an upperclassman, he is not subject to the policy himself. He alleges only injury to the organization to which he belongs, or, at most, injury that is derivative of the harm to that organization—and the Complaint conspicuously does not say that his organization is a plaintiff here (nor, as explained above, would it have standing to be). John Doe 3's allegations are insufficient under clear and well-established precedent.

To establish standing, a plaintiff must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct." *Allen v. Wright*, 468 U.S. 737, 751 (1984). The injury must "affect the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992). Moreover, an injury to an agent is not sufficient to establish standing if it is merely derivative of an injury to the principal. In *Pagan v. Calderon*, 448 F.3d 16 (1st Cir. 2006), for example, the court held that an employee did not have standing to sue the former governor of Puerto Rico when the corporation he worked for folded for lack of financing. The employee alleged that "as a consultant, he depended on [the company's] viability to earn his living." *Id.* at 30. The court held that "[i]t is not enough for the agent to allege an injury that is qualitatively different from that suffered by the principal; rather, the agent must allege an injury that does not derive from the injury to the principal." *Id.* The plaintiff's injury (loss of earnings) was merely derivative of the corporation's injury (failing business), and therefore it was

9

insufficient to establish standing.

Under these well-established principles, John Doe 3 does not have standing to bring this suit. The Complaint alleges that John Doe 3 is a member of an unidentified single-gender organization but acknowledges that, as an upperclassman, he is not subject to Harvard's policy. Compl. ¶ 53. His sole allegations of harm in the Complaint are that "morale within John Doe 3's organization is lower"; Harvard's policy has made his recruitment, retention, and fundraising responsibilities for the organization "more difficult"; and he "has had to raise additional funds to address the impact of the [policy] on his organization." *Id.* ¶ 54.[5] These allegations are too vague to credit. But even if they were not, these harms are to the organization, not to John Doe 3. It is the organization that allegedly suffers from low morale, fewer members, and less money. To the extent any of these harms impact John Doe 3—for example, by requiring him to raise additional funds—they derive from the organization's harm, and therefore cannot establish his standing to sue. *See Pagan*, 448 F.3d at 30.

## II.  THE COMPLAINT DOES NOT STATE A CLAIM UNDER TITLE IX.

To the extent that any of the Plaintiffs has standing, their claims fail on the merits. Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Plaintiffs allege that Harvard's policy violates this provision because: (1) it is per se disparate-treatment discrimination; (2) it is associational discrimination; (3) it is based in sex-stereotyping; and (4) it

---

[5] John Doe 3, an upperclassman, is not subject to the policy, but the Complaint cursorily alleges that John Doe 3 has "been personally stigmatized" by the application of the policy to other people. Compl. ¶¶ 53-54. Stigma at most "accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Allen*, 468 U.S. at 755 (citation omitted); *accord Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972); *Rizzo v. Goode*, 423 U.S. 362 (1976). John Doe 3 does not allege that the policy has denied *him* anything. His theory of stigmatic injury, which would allow any individual "member" of any single-sex organization to sue based on perceived harm to their "identity," does not satisfy Article III.

is based in anti-male bias.  None of these theories plausibly asserts a violation of Title IX.

### A.  The Complaint Does Not State A Claim For Per Se Sex Discrimination.

Plaintiffs' per se sex discrimination argument is based on the notion that Harvard's policy treats students differently on account of their sex.  *See* Compl. ¶ 198.  But Harvard's policy treats male and female students exactly the same.  Plaintiffs therefore cannot show the "disparate treatment based on sex" that is the "touchstone of both Title VII and Title IX claims."  *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534-35 (3d Cir. 2018); *accord, e.g.*, *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 153 (1st Cir. 1990) ("The inquiry in a Title VII disparate treatment case is whether the defendant intentionally discriminated against the plaintiff on the basis of a protected attribute."); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to *disadvantageous* terms or conditions of employment to which members of the other sex are not exposed." (emphasis added)).  Under Harvard's policy, all students face the same choice, regardless of sex: to remain eligible for the College's nominations and leadership positions covered by the policy, or to join a gender-exclusionary organization instead.

A policy does not result in unlawful disparate treatment just because it takes sex into account in some way.  *See, e.g.*, *Cleaves v. City of Chicago*, 68 F. Supp. 2d 963, 967 (N.D. Ill. 1999) (dismissing a Title VII sex-discrimination claim and finding that the policy "treats men and women exactly the same," even if it takes sex into account when defining the types of relationships that trigger benefits eligibility).  Here, Plaintiffs do not allege, nor could they, that Harvard's policy treats men and women differently.  Plaintiffs' per se discrimination claim is particularly weak given that the references to sex in Harvard's sex-neutral policy are the result of Plaintiffs' own practices.  Plaintiffs, not Harvard, are treating students differently based on sex.

In an attempt to demonstrate disparate treatment where there is none, Plaintiffs insist that

"Harvard's discrimination against women is no less sex discrimination just because Harvard has also decided to discriminate against men in a similar way."  Compl. ¶ 200.  This makes no sense. Subjecting men and women to the *same* rule is precisely what makes a policy *non*discriminatory. Plaintiffs also try to slice the policy into two sex-specific halves, suggesting that "Harvard's policy of punishing men for joining all-male organizations is sex discrimination, as is its policy of punishing women for joining all-female organizations."  *Id.*  But Harvard has just one policy, which treats men and women identically.  Plaintiffs cannot plead a plausible claim by recharacterizing a policy that applies equally to everyone as two discriminatory policies, one for men and one for women, any more than they could recharacterize a religion-neutral policy as separate policies for Catholics, Protestants, Muslims, Jews, and so on.  Plaintiffs' novel theory of "discrimination" where everyone is treated equally has no basis in the law and must be rejected.

**B.  The Complaint Does Not State A Claim For Associational Discrimination.**

Plaintiffs' associational discrimination claim fares no better.  Plaintiffs allege that "Harvard's Sanctions Policy punishes students because they associate with individuals of a particular sex."  *Id.* ¶ 204.  That is legally unsupported and at odds with the plain terms of the policy that Plaintiffs themselves recite.  Plaintiffs do not and cannot allege that Harvard's policy restricts any individual's ability to associate with men *or* with women *or* with both.  No court has ever embraced an associational discrimination theory like the one Plaintiffs propose, one that is not based on animus against any protected class of people with whom the plaintiff associates, but on the plaintiff's choice of a setting in which to associate.  As the Second Circuit recently explained in *Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018), which Plaintiffs cite in the Complaint, associational discrimination occurs when the defendant has taken an action because it "disapproves" of certain "association[s]" based on a protected characteristic, causing those who participate in such associations to "suffer[] discrimination."  *Id.* at 124-26.  Such

claims are "premised on the [defendant's] motivation," *i.e.*, the defendant's discriminatory animus. *Id.* at 128 n.30; *see also, e.g.*, *Pennington v. S. Motion, Inc.*, 2017 WL 3897166, at *5 (N.D. Miss. Sept. 6, 2017) (holding that "an associational discrimination claim depends on an unlawful discriminatory animus arising from a relationship"). Thus, in *Zarda*, the Court found that "sexual orientation discrimination" constituted "associational discrimination" under Title VII because "the employer's decision" was "based on . . . opposition to association between particular sexes and thereby discriminates against an employee based on their own sex." *Id.* at 128; *see also Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 349 (7th Cir. 2017) (same).[6]

The instant case is easily distinguishable from *Zarda*. Plaintiffs do not allege, nor could they allege, that Harvard acted out of bias against friendships or any other form of personal relationship between people of the same sex. Nor, as explained pp. 14-16, *infra*, have Plaintiffs adequately alleged animus toward men or women as a motivating factor for the challenged policy: Plaintiffs have not alleged that the policy is based on a belief that men should not associate with men, or women with women. Indeed, under Harvard's policy, all students remain free to associate with as many women or men as they like. The policy provides students with a choice and attaches consequences only to joining other members of the same sex *in a particular setting*—and the consequences concern only eligibility for certain privileges.[7] There is no legitimate associational discrimination claim here.

---

[6] Courts in the First Circuit often look to Title VII cases when determining the scope of Title IX. *See Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65-66 (1st Cir. 2002). And under Title VII caselaw, Plaintiffs' claims fail for all the reasons described above. Regardless, no court has recognized an associational discrimination claim like Plaintiffs' in the Title IX context, so Plaintiffs seek an unprecedented expansion of Title IX's scope.

[7] In the cases on which Plaintiffs rely, courts applied Title VII to strike down policies or practices that imposed burdens on interracial associations—interracial marriages, interracial friendships, and interracial adoptions—because of discriminatory racial animus. *See Floyd v. Amite Cnty. Sch. Dist.*, 581 F.3d 244, 250 (5th Cir. 2009) (collecting associational discrimination cases from the racial discrimination context and observing that these cases are all "predicated on animus against the employee because of his association with persons of another race"). Those cases are completely inapposite.

**C.  The Complaint Does Not State A Claim For Sex Stereotyping.**

Plaintiffs' sex-stereotyping argument alleges that Harvard's policy "impermissibly discriminates against men and women on the basis of stereotypes about how men and women intrinsically behave and how men and women ought to behave."  Compl. ¶ 207.  But the Complaint does not support this argument.  The Complaint relies on the allegation that Harvard administrators "expressed the view that men who join all-male organizations are prone to sexual violence and promote and engage in bigotry," that "women who join all-female organizations do so only as a way of coping with exclusion from all-male organizations," and "that men and women who join single-sex organizations do not act like modern men and women" and exhibit "behaviors and attitudes . . . at odds with the aspirations of . . . 21st century society."  *Id.* ¶¶ 208-209.  These conclusory allegations do not establish that Harvard acted based on a stereotype about how men and women behave or ought to behave.

Title IX forbids discrimination on the basis of sex; action based on something *other* than a person's sex—for example, the individual's position or conduct—is not actionable discrimination.  For example, in *Nungesser v. Columbia University*, 244 F. Supp. 3d 345, 363 (S.D.N.Y. 2017), a woman allegedly harassed a man, but because of personal dislike rather than sex:  "to the extent that [the woman's action] was aimed at [the male plaintiff], the [complaint] specifically allege[d] that it was because of *his conduct* toward her . . . and her resulting personal animus against him, not because of *his status* as a male."  *See also Jespersen v. Harrah's Operating Co.*, 444 F.3d 1104, 1111-13 (9th Cir. 2006) (en banc) (restaurant's policy was not sex stereotyping where it "applie[d] largely the same [dress and appearance] requirements to both men and women" and there was no evidence that it was "adopted to make women bartenders conform to a commonly-accepted stereotypical image").  Similarly, the Complaint's allegations, which seem to claim that Harvard harbors stereotypes against students based on their

*decision* to join single-gender organizations, do not state a claim for stereotyping based on sex.[8]

Finally, even if the Complaint alleged that Harvard's policy is rooted to some degree in sex-stereotyping (and it does not), the policy still would not violate Title IX, because the Complaint fails to allege that it results in *discrimination* based on sex—that is, that it results in "disparate treatment." Discrimination is a *sine qua non* for a claim under Title IX, including a sex-stereotyping claim. Indeed, one of the very cases Plaintiffs cite, Compl. ¶ 207, makes clear that the law prohibits "*disparate treatment* of men and women resulting from sex stereotypes," not sex-stereotyping writ large. *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978) (emphasis added); *see also* p. 11, *supra* (disparate treatment based on sex is the "touchstone" of a Title IX claim). Here, where the policy is equally applied to both men and women, the Complaint cannot make out a claim.

### D. The Complaint Does Not State A Claim For Anti-Male Bias.

For similar reasons, the Complaint fails to state a claim that Harvard's policy is motivated by "anti-male bias." Compl. ¶¶ 210-218.

In support of Plaintiffs' anti-male bias argument, the Complaint alleges that Harvard adopted the policy in reliance on a report that "discuss[ed] student-reported anecdotes of sexist behavior by the final clubs," which the report blamed on "deeply misogynistic attitudes" at those clubs. Compl. ¶ 213. And it states that Harvard was motivated solely by a belief that these "[all-male] organizations make women 'second-class citizen[s],' 'not equal,' and lower on a 'hierarchy' than men," and "perpetuat[e] . . . spaces that are rife with power imbalances." *Id.* ¶ 214 (alterations in original). Put differently, the Complaint on its face alleges that the policy

---

[8] The cases on which Plaintiffs rely involve discrimination based on perceived female characteristics. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (employer acted on the "basis of a belief that a woman cannot be aggressive"); *City of Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 708-11 (1978) (policy based on a belief that women live longer than men); *Harrington v. City of Attleboro*, 172 F. Supp. 3d 337, 344 (D. Mass. 2016) (plaintiff endured "name calling and assaults" because she "did not conform to certain female stereotypes").

was motivated by opposition to *groups that exclude women*, a point Harvard strongly disputes. Even assuming their truth, however, as Harvard does for purposes of this motion, such allegations are insufficient to state a claim that Harvard was motivated by bias against *men*.

As an initial matter, the Complaint's factual allegations fail plausibly to allege that Harvard was actually motivated by a bias against men. Just like the allegations recited in the count itself, the facts elsewhere in the Complaint allege (incorrectly) that the policy arose from opposition to particular all-male groups, not bias against males as males. *See, e.g.*, Compl. ¶ 213 (referring to Harvard's supposed view that all-male finals clubs are more likely to engage in sexual violence). Moreover, facts elsewhere in the Complaint support the inference that the policy is not biased against men. For example, according to the Complaint, "women and their former all-female social clubs"—not men and their all-male social clubs—"have suffered the most" as a result of the policy. *Id.* ¶ 1. The anti-male bias claim is therefore insufficiently supported under *Twombly*. *See* 550 U.S. at 570.

As importantly, even if the Complaint *did* plausibly allege that Harvard's policy was motivated by bias against men, it still fails to state a claim under Title IX, because it does not allege that the resulting policy discriminates against men. *See Manhart*, 435 U.S. at 707 n.13; *see also* p. 11, *supra* (Title IX protects against disparate treatment based on sex). The policy treats all Harvard students—men and women alike—equally. Plaintiffs do not allege a disparate impact on male students (which is not actionable under Title IX in any event), and there has been none. *See* Compl. ¶ 1 (alleging that women and all-female groups have suffered the most). Here again, Plaintiffs have failed to allege any sex *discrimination*, and this failure is fatal to their Title IX-based claims.

## III.  THE MCRA CLAIM SHOULD BE DISMISSED.

To make out an MCRA claim, the plaintiff must allege facts sufficient to show that the

defendant has "interfere[d] with, or attempted to … interfere[] with," the plaintiff's exercise or enjoyment of constitutional or statutory rights "by threats, intimidation or coercion." M.G.L. c. 12, §§ 11H, 11I. Plaintiffs cannot make out this claim here. Plaintiffs point only to the right to equal protection under the Fourteenth Amendment. Compl. ¶¶ 221-222. Harvard's policy, however, neither constitutes a "threat, intimidation, or coercion" under the MCRA, nor interferes with Plaintiffs' right to equal protection.

### A.  The Complaint Fails To Allege Threats, Intimidation, Or Coercion.

Plaintiffs allege that Harvard's policy "threaten[s] substantial harm to Plaintiffs' future professional opportunities and professional reputations by withholding valuable opportunities and sowing a culture of fear and intimidation," *id.* ¶ 222, but this allegation falls far short of satisfying the MCRA's explicit "threat, intimidation, or coercion" requirement. Courts have rigorously enforced this requirement to ensure that the MCRA remains a limited remedy for a particular type of injury, as the legislature intended—not a "vast constitutional tort" that would effectively require private actors to follow all the same rules as government bodies. *Currier v. Nat'l Bd. of Med. Exam'rs*, 462 Mass. 1, 12 (2012); *see also O'Connell v. Chasdi*, 400 Mass. 686, 694 (1987) (noting that the original purpose of the MCRA was to "provide a remedy for victims of racial harassment"). In particular, the Supreme Judicial Court ("SJC") has explained that any "threats, intimidation or coercion" both must be "individualized," *i.e.*, "directed toward a particular individual or class of persons," and must give rise to reasonable fear of "serious harm." *Bally,* 403 Mass. at 718-20.

Here, none of the Plaintiffs raise allegations sufficient to satisfy these two requirements. The organizational Plaintiffs simply do not, and cannot, allege that the policy threatens, intimidates, or coerces them in any way. This alone is fatal to their claims. They do not even attempt to assert an MCRA claim on their own behalf but instead point to the alleged threats,

intimidation, or coercion of *others*.

As for the students themselves, the Complaint does not plausibly allege any threats, intimidation, or coercion. As an initial matter, Plaintiffs' argument ignores that Harvard students accepted the challenged policy when they made a voluntary decision to attend Harvard. Plaintiffs concede that Harvard's policy applies only prospectively to students who had not yet chosen to matriculate at the time the policy was enacted. Compl. ¶ 2. And Plaintiffs certainly do not allege that they were intimidated or coerced into attending Harvard.

Courts have routinely rejected MCRA claims where the plaintiffs voluntarily accepted the very policy or action they later claimed was threatening, intimidating, or coercive. *See, e.g.*, *Webster v. Motorola, Inc.*, 418 Mass. 425, 429-30 (1994) (threatening to terminate at-will employees was not actionable under the MCRA, because the employees had voluntarily entered into at-will employment agreements); *Johnson v. Town of Duxbury*, 2018 WL 5269989, at *5 (D. Mass. Oct. 23, 2018) (rejecting employee's argument that contract with employer was inherently coercive under the MCRA where employee voluntarily entered into the contract). Students cannot voluntarily decide to attend Harvard with full knowledge of its rules, which reflect Harvard's reasoned pedagogic judgments, and then claim that they are being coerced, threatened, or intimidated by those very rules, particularly where the rule at issue presents students with a choice rather than threatening some punishment for noncompliance.

Even were it possible for a plaintiff to bring an MCRA claim under such circumstances, *Bally* squarely establishes that Harvard's policy is not sufficiently "individualized," and does not threaten sufficiently "serious harm," to give rise to MCRA liability. In *Bally*, the SJC rejected an MCRA challenge to a Northeastern University policy requiring student athletes to undergo drug testing as a condition for participation in intercollegiate athletics. Both prongs of *Bally*'s holding

are relevant here: first, the Court explained that Northeastern's policy authorized only "indiscriminate, impartially administered testing," so it was insufficiently "individualized" to give rise to MCRA liability. 403 Mass. at 719. Second, the SJC held that any "harm" from Northeastern's policy was in any event insufficiently "serious" to constitute a "threat, intimidation, or coercion" under the MCRA, because the policy did not involve a "physical confrontation accompanied by a threat of harm," or the "loss of a contract right." *Id.* at 719-20. As the Court put it, "Northeastern merely excluded Bally from intercollegiate sports." *Id.* at 720.

*Bally* is indistinguishable from this case in both respects. First, Harvard's policy, which applies generally to all undergraduates, is no more "directed toward a particular individual or class of persons" than was the Northeastern policy at issue in *Bally*. *Id.* at 719-20; *contrast Rinsky v. Trs. of Boston Univ.*, 2010 WL 5437289, at *8 (D. Mass. Dec. 27, 2010) (finding threat sufficiently individualized where plaintiff alleged that BU administrators had chastised and threatened her for complaining about sexual harassment at an offsite school-administered internship). Second, if a choice between physically intrusive drug testing and participation in intercollegiate sports does not give rise to a "serious" harm, *see Horsemen's Benev. & Protective Ass'n, Inc. v. State Racing Comm'n*, 403 Mass. 692, 705 (1989) (calling urinalysis drug testing "highly invasive"), then it is hard to imagine how a choice between membership in certain single-gender social organizations and eligibility for certain leadership opportunities could possibly suffice. If losing eligibility to *play* on a team does not qualify as a threat of serious harm under the MCRA, losing eligibility to *captain* a team plainly does not qualify. The same is true of the other endorsements and opportunities the policy regulates: students have no entitlement to them, and the loss of eligibility is not a cognizable threat.

### B. The Complaint Fails To Allege An Equal Protection Violation.

Even had Plaintiffs adequately alleged a "threat, intimidation, or coercion," Plaintiffs'

MCRA claim still would fail because Harvard's policy does not violate equal protection. Plaintiffs suggest that heightened scrutiny applies because the policy discriminates based on sex. Compl. ¶ 221. But as Plaintiffs concede, heightened scrutiny applies only where a challenged policy "'closes a door or denies opportunity to women (or to men)'"—not where a challenged policy applies equally to both women and men. *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 532 (1996)). For all of the reasons explained above, Harvard's policy is not discriminatory: every student at Harvard is treated equally under the challenged policy. Rational basis review therefore applies, and Plaintiffs do not contend that Harvard's policy is irrational. Nor could they: Harvard's decision to advance its principles of antidiscrimination through the allocation of scarce resources is surely rational, if not basic common sense. *See Schaer v. Brandeis Univ.*, 432 Mass. 474, 482 (2000) ("[C]ourts are chary about interfering with academic . . . decisions made by private colleges and universities."). Harvard's policy further satisfies even a stricter standard if that were held to apply. Fostering a culture of inclusivity and antidiscrimination is a compelling interest, *see Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987), and Harvard has tailored the policy to serve that interest in the least restrictive way; it does not bar students from joining single-gender organizations, but rather merely restricts access to certain privileges for students who choose to do so.

**CONCLUSION**

Plaintiffs may disagree with Harvard's policy, but the law does not entitle them to impose their policy view on Harvard. Their legal theories are unprecedented and lack any support in the statutes that they invoke. The Court should dismiss the organizational Plaintiffs and John Doe 3 under Rule 12(b)(1). It should dismiss the entire Complaint under Rule 12(b)(6).

Dated: February 8, 2019

Respectfully submitted,

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE

By its attorneys,

*/s/ Roberto M. Braceras*
Roberto M. Braceras (BBO# 566816)
Joshua J. Bone (BBO# 687722)
Edwina B. Clarke (BBO# 699702)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: +1 617 570 1000
Fax.: +1 617 523 1231
Email: rbraceras@goodwinlaw.com
jbone@goodwinlaw.com
eclarke@goodwinlaw.com

William M. Jay (*pro hac vice*)
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, DC  20001
Tel.: +1 202 346 4000
Fax.: +1 202 346 4444
E-mail: wjay@goodwinlaw.com

## CERTIFICATE OF SERVICE

I, Roberto M. Braceras, hereby certify that on February 8, 2019, a true copy of the foregoing Memorandum was served by CM/ECF upon all other counsel of record in this action.

February 8, 2019

/s/ Roberto M. Braceras
Roberto M. Braceras