# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KAPPA ALPHA THETA FRATERNITY, INC.; KAPPA KAPPA GAMMA FRATERNITY; SIGMA CHI; SIGMA ALPHA EPSILON; SIGMA ALPHA EPSILON—MASSACHUSETTS GAMMA; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3, | : : : : : : : : | Civil Action No. 18-cv-12485-NMG |
| Plaintiffs, | : : |  |
| v. | : : |  |
| HARVARD UNIVERSITY; PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | : : : : |  |
| Defendants. | : : |  |
| _____ | : |  |

## PLAINTIFFS' OPPOSITION TO HARVARD'S
## MOTION TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................................................iii

INTRODUCTION ................................................................................................................... 1

FACTUAL ALLEGATIONS IN THE COMPLAINT .................................................. 3

STANDARD OF REVIEW FOR A MOTION TO DISMISS ...................................... 4

ARGUMENT ........................................................................................................................ 5

I.      All Plaintiffs Have Article III Standing ................................................................ 5

      A.      It Is Undisputed That John Doe 1 and John Doe 2 Have Standing ...................... 5

      B.      Organizational Plaintiffs Have Organizational and Associational Standing .......... 6

      C.      John Doe 3 Has Standing ...................................................................................... 8

II.     The Complaint States Four Plausible Title IX Claims........................................... 9

      A.      The Complaint States a Plausible Claim of *Per Se* Sex Discrimination................ 9

      B.      The Complaint States a Plausible Claim of Associational Discrimination........... 11

      C.      The Complaint States a Plausible Claim of Sex Stereotyping.............................. 14

      D.      The Complaint States a Plausible Claim of Anti-Male Bias................................ 15

III.    The Complaint States a Plausible Claim Under the Massachusetts Civil Rights Act ...... 16

      A.      The Complaint Plausibly Alleges Threats, Intimidation, or Coercion.................. 17

      B.      The Complaint Plausibly Alleges an Equal Protection Violation......................... 20

CONCLUSION.................................................................................................................... 20

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Gov't Emps. Local 1 v. Stone*,
502 F.3d 1027 (9th Cir. 2007) ........................................................................................6

*Bally v. Northeastern University*,..................................................................................19, 20
532 N.E.2d 49 (Mass. 1989)

*Batchelder v. Allied Stores Corp.*,
473 N.E.2d 1128 (Mass. 1985) ......................................................................................16

*Buster v. George W. Moore, Inc.*,
783 N.E.2d 399 (Mass. 2003) ....................................................................................17, 20

*Cabi v. Bos. Children's Hosp.*,
161 F. Supp. 3d 136 (D. Mass. 2016) ............................................................................18

*Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*,
799 F.2d 6 (1st Cir. 1986)................................................................................................8

*Christiansen v. Omnicom Grp., Inc.*,
852 F.3d 195 (2d Cir. 2017)...........................................................................................13

*City of L.A., Dep't of Water & Power v. Manhart*,
435 U.S. 702 (1978)........................................................................................................9

*Cleaves v. City of Chi.*,
68 F. Supp. 2d 963 (N.D. Ill. 1999) ...............................................................................11

*Clinton v. City of New York*,
524 U.S. 417 (1998)........................................................................................................5

*Comfort v. Lynn Sch. Comm.*,
418 F.3d 1 (1st Cir. 2005), *abrogated on other grounds*, *Parents Involved in
Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) ................................5, 6

*Connolly v. Shaw's Supermarkets, Inc.*,
No. 17-11711-NMG, 2018 WL 6697676 (D. Mass. Dec. 20, 2018) .........................5

*Cooperman v. Individual, Inc.*,
171 F.3d 43 (1st Cir. 1999)..............................................................................................4

*Ctr. for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015) .........................................................................................7

*Currier v. Nat'l Bd. of Med. Exam'rs*,
    965 N.E.2d 829 (Mass. 2012) ...............................................17

*Doe v. Columbia Univ.*,
    831 F.3d 46 (2d Cir. 2016).............................................9, 15

*Fenn v. Mansfield Bank*,
    No. 14-12554-NMG, 2015 WL 628560 (D. Mass. Feb. 12, 2015) .........12

*Glovsky v. Roche Bros. Supermarkets, Inc.*,
    17 N.E.3d 1026 (Mass. 2014) ............................................17

*Greene v. Cabral*,
    323 F. Supp. 3d 96 (D. Mass. 2018) .....................................17

*Handal v. State St. Bank & Tr. Co.*,
    941 F. Supp. 2d 167 (D. Mass. 2013) .....................................4

*Harrington by Harrington v. City of Attleboro*,
    No. 15-CV-12769-DJC, 2018 WL 475000 (D. Mass. Jan. 17, 2018) ......14

*Haufler v. Zotos*,
    845 N.E.2d 322 (Mass. 2006) ............................................17

*Hively v. Ivy Tech Cmty. Coll. of Ind.*,
    853 F.3d 339 (7th Cir. 2017) (en banc) ..................9, 10, 12, 14

*Houlton Citizens' Coal. v. Town of Houlton*,
    175 F.3d 178 (1st Cir. 1999)..............................................5

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977).....................................................6, 7

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005)....................................................2, 16

*Kennie v. Nat. Res. Dep't*,
    889 N.E.2d 936 (Mass. 2008) .......................................17, 19, 20

*Loving v. Virginia*,
    388 U.S. 1 (1967)........................................................10

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)......................................................5

*Mass. Delivery Ass'n v. Coakley*,
    671 F.3d 33 (1st Cir. 2012)..............................................6

*Miss. Univ. for Women v. Hogan*,
  458 U.S. 718 (1982)............................................................................20

*Morgan v. Town of Lexington*,
  823 F.3d 737 (1st Cir. 2016)...............................................................15

*NAACP v. Harris*,
  567 F. Supp. 637 (D. Mass. 1983) ........................................................7

*Pennington v. Southern Motion, Inc.*,
  No. 16-CV-110-DMB-DAS, 2017 WL 3897166 (N.D. Miss. Sept. 6, 2017) ........................13

*Persson v. Bos. Univ.*,
  No. 15-14037-JGD, 2019 WL 917205 (D. Mass. Feb. 25, 2019) ...........................12

*Pheasant Ridge Assocs. Ltd. P'ship v. Town of Burlington*,
  506 N.E.2d 1152 (Mass. 1987) ..........................................................19

*Planned Parenthood League of Mass., Inc. v. Blake*,
  631 N.E.2d 985 (Mass. 1994) ...........................................................17

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989).................................................................14, 15

*Redgrave v. Bos. Symphony Orchestra, Inc.*,
  502 N.E.2d 1375 (Mass. 1987) .........................................................17

*Reprod. Rights Network v. President of Univ. of Mass.*,
  699 N.E.2d 829 (Mass. App. Ct. 1998) ................................................19

*Rinsky v. Trs. of Bos. Univ.*,
  No. 10cv10779-NG, 2010 WL 5437289 (D. Mass. Dec. 27, 2010) .......................18

*Ruivo v. Wells Fargo Bank, N.A.*,
  766 F.3d 87 (1st Cir. 2014).................................................................4

*Sierra Club v. Morton*,
  405 U.S. 727 (1972)...................................................................5, 8

*Town of Norwood v. FERC*,
  202 F.3d 392 (1st Cir. 2000)................................................................7

*United States v. Virginia*,
  518 U.S. 515 (1996)......................................................................20

*Valentin v. Hosp. Bella Vista*,
  254 F.3d 358 (1st Cir. 2001)................................................................5

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................................. 6, 8

*In re Workers' Comp. Refund*,
    46 F.3d 813 (8th Cir. 1995) ................................................................................... 9

*Zarda v. Altitude Express, Inc.*,
    883 F.3d 100 (2d Cir. 2018) (en banc) .......................... 9, 10, 11, 12, 13, 14, 15

**Statutes**

20 U.S.C. § 1681 *et seq.* ..................................................................................... 1, 2, 9, 10

Mass. Gen. Laws ch. 12, §§ 11H, 11I .......................................................................... 16

**Other Authorities**

13A Charles Alan Wright et al., Federal Practice and Procedure § 3531.9.5 (3d ed.
    2018) ...................................................................................................................... 6, 8

*FAQs*, Rhodes Scholarship, https://www.rhodeshouse.ox.ac.uk/media//1168faqs-
    flyer-01.pdf ............................................................................................................ 18

**INTRODUCTION**

Harvard does not punish its students for joining private off-campus organizations comprised only of members of their own race, national origin, citizenship, sexual orientation, religion, age, disability status, marital status, relationship status, IQ, political affiliation, or any other characteristic.  But under its new student-conduct policy (the "Sanctions Policy"), Harvard punishes students who join single-sex social organizations, solely because those organizations are single-sex.  Harvard's Sanctions Policy denies women who join women's clubs, and men who join men's clubs, the opportunity to hold on-campus leadership roles or to apply for prestigious post-graduate fellowships that require an institutional endorsement.  After initially seeking to target only the men's clubs on the basis of anti-male bias, Harvard eventually expanded the Sanctions Policy to cover the women's clubs as well, calling the women's clubs "collateral damage" and saying that they "have no value."  Compl. ¶ 9, Dkt. No. 1.  In developing the policy, Harvard has invoked demeaning sex stereotypes that men in men's clubs are sexually dangerous and that women join women's clubs just to cope with their inability to join men's clubs.  In response to the Sanctions Policy, nearly all of the women's organizations at Harvard have closed their doors or renounced their proud status as women's organizations.

The Complaint states viable claims that the Sanctions Policy discriminates "on the basis of sex" in violation of Title IX, 20 U.S.C. §§ 1681-88, and this Court has jurisdiction to hear those claims.  Harvard's motion to dismiss argues that some—but not all—of the plaintiffs lack Article III standing.  Mem. Law Supp. Mot. to Dismiss ("MTD") at 6-10, Dkt. No. 30.  Those arguments are makeweight, as all the plaintiffs have standing.  But even one plaintiff's standing is enough to establish this Court's jurisdiction, and Harvard does not dispute that two plaintiffs— John Doe 1 and John Doe 2—have standing.  Nor could it.

Harvard's Rule 12(b)(6) arguments fare no better. *Id.* at 10-16. Harvard glosses over a myriad of precedent supporting each of Plaintiffs' Title IX claims—*per se* sex discrimination, associational discrimination, sex stereotyping, and anti-male bias. Nor does Harvard grapple with the Complaint's extensive factual allegations detailing the Sanctions Policy's discriminatory origins and effects. Instead, Harvard contends that the policy cannot be sex discrimination because it "treats men and women equally." *Id.* at 2. But the only sense in which the policy treats men and women "equally" is that it constitutes unlawful sex discrimination against both. The policy punishes a male student in a men's club based solely on his sex and the sex of the members of his club. It also punishes a female student in a women's club based solely on her sex and the sex of the members of her club. That is sex discrimination against both students, not neither of them. By Harvard's logic, a policy punishing both men and women in same-sex relationships could not be sex discrimination because it treats men and women "equally"—gay men and lesbian women alike are punished. Laws barring interracial marriages likewise treated people of all races "equally"—no person of any race could marry a person of a different race. The Supreme Court long ago rejected such logic, and courts today do not embrace it.

Harvard further asserts that, rather than discriminate on the basis of sex, its policy merely channels benefits to students who share Harvard's "values" and "aspirations" of "inclusion." *Id.* at 1, 3. But regardless of Harvard's ever-shifting justifications for the Sanctions Policy, Harvard now punishes students for their associations with other students of the same sex, through a policy rooted in sexist stereotypes about how women and men "are" and how they should behave. Such a policy violates the most basic tenet of Title IX, that schools not discriminate against students "on the basis of sex." 20 U.S.C. § 1681(a). Those words—"on the basis of sex"—are as broad as they appear. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 179, 179 n.3 (2005).

The Complaint also states a viable claim under the Massachusetts Civil Rights Act (the "MCRA"). Plaintiffs have plausibly alleged that the Sanctions Policy constitutes impermissible "coercion" under the MCRA, and that the policy violates the Equal Protection Clause because it discriminates on the basis of sex without an exceedingly persuasive justification.

Harvard's motion to dismiss should be denied in its entirety.

## FACTUAL ALLEGATIONS IN THE COMPLAINT

Over the past four years, Harvard has engaged in an aggressive campaign of intimidation and coercion against students who join single-sex organizations and advocate for their continued existence. Harvard has suggested that students who join single-sex organizations could be expelled. Compl. ¶¶ 11, 112. It has singled out students who join single-sex organizations for scathing criticism in university-wide letters, emails, reports, and media articles. *Id.* ¶¶ 11, 111, 115, 121, 138, 146-47. Harvard's administrators expressed the view that men who join men's clubs are prone to sexual violence and promote and engage in bigotry. *Id.* ¶¶ 7-8, 111, 126-27. Harvard said that women who join women's clubs do so only as a way of coping with the inability to join all-male organizations, and that women's clubs have no value. *Id.* ¶¶ 156, 208-09. Harvard stated on multiple occasions that all-male organizations are "unsafe" and cause sexual assault. *Id.* ¶¶ 7-8, 123, 215. One Harvard committee asserted that men's clubs are places of "deeply misogynistic attitudes," *id.* ¶ 121, and another committee said that they "participat[e] in and perpetuat[e] . . . social structures that discriminate based on . . . race, class, and sexual orientation," *id.* ¶ 174.

Harvard's efforts culminated with the announcement of the Sanctions Policy in May 2016. First applicable to the class of 2021, the Sanctions Policy punishes undergraduate students who join "unrecognized" single-sex social organizations, even private off-campus ones. *Id.* ¶ 2. While Harvard has consistently singled out fraternities, sororities, and final clubs, the policy on

its face is far broader. *Id.* ¶ 6. Under the Sanctions Policy, any student who joins a single-sex social organization may not hold a leadership position in any on-campus student organization, captain any athletic team, or compete for any post-graduate fellowship that requires an institutional endorsement, like the prestigious Rhodes, Marshall, and Mitchell Scholarships. *Id.* ¶ 2; *see also* MTD at 3-4. Since announcing the Sanctions Policy, Harvard has expressed the view that men and women who join single-sex clubs do not act like modern men and women, exhibiting "behaviors and attitudes . . . at odds with the aspirations of the 21st century society to which the College hopes and expects our students will contribute." Compl. ¶¶ 10, 138, 146, 209.

Although Harvard claims that, because the Sanctions Policy applies only prospectively, it "affected only students who would be fully aware of the policy before deciding to apply to or attend Harvard," MTD at 3, the harmful impact of the Sanctions Policy on current students has been immediate and stark. Harvard's pressure campaign against students who join single-sex organizations caused several single-sex organizations to close and has intimidated many students who favor single-sex organizations into silence. *See, e.g.*, Compl. ¶¶ 11, 107, 112, 119.

## STANDARD OF REVIEW FOR A MOTION TO DISMISS

In evaluating a Rule 12(b)(6) motion to dismiss, (1) the complaint is construed "in the light most favorable to the plaintiff," (2) its allegations are taken as true, and (3) "all reasonable inferences" that can be drawn from the pleading are drawn "in plaintiff's favor." *Ruivo v. Wells Fargo Bank, N.A.*, 766 F.3d 87, 90 (1st Cir. 2014). "[T]he court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all reasonable inferences." *Handal v. State St. Bank & Tr. Co.*, 941 F. Supp. 2d 167, 172 (D. Mass. 2013) (citing *Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir. 1999)).

Under Rule 12(b)(1), when a "defendant proffers a 'sufficiency challenge'" to a plaintiff's Article III standing, "the court will assess plaintiff's jurisdictional allegations liberally,

4

treating all well-pled facts as true and drawing all reasonable inferences in the plaintiff's favor."

*Connolly v. Shaw's Supermarkets, Inc.*, No. 17-11711-NMG, 2018 WL 6697676, at *2 (D. Mass.

Dec. 20, 2018) (citing *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001)).

## ARGUMENT

## I.     All Plaintiffs Have Article III Standing

Harvard contends that some—but not all—of the plaintiffs lack Article III standing.  To

plead standing, a plaintiff must allege (1) an injury in fact, (2) fairly traceable to the challenged

actions of the defendant, that (3) is likely to be redressed by a favorable ruling on the merits.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  "[E]conomic injuries have long been

recognized as sufficient to lay the basis for standing."  *Sierra Club v. Morton*, 405 U.S. 727, 733

(1972); *accord Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998).

### A.     It Is Undisputed That John Doe 1 and John Doe 2 Have Standing

To begin with, Harvard does not dispute that John Doe 1 and John Doe 2 have Article III

standing.  And they clearly do.  The Sanctions Policy directly targets them, causing them

concrete economic and other harms, and winning this lawsuit would redress those harms.  *See*

Compl. ¶¶ 46-52.  Thus, regardless of any other plaintiff's standing, Harvard must answer the

Complaint on the merits.  "So long as one plaintiff has standing to seek a particular form of

global relief, the court need not address the standing of other plaintiffs seeking the same relief."

*Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 11 (1st Cir. 2005), *abrogated on other grounds*,

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *see also, e.g.*,

*Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 183 (1st Cir. 1999).

**B.     Organizational Plaintiffs Have Organizational and Associational Standing**

Though this Court "need not address the standing of other plaintiffs," *Comfort*, 418 F.3d at 11, each of the organizational plaintiffs also has Article III standing to sue, both on its own behalf and on behalf of its members. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975).

To plead organizational standing, an organization need only allege injury, traceability, and redressability. *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 44 n.7 (1st Cir. 2012). "Injury to an organization itself may involve matters no different than injury to any person, real or abstract. . . . The interest in collecting dues, contributions, or government funding falls naturally into this area." 13A Charles Alan Wright et al., Federal Practice and Procedure § 3531.9.5 (3d ed. 2018). Interference with an organization's "ability to solicit membership and communicate its message" or "carry out its mission" also gives rise to injury-in-fact. *Am. Fed'n of Gov't Emps. Local 1 v. Stone*, 502 F.3d 1027, 1032-33 (9th Cir. 2007). Plaintiffs have plausibly alleged that Harvard's policy has caused them concrete harms by interfering with their ability to recruit and retain members, their ability to communicate their messages, their members' rights of association, and as a result, their ability to carry out their missions. *See* Compl. ¶¶ 26-45. Moreover, Plaintiffs have plausibly alleged that enjoining the Sanctions Policy would at least partially remedy those harms. *See, e.g.*, *id.* ¶¶ 29, 33.

The organizational plaintiffs also have associational standing. To plead associational standing, an organization must allege that (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Associational standing frequently exists when, as here, "the association seeks a

declaration, injunction, or some other form of prospective relief," because "the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Id.*

First, the organizational plaintiffs' members would have standing to sue in their own right. Harvard does not dispute that the fraternities' male members could sue. MTD at 7-8. So too could the sororities' female members. Harvard's policy caused them to lose access to the financial, educational, emotional, and professional benefits of membership in their sororities. *See* Compl. ¶¶ 26-34. Harvard asserts that the sororities lack standing because their "local chapters have closed" and thus "they no longer have members at Harvard." MTD at 7. By this logic, Harvard should have imposed even more draconian penalties that would eliminate *all* single-sex organizations, then no organization would have associational standing to sue. That is not the law. The sororities' former members do not need to be members today for the sororities to represent their interests. *See Hunt*, 432 U.S. at 342, 345 (association with "no members at all" could nonetheless represent "its constituents"); *NAACP v. Harris*, 567 F. Supp. 637, 639-40 (D. Mass. 1983) (NAACP had standing to represent all African Americans in Boston because its "membership is in fact different from its constituency").

Second, the interests this lawsuit seeks to protect are germane to the organizational plaintiffs' purposes. The germaneness requirement mandates "pertinence between litigation subject and organizational purpose." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015). This requirement serves to "prevent[] litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care." *Town of Norwood v. FERC*, 202 F.3d 392, 407 (1st Cir. 2000). Here, the organizational plaintiffs' missions are to provide personal, social, and professional opportunities to university students nationwide through

a network of *single-sex* collegiate and alumni chapters.  Compl. ¶¶ 26-45.  Pursuing litigation to protect a defining characteristic of their organizations—their single-sex character—is palpably germane to the organizations' purposes.  This is not a case where the organizational plaintiffs are attempting to represent their members in a lawsuit over something divorced from their missions, or about which their members may not care.  Fraternities and sororities, and their members, care deeply about the issues of sex discrimination and freedom of association at this lawsuit's core.

Finally, neither the claims asserted nor the relief requested requires the participation of individual members in this case.  Plaintiffs request only declaratory and injunctive relief, and "[a]ctions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation."  *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986).  "The most compelling need for individual participation" occurs "when there are conflicts of interest, or at least a divergence of views, between members of the organization or between the organization and its members."  Wright et al., *supra*, § 3531.9.5; *see also Warth*, 422 U.S. at 511 (question is whether member participation is "*indispensable* to proper resolution of the case" (emphasis added)).  This is not such a case.  These organizations are ideal representatives of their members.

### C.     John Doe 3 Has Standing

John Doe 3 also has standing.  While the Sanctions Policy does not formally apply directly to him, the policy has nonetheless caused him psychic and reputational harm.  Compl. ¶ 53.  The policy also has caused him concrete harms by requiring him to devote more time and effort to aiding his single-sex organization's recruiting, outreach, and membership retention efforts (economic harm), and by harming the organization of which he is a member.  *Id.* ¶ 54.  Both of those harms are injuries in fact.  *See Sierra Club*, 405 U.S. at 733 (economic harm); Wright et al., *supra*, § 3531.9.5 (explaining that "an injured member may have standing to

advance the organization's interests as well as the member's own interests" (citing *In re Workers' Comp. Refund*, 46 F.3d 813, 822 (8th Cir. 1995)).  Further, a favorable decision would redress John Doe 3's injuries.  Compl. ¶ 54.

## II.     The Complaint States Four Plausible Title IX Claims

Title IX provides in relevant part:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  "[A] complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex . . . is sufficient with respect to the element of discriminatory intent . . . if it pleads specific facts that support a *minimal plausible inference* of such discrimination."  *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016) (emphasis added).

As Harvard acknowledges, Title VII precedents apply to Title IX by analogy, as "disparate treatment based on sex" is the "touchstone of both Title VII and Title IX claims." MTD at 11; *see also id.* at 13 n.6 ("Courts in the First Circuit often look to Title VII cases when determining the scope of Title IX.").  Here, application of established Title VII and Title IX principles shows that Plaintiffs' Complaint states four viable Title IX claims.

### A.     The Complaint States a Plausible Claim of *Per Se* Sex Discrimination

The Complaint plausibly alleges that Harvard's policy is sex discrimination *per se*. Compl. ¶¶ 197-200.  To state a claim for *per se* sex discrimination, a plaintiff must allege that she would be treated differently but for her sex.  *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978).  The *en banc* Second and Seventh Circuits recently held that differential treatment of men and women *equally* on the basis of sexual orientation constitutes unlawful *per se* sex discrimination.  *See Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 116 (2d Cir. 2018) (en banc); *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 345-47 (7th Cir. 2017)

(en banc). Similarly here, the Complaint adequately alleges that the Sanctions Policy treats students differently "on the basis of" their sex. 20 U.S.C. § 1681(a). But for the fact that she is a woman, a woman could freely join an all-female organization. Compl. ¶¶ 3, 198; MTD at 3-4. But for the fact that he is a man, a man could freely join an all-male organization. *Id.* This differential treatment on the basis of sex states a viable claim for *per se* sex discrimination.

This Court should reject Harvard's argument that the policy cannot constitute sex discrimination because it "treats men and women equally," or "exactly the same." MTD at 2, 11. As *Zarda* and *Hively* recently held, a policy punishing same-sex relationships between *both* men *and* women does not actually treat men and women equally. "[P]olicies that distinguish according to protected characteristics cannot be saved by equal application." *Zarda*, 883 F.3d at 126; *see also Hively*, 853 F.3d at 349 ("[T]he essence of the claim is that the plaintiff would not be suffering the adverse action had his or her sex . . . been different."). Similarly, the Supreme Court in *Loving v. Virginia*, 388 U.S. 1 (1967), held that a policy banning *all* interracial marriages does not treat members of all races equally. *Loving* "recognized that equal application of a law that prohibited conduct only between members of different races did not save it. Changing the race of one partner made a difference in determining the legality of the conduct, and so the law rested on 'distinctions drawn according to race,' which were unjustifiable and racially discriminatory." *Hively*, 853 F.3d at 348 (quoting *Loving*, 388 U.S. at 11). So too, here. Changing the sex of the student who joins a single-sex organization changes the student's treatment under Harvard's policy. The policy therefore rests on unlawful distinctions drawn according to sex.

As support for its view that a policy applying to men and women in analogous ways cannot be *per se* sex discrimination, Harvard cites an out-of-circuit, pre-*Obergefell* district court

case, where a man argued that because unmarried *same-sex* registered domestic partners received benefits analogous to spousal benefits, unmarried *opposite-sex* couples should too. MTD at 11 (citing *Cleaves v. City of Chi.*, 68 F. Supp. 2d 963, 967 (N.D. Ill. 1999)). The court held that refusing *spousal* benefits to *unmarried* opposite-sex couples (who, unlike same-sex couples, could have gotten lawfully married if they chose to) drew a line on the basis of marital status, not sex. The case is totally irrelevant here and obsolete anyway now that same-sex marriage exists.

For similar reasons, Harvard is wrong to call it "novel" (and to say that it "makes no sense") that Harvard's policy is really two policies, one that discriminates against men and one that discriminates against women. MTD at 12. In practical effect it is two policies, one for women in women's clubs, and another for men in men's clubs. An employer's discriminatory policy is still "sex-discrimination irrespective of whether the employer uses a double-edged sword that cuts both men and women." *Zarda*, 883 F.3d at 123. A Harvard policy of expelling a man every time it expelled a woman would obviously be sex discrimination. Harvard could not "make up for it" by instituting a second policy of expelling a woman every time it expelled a man. The resulting policy could be written in sex-neutral terms and called the "Inclusive Discipline Policy." But in practice it would still be two sex-discriminatory policies, and both would be unlawful. Likewise here, Harvard decided to punish men for joining men's groups. To "make up for it," Harvard decided to punish women for joining women's groups. Both policies are discriminatory. The discrimination of one does not negate the discrimination of the other.

### B. The Complaint States a Plausible Claim of Associational Discrimination

The Complaint also plausibly alleges that Harvard's Sanctions Policy violates Title IX by discriminating against students on the basis of their association, through single-sex social organizations, with members of the same sex. Compl. ¶¶ 10, 17, 21, 201-04. To state a claim for associational sex discrimination, the plaintiff must allege that she was treated differently

11

because of the sex of those with whom she associates. *Person v. Bos. Univ.*, No. 15-14037-JGD, 2019 WL 917205, at *11 (D. Mass. Feb. 25, 2019); *see also Hively*, 853 F.3d at 347; *Zarda*, 883 F.3d at 124-28. That is the case here. In applying its Sanctions Policy, Harvard must take note of not only the sex of the punished student himself or herself, but also the sex of the members of the student's social organization. A female student who joins a women's club is ineligible for any on-campus leadership role or institutional endorsement *because of* the sex of the members of her club. The student would not be punished if, in conformance with Harvard's preference, members of the club she joined were a different sex. The decision to apply Harvard's policy will always be based on the student's sex *and* the sex of the members of his or her social organization. This is associational sex discrimination. *See Fenn v. Mansfield Bank*, No. 14-12554-NMG, 2015 WL 628560, at *4 (D. Mass. Feb. 12, 2015).

Harvard's challenges to this claim misconstrue precedent. First, Harvard argues that Plaintiffs have not sufficiently alleged associational discrimination because the Complaint does not allege that Harvard "restrict[ed] any individual's ability to associate with men *or* with women *or* with both." MTD at 12. But Plaintiffs need not allege that Harvard has attempted to control each and every relationship they enter into. Plaintiffs' claims are based on Harvard's treatment of students in unrecognized social organizations. As a result, they need only allege that Harvard has punished students in unrecognized social organizations on the basis of sex.

Likewise, Harvard's attempt to diminish the significance of this discrimination by stating that it only occurs "*in a particular setting*" has no legal support. *Id.* at 13. Nearly all claims of associational sex- or race-based discrimination involve a defendant's mistreatment of a plaintiff "in a particular setting." Sometimes, associational discrimination will be based on a trait that a person expresses consistently, such as sexual orientation. *See Zarda*, 883 F.3d at 124-28. But

associational discrimination may be based on other types of relationships, *including friendships*. *See, e.g.*, *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 204 (2d Cir. 2017) ("If a white employee fired or subjected to a hostile work environment after friendly association with black coworkers has a claim under Title VII . . . then a female employee fired or subjected to a hostile work environment after friendly association with male coworkers should have a claim under Title VII." (citations omitted)). The "particular setting" of single-sex social organizations does not somehow allow Harvard to discriminate with impunity.

This Court should similarly reject Harvard's argument that Plaintiffs are required to show that Harvard was motivated by "discriminatory animus." MTD at 12-13. For starters, as detailed in § II.C below about gender stereotyping, the Complaint *does* allege that the Sanctions Policy was motivated by Harvard's disapproval of men and women who join single-sex organizations. But factual allegations aside, a plaintiff need not allege discriminatory animus to plead a viable Title IX claim. Title IX does not require proof of any bad motive. In the analogous Title VII context, courts have rejected the argument that "racism and sexism are necessary elements of a Title VII claim because these beliefs are invidious or malicious. . . . Malice, which the Supreme Court has described as an 'evil motive,' is not required by Title VII." *Zarda*, 883 F.3d at 127 n.29 (citations omitted). And in *Pennington v. Southern Motion, Inc.*, No. 16-CV-110-DMB-DAS, 2017 WL 3897166, at *5 (N.D. Miss. Sept. 6, 2017) (cited in MTD at 13), the court dismissed a Title IX claim based on the plaintiff's failure to allege that his employer's decision to fire him was "based on" sex, not for failure to allege discriminatory animus.

Lastly, although Harvard disregards the applicability of many cases where courts have found race-based associational discrimination unlawful (MTD at 13 n.7), there is ample legal support for the proposition that race-based associational discrimination is analogous to sex-based

discrimination and does not operate under distinct legal principles. "[T]he prohibition on associational discrimination applies with equal force to all the classes protected by Title VII, including sex." *Zarda*, 883 F.3d at 124-25; *see also Hively*, 853 F.3d at 349 (same).

### C.    The Complaint States a Plausible Claim of Sex Stereotyping

The Complaint plausibly alleges an independent Title IX claim based on impermissible sex stereotyping. Compl. ¶¶ 21, 205-09. "Discrimination based on a perceived failure to conform to . . . gendered stereotypes constitutes actionable discrimination under Title IX." *Harrington by Harrington v. City of Attleboro*, No. 15-CV-12769-DJC, 2018 WL 475000, at *5 (D. Mass. Jan. 17, 2018). Here, the Complaint details Harvard administrators' repeated statements that men who belong to men's organizations are, among other things, more likely to sexually assault women and promote bigotry. *See* Compl. ¶¶ 105-07, 111, 121-33, 201-04. They have also stated that women's organizations "have no value" (*id.* ¶ 156) and promote inequality themselves (*id.* ¶¶ 165-67). Some administrators indicated that Harvard had excluded members of women's organizations from discussions about the formulation of the Sanctions Policy because the women were "intimidated by the men." *Id.* ¶ 109. At a minimum, those statements give rise to a plausible inference that Harvard's policy is the product of sex stereotypes. Discovery is warranted to test the meaning of Harvard's actions and words.

This Court should reject Harvard's argument that its policy is not rooted in sex stereotypes merely because it punishes conduct—the "*decision* to join single-gender organizations," MTD at 14-15—rather than a student's identity. The linkage between sex and conduct is central to the very concept of stereotype-based sex discrimination. In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court held that an employer engages in unlawful sex-stereotyping by discriminating against women who "*behave* aggressively." *Id.* at 250-51 (emphasis added). The female plaintiff in *Price Waterhouse* might have chosen to

conduct herself differently, or worn a "soft-hued suit or a new shade of lipstick," *id.* at 256, just as a female Harvard student might decide not to join a sorority. But under Title VII and Title IX, women must not be required to choose "correct" behaviors or be punished for it. *See id.* Harvard cannot force its students to conform to its definition of a "modern" man or woman.[1]

Harvard argues that even if the Sanctions Policy "is rooted to some degree in sex-stereotyping," it still does not violate Title IX absent "disparate treatment" of men and women. MTD at 15. In Harvard's view, then, it is perfectly lawful to adopt a policy based on offensive stereotypes about women, as long as the policy also draws on offensive stereotypes about men. As explained above, Harvard's policy applies differently to men and women. *See Zarda*, 883 F.3d at 123. But regardless, the fact that a policy impacts both men and women does not end the analysis under Title IX. The Court must ask whether the Sanctions Policy treats a woman in a particular situation just as it would treat a man in the same situation. Harvard's policy does not.

### D. The Complaint States a Plausible Claim of Anti-Male Bias

The Complaint also plausibly alleges that Harvard's policy violates Title IX because it is rooted in anti-male bias. "[A] complaint . . . is sufficient with respect to the element of discriminatory intent . . . if it pleads specific facts that support a minimal plausible inference of such discrimination." *Doe v. Columbia*, 831 F.3d at 56. Numerous statements and actions by

---

[1] Harvard's reliance on *Nungesser v. Columbia University* is misplaced. 244 F. Supp. 3d 345, 362 (S.D.N.Y. 2017), *appeal withdrawn*, No. 17-900, 2017 WL 4404575 (2d Cir. July 10, 2017). *Nungesser* does not stand for the proposition that discrimination based on a person's conduct may never give rise to a viable Title IX claim. The plaintiff there alleged that Columbia University failed to respond to his claims that he was harassed by a female student who had previously accused him of sexual assault. The district court, taking all of plaintiff's allegations as true, narrowly held that the female student's harassment appeared to be based on personal animus stemming from plaintiff's prior conduct, not sex. *Id.* at 363; *see also Morgan v. Town of Lexington*, 823 F.3d 737, 740 (1st Cir. 2016) (dismissing Title IX claim because complaint described only "undifferentiated bullying" unrelated to gender).

Harvard committees and administrators, as alleged in the Complaint, support such a "minimal plausible inference" here. *See, e.g.*, Compl. ¶¶ 210-18.

Harvard argues that the Sanctions Policy cannot reflect anti-male bias for three reasons: (1) Harvard only wanted to harm "all-male finals clubs"; (2) the policy hurts women more than men; and (3) the policy applies to men and women equally. MTD at 16. Those points would not be grounds for dismissal even if they were true. Harvard plausibly could have wanted to harm only "all-male final clubs" based on anti-male bias. It is also plausible that Harvard's anti-male bias could be revealed by the fact that the policy sweeps far more broadly than final clubs, covering every all-male organization. And it is not a contradiction for Harvard's policy to hurt women more than men in practice and still originate from anti-male bias. Particularly at the pleading stage of this case, none of Harvard's fact-bound defenses dispels the inference that Harvard adopted its policy based on anti-male bias.

Finally, Harvard once again errs in its repeated refrain that a policy cannot violate Title IX so long as it applies to both men and women. A policy rooted in anti-male bias violates Title IX even if it harms a woman for every man. Male and female victims of a policy rooted in anti-male bias all may sue over such a policy. *See Jackson*, 544 U.S. at 179, 179 n.3 (Title IX recognizes indirect victims of sex discrimination).

## III. The Complaint States a Plausible Claim Under the Massachusetts Civil Rights Act

In addition to the Title IX claims above, the Complaint also states a claim that Harvard has violated the MCRA. The MCRA provides a cause of action "[w]henever any person or persons, whether or not acting under color of law, interfere . . . or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States." Mass. Gen. Laws ch. 12, §§ 11H, 11I. The MCRA is "entitled to liberal construction of its terms." *Batchelder v. Allied Stores Corp.*,

473 N.E.2d 1128, 1130 (Mass. 1985). "[C]ases within the reason, although not within the letter" of the MCRA, "are embraced by its provisions." *Redgrave v. Bos. Symphony Orchestra, Inc.*, 502 N.E.2d 1375, 1378 (Mass. 1987).

To plead a MCRA claim, a plaintiff must allege that "(1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." *Currier v. Nat'l Bd. of Med. Exam'rs*, 965 N.E.2d 829, 837-38 (Mass. 2012). The second prong is easily met here, and Harvard does not dispute it. Plaintiffs also adequately allege the MCRA's other two prongs.

### A.     The Complaint Plausibly Alleges Threats, Intimidation, or Coercion

"Massachusetts sets a low bar for what constitutes coercion under the MCRA." *Greene v. Cabral*, 323 F. Supp. 3d 96, 111 n.10 (D. Mass. 2018). Under the MCRA, "'coercion' is 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.'" *Glovsky v. Roche Bros. Supermarkets, Inc.*, 17 N.E.3d 1026, 1035 (Mass. 2014) (quoting *Haufler v. Zotos*, 845 N.E.2d 322, 335 (Mass. 2006)). Applying an "objective standard," courts ask whether a reasonable person in the plaintiff's position would be "coerced by the defendants' conduct." *Planned Parenthood League of Mass., Inc. v. Blake*, 631 N.E.2d 985, 990 (Mass. 1994). Coercion "may rely on physical, moral, or economic coercion." *Kennie v. Nat. Res. Dep't*, 889 N.E.2d 936, 944 (Mass. 2008). Thus, "economic coercion, standing alone, may be actionable." *Buster v. George W. Moore, Inc.*, 783 N.E.2d 399, 411 (Mass. 2003). "[E]conomic pressure may be deployed in any number of commercial settings in the absence of actual or threatened physical force to coerce individuals to forgo the exercise of their secured rights." *Id.*

Harvard's policy itself, standing alone, plausibly meets the MCRA's "low bar" for economic coercion. Students now face a choice between exercising their constitutional rights, on

the one hand, and serving in leadership positions in recognized clubs or receiving institutional support for prestigious fellowships, on the other. The Rhodes Scholarship, which alone covers tuition and fees at Oxford plus a stipend, is a "life-changing opportunity" and represents a "life-long connection which goes far beyond financial value." *FAQs*, Rhodes Scholarship, https://www.rhodeshouse.ox.ac.uk/media/1168/faqs-flyer-01.pdf. And the Rhodes is just one of the prestigious scholarships Harvard withholds from students in single-sex clubs. Compl. ¶ 2. Leadership positions in recognized groups also have significant economic value. Losing access to these opportunities would significantly impact and potentially hinder students' careers, and forcing students to choose between these opportunities and participating in single-sex organizations constitutes clear-cut economic coercion. *See, e.g.*, *Cabi v. Bos. Children's Hosp.*, 161 F. Supp. 3d 136, 149-50 (D. Mass. 2016) (denying motion to dismiss MCRA claim); *Rinsky v. Trs. of Bos. Univ.*, No. 10cv10779-NG, 2010 WL 5437289, at *8 (D. Mass. Dec. 27, 2010).

Beyond the face of the policy, the Complaint includes further factual allegations showing that Harvard has coerced students to sacrifice their constitutional rights. Harvard "has suggested that students who join single-sex organizations could be expelled." Compl. ¶¶ 11, 112. Harvard suggested that claims of sexual assault against members of men's final clubs could be leaked if the clubs refused to go co-ed. *Id.* ¶ 107. Members of the Fox Club wrote in a confidential letter to their graduate members that Harvard has applied "tremendous pressure" and that their "individual reputations and careers, as well as the reputation, autonomy and existence of the Fox Club going forward, are at serious risk." *Id.* ¶ 119.

Harvard claims, without support, that Plaintiffs must describe coercion that is "individualized" and "threaten[s] sufficiently serious harm." MTD at 17-19. Those are requirements Harvard made up. It is "for a trier of fact to determine whether" a defendant's

words and actions "represented actionable coercion." *Kennie*, 889 N.E.2d at 944 (denying

summary judgment); *see also Pheasant Ridge Assocs. Ltd. P'ship v. Town of Burlington*, 506

N.E.2d 1152, 1159 (Mass. 1987) (same). But Plaintiffs' claim survives even under Harvard's

standard. In the principal case Harvard cites, *Bally v. Northeastern University*, 532 N.E.2d 49

(Mass. 1989), "the University indiscriminately required all intercollegiate athletes to undergo

drug testing and did not direct its mandate to a particular individual or class of persons."

*Reprod. Rights Network v. President of Univ. of Mass.*, 699 N.E.2d 829, 838 (Mass. App. Ct.

1998). By contrast, Harvard's policy is not indiscriminate—it targets members and potential

members of fraternities, sororities, final clubs, and other single-sex social groups specifically.

*See id.* (upholding MCRA challenge to university building closure and distinguishing *Bally*

because even though the closure impacted everyone on campus, it targeted a specific group of

people—"demonstration planners who intended to exercise controversial speech on campus"). It

would pervert the MCRA's purpose to permit Harvard to sow an atmosphere of intimidation and

fear but escape liability by claiming that it never directly threatened a specific person.[2]

     Harvard's "sufficiently serious harm" requirement is also met. Under the true standard, a

plaintiff can bring a MCRA claim even if the threatened consequence is uncertain. *See Kennie*,

889 N.E.2d at 944 (finding triable facts as to coercion where defendant said he would "take care

of" plaintiffs' issue); *Pheasant Ridge*, 506 N.E.2d at 1159 (triable facts as to coercion where

defendants said they "would take any action necessary" to stop plaintiffs).

     Unlike in *Bally*, moreover, Harvard's policy does more than merely exclude students

from intercollegiate sports—it denies them access to some of Harvard's most valuable

---

[2] Harvard also argues that "[c]ourts have routinely rejected MCRA claims where the plaintiffs voluntarily accepted the very policy or action they later claimed was threatening, intimidating, or coercive." MTD at 18. To the contrary, Plaintiffs have never "voluntarily accept[ed]" Harvard's policy. They have always believed it is unlawful and are now suing to enjoin it.

opportunities.  And, unlike in *Bally*, Harvard has threatened to go further than its written policy, including possibly expelling students for joining single-sex social organizations.  The gravity and kind of harm that Harvard has threatened to inflict on its students readily distinguishes this case from *Bally*.  The harm here is also more particularized than in *Bally*—unlike in *Bally* there is no nexus between Harvard's policy and any pedagogical interest.  *Bally* was also decided thirty years ago, long before *Buster*, *Kennie*, and other cases recognized economic coercion claims. *See, e.g.*, *Kennie*, 889 N.E.2d at 944.

**B.**    **The Complaint Plausibly Alleges an Equal Protection Violation**

Plaintiffs have also plausibly established that Harvard's policy discriminates on the basis of sex in violation of the Equal Protection Clause.  Applying the applicable intermediate scrutiny standard, Plaintiffs have plausibly alleged that Harvard has no exceedingly persuasive justification for the policy, and that the policy is not narrowly tailored to achieve an important interest.  *See United States v. Virginia*, 518 U.S. 515, 531 (1996); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 726-30 (1982).  Indeed, Harvard has repeatedly changed its justification for the policy, and has offered shifting views on the interests supposedly at stake.  Compl. ¶ 7. Accepting Plaintiffs' allegations as true, Harvard cannot prevail on its motion to dismiss merely by reciting that it had an exceedingly persuasive justification for its policy.  Harvard must affirmatively "demonstrate" such a justification.  *Virginia*, 518 U.S. at 531.  Certainly at this stage, the Complaint does not remotely establish that Harvard had any non-discriminatory justification for its policy, let alone an "exceedingly persuasive" one.  Discovery will tell.

Reading the Complaint in the light most favorable to Plaintiffs, the Complaint plausibly alleges that Harvard's policy violates equal protection and in turn violates the MCRA.

## CONCLUSION

For the foregoing reasons, Harvard's motion to dismiss should be denied in its entirety.

Dated:  March 22, 2019                    Respectfully submitted,


                                          **ARNOLD & PORTER**
                                          **  KAYE SCHOLER LLP**


By:     */s/ R. Stanton Jones*_____
        R. Stanton Jones*
        John A. Freedman (BBO # 629778)
        Andrew T. Tutt*
        601 Massachusetts Ave. NW
        Washington, DC 20001
        (202) 942-5000
        stanton.jones@arnoldporter.com
        john.freedman@arnoldporter.com
        andrew.tutt@arnoldporter.com

        Sara L. Shudofsky*
        Ada Añon*
        250 West 55th Street
        New York, NY 10019
        (212) 836-8000
        sara.shudofsky@arnoldporter.com
        ada.anon@arnoldporter.com

        Alexa D. Jones*
        370 Seventeenth Street, Suite 4400
        Denver, CO 80202
        (303) 863-1000
        alexa.jones@arnoldporter.com

        *Counsel for Plaintiffs*

        *\* Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the date of electronic filing.

*/s/ R. Stanton Jones*
R. Stanton Jones
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000
stanton.jones@arnoldporter.com