# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAPPA ALPHA THETA FRATERNITY, INC.; KAPPA KAPPA GAMMA FRATERNITY; SIGMA CHI; SIGMA ALPHA EPSILON; SIGMA ALPHA EPSILON--MASSACHUSETTS GAMMA; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3,<br><br>    Plaintiffs,<br><br>    v.<br><br>HARVARD UNIVERSITY; PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION),<br><br>    Defendants. | Civil Action No. 18-cv-12485-NMG<br><br>**Oral Argument Requested** |

**DEFENDANT PRESIDENT AND FELLOWS OF HARVARD COLLEGE'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS <u>MOTION TO DISMISS THE COMPLAINT</u>**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 1
    I.     THE ORGANIZATIONAL PLAINTIFFS AND JOHN DOE 3 LACK STANDING. ............................................................................................................ 1
         A.     The Court Cannot Assume That Any Plaintiff Has Standing. ................... 1
         B.     The Organizational Plaintiffs Lack Standing. ............................................ 2
         C.     John Doe 3 Lacks Standing. ....................................................................... 3
    II.    THE TITLE IX CLAIMS SHOULD BE DISMISSED. ....................................... 4
         A.     The Complaint Does Not State A Claim For Per Se Sex Discrimination. ............................................................................................ 4
         B.     The Complaint Does Not State A Claim For Associational Discrimination. ............................................................................................ 6
         C.     The Complaint Does Not State A Claim For Sex Stereotyping Or Anti-Male Bias. ........................................................................................... 7
    III.   THE MCRA CLAIM SHOULD BE DISMISSED. ............................................... 8

CONCLUSION ........................................................................................................................ 10

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Bally v. Northeastern Univ.*,
   403 Mass. 713 (1989) ...................................................................................................8, 9

*Buster v. George W. Moore, Inc.*,
   438 Mass. 635 (2003) ......................................................................................................9

*Cleaves v. City of Chicago*,
   68 F. Supp. 2d 963 (N.D. Ill. 1999) .................................................................................5

*Fenn v. Mansfield Bank*,
   2015 WL 628560 (D. Mass. Feb. 12, 2015) ....................................................................7

*Franchina v. City of Providence*,
   881 F.3d 32 (1st Cir. 2018)...............................................................................................4

*Glovsky v. Roche Bros. Supermarkets, Inc.*,
   469 Mass. 752 (2014) ......................................................................................................9

*Higgins v. New Balance Athletic Shoe, Inc.*,
   194 F.3d 252 (1st Cir. 1999) ............................................................................................4

*Hively v. Ivy Tech Cmty. Coll.*,
   853 F.3d 339 (7th Cir. 2017) .......................................................................................4, 5

*Holcomb v. Iona Coll.*,
   521 F.3d 130 (2d Cir. 2008).............................................................................................6

*Houlton Citizens' Coal. v. Town of Houlton*,
   175 F.3d 178 (1st Cir. 1999) ............................................................................................2

*Hunt v. Washington State Apple Adver. Comm'n*,
   432 U.S. 333 (1977).........................................................................................................2

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005).........................................................................................................8

*Kennie v. Natural Res. Dep't of Dennis*,
   451 Mass. 754 (2008) ................................................................................................9, 10

*Loving v. Virginia*,
   388 U.S. 1 (1967).............................................................................................................5

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) ........................................................................................................ 2, 4

*McGinest v. GTE Serv. Corp.*,
 360 F.3d 1103 (9th Cir. 2004) .............................................................................................. 7

*NAACP v. Harris*,
 567 F. Supp. 637 (D. Mass. 1983) ....................................................................................... 3

*Pagan v. Calderon*,
 448 F.3d 16 (1st Cir. 2006) .................................................................................................. 4

*Pheasant Ridge Assocs. Ltd. P'ship v. Town of Burlington*,
 399 Mass. 771 (1987) ......................................................................................................... 10

*Price Waterhouse v. Hopkins*,
 490 U.S. 228 (1989) ......................................................................................................... 7, 8

*Reprod. Rights Network v. President of Univ. of Mass.*,
 45 Mass. App. Ct. 495 (1998) .............................................................................................. 9

*S.S. v. City of Springfield*,
 332 F. Supp. 3d 367 (D. Mass. 2018) .................................................................................. 2

*Sheffield v. Pieroway*,
 361 F. Supp. 3d 160 (D. Mass. 2019) .................................................................................. 9

*Sierra Club v. Morton*,
 405 U.S. 727 (1972) ............................................................................................................. 4

*Simon v. E. Ky. Welfare Rights Org.*,
 426 U.S. 26 (1976) ............................................................................................................... 3

*Zarda v. Altitude Express, Inc.*,
 883 F.3d 100 (2d Cir. 2018) ....................................................................................... 4, 5, 6, 7

## INTRODUCTION

Plaintiffs have not pleaded any claim under any recognized body of law that gives them a right to overturn Harvard's policy. The organizational Plaintiffs (*i.e.*, the fraternities and sororities) and the student who is exempt have no right even to sue over a policy that simply does not apply to them. And on the merits, a policy that applies to *all* students is not sex discrimination under Title IX, especially since it is not based on any desire to treat one sex less favorably than the other. Indeed, no court has ever read Title IX to grant students the inalienable right to join a single-sex fraternity or sorority, and this Court should not be the first.

The Massachusetts Civil Rights Act ("MCRA") likewise does not apply. Plaintiffs voluntarily subjected themselves to Harvard's policy: they cannot now convert that policy into "threats, intimidation, or coercion" under state law. Plaintiffs want a Harvard education and a Harvard degree without having to live by Harvard's rules, which allocate Harvard's resources and institutional endorsements in accordance with the university's core values of inclusion and nondiscrimination. Neither federal nor state law entitles Plaintiffs to join a discriminatory group free of any consequences, or to compel Harvard to give them its institutional endorsement. No civil-rights law requires this Court to upend a sound policy, applicable to all students equally, that does not even prohibit anyone from joining any single-sex organization. The Court should dismiss Plaintiffs' claims in their entirety.

## ARGUMENT

### I.   THE ORGANIZATIONAL PLAINTIFFS AND JOHN DOE 3 LACK STANDING.

#### A.   The Court Cannot Assume That Any Plaintiff Has Standing.

Plaintiffs argue that the Court need not address Harvard's challenge as to the standing of six Plaintiffs because the *other* two have adequately pleaded standing. Opp. 5. Courts in this District, however, have rejected this argument, holding to the contrary that, under Article III,

1

each party must show in district court that *it* has standing, not just "that one named plaintiff has standing." *S.S. v. City of Springfield*, 332 F. Supp. 3d 367, 373 n.6 (D. Mass. 2018).[1]

If this case were to proceed, each plaintiff would have to substantiate its standing allegations and maintain standing throughout the lawsuit. *E.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). If a plaintiff has not even *pleaded* standing, the plaintiff is not properly part of the case. This is not only the law, but also an important means of preserving judicial resources. The potential to narrow the case (if it is not dismissed entirely) is particularly apparent here because none of the organizational plaintiffs has pleaded standing.[2]

### B. The Organizational Plaintiffs Lack Standing.

The organizations cannot sue on behalf of others because they have not satisfied the requirements for associational standing, and they do not even claim to have third-party standing.

First, the sorority Plaintiffs cannot allege injury to their members, as they have no members. Their response is that membership is not required, but they cite no case allowing organizations to invoke the rights of *former* members. The two unusual cases that they do cite are inapposite. In *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), the Court held that a state body could sue on behalf of the apple growers it *currently* represented because "they possess[ed] all of the indicia of membership in an organization," such as the ability to vote, hold office, and pay dues. *Id.* at 344-45. The plaintiff sororities do not allege that former members retain any, never mind *all*, of the "indicia of membership." And in

---

[1] The rules are different when a case is on appeal after final judgment; the cases Plaintiffs cite establish only that an "*appellate court* need not verify the independent standing" of every plaintiff if one plaintiff has standing. *S.S.*, 332 F. Supp. 3d at 373 n.6 (quoting *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 183 (1st Cir. 1999) (emphasis added)). But this case is not an appeal, and those cases do not apply. As discussed, there are practical reasons a trial court, as opposed to the appeals court, must determine the standing of each plaintiff.

[2] The Court also has ruled that "if this case proceeds beyond the motion to dismiss stage, the student plaintiffs will not be permitted to proceed anonymously," Dkt. No. 25, at 1; that is a further reason to dismiss an individual plaintiff who has not adequately pleaded standing.

2

*NAACP v. Harris*, 567 F. Supp. 637 (D. Mass. 1983), the court held that the Boston NAACP could sue on behalf of "all the black people in metropolitan Boston," because the group was its "constituency" and the NAACP had the "historic role" of representing them. *Id.* at 640. These sororities have no such role. Nonmember students can assert their own rights if they choose.

Second, on germaneness, the organizational Plaintiffs insist that this lawsuit aims to "protect a defining characteristic of their organizations—their single-sex character." Opp. 8. But Harvard's policy does not require that they change this character; it does not regulate these organizations in any respect. Rather, Harvard is simply determining how it will allocate some of its own endorsements and other resources among its students.

Third, Plaintiffs do not challenge Harvard's showing (Mem. 8-9) that this case requires fact-intensive and individualized inquiries into at least the "threats, intimidation or coercion" element. The necessary participation of members alone defeats associational standing.

Unable to sue on behalf of members, the entity Plaintiffs contend that they have "organizational standing" to sue on their own behalf. Opp. 6. But the Complaint nowhere alleges that the *organizations*' protected rights have been interfered with; it alleges only interference with unnamed *members*' rights (members the sorority plaintiffs do not have). *See* Mem. 6. And the Complaint itself shows that the asserted harm is traceable not to Harvard's policy, but to students' choices. *See id.* at 6 n.3; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-43 (1976) (no standing where injury resulted from a third party's "independent action").

### C. John Doe 3 Lacks Standing.

John Doe 3, an upperclassman not subject to the policy, has pleaded no injury to himself. He claims "psychic and reputational harm," apparently based on the Complaint's allegation that he suffered "stigma[]" as a result of the application of the policy *to others*. Opp. 8; Compl. ¶ 53. That unprecedented assertion of standing based on "stigma by proxy" does not plead a plausible

3

injury. *See* Mem. 10 n.5. Plaintiffs also claim that the policy harms John Doe 3's organization and makes him work harder to help it. Opp. 8-9. But John Doe 3 must show injury particular to *him*, not an injury to his organization (or one "derivative of" harm to his organization). *Pagan v. Calderon*, 448 F.3d 16, 30 (1st Cir. 2006); *see Lujan*, 504 U.S. at 560 n.1.[3]

## II. THE TITLE IX CLAIMS SHOULD BE DISMISSED.

### A. The Complaint Does Not State A Claim For Per Se Sex Discrimination.

In its opening brief, Harvard explained that its sex-neutral policy does not discriminate based on sex: all students—regardless of gender—face the same consequence if they join an unrecognized single-gender social organization. Plaintiffs attempt to analogize to two out-of-circuit cases about whether sexual-orientation discrimination in employment is actionable as sex discrimination under Title VII. Even if the First Circuit would endorse that broad theory of sex discrimination *and* apply it to Title IX, which it has not done,[4] the analogy still fails. Plaintiffs ignore the elephant in the room: their own exclusionary policies.

The sexual-orientation-discrimination cases focused on whether the gay or lesbian plaintiff's sex was a but-for cause of an alleged adverse employment action. As the Seventh Circuit put it, "if [the plaintiff] had been a man married to a woman . . . and everything else had stayed the same, [the defendant] would not have fired her. . . . This describes paradigmatic sex discrimination." *Hively v. Ivy Tech Cmty. Coll.*, 853 F.3d 339, 358 (7th Cir. 2017) (en banc); *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 119 (2d Cir. 2018) (en banc).

---

[3] Plaintiffs do not deal with *Pagan*'s rejection of "derivative injury" at all. They rely on *Sierra Club v. Morton*, 405 U.S. 727 (1972), which holds only that economic harm *to the plaintiff* is injury. *Id.* at 733-34.

[4] Contrary to the Second and Seventh Circuits, the First Circuit has held that "Title VII does not proscribe harassment simply because of sexual orientation." *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999); *see also Franchina v. City of Providence*, 881 F.3d 32, 54-55 (1st Cir. 2018) (holding that a plaintiff may rely on sexual-orientation evidence to prove a hostile work environment claim so long as the plaintiff also presents evidence of sex discrimination). Plaintiffs thus rest their per se discrimination theory on a line of cases inconsistent with First Circuit precedent, and on which there is a deep circuit conflict. *See, e.g.*, Pet. for a Writ of Certiorari at 11-13, *Altitude Express Inc. v. Zarda*, No. 17-1623 (U.S. filed May 29, 2018).

Try as they might, Plaintiffs cannot make that analysis fit this case: Plaintiffs assert that "[b]ut for the fact that she is a woman, a woman could freely join an all-female organization." Opp. 10. This argument makes no sense. Plaintiffs' own exclusionary policies mean that, if she were not a woman, the all-female organizations would not admit her; if the organizations did admit men, they would no longer be exclusionary. All students, male or female, can still join an organization with such an exclusionary policy, but all face the same consequences under Harvard's sex-neutral policy if they do. Plaintiffs thus have not alleged that the policy treats anyone differently *because* he is a man or she is a woman. The but-for cause of the treatment Plaintiffs complain about is the exclusionary nature of the organizations themselves.

Neither *Hively* nor *Zarda* endorses Plaintiffs' novel theory that equal treatment can be *per se* discrimination. In *Hively*, the inquiry was whether a particular employment action "disadvantage[ed]" the plaintiff "*because she is a woman*." 853 F.3d at 345-46 (emphasis in original). In answering that question, the court relied on "the gender non-conformity line of cases" to hold that "Hively represents the ultimate case of failure to conform to the female stereotype." *Id.* at 346.[5] Here, by contrast, the Complaint fails to allege any link between gender stereotypes or bias and the choice Harvard's policy presents to all undergraduates, regardless of sex or stereotyping. *See* Mem. 14-16; *infra*, pp. 7-8.[6]

---

[5] *See also Zarda*, 883 F.3d at 118-19 (recognizing that employers may impose sex-specific policies only if they impose the same burden irrespective of gender). The snippet Plaintiffs quote from *Zarda* is actually from its discussion of *associational* discrimination, *id.* at 124-28, which is discussed below.

[6] For the same reason, the Supreme Court's decision in *Loving v. Virginia*, 388 U.S. 1 (1967), is inapposite. The Court in that case rejected the State's "equal application" theory because the racial classification rested on "invidious racial discrimination," and because the State's policy "prohibit[ed] only interracial marriages involving white persons." *Id.* at 8, 11. "Changing the race of one partner made a difference in determining the legality of the conduct," so it was race discrimination. *Hively*, 853 F.3d at 348 (explaining *Loving*). Harvard's policy is much more akin to the policy at issue in *Cleaves v. City of Chicago*, 68 F. Supp. 2d 963 (N.D. Ill. 1999). *See* Mem. 11. Plaintiffs argue that *Cleaves* pre-dated the legalization of same-sex marriage, but this context is irrelevant to the Court's holding that a policy providing certain benefits only to unmarried, cohabiting same-sex couples—and not to unmarried, cohabiting opposite-sex couples—does not discriminate on the basis of sex, even though it takes sex into account, because it "treats men and women exactly the same." 68 F. Supp. 2d at 967.

5

### B.     The Complaint Does Not State A Claim For Associational Discrimination.

Plaintiffs' associational discrimination theory is similarly inconsistent with precedent. Courts have confined associational discrimination claims to situations where the defendant "disapproves of" certain associations on the basis of a protected characteristic. *See, e.g.*, *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) ("[W]here an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race").[7] Plaintiffs, however, have failed to allege that Harvard implemented the challenged policy because it disapproves of men associating with other men, or women associating with other women. *See* Mem. 12-16; *infra*, pp. 7-8.

Plaintiffs try to equate disapproval of fraternities and sororities with disapproval of associations between people of the same sex. First, the allegations in the Complaint do not back up their claim. As explained at pp. 7-8, *infra*, Plaintiffs at most have alleged that Harvard disapproves of certain *conduct* associated with unrecognized single-gender social organizations. Second, even disapproval of "fraternities and sororities" (rather than conduct) would not support an inference that Harvard objects to men associating with men or women associating with women. Moreover, Plaintiffs have not cited any case where a court has equated disapproval of membership in an organization with disapproval based on race or sex. All of the cases Plaintiffs cite involve general disapproval of a broad category of relationships. *See, e.g.*, *Zarda*, 883 F.3d

---

[7] As Harvard explained (Mem. 12-13), *Zarda* applies exactly this rule to associational discrimination, citing *Holcomb*. 883 F.3d at 124, 128 ("[T]he source of the Title VII claim is not the employee's associational act but rather the employer's discrimination, which is motivated by disapproval of a particular type of association." (internal brackets and quotation marks omitted)). After relying heavily on *Zarda* to support their *per se* discrimination claim, Plaintiffs all but ignore *Zarda*'s separate discussion of associational discrimination—except to portray a snippet from that discussion as if it addressed *per se* discrimination, *see* Opp. 10. Plaintiffs' only attempt to grapple with this aspect of *Zarda*'s reasoning (Opp. 13) is to cite a footnote clarifying that "malice" is not a necessary element of a Title VII associational discrimination claim. 883 F.3d at 127 n.29. While true, that does nothing to obscure *Zarda*'s relevant holding: to show associational discrimination, Plaintiffs need to allege that Harvard implemented the policy because it disapproves of certain associations between men and men, or between women and women, *because of* the sex of the people involved. As discussed below, Plaintiffs have alleged neither such disapproval nor any facts supporting it.

6

at 124 (same-sex romantic relationships); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1118 (9th Cir. 2004) (interracial friendships).[8] Adopting Plaintiffs' associational discrimination theory would constitute an unprecedented expansion of Title IX's scope.

### C. The Complaint Does Not State A Claim For Sex Stereotyping Or Anti-Male Bias.

Plaintiffs' own paraphrasing of the allegations in the Complaint confirms that the Complaint does not plausibly allege that Harvard's policy discriminates based on sex stereotypes or anti-male bias. The Complaint, Plaintiffs say, "details Harvard administrators' repeated statements that men who belong to men's organizations are . . . more likely to sexually assault women and promote bigotry." Opp. 14. This is an allegation that Harvard acted based on conduct, not on perceived "male" or "female" characteristics.[9]

Citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), Plaintiffs argue that there is no distinction between sex and conduct. But *Price Waterhouse* held that discrimination against women who "behave aggressively" is based on a stereotype that women should not behave aggressively, even though men may. *Id.* at 250-51 (plurality opinion). The Complaint does not allege that Harvard believed women should not join single-sex organizations because it is not feminine to do so or men because it is not masculine to do so; it alleges that Harvard expressed the view that neither women nor men should join those organizations because "men and women

---

[8] There is a separate species of associational discrimination claim in which the plaintiff alleges that, although he is not a member of a certain protected class, he has suffered injury on account of discrimination against someone with whom he associates, who is a member of that protected class. *See, e.g.*, *Fenn v. Mansfield Bank*, Civ. A No. 14-12554-NMG, 2015 WL 628560, at *4 (D. Mass. Feb. 12, 2015) (involving associational discrimination claim based on male employee's association with disabled wife). Plaintiffs cannot make out such a claim here, because all members of unrecognized single-gender social organizations share the same relevant characteristic.

[9] Plaintiffs speculate wildly that *if* Harvard is motivated not by conduct, but by bias against fraternity and final club members (which would not be an actionable sex-discrimination theory standing alone), perhaps Harvard is biased against *all* men. *See* Opp. 16. That speculation does not support a plausible claim of anti-male bias. For one thing, the policy applies equally to sorority *and* fraternity members; does that mean Plaintiffs think Harvard is biased against all women *and* all men? Indeed, Plaintiffs never reconcile their allegation (Compl. ¶ 1) that the policy has hurt "all-female social clubs … the most" with their claim that the policy is driven by anti-*male* bias.

7

who join single-sex organizations do not act like modern men and women." Compl. ¶ 209. A perceived "lack of modernity" that applies to men *and* women alike is not *sex* stereotyping.

Last, Plaintiffs are wrong that a claim of sex-stereotyping or anti-male bias need not allege disparate treatment. Opp. 15-16. The law is clear that disparate treatment is required, *see* Mem. 15-16; *Price Waterhouse*, 490 U.S. at 251, and neither *Zarda* nor *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), holds otherwise. *See* pp. 4-5, *supra*; 544 U.S. at 174 (retaliation for complaining about discrimination is itself "a form of 'discrimination' *because the complainant is being subjected to differential treatment*" (emphasis added)).[10]

### III.   THE MCRA CLAIM SHOULD BE DISMISSED.

Plaintiffs have come nowhere close to satisfying the MCRA's "threats, intimidation, or coercion" element. The challenged policy applies only prospectively—to students who applied to, and chose to enroll at, Harvard *after* the policy was announced. These students voluntarily chose Harvard, rather than a school that fosters fraternity life. That rules out any claim of coercion. Plaintiffs have almost no response—just a brief footnote where they assert (citing nothing) that they "never 'voluntarily accepted' Harvard's policy" and have "always believed it is unlawful." Opp. 19 n.2. Believing a policy to be unlawful when you voluntarily accept it does not give you an MCRA cause of action for "threats, intimidation, or coercion."

Any threats, intimidation, or coercion must also be "individualized" and "threaten . . . serious harm" to support MCRA liability, as the SJC held in *Bally v. Northeastern University*, 403 Mass. 713, 720 (1989). Mem. 17. Remarkably, Plaintiffs actually assert (Opp. 18) that Harvard "made up" the elements of the MCRA that were quoted verbatim from the SJC's

---

[10] Plaintiffs are correct that the Court therefore must "ask whether the . . . [p]olicy treats a woman in a particular situation just as it would treat a man in the same situation." Opp. 15. The answer is "yes": all members of unrecognized single-sex social organizations, regardless of gender, are subject to the policy.

decision. *Bally,* 403 Mass. at 720 (finding no MCRA violation because the plaintiff "alleges neither an individualized threat nor a threat of serious harm"). Contrary to Plaintiffs, *Bally* remains good law—indeed, the SJC routinely cites *Bally* when describing the contours of MCRA claims. *See, e.g.*, *Glovsky v. Roche Bros. Supermarkets, Inc.*, 469 Mass. 752, 762-63 (2014); *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 644-46 (2003); *accord, e.g.*, *Sheffield v. Pieroway*, 361 F. Supp. 3d 160, 166 (D. Mass. 2019).

To the extent that Plaintiffs engage with *Bally*, their proffered distinctions are unpersuasive. They claim that Northeastern's policy, which applied to membership on sports teams, was "indiscriminate," whereas Harvard's policy, which applies to undergraduates who seek leadership positions on any club or team (or apply for fellowships), is "not indiscriminate" but "specifically" "target[ed]." Opp. 19. That makes no sense, and in any event misses the point of *Bally*—that the MCRA is not the right vehicle to challenge a broadly applicable policy. *Reproductive Rights Network v. President of University of Massachusetts*, 45 Mass. App. Ct. 495 (1998), which Plaintiffs also cite, illustrates that point: the challenged university action in that case was "directed specifically" at certain individuals who sought to organize a particular demonstration. *Id.* at 507 (distinguishing *Bally* on this basis).

The consequences of the challenged policy are also insufficiently serious under *Bally*, *see* Mem. 19, and Plaintiffs' assertion (Opp. 19-20) that Harvard's policy "denies them access to some of Harvard's most valuable opportunities" in no way engages with the substance of Harvard's argument or sufficiently states a claim under the law.[11] Plaintiffs argue that "a plaintiff can bring a MCRA claim even if the threatened consequence is uncertain." Opp. 19. But the cases Plaintiffs cite for this proposition say nothing of the sort. In *Kennie v. Natural*

---

[11] For this reason, Plaintiffs' lengthy discussion of the value of the Rhodes Scholarship and other leadership positions is legally irrelevant: under *Bally*, losing access to these sorts of extracurricular opportunities is simply not enough to give rise to MCRA liability.

*Resource Department of Dennis*, 451 Mass. 754 (2008), the defendant did not just make vague, open-ended threats, but took active steps to interfere with the plaintiffs' property rights through fraudulent means. *Id.* at 760-61. And in *Pheasant Ridge Associates Limited Partnership v. Town of Burlington*, 399 Mass. 771 (1987), the court merely held that the meaning of a threat to "take any action necessary" was a fact question appropriate for jury resolution in the context of that case. *Id.* at 781-82. Here, there is no dispute about the consequences of Harvard's policy for a jury to resolve.[12]

Finally, and just as fundamentally, Plaintiffs have no response to Harvard's explanation as to why its policy is entirely consistent with equal protection. As explained above, the policy is not sex-discriminatory. And even if it were, Plaintiffs entirely fail to engage with Harvard's compelling interest (Mem. 20): allocating its own resources in ways that foster a culture of inclusivity and advance its commitment to nondiscrimination.

## CONCLUSION

The Court should dismiss the organizational Plaintiffs and John Doe 3 under Rule 12(b)(1). It should dismiss the entire Complaint under Rule 12(b)(6).

---

[12] Plaintiffs also assert in a vague and conclusory manner that Harvard has threatened expulsion of students who join unrecognized single-sex social organizations—contrary to the terms of the policy—and has suggested that it might leak negative information about members of such organizations. These assertions are factually incorrect, but, in any event, Plaintiffs seek only prospective relief to invalidate and enjoin Harvard's policy, not relief from any more generalized alleged threats of retaliation. As the claims are against the policy, any coercion must come from the policy itself, which does not contemplate expulsion or the public release of negative information. *See* Compl., Prayer for Relief.

| | |
|---|---|
| Dated: April 19, 2019 | Respectfully submitted,<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE<br><br>By its attorneys,<br><br>*/s/ Roberto M. Braceras*<br>Roberto M. Braceras (BBO# 566816)<br>Joshua J. Bone (BBO# 687722)<br>Edwina B. Clarke (BBO# 699702)<br>GOODWIN PROCTER LLP<br>100 Northern Avenue<br>Boston, Massachusetts 02210<br>Tel.: +1 617 570 1000<br>Fax.: +1 617 523 1231<br>Email: rbraceras@goodwinlaw.com<br>jbone@goodwinlaw.com<br>eclarke@goodwinlaw.com<br><br>William M. Jay (*pro hac vice*)<br>GOODWIN PROCTER LLP<br>901 New York Avenue NW<br>Washington, DC  20001<br>Tel.: +1 202 346 4000<br>Fax.: +1 202 346 4444<br>E-mail: wjay@goodwinlaw.com |

## **CERTIFICATE OF SERVICE**

    I, Roberto M. Braceras, hereby certify that on April 19, 2019, a true copy of the foregoing Memorandum was served by CM/ECF upon all other counsel of record in this action.

April 19, 2019                                             */s/ Roberto M. Braceras*
                                                                                  Roberto M. Braceras