**United States District Court**
**District of Massachusetts**

_____
)
KAPPA ALPHA THETA FRATERNITY,    )
INC., KAPPA KAPPA GAMMA          )
FRATERNITY, SIGMA CHI, SIGMA     )
ALPHA EPSILON, SIGMA ALPHA       )
EPSILON – MASSACHUSETTS GAMMA,   )
JOHN DOE 1, JOHN DOE 2 and JOHN  )
DOE 3,                           )
                                 )
          Plaintiffs,            )
                                 )
          v.                     )     Civil Action No.
                                 )     18-12485-NMG
HARVARD UNIVERSITY and PRESIDENT )
AND FELLOWS OF HARVARD COLLEGE,  )
                                 )
          Defendants.            )
_____  )

**MEMORANDUM & ORDER**

GORTON, J.

    This case involves claims for declaratory and injunctive
relief, as well as damages, pursuant to Title IX of the
Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., and
the regulations and policies thereunder ("Title IX"), and the
Massachusetts Civil Rights Act, M.G.L. c. 12, §§ 11H, 11I ("the
MCRA").  Five national or local fraternities and sororities
("the organizational plaintiffs") and three anonymous members of
those organizations ("the individual plaintiffs") have brought
suit against Harvard University and the President and Fellows of
Harvard College (collectively "Harvard" or "defendant") for sex
discrimination.  They allege that Harvard has adopted and

-1-

enforced a student-conduct policy which withholds eligibility
for certain benefits and opportunities from students who choose
to join unrecognized, single-sex, social organizations ("the
Policy").

Before the Court is Harvard's motion to dismiss the
complaint (Docket No. 29).  For the reasons that follow, that
motion will be allowed, in part, and denied, in part.

I.    **Background**

A.    **The Parties**

Harvard is a renowned private university with both
undergraduate and graduate students.  As an educational
institution receiving federal funds, it must comply with the
requirements of Title IX which prohibits discrimination on the
basis of sex in any educational program or activity receiving
such assistance.

Plaintiffs Sigma Chi and Sigma Alpha Epsilon ("SAE") are
respected national fraternities and Sigma Alpha Epsilon—
Massachusetts Gamma ("Mass Gamma") is SAE's local chapter.  All
three of those fraternities have members who are students at
Harvard.  Plaintiffs Kappa Alpha Theta Fraternity, Inc.
("Theta") and Kappa Kappa Gamma Fraternity ("Kappa") are
prominent national sororities, neither of which currently has
members who are students at Harvard.  John Does 1 and 2 are
members of all-male organizations at Harvard who are currently

-2-

subject to the Policy at issue.  John Doe 3 is also a member of an all-male organization at Harvard but, as an upperclassman, is not subject to that Policy.

**B.   The Policy**

In May, 2016, after extended debate among interested parties on campus, Harvard announced a new policy which provided that

> [f]or students matriculating in the fall of 2017 and thereafter: any such students who become members of unrecognized single-gender social organizations will not be eligible to hold leadership positions in recognized student organizations or athletic teams . . . [and] will not be eligible to receive College-Administered fellowships [including the Rhodes, Marshall and Mitchell Scholarships which require the University's endorsement].

Harvard declares that the Policy is necessary to promote its values of inclusivity and non-discrimination which are "essential to its pedagogical objects and institutional mission."

The Policy applies prospectively, beginning with students who matriculated in the fall of 2017.  It does not prohibit students from joining single-sex organizations nor does it regulate the activities of those organizations.  It applies only to students who choose to become members of such organizations and applies equally to men who join all-male organizations and women who join all-female organizations.  The organizational

plaintiffs are all considered unrecognized, single-sex organizations under the Policy.

The organizational plaintiffs (some of whose members are subject to the Policy) allege that it is part of a broader campaign of intimidation and coercion against students who join single-sex, social organizations, specifically fraternities, sororities and so-called "final clubs". They assert that Harvard has singled out students who join such organizations and has criticized them in University-wide letters, emails, reports and media articles. Harvard administrators have purportedly suggested that 1) students could be expelled for joining such organizations, 2) men who join all-male social organizations are more likely to engage in sexual violence, misogyny and bigotry and 3) women who join all-female social organizations only do so to cope with their exclusion from all-male organizations and that those clubs otherwise have no value. A month before enacting the Policy, the Dean of Harvard College allegedly expressed to staff at Harvard's daily student newspaper the view that students who join single-sex organizations do not act like modern men and women because they exhibit

> behaviors and attitudes . . . at odds with the
> aspirations of the 21st century society to which the
> College hopes and expects our students will
> contribute.

Plaintiffs assert that students who join unrecognized, single-sex organizations are harmed as a result of the Policy because they are forced to forego valuable leadership and post-graduate opportunities which can impact future professional opportunities.  Those students have purportedly suffered emotional and reputational harm and embarrassment as a result of the stigma produced by Harvard's alleged campaign against fraternities and sororities.  The organizational plaintiffs claim that they, in turn, have been injured because the Policy has made it more difficult for them to recruit and maintain members and to raise money.  Indeed, Theta and Kappa have both closed their Harvard Chapters allegedly as a result of the Policy.

### C.   Procedural History

In December, 2018, plaintiffs filed a complaint in this Court alleging: 1) disparate treatment on the basis of sex in violation of Title IX (Count I); 2) associational discrimination on the basis of sex in violation of Title IX (Count II); 3) gender stereotyping in violation of Title IX (Count III); 4) discrimination on the basis of anti-male bias in violation of Title IX (Count IV); and 5) interference with plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by way of threats, intimidation or coercion in violation of the MCRA.

In conjunction with their complaint, plaintiffs also filed a motion to permit the individual plaintiffs to proceed under pseudonyms and for a protective order to protect their identities.  In January, 2019, this Court entered an Order (Docket No. 25) allowing the individual plaintiffs to proceed, for the time being, under pseudonyms, with the understanding that, if the case proceeds beyond the motion to dismiss stage, they will be required to reveal their identities.

In February, 2019, Harvard filed a motion to dismiss the complaint.  It contends that the organizational plaintiffs lack standing 1) to sue on their own behalf because the Policy does not apply directly to them and 2) to sue on behalf of their members because they fail to satisfy the requirements for associational standing.  It also submits that John Doe 3 lacks standing because, as an upperclassman, the Policy does not apply to him and the alleged injury to his ability to recruit or fundraise is derivative from the alleged harm to his organization.  Furthermore, Harvard maintains that, to the extent any of the plaintiffs has standing, he or it has failed to state a claim 1) for violation of Title IX because the Policy applies equally to both male and female students and thus does not discriminate on the basis of sex and 2) for violation of the MCRA because students subject to the Policy knowingly and voluntarily accepted it in deciding to attend Harvard and thus

have not been threatened, intimidated or coerced within the meaning of that statute.

The organizational plaintiffs respond that they have established standing both on their own behalf and on behalf of their members and that Harvard has conceded that John Does 1 and 2 have standing as students currently subject to the Policy. Plaintiffs also assert that the equal application of the Policy to both male and female students is irrelevant for purposes of Title IX because it, nevertheless, treats individual students differently based on their sex.  Moreover, they aver that Harvard discriminates against students based on the sex of those with whom they associate and based on impermissible gender stereotypes.  Finally, plaintiffs contend that the Policy and alleged campaign against fraternities, sororities and "final clubs" constitutes actionable economic coercion that is sufficiently particularized and serious for purposes of the MCRA.

## II.  <u>Motion to Dismiss</u>

### A.  **Legal Standard**

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 570 (2007).  In considering the merits of a motion to dismiss, the Court may look only to the facts

alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken. Nollet v. Justices of Trial Court of Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000), aff'd, 248 F.3d 1127 (1st Cir. 2000). Furthermore, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000). Although a court must accept as true all of the factual allegations contained in a complaint, that doctrine is not applicable to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662 (2009).

### B.    Standing

#### 1.    Applicable Law

To establish Article III standing, a plaintiff must show that it has suffered an injury in fact that is 1) particularized and actual or imminent, 2) fairly traceable to the challenged conduct and 3) likely to be redressed by a favorable decision of the court. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992). Stigmatic harm may suffice to establish standing so long as the stigma suffered is the direct result of having personally been denied equal treatment. Allen v. Wright, 468 U.S. 737, 755-56 (1984) (collecting cases), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014). A District Court must determine

-8-

whether each particular plaintiff has standing to pursue each of the claims asserted. S.S. v. City of Springfield, 332 F. Supp. 3d 367, 373, 373 n.6 (D. Mass. 2018); see also Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006) ("The standing inquiry is both plaintiff-specific and claim-specific.").

Generally, a litigant must assert his or her own legal rights and cannot base his or her claim on the rights or interests of third parties. Kowalski v. Tesmer, 543 U.S. 125, 129 (2004) (citing Warth v. Seldin, 422 U.S. 490, 499 (1975)). An organization has standing, however, to sue on behalf of its members when

> [(1)] its members would otherwise have standing to sue in their own right; [(2)] the interests it seeks to protect are germane to the organization's purpose; and [(3)] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).

An organization may not merely seek to vindicate its own abstract social interests or value preferences but rather must show that at least one of its members has suffered an injury in fact. Sierra Club v. Morton, 405 U.S. 727, 739-40 (1972). Moreover, associational standing is inappropriate where adjudicating the merits of the claim will require fact-intensive inquiries of individual members. N.H. Motor Transp. Ass'n v.

Rowe, 448 F.3d 66, 72 (1st Cir. 2006).  Actions for declaratory or injunctive relief have generally been held to be well-suited to representation by an association assuming that the participation of individual members is not necessary. Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 12 (1st Cir. 1986); see also Rowe, 448 F.3d at 72.

The United States Supreme Court has held that individuals who possess all of the "indicia of membership in an organization" may be considered members for purposes of establishing associational standing even where they are not formal members of the organization. Hunt, 432 U.S. at 344-45 (including as part of the indicia of membership the right 1) to elect the leadership of the organization, 2) to serve in the organization, 3) to finance the organization's activities and 4) to have the individual's views and interests expressed and promoted collectively through the organization).  At least one Session of this Court has held that the NAACP may represent the interests of its broader "constituency" even if those individuals are neither formal members of the organization nor possess the indicia of membership in the organization. See NAACP v. Harris, 567 F. Supp. 637, 639-40 (D. Mass. 1983).

### 2.  Application

The organizational plaintiffs assert that they have standing to sue both on their own behalf and on behalf of their

members.  While impediments to the ability of the fraternities
and sororities to raise money, recruit and maintain members is
an actual and particularized injury to those organizations, they
have not established that those injuries are fairly traceable to
Harvard's Policy such that a favorable decision of this Court
would redress that harm.  Indeed, the Policy does not directly
apply to the organizational plaintiffs or regulate their
activity or membership.  Any injury suffered as a result of the
Policy is attributable to the decisions of Harvard students who
have chosen not to join those organizations because of the
Policy or the general attitudes and stigma surrounding certain
single-sex organizations. See Simon v. E. Ky. Welfare Rights
Org., 426 U.S. 26, (1976) (holding that, in order to establish
standing, the injury must have resulted from the challenged
conduct and not "the independent action of some third party not
before the court").  Some students may have chosen not to join
single-sex organizations (even in the absence of Harvard's
Policy) because of those other considerations.  The
organizational plaintiffs have therefore failed to demonstrate
standing sufficient to sue on their own behalf.

    At least some of the organizational plaintiffs have,
however, demonstrated the requirements for associational
standing.  Sigma Chi, SAE and Mass Gamma all allegedly have
members who are students at Harvard subject to the Policy.

-11-

Those members certainly suffer a real and particularized injury because they are denied the ability to hold leadership positions on campus or to apply for prestigious, post-graduate fellowships.  They are also purportedly subject to stigma on campus as a result of Harvard's alleged campaign against single-sex, social organizations.  But for Harvard's disparate treatment of students on the basis of their membership in single-sex organizations, those students would have full access to the subject opportunities on campus.  The alleged injury to those students is thus both fairly traceable to the challenged conduct and likely redressable by the requested declaratory and injunctive relief.

Furthermore, those fraternities have an interest in raising money and sustaining their membership which is hindered by the Policy.  Those interests are certainly germane to the organizations' purpose in building a social network and community.  Finally, to the extent that the organizations merely seek declaratory and injunctive relief, participation of their individual members is unnecessary to adjudicate the claims.  The issue of whether Harvard's Policy discriminates on the basis of sex in violation of Title IX is common to all members of single-sex social organizations and does not require a fact-intensive inquiry of any particular member.  The only possible fact-specific inquiry would be with respect to the amount of damages

-12-

that any one member has suffered as a result of the alleged malfeasance but that analysis is unnecessary for the awarding of declaratory or injunctive relief.  Sigma Chi, SAE and Mass Gamma have therefore all established associational standing to pursue declaratory and injunctive relief on behalf of their members.

Theta and Kappa have not, however, demonstrated associational standing.  Neither currently has a Harvard Chapter and thus they cannot show that their members have suffered an injury as a result of the challenged Policy.  Furthermore, unlike the NAACP in Harris, Theta and Kappa do not have a broader "constituency" the interests of whom they clearly represent.  See Harris, 567 F. Supp. at 640.  The holding in Harris concluding that the NAACP had standing to represent the interests of all black people in Boston (even if not formally members of the NAACP or carrying the indicia of membership) was premised on the "historic role" of the NAACP as the appropriate representative of the interests of all persons of color.  Theta and Kappa do not have that same unique role as a representative of the interests of a broad constituency but rather have a relatively narrow membership with a very different mission from the NAACP.  Accordingly, Theta and Kappa do not have standing to represent the interests of individuals who are not actually members of their respective organizations and without such membership at Harvard, Theta and Kappa lack standing.

-13-

As to the individual plaintiffs, John Does 1 and 2 clearly have standing as members of unrecognized, single-sex social organizations currently subject to the Policy and Harvard does not challenge their standing to sue.  John Doe 3 has not, however, established standing.  He is an upperclassman who is not subject to the Policy and, as such, he has not been denied access to any opportunities or privileges on Harvard's campus by virtue of his membership in an unrecognized, single-sex organization.  Furthermore, his standing to sue cannot be premised on his alleged stigmatic harm because he has not personally been deprived of equal treatment under Harvard's Policy. See 468 U.S. at 755-56.

John Doe 3 submits that he has standing as a result of the increased difficulty in fundraising for (and recruiting and maintaining membership in) his organization.  That asserted injury is derivative from the harm suffered by the organization itself and is therefore insufficient to establish standing. Pagán, 448 F.3d at 30 (holding that an agent of an organization must allege an injury that does not derive from the injury to the principal in order to establish standing).

To summarize, Sigma Chi, SAE, Mass Gamma and John Does 1 and 2 have all demonstrated standing.  Theta, Kappa and John Doe 3 have failed to establish standing and will therefore be dismissed from this case.

-14-

C.    **Title IX**

1.    **Applicable Law**

Pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688,

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).  Courts in the First Circuit cite cases from the Title VII context in analyzing the scope of Title IX. See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65-66 (1st Cir. 2002).

The anti-discrimination law in the Title VII context is violated by a finding of disparate treatment on the basis of a protected attribute, such as sex. Cumpiano v. Banco Santander P.R., 902 F.2d 148, 153-56 (1st Cir. 1990).  Under that theory of liability, an employer is liable under Title VII when sex is a substantial motivating factor behind an adverse employment decision. Id. at 155; see also Zarda v. Altitude Express, Inc., 883 F.3d 100, 112, 128 (2d Cir. 2018) (en banc); Doe v. Columbia Univ., 831 F.3d 46, (2d Cir. 2016) ("Because Title IX prohibits . . . subjecting a person to discrimination on account of sex, it is understood to bar[] the imposition of university discipline where gender is a motivating factor in the decision to discipline" (second alteration in original) (internal

-15-

quotation marks omitted) (quoting <u>Yusuf</u> v. <u>Vassar Coll.</u>, 35 F.3d
709, 715 (2d Cir. 1994))).  To determine whether sex is a
motivating factor behind an adverse decision or policy, courts
apply a "comparative" or "but-for" test which

> determines whether the trait that is the basis for
> discrimination is a function of sex by asking whether
> an employee's treatment would have been different "but
> for that person's sex."

<u>Zarda</u>, 883 F.3d at 116 (quoting <u>City of L.A., Dep't of Water &</u>
<u>Power</u> v. <u>Manhart</u>, 435 U.S. 702, 711 (1978)); <u>Hively</u> v. <u>Ivy Tech</u>
<u>Cmty. Coll. of Ind.</u>, 853 F.3d 339, 345 (7th Cir. 2017) (en
banc).

In <u>Zarda</u> and <u>Hively</u>, the Second and Seventh Circuit Courts
of Appeals, respectively, applied the comparative or but-for
test to determine whether an adverse employment decision made on
the basis of an employee's sexual orientation constitutes
impermissible sex discrimination under Title VII. <u>See</u> <u>Zarda</u>, 883
F.3d at 116; <u>Hively</u>, 853 F.3d at 345.  Both the Second and
Seventh Circuits held that discrimination on the basis of sexual
orientation is actionable sex discrimination under Title VII
because but-for being a man attracted to another man (i.e. a
woman attracted to a man) or a woman being attracted to another
woman (i.e. a man attracted to a woman), the employee would have
been treated differently and thus the sex of the employee was a
motivating factor in the adverse employment decision. <u>Zarda</u>, 883

F.3d at 116-18 (citing Manhart, 435 U.S. at 711, and Price
Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989), in discussing
the application of the comparative or but-for test); Hively, 853
F.3d at 345-47 (explaining that in conducting the comparative or
but-for test, it is essential that the only variable that is
allowed to change is the plaintiff's sex).

Both the Second and Seventh Circuits found it irrelevant
that the discriminatory policy applied equally to both gay men
and lesbian women, holding that the equal application of the
employer's policy to both men and women did not change the fact
that the policy drew distinctions according to the particular
individual's sex. Zarda, 883 F.3d at 126 (citing Loving v.
Virginia, 388 U.S. 1, 10-11 (1967), for the proposition that a
policy that discriminates on the basis of a protected
characteristic cannot be saved by equal application of that
discriminatory policy); Hively, 853 F.3d at 348-49 (same).

A separate theory of liability under Title VII is
associational discrimination in which an employer discriminates
against an employee on the basis of the protected characteristic
of a person with whom the employee associates. Holcomb v. Iona
Coll., 521 F.3d 130, 139 (2d Cir. 2008) (holding that "where an
employee is subjected to adverse action because an employer
disapproves of interracial association, the employee suffers
discrimination because of the employee's own race" (emphasis in

original)); see also Zarda, 883 F.3d at 124-26 ("Applying the
reasoning of Holcomb, if a male employee married to a man is
terminated because his employer disapproves of same-sex
marriage, the employee has suffered associational discrimination
based on his own sex because the fact that the employee is a man
instead of a woman motivated the employer's discrimination
against him." (internal quotation marks omitted)); Hively, 853
F.3d at 347.

A third theory of liability under Title VII is
discrimination on the basis of stereotypes about how a person of
a particular gender should be or act. See Price Waterhouse, 490
U.S. at 251 ("As for the legal relevance of sex stereotyping, we
are beyond the day when an employer could evaluate employees by
assuming or insisting that they matched the stereotype
associated with their group, for [i]n forbidding employers to
discriminate against individuals because of their sex, Congress
intended to strike at the entire spectrum of disparate treatment
of men and women resulting from sex stereotypes." (alteration in
original) (internal quotation marks omitted) (quoting Manhart,
435 U.S. at 707 n.13)); Zarda, 883 F.3d at 119-20 ("[T]he
question of whether there has been improper reliance on sex
stereotypes can sometimes be answered by considering whether the
behavior or trait at issue would have been viewed more or less
favorably if the employee were of a different sex."); Hively,

853 F.3d at 346-47; Harrington v. City of Attleboro, No. 15-CV-12769-DJC, 2018 WL 475000, at *5 (D. Mass. Jan. 17, 2018) (holding that discrimination on the basis of sex stereotyping is actionable under Title IX).

### 2.  Application

Plaintiffs have alleged a plausible claim for violation of Title IX under a disparate treatment theory of liability. Applying the comparative or but-for test to the situation of Harvard students subject to the Policy demonstrates that the Policy discriminates on the basis of sex.  The Court finds the decisions in Zarda and Hively particularly instructive in this regard.

Just as the employment policies at issue in Zarda and Hively drew distinctions on the basis of the sex of the homosexual employees, it is impossible for Harvard to apply its Policy without considering both the sex of the particular student and the sex of the other students with whom he or she seeks to associate.  Whereas a male student seeking to join an all-male organization would be subject to the Policy (and vice versa), a female student seeking to join the same all-male organization would not be subject to the Policy (and vice versa).  The fact that the female student would otherwise not be allowed to join the all-male organization because of the organization's own discriminatory policy does not alter the

conclusion that the sex of the student is a substantial
motivating factor behind the Policy.  Indeed, sex is essential
to the application of the Policy to any particular student.

It is simply irrelevant that the Policy applies equally to
both male and female students.  A policy is no less
discriminatory or motivated by sex simply because it applies
equally to members of both sexes. See Loving, 388 U.S. at 10-11;
see also Zarda, 883 F.3d at 126; Hively, 853 F.3d at 348-49.
What matters is that the Policy, as applied to any particular
individual, draws distinctions based on the sex of that
individual.

Moreover, plaintiffs have alleged a plausible claim for
associational discrimination under Title IX.  While none of the
parties cites caselaw from the First Circuit applying the
associational discrimination theory in the Title IX context, the
Court has no reason to believe that theory would not extend to
Title IX given that courts in this Circuit often look to the
Title VII context to analyze the scope of Title IX.  Moreover,
the analysis of the theory of associational discrimination
overlaps with the analysis of the theory of disparate treatment
(which is clearly within the scope of Title IX).  That is
because in determining whether a policy discriminates against a
student on the basis of the sex of those with whom he or she
associates, fundamental consideration must be given to his or

her own sex.  Here, Harvard's Policy can be applied to any
particular student only after analyzing the sex of the students
in a social organization with which the student seeks to
associate.  In doing so, Harvard discriminates both on the basis
of the sex of the students in the social organization and the
sex of the student who associates with that organization.

Finally, plaintiffs have alleged facts sufficient to state
a plausible claim under a theory of gender stereotyping.
Plaintiffs have asserted that Harvard's Policy was motivated, in
part, by the view that single-sex, social organizations promote
sexual assault and bigotry on campus and produce individuals who
fail to act as modern men and women should.  It is certainly
plausible that Harvard's purported ideal of the "modern" man or
woman is informed by stereotypes about how men and women should
act.  Withholding benefits from students who fail to conform to
such stereotypes violates Title IX.

For similar reasons, plaintiffs have alleged facts
sufficient to state a plausible claim under a theory of anti-
male bias.  Simply because the Policy applies equally to men and
women and has purportedly had a greater impact upon all-female
organizations than upon all-male organizations does not mean
that the Policy was not originally motivated by bias against
all-male social organizations.  Indeed, plaintiffs allege that
various Harvard committees and administrators have made

disparaging comments about all-male "final clubs", indicating that such organizations promote sexual violence, misogyny and bigotry.  While the alleged bias is not against men generally, it is a bias against a certain subset of men and the Court must accept plaintiff's factual allegations as true for purposes of a motion to dismiss.

Accordingly, Harvard's motion to dismiss the Title IX claims (Counts I-IV) will be denied.

### D.    The MCRA

To establish a claim under the MCRA, the plaintiff must prove that 1) the exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth 2) has been interfered with, or attempted to be interfered with, 3) by threats, intimidation or coercion. Bally v. Ne. Univ., 532 N.E.2d 49, 51-52 (Mass. 1989) (citing M.G.L. c. 12, §§ 11H, 11I).  Furthermore, the alleged threat, intimidation or coercion must be aimed at a particular individual or group of individuals and the harm involved must be sufficiently serious. Id. at 52-53 (holding that indiscriminate, impartially administered urine drug testing for participation in intercollegiate sports is insufficiently particularized to constitute a threat, intimidation or coercion under the MCRA nor is the harm of exclusion from intercollegiate sports sufficiently serious).

The standard for determining whether conduct constitutes
threats, intimidation or coercion is an objective, reasonable
person standard. Currier v. Nat'l Bd. of Med. Exam'rs, 965
N.E.2d 829, 838 (Mass. 2012).  The mere violation of a protected
right by itself is insufficient to establish a claim under the
MCRA. Id. at 838-39.

Plaintiffs have not demonstrated a plausible claim for
relief under the MCRA with respect to the Policy.  The only
students subject to the Policy are those who were aware of the
Policy before enrolling at Harvard and nevertheless chose to
attend that school (including John Does 1 and 2).  The fact that
they (on whose behalf the organizational plaintiffs bring suit)
voluntarily chose to attend Harvard with full knowledge of the
Policy negates any inference of threats, intimidation or
coercion on the part of defendant.  It is not reasonable to
infer that a student would feel threatened, intimidated or
coerced by a policy that he or she chose to accept by attending
Harvard unless the student's choice to enroll at Harvard was
itself the product of threat, intimidation or coercion.
Plaintiffs do not contend, however, that Harvard coerced those
students into attending the University.  They were free to
attend any other college or university that recognized single-
sex, social organizations on campus.

Even if the Policy were found to be coercive despite the students' voluntary choice to attend Harvard, the alleged threats, intimidation and coercion are insufficiently particularized to be actionable under the MCRA.  Just as the drug-testing policy at issue in <u>Bally</u> was found to apply indiscriminately to all student athletes (and thus insufficiently particularized), Harvard's Policy applies indiscriminately to all students who have matriculated after 2016 and who choose to join an unrecognized, single-sex organization.  It is not aimed at any particular individual or group of individuals and therefore cannot be the basis of a claim under the MCRA.

To the extent that plaintiffs allege that John Does 1 and 2 and other students have, apart from the Policy itself, suffered other threats of discipline or intimidation as a result of joining single-sex organizations or have been coerced into not joining single-sex organizations, such specific threats may be sufficiently individualized to be actionable under the MCRA if they were made to particular students.  The Court is unable to determine at this stage whether such separate threats, intimidation or coercion (if identified through discovery) are sufficiently serious to be actionable under the MCRA.

Harvard's motion to dismiss the MCRA claim (Count V) will therefore be denied, without prejudice, with the caveat that the

Policy alone cannot constitute the threats, intimidation or coercion sufficient to prevail on that claim.

### ORDER

For the foregoing reasons, Harvard's motion to dismiss (Docket No. 29) is, with respect to plaintiffs Theta, Kappa and John Doe 3, **ALLOWED** but is otherwise **DENIED**.  John Does 1 and 2 are directed to reveal their identities if they choose to proceed with their claims under Title IX and the MCRA.


**So ordered.**

                                   /s/ Nathaniel M. Gorton
                                   Nathaniel M. Gorton
                                   United States District Judge

Dated August 9, 2019