**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| KAPPA ALPHA THETA FRATERNITY, INC.; KAPPA KAPPA GAMMA FRATERNITY; SIGMA CHI; SIGMA ALPHA EPSILON; SIGMA ALPHA EPSILON—MASSACHUSETTS GAMMA; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3, | : : : : : : : : | Civil Action No.  18-cv-12485 |
| Plaintiffs, | : : | ORAL ARGUMENT REQUESTED |
| v. | : : | |
| HARVARD UNIVERSITY; PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | : : : | |
| Defendant. | : : | |
| _____ | : | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
<u>PRELIMINARY OR PERMANENT INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

RELEVANT BACKGROUND ............................................................................... 3

STANDARD OF REVIEW .................................................................................... 5

ARGUMENT .......................................................................................................... 6

I.    Plaintiffs Are Likely to Succeed on the Merits of their Title IX Claims ........... 6

   A.   Plaintiffs Are Likely to Succeed on their *Per Se* Disparate
        Treatment (Count I) and Associational Sex Discrimination Claims
        (Count II) Under Title IX ......................................................................... 6

   B.   Plaintiffs Are Likely to Succeed on their Claims for Sex
        Stereotyping (Counts III) and Anti-Male Bias (Count IV) Under
        Title IX ..................................................................................................... 10

II.   The Equities Favor an Injunction Against the Sanctions Policy ...................... 15

   A.   Plaintiffs Will Suffer Irreparable Harm Without an Injunction ............. 15

   B.   The Balance of Hardships Weighs in Plaintiffs' Favor ......................... 17

   C.   An Injunction Is in the Public Interest ................................................... 18

III.  Plaintiffs' Motion Is Timely ........................................................................... 18

CONCLUSION ..................................................................................................... 20

CERTIFICATE OF SERVICE ............................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................5

*Animal Welfare Inst. v. Martin*,
588 F. Supp. 2d 70 (D. Me. 2008) ........................................................19

*Aponte v. Calderon*,
284 F.3d 184 (1st Cir. 2002)..................................................................5

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014) ...........................................................19, 20

*Biediger v. Quinnipiac Univ.*,
616 F. Supp. 2d 277 (D. Conn. 2009) ..................................................16

*Bostock v. Clayton County*,
No. 17-1618, 2020 WL 3146686 (U.S. June 15, 2020) ................. *passim*

*City of L.A., Dep't of Water & Power v. Manhart*,
435 U.S. 702 (1978)..............................................................................6, 9

*Cohen v. Brown Univ.*,
991 F.2d 888 (1st Cir. 1993)..................................................................18

*Coquico, Inc. v. Rodriguez-Miranda*,
562 F.3d 62 (1st Cir. 2009)....................................................................5

*Cuviello v. City of Vallejo*,
944 F.3d 816 (9th Cir. 2019) ................................................................19

*Gabriel v. Wells Fargo Bank Nat'l Ass'n*,
No. 19-10630-NMG, 2020 WL 1853226 (D. Mass. Apr. 13, 2020) .........5

*Harrington v. City of Attleboro*,
No. 15-CV-12769-DJC, 2018 WL 475000 (D. Mass. Jan. 17, 2018) ....11

*Hively v. Ivy Tech Cmty. Coll. of Ind.*,
853 F.3d 339 (7th Cir. 2017) .........................................................4, 7, 11

*Howe v. U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr. Series 2016-CTT*,
No. CV 19-12597-NMG, 2020 WL 730890 (D. Mass. Feb. 13, 2020)....5

*Ideal Indus., Inc. v. Gardner Bender, Inc.*,
   612 F.2d 1018 (7th Cir. 1979) ...........................................................................19

*Jean v. Mass. State Police*,
   492 F.3d 24 (1st Cir. 2007) ..................................................................................5

*Lamex Foods, Inc. v. Audeliz Lebron Corp.*,
   646 F.3d 100 (1st Cir. 2011) ................................................................................5

*Loving v. Virginia*,
   388 U.S. 1 (1967) .................................................................................................7

*Mayerova v. E. Mich. Univ.*,
   346 F. Supp. 3d 983 (E.D. Mich. 2018) ........................................................15, 18

*Mayson-Dixon Strategic Consulting, LLC v. Mason-Dixon Polling & Strategic Consulting, Inc.*,
   324 F. Supp. 3d 569 (D. Md. 2018) .....................................................................20

*Morris & Assocs., Inc. v. Cooling & Applied Tech., Inc.*,
   No. 5:09-CV-00023-BR, 2010 WL 4483412 (E.D.N.C. Oct. 20, 2010) ...............20

*Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*,
   354 F.3d 249 (4th Cir. 2003) ..............................................................................17

*Peoples Fed. Savings Bank v. People's United Bank*,
   750 F. Supp. 2d 217 (D. Mass. 2010) ...................................................................5

*Phillips v. Martin Marietta Corp.*,
   400 U.S. 542 (1971) (*per curiam*) ........................................................................9

*Portz v. St. Cloud State Univ.*,
   196 F. Supp. 3d 963 (D. Minn. 2016) ............................................................17, 18

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989) ...........................................................................................11

*Puente Ariz. v. Arpaio*,
   76 F. Supp. 3d 833 (D. Ariz. 2015), *rev'd in part on other grounds, vacated in part on other grounds*, 821 F.3d 1098 (9th Cir. 2016) ...........................................20

*Rogers v. Windmill Pointe Village Club Ass'n*,
   967 F.2d 525 (11th Cir. 1992) ............................................................................15

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
   251 F.3d 814 (9th Cir. 2001) ..............................................................................15

*Suero v. Fed. Home Loan Mortg. Corp*,
No. 13-13014-JGD, 2013 WL 6709001 (D. Mass. Dec. 17, 2013) ........................................16

*Weaver v. Henderson*,
984 F.2d 11 (1st Cir. 1993) .................................................................................................5

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Edu.*,
858 F.3d 1034 (7th Cir. 2017) .............................................................................................17

*Women, Action & the Media Corp. v. Women in the Arts & Media Coal., Inc.*,
No. CIV.A. 13-10089-RWZ, 2013 WL 3728414 (D. Mass. July 12, 2013) ..........................19

*Zarda v. Altitude Express, Inc.*,
883 F.3d 100 (2d Cir. 2018) ......................................................................................... *passim*

**Statutes**

20 U.S.C. § 1681 .......................................................................................................................3

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................................................5

Fed. R. Civ. P. 65(a)(2) ..............................................................................................................5

## <u>Other Authorities</u>

11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
§ 2950 (3d ed.) ....................................................................................................................5

## INTRODUCTION

The Court should enjoin Harvard's policy that punishes students for joining single-sex social organizations (the "Sanctions Policy" or "Policy") at least pending final resolution of this lawsuit.  Under the U.S. Supreme Court's recent landmark civil rights decision in *Bostock v. Clayton County*, No. 17-1618, 2020 WL 3146686 (U.S. June 15, 2020), Harvard's Sanctions Policy unquestionably constitutes unlawful *per se* disparate treatment (Count I) and associational sex discrimination (Count II) in violation of Title IX.

In *Bostock*, the Supreme Court held that an employer's policy of firing employees for being homosexual or transgender discriminates based on sex in violation of Title VII.  *Id.* at *1. Just like an employer's policy of firing homosexual or transgender employees, Harvard's Policy "intentionally singles out [a student] to [punish] based in part on the [student's] sex, and the affected [student's] sex is a but-for cause of his [punishment]."  *Id.* at *7.  Like the employer's discriminatory policy, "it is impossible to discriminate against a person for being [in a single-sex organization] without discriminating against that individual based on sex."  *Id.*  "Sex plays a necessary and undisguisable role in the decision, exactly what [Title IX] forbids."  *Id.* at *3.

*Bostock* conclusively refutes any defense Harvard might now try to mount to Plaintiffs' *per se* and associational sex discrimination claims.  On its face, the Sanctions Policy punishes students based on both their sex and the sex of those with whom they associate, and the Policy's application to both men and women does not negate the discrimination, it "doubles it."  *Id.* at *6. Plaintiffs are therefore entitled to at least a preliminary injunction.  And because there is no genuine dispute of material fact as to Counts I and II, the Court also may grant final judgment and a permanent injunction as to those counts following a hearing on this motion.  *See infra* p.5.

In addition to a preliminary or permanent injunction on Counts I and II, Plaintiffs are entitled to a preliminary injunction on their sex stereotyping (Count III) and anti-male bias

claims (Count IV).  While discovery remains ongoing, the evidence already uncovered demonstrates that Harvard personnel developed and adopted the Sanctions Policy to gain "more control of the gender dynamics," Ex. 1 at HARV-F-00011512, based on a perceived "obligation to re-educate both male and female students about appropriate sexual norms," Ex. 2 at HARV-F-00002211.[1]  Their "goal" was to cause "undergraduates [to] regard gender- and race-neutral organizations as the norm" and cause "the single-sex idea to wither away."  Ex. 3 at HARV-F-00001596.  The Policy stemmed from Harvard administrators' belief that all-male organizations, by their very nature, "institutionaliz[e] gender inequities," Ex. 4 at HARV-F-00002328, and exert a "deeply disturbing" "continuing hegemony" "over undergraduate social life" that threatens female students' "fundamental physical safety,"  Ex. 6 at HARV-F-00002384.  As one internal Harvard document aptly put it, the Sanctions Policy is all about "expectations on gender"—it has a singular "focus on gender."  Ex. 7 at HARV-F-00001703.

This is a textbook case for a preliminary or permanent injunction.  Plaintiffs are likely to succeed on the merits in light of controlling U.S. Supreme Court precedent.  Plaintiffs and numerous other Harvard students are suffering irreparable harm every day the Sanctions Policy remains in effect.  Absent injunctive relief, that harm will be magnified in the upcoming academic year because, for the first time, Harvard seniors will be subject to the Policy and will therefore be denied team captainships, leadership positions at the highest levels in recognized student organizations, and endorsements for major post-graduate fellowships.  And Harvard has no legitimate countervailing interest in continuing to maintain an obviously unlawful, discriminatory policy.  Plaintiffs thus respectfully request that the Court enter a preliminary or permanent injunction as soon as possible and at least by the time classes resume this fall.

---

[1] All exhibit references are to the Declaration of R. Stanton Jones, filed with this motion.

**RELEVANT BACKGROUND**

On May 6, 2016, Harvard announced that, beginning in the fall of 2017, it would punish undergraduate students who join "unrecognized single-gender social organizations," or "USGSOs." In particular, Harvard's Sanctions Policy provides as follows:

> For students matriculating in the fall of 2017 and thereafter: any such students who become members of unrecognized single-gender social organizations will not be eligible to hold leadership positions in recognized student organizations or athletic teams . . . [and] will not be eligible to receive College-Administered fellowships [including the Rhodes, Marshall and Mitchell Scholarships which require the University's endorsement].

Mem. & Order ("MTD Op.") at 3, Dkt.39 (quoting the Policy).

Plaintiffs sued to enjoin the Policy on December 3, 2018, *see* Dkt.1, principally alleging that it violates Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). On its face, the Policy punishes students "on the basis of sex"—it explicitly punishes men solely for joining men's groups and women solely for joining women's groups. The Complaint further alleges that the Policy was motivated, at least in part, by impermissible sex stereotypes and anti-male bias.

On August 9, 2019, the Court denied Harvard's motion to dismiss all claims of Plaintiffs John Doe 1, John Doe 2, Sigma Alpha Epsilon—Massachusetts Gamma, Sigma Alpha Epsilon, and Sigma Chi. As relevant here, the Court held that the Complaint plausibly alleges that Harvard's Sanctions Policy is *per se* disparate treatment (Count I) and associational sex discrimination (Count II), and that the Policy was impermissibly motivated by sex stereotypes (Count III) and anti-male bias (Count IV). MTD Op. at 15-22.

With respect to Plaintiffs' *per se* and associational sex discrimination claims, this Court found "particularly instructive" the Second and Seventh Circuits' decisions holding that an employer's policy of firing employees for being homosexual unlawfully discriminates on the basis of sex in violation of Title VII. *Id.* at 19 (discussing *Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) (en banc), and *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339 (7th Cir. 2017) (en banc)). "Just as the employment policies at issue in *Zarda* and *Hively* drew distinctions on the basis of the sex of the homosexual employees, it is impossible for Harvard to apply its Policy without considering both the sex of the particular student and the sex of the other students with whom he or she seeks to associate." *Id.* This Court further found it "simply irrelevant that the Policy applies equally to both male and female students," because "[a] policy is no less discriminatory or motivated by sex simply because it applies equally to members of both sexes." *Id.* at 20. "What matters," the Court explained, "is that the Policy, as applied to any particular individual, draws distinctions based on the sex of that individual." *Id.*

Harvard subsequently filed its Answer, Dkt.42, and the parties have been engaged in discovery since then.

Two weeks ago, on June 15, the U.S. Supreme Court decided *Bostock*, holding that an employer's policy of firing employees of both sexes for being homosexual or transgender violates Title VII. 2020 WL 3146686, at *2 (affirming the Second Circuit's decision in *Zarda*). *Bostock* decisively validates this Court's decision as to Counts I and II asserting that Harvard's Policy constitutes unlawful *per se* disparate treatment and associational sex discrimination. Indeed, *Bostock* tracks every aspect of this Court's decision. Thus, Supreme Court precedent now conclusively establishes that Harvard's Sanctions Policy discriminates on the basis of sex in violation of Title IX. This motion for a preliminary injunction followed.

**STANDARD OF REVIEW**

This Court weighs four factors when evaluating a motion for preliminary injunction: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is withheld; (3) the balance of hardships; and (4) the public interest. *Jean v. Mass. State Police*, 492 F.3d 24, 26-27 (1st Cir. 2007). Of the four factors, the first—likelihood of success on the merits—"normally weighs heaviest in the decisional scales." *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009); *see also Howe v. U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr. Series 2016-CTT*, No. CV 19-12597-NMG, 2020 WL 730890, at *2 (D. Mass. Feb. 13, 2020). A strong likelihood of success on the merits can overcome a "somewhat less" showing of another element. *Peoples Fed. Savings Bank v. People's United Bank*, 750 F. Supp. 2d 217 (D. Mass. 2010) (quoting *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)).

In addition, under Federal Rule of Civil Procedure 65(a)(2), a district court may grant final judgment and a permanent injunction so long as the parties have "indisputably clear notice" of the consolidation of the merits and preliminary injunction in the notice of hearing on this motion. *Lamex Foods, Inc. v. Audeliz Lebron Corp.*, 646 F.3d 100, 106-07 (1st Cir. 2011); *see also Aponte v. Calderon*, 284 F.3d 184, 190-91 (1st Cir. 2002) (same); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2950 (3d ed.). Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a)—*i.e.*, there is no disputed fact that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Gabriel v. Wells Fargo Bank Nat'l Ass'n*, No. 19-10630-NMG, 2020 WL 1853226, at *2-3 (D. Mass. Apr. 13, 2020).

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits of their Title IX Claims

#### A.    Plaintiffs Are Likely to Succeed on their *Per Se* Disparate Treatment (Count I) and Associational Sex Discrimination Claims (Count II) Under Title IX

If there were ever any doubt regarding Plaintiffs' likelihood of success, the U.S. Supreme Court's recent landmark civil rights decision in *Bostock* eliminates it.  Harvard's Sanctions Policy is rank sex discrimination, through and through.  Based on *Bostock*, Plaintiffs are all but certain to succeed on their claims challenging the Policy as *per se* disparate treatment (Count I) and associational sex discrimination (Count II) under Title IX.  If anything, Harvard's Policy is even more explicitly sex-based discrimination than the discriminatory employment policies at issue in *Bostock*.  To determine whether to punish a student, the Policy explicitly turns on the sex of both the student and those with whom the student associates.  There is no conceivable doubt that the student's sex is a "but for" cause of punishment under the Policy.

In denying Harvard's motion to dismiss, this Court held that Harvard's Policy plausibly violates Title IX based on both *per se* and associational sex discrimination.  MTD Op. at 15-22.  As the Court explained, "[c]ourts in the First Circuit cite cases from the Title VII context in analyzing the scope of Title IX," and under Title VII "courts apply a 'comparative' or 'but-for' test which determines whether the trait that is the basis for discrimination is a function of sex by asking whether an employee's treatment would have been different 'but for that person's sex.'" *Id.* at 15-16 (quoting *Zarda*, 883 F.3d at 116 (quoting *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978))).  This Court thus held that Plaintiffs "have alleged a plausible claim for violation of Title IX under a disparate treatment theory of liability," because "[a]pplying the comparative or but-for test to the situation of Harvard students subject to the Policy demonstrates that the Policy discriminates on the basis of sex." *Id.* at 19.

In so holding, this Court relied heavily on Second and Seventh Circuit decisions holding that an employer's policy of firing homosexual employees violates Title VII. *Id.* at 19-20. "Just as the employment policies at issue in *Zarda* and *Hively* drew distinctions on the basis of the sex of the homosexual employees, it is impossible for Harvard to apply its Policy without considering both the sex of the particular student and the sex of the other students with whom he or she seeks to associate." *Id.* at 19. "Whereas a male student seeking to join an all-male organization would be subject to the Policy (and vice versa), a female student seeking to join the same all-male organization would not be subject to the Policy (and vice versa)." *Id.* "The fact that the female student would otherwise not be allowed to join the all-male organization because of the organization's own discriminatory policy does not alter the conclusion that the sex of the student is a substantial motivating factor behind the Policy." *Id.* at 19-20. "Indeed, sex is essential to the application of the Policy to any particular student." *Id.* at 20.

This Court found it "simply irrelevant that the Policy applies equally to both male and female students." *Id.* at 20. Citing *Zarda*, *Hively*, and the Supreme Court's decision in *Loving v. Virginia*, 388 U.S. 1 (1967), this Court explained that "[a] policy is no less discriminatory or motivated by sex simply because it applies equally to members of both sexes." MTD Op. at 20. "What matters is that the Policy, as applied to any particular individual, draws distinctions based on the sex of that individual." *Id.* Lastly, the Court noted that a policy that discriminates against a person "on the basis of the protected characteristic of a person with whom the [person] associates" violates Title IX. *Id.* at 17, 20.

In *Bostock*, the Supreme Court unequivocally endorsed every aspect of this Court's decision as to Counts I and II. Affirming the Second Circuit's decision in *Zarda*, the Supreme Court in *Bostock* held that an employer's policy of firing homosexual or transgender employees

violates Title VII.  2020 WL 3146686, at *8.  The Court explained that "[a]n employer violates Title VII when it intentionally fires an individual employee based in part on sex," and "[i]t doesn't matter if other factors besides the plaintiff's sex contributed to the decision."  *Id.* at *6. "So long as the plaintiff's sex was one but-for cause of the defendant's decision, that is enough to trigger the law."  *Id.* at *5 (bracketing omitted).  "If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred."  *Id.* at *6.

Applying the but-for test, the Supreme Court concluded that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  *Id.* at *7.  "Consider, for example, an employer with two employees, both of whom are attracted to men.  The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman.  If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague.  Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge."  *Id.*

The Supreme Court further held that a defendant "cannot escape liability by demonstrating that it treats males and females comparably as groups."  *Id.* at *9.  Under the statute's plain text, "it doesn't matter if the employer treated women as a group the same when compared to men as a group."  *Id.* at *6.  It is therefore no defense for a defendant "to say it discriminates against both men and women because of sex," because the statute "works to protect individuals of both sexes from discrimination, and does so equally."  *Id.*  "So an

8

employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally.  But in *both* cases the employer fires an individual in part because of sex.  Instead of avoiding Title VII exposure, this employer doubles it."  *Id.* at *6.

Nor is it a defense to sex discrimination against an individual man or woman that "an employer may happen to favor women [or men] as a class."  *Id.* at *8 (discussing *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (*per curiam*)).  Indeed, an "employer's insistence that its actions were motivated by a wish to achieve classwide equality between the sexes" is simply "irrelevant."  *Id.* (discussing *Manhart*, 435 U.S. 702).  "An employer's intentional discrimination on the basis of sex is no more permissible when it is prompted by some further intention (or motivation), even one as prosaic as seeking to account for" the fact "that women tend to live longer than men."  *Id.*

*Bostock* is controlling here and conclusively establishes that Harvard's Sanctions Policy constitutes *per se* and associational sex discrimination in violation of Title IX.  As this Court previously recognized, and Harvard has never disputed, courts in the First Circuit look to cases from the Title VII context in analyzing the scope of Title IX.  MTD Op. at 15.  And under a straightforward application of the Supreme Court's Title VII decision in *Bostock*, Harvard's Sanctions Policy violates Title IX.  Harvard cannot determine whether a student has violated the Policy without reference to that student's sex.  Under the Policy's explicit terms and by its natural operation, "sex plays an essential but-for role."  *Bostock*, 2020 WL 3146686, at *13.  That is *per se* sex discrimination as a matter of law, full stop.  As the Supreme Court explained, "[y]ou can call the statute's but-for causation test what you will—expansive, legalistic … even … wooden or literal.  But it is the law."  *Id.* at *10.  Similarly, Harvard cannot determine

9

whether the Policy applies without reference to the sex of the people with whom a student associates.  Under *Bostock*'s inescapable logic, that is clear-cut associational sex discrimination as a matter of law.  *See id.*; *see also* MTD Op. at 20-21.

What's more, *Bostock* roundly rejected each and every argument Harvard makes in defense of the Sanctions Policy.  That Harvard may have considered "other factors besides the plaintiff's sex" in developing and adopting the Policy is irrelevant.  2020 WL 3146686, at *6-7. That Harvard supposedly had some good, nondiscriminatory reason for adopting the Policy is irrelevant.  *Id.* at *8.  And a policy that treats men and women "equally" by discriminating against individuals of both sexes does not avoid Title IX liability, but "doubles it."  *Id.* at *6, *8. "[I]t's irrelevant what [a university] might call its discriminatory practice, how others might label it, or what else might motivate it."  *Id.* at *9.  "When [a university punishes a student] for being [in a single-sex organization], it necessarily and intentionally discriminates against that individual in part because of sex.  And that is all Title [IX] has ever demanded to establish liability."  *Id.* at *9.

Because Harvard's Sanctions Policy discriminates on the basis of the sex of both the affected student and those with whom the affected student associates, Plaintiffs are highly likely to succeed on the merits of their claims for *per se* disparate treatment and associational sex discrimination in violation of Title IX.

### B.      Plaintiffs Are Likely to Succeed on their Claims for Sex Stereotyping (Counts III) and Anti-Male Bias (Count IV) Under Title IX

While discovery remains ongoing with respect to Plaintiffs' other Title IX claims, the evidence uncovered so far confirms the Sanctions Policy's deep roots in impermissible sex stereotypes and anti-male bias.  Plaintiffs thus are likely to succeed on Counts III and IV as well.

In denying Harvard's motion to dismiss, this Court explained that an employer can violate Title VII by acting "on the basis of stereotypes about how a person of a particular gender should be or act."  MTD Op. at 18 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989); *Zarda*, 883 F.3d at 119-20; *Hively*, 853 F.3d at 346-47).  And as the Court explained, Title VII's prohibition on sex-stereotyping discrimination applies equally to Title IX.  *Id.* at 19 (citing *Harrington v. City of Attleboro*, No. 15-CV-12769-DJC, 2018 WL 475000, at *5 (D. Mass. Jan. 17, 2018)).  The Court concluded that Harvard's Sanctions Policy was plausibly motivated, at least in part, by sex stereotypes, including "the view that single-sex, social organizations promote sexual assault and bigotry on campus and produce individuals who fail to act as modern men and women should."  *Id.* at 21.  The Court also found that the Policy was plausibly motivated by anti-male bias, noting that "various Harvard committees and administrators have made disparaging comments about all-male 'final clubs,' indicating that such organizations promote sexual violence, misogyny and bigotry."  *Id.* at 21-22.

As outlined in the Complaint, between Fall 2014 and Spring 2016, Harvard engaged in an aggressive pressure campaign to get men's final clubs to go co-ed.  Dkt.1 ¶¶ 11, 112, 119.  On May 6, 2016, Harvard announced the Sanctions Policy.  *Id.* ¶ 148.  Thereafter, Harvard created two committees:  *first*, the "Implementation Committee," announced in September 2016, to "outlin[e] the expectations and principles that would characterize a formal relationship between private, gender-inclusive social organizations and Harvard College," Ex. 8 at HARV-F-00003293, 3297; *second*, the "USGSO Committee," a faculty committee formed in January 2017 to avert a faculty vote to rescind the Policy, Dkt.1 ¶ 163.  Each Committee produced multiple "reports," resulting most notably in the Final Report of the Implementation Committee on February 17, 2017, which reaffirmed the May 6, 2016 Policy.  Ex. 8 at HARV-F-00003288.  The

Policy took effect for freshmen starting in Fall 2017—*i.e.*, the class of 2021, who are now seniors.

Evidence adduced in discovery reveals, however, that the Sanctions Policy (or something very much like it) was in the works long before May 2016; that the process for adopting the Policy was infused with sex stereotypes and anti-male bias; and that the Implementation and USGSO Committees were constituted to do little more than add a veneer of process to decisions already made by Harvard's administrators long before.

In an internal memo and presentation prepared in late 2015 and early 2016, the architect of the Sanctions Policy—Dean Rakesh Khurana—declared that he wanted to punish men who join men's groups because men's groups "jeopardize safety."  Ex. 4 at HARV-F-00002328-29; Ex. 9 at HARV-F-00002350.  These documents show that Khurana already planned to target men's organizations long before Harvard formed any committee or engaged in any kind of deliberative process, and that he was motivated to do so by a view that men's groups are categorically unsafe places.  *See id.*; *see also* Ex. 10 at HARV-F-00002257; Ex. 11 at HARV-F-00002457.  The documents also show that the supposed "gender equity" rationale for the Policy was nothing but messaging.  In a list of "pros" for targeting all single-sex organizations as a way of eliminating men's groups, Khurana wrote that this ostensibly even-handed approach would improve "public relations: 'University committed to gender equity.'"  Ex. 9 at HARV-F-00002357; *see also* Ex. 12 at HARV-F-00003018; Ex. 13 at HARV-F-00011645; Ex. 14 at HARV-F-00011978; Ex. 15 at HARV-F-00012382.

In an email and attachment sent to Dean Khurana on March 2, 2016, Harvard's then-President Drew Faust expressed similar anti-male bias in supporting adoption of the Sanctions Policy.  Ex. 5 at HARV-F-00002383; Ex. 6 at HARV-F-00002384.  Faust declared that "the

continuing hegemony of exclusive all male Final Clubs over undergraduate social life is deeply

disturbing."  Ex. 6 at HARV-F-00002384.  In her view, men's groups—which she characterized

as "overwhelmingly white and largely financially well-off men"—"yield disproportionate

numbers of sexual assaults" as "the product of the hierarchical, gendered assumptions that form

the very basis for [their] existence."  *Id.*  "These organizations and the attitudes their current

structure -- all male, unsupervised access to alcohol, exclusivity of male membership --inevitably

encourages pose real dangers," including to "fundamental physical safety."  *Id.*

Numerous other previously unavailable documents show that sex stereotypes and anti-

male bias shaped the Policy and drove its adoption.  In internal Harvard documents, men's

organizations are consistently described as places of misogyny, racism, homophobia, and sexual

violence; women are consistently described as unequal, victimized, and disempowered; and

women's organizations are disregarded as an unfortunate consequence of men's organizations,

existing solely as a mechanism to cope with exclusion from men's spaces.  By way of example:

- In a March 8, 2015 email to Dean Khurana, another Harvard dean supported "[m]arginalizing the clubs as you've described" to gain "***more control of the gender dynamics***."  Ex. 1 at HARV-F-00011512 (emphasis added).  In a September 1, 2015 email to Dean Khurana supporting the Policy, this dean wrote that "we have an ***obligation to re-educate both male and female students about appropriate sexual norms***."  Ex. 2 at HARV-F-00002211 (emphasis added).

- In a May 2, 2016 email exchange, Dean Khurana expressed agreement with another faculty member's statements that Harvard's women's groups "***emerged in reaction to a male-dominated culture***," that "the male-dominated culture won't go away overnight," and that "you don't think it is consistent with our values to support normalizing that male dominated culture by creating organizations that ***attempt to compensate for the fact that they haven't been given access to these more powerful organizations***."  Ex. 16 at HARV-F-00002490 (emphases added).  Khurana replied:  "Exactly the point we would like to make.  I don't want to institutionalize 'separate but equal.'"  *Id.*  In a September 12, 2017 message to Dean Khurana, this faculty member wrote that she had "tried to edit" his draft remarks concerning the Sanctions Policy "to make the move from 'all single gender' to ***'male are the main problem'*** smoother," but she did not know "the best way to deal with that particular critique (that ***this is really about a handful of***

13

*male clubs* that have parties and **not about all the groups**).”  Ex. 17 at HARV-F-00004360 (emphases added).

- According to notes from the Implementation Committee's November 30, 2016 "outreach meeting" with other Harvard stakeholders, one committee member said that the Policy seeks to alter "**expectations on gender**," and that "[o]ur **formal charge is gender**."  Ex. 7 at HARV-F-00001703 (emphases added); *id.* at 1704 ("We were charged with looking at gender … .").  Another committee member stated that "[t]he policy **does focus on gender**," and in response to a question about "other steps being made related to sexual assault," he stated, "Our formal charge is … **not sexual assault**."  *Id.* at 1703 (emphases added).  This member also said that "the **sororities have developed in response to the Final Clubs**," *id.* at 1704 (emphasis added), and he acknowledged "the possibility of **collateral damage to other orgs** with meritorious goals," *id.* at 1705 (emphasis added).

- In a March 2017 report questioning "whether the new sanctions unduly punish single sex female clubs," a committee of the Harvard Board of Overseers wrote that "[a]lthough some may have **formed as a reaction to the male clubs**, they do also serve a function of providing women extra support in a still unequal environment."  Ex. 18 at HARV-F-00010893 (emphasis added).

- Harvard administrators persisted in these stereotypical views about women's groups even as they were told repeatedly that these are *not* the only or even predominant reasons that women's groups exist.  *See, e.g.*, Ex. 19 at HARV-F-00011629 ("As for single-sex organizations, I can assuredly say that without my participation in the Seneca, I may not have had the confidence to compete for and win a Rhodes Scholarship…. Being a member of the Seneca opened my mind to an amazing group of supportive, dynamic women—women who cheered me on when I was having trouble coming up with a Rhodes essay topic, and who helped me study current events for my eventual Rhodes interviews.").

- In a December 2, 2016 email, the Implementation Committee's graduate assistant wrote that "Harvard deliberately wants to break from the traditions that are invoked and reperformed every weekend when the apex of social life is final clubs -- that is, **heterosexist patriarchy** with a binge-drinking focus."  Ex. 20 at HARV-F-00001724 (emphasis added); *see also* Ex. 21 at HARV-F-00001810.

- The Confidential "Appendix C" to the Implementation Committee's February 17, 2017 Final Report (written by the same graduate assistant) states that single-sex organizations are harmful to transgender and homosexual students because "the gender binary is preserved and affirmed whenever gender is the organizing principle for an institution"; "[g]ender separation affirmed/enforced through heteronormative social spaces"; "gender binary is conflated onto hetero binary" and "masculinity and hetero violations manifest through misogyny."  Ex. 8 at HARV-F-00003325, 3333-34.  A month later, a presentation entitled "USGSO" states that "[m]en's final clubs in particular can leverage the historical dominance

of gender, class, and race, to preserve [their] power."  Ex. 22 at HARV-F-0003478.

- In a September 16, 2017 email to Dean Khurana, another faculty member wrote that "some faculty detractors, often white men who have spent significant time at the institution, express concern for women's sexual violation in final clubs while describing their own efforts to intervene (usually through guidance and moral suasion) on behalf of female students' safety.  Not only does this gesture depend upon and reinforce victim-blaming, it is part of a deeply problematic historical genealogy of chivalric rescue by which (white, propertied) men are the protectors of (white) women's virtue.  The racial and heterosexist implications are often lost to those people who invoke this logic of protection, which is in part why they are perniciously influential."  Ex. 23 at HARV-F-00012110.  Dean Khurana responded that these statements "put into words feelings I've had but didn't have language for."  *Id.*  Days later, on September 29, 2017, the USGSO Committee issued its Final Report stating that "[s]ome faculty shared their own efforts to persuade female students not to attend final club parties or to attend only with trusted friends.  But as well-intentioned as these efforts may be, they are couched in what the committee sees as an inside-out effort to shape the behavior of those targeted by gender inequity and other harms, rather than those responsible."  Ex. 24 at ALL00000913.

These documents reinforce the evidence Plaintiffs already marshalled from public sources in the Complaint.  Through the Sanctions Policy, Harvard wanted to eliminate men's organizations *because* they are men's organizations, and to change the behavior of its male and female students based on the administration's perceptions about those students' essential qualities as men and women.  That is sex-stereotyping and anti-male bias, plain and simple.

## II.    The Equities Favor an Injunction Against the Sanctions Policy

### A.    Plaintiffs Will Suffer Irreparable Harm Without an Injunction

Harvard's ongoing violation of Title IX is causing Plaintiffs irreparable harm.  To begin with, sex discrimination itself is a form of irreparable harm.  *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) (holding there is a presumption of irreparable harm when a plaintiff has shown a "violat[ion] [of] a civil rights statute"); *Rogers v. Windmill Pointe Village Club Ass'n*, 967 F.2d 525, 528 (11th Cir. 1992) (irreparable harm "may be presumed from the fact of discrimination"); *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983,

998 (E.D. Mich. 2018) (Title IX plaintiffs showed irreparable injury by demonstrating that their right to be free from discrimination under Title IX had likely been violated).

The irreparable loss of specific opportunities that Harvard's Policy inflicts is also irreparable harm.  The Policy denies students in single-sex groups the ability to hold leadership positions in recognized student organizations at Harvard, to captain athletic teams, and to apply for prestigious scholarships and fellowships.  *See* Ex. 25, Decl. of John Doe 1 ¶¶ 3-5, Dkt.6-1; Ex. 26, Decl. of John Doe 2 ¶¶ 3-4, Dkt.6-2.  The loss of those sorts of unique and irreplaceable opportunities is irreparable.  *See Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) (granting a preliminary injunction prohibiting the elimination of certain women's teams and recognizing that a plaintiff suffers an irreparable harm if he or she "lose[s] the opportunity to participate in their sport of choice on a continuous and uninterrupted basis").

The Sanctions Policy also poses an existential threat to the organizational Plaintiffs, substantially interfering with their ability to recruit and retain members at Harvard.  Ex. 27, Pls.' Verified Interrog. Resps. at 25-28.  This is no hypothetical concern:  the Policy already eliminated nearly all of the local sorority chapters at Harvard.  And the membership of the organizational Plaintiffs has significantly dwindled since the Policy went into effect, leading to reduced membership fees and, in turn, a reduced budget.  *Id.*  These chapters will continue to lose members and dues so long as the Policy is in effect, which could lead to their demise at Harvard.  Courts have long recognized that where an injury threatens an organization's very existence, that harm is irreparable.  *See, e.g.*, *Suero v. Fed. Home Loan Mortg. Corp*, No. 13-13014-JGD, 2013 WL 6709001, at *7 (D. Mass. Dec. 17, 2013) (noting that threatened loss of "the very existence of the movant's business" is irreparable harm (quotation marks omitted)).

16

**B.     The Balance of Hardships Weighs in Plaintiffs' Favor**

The balance of hardships overwhelmingly favors injunctive relief.  On one hand, under controlling U.S. Supreme Court precedent, the Sanctions Policy clearly constitutes unlawful sex discrimination against students in violation of Title IX.  If permitted to remain in effect for the upcoming academic year, the Policy will continue discriminating against John Does 1 and 2 and the members of Sigma Chi and Sigma Alpha Epsilon, among thousands of other Harvard students, on the basis of their sex.  Notably, this will be the first academic year in which the Policy applies to seniors—those most likely to seek leadership positions in student organizations, to captain athletic teams, and to apply for prestigious post-graduate fellowships like the Rhodes, Marshall, and Mitchell Scholarships.  These students will be forced to choose between being a member of a single-sex social organization and having these other important opportunities.

In contrast, enjoining the Sanctions Policy will cause no hardship to Harvard.  A defendant can claim no legitimate interest in continuing to enforce an unlawful, discriminatory policy.  Beyond that, Harvard will simply be in the same place it had been for decades before the Policy took effect.  *See, e.g.*, *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Edu.*, 858 F.3d 1034, 1054 (7th Cir. 2017) (rejecting school's claim of harm if a preliminary injunction allowed a transgender student to use the boy's restroom because the transgender student had used that restroom for nearly six months without incident and there was no evidence of any invasion of privacy); *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (defendant is "in no way harmed by issuance of a preliminary injunction which prevents it from enforcing" a school policy that is likely to be found unconstitutional); *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 974 (D. Minn. 2016) (balance of hardships weighed in Title IX plaintiff's favor in part because "continuing the tennis team for one more

year will apparently cost little if anything and merely maintains the status quo").  Moreover,

Harvard will suffer no physical or economic harm if the Court enjoins the Sanctions Policy.

### C.   An Injunction Is in the Public Interest

Enjoining the discriminatory and unlawful Sanctions Policy will serve the public interest.

The public interest is always served by eliminating unlawful sex discrimination.  The "overriding

public interest lay[s] in the firm enforcement of Title IX."  *Cohen v. Brown Univ.*, 991 F.2d 888,

906 (1st Cir. 1993); *see also, e.g.*, *Portz*, 196 F. Supp. 3d at 978 ("[T]he public's interest in

eradicating sex discrimination is compelling."); *Mayerova*, 346 F. Supp. 3d at 999 ("[T]he public

interest is best served by upholding the goals of Title IX.").

Moreover, the requested injunctive relief would have no detrimental effect on the public

interest.  To the contrary, by punishing students for joining unrecognized single-sex social

organizations, Harvard has significantly interfered with these organizations' ability to recruit and

retain new members and continue their philanthropic activities that benefit the public interest.

And sorority chapters for Harvard students will be unable to reopen until the Policy is lifted.

### III.   Plaintiffs' Motion Is Timely

The timing of Plaintiffs' motion does not undercut the need for injunctive relief.

Harvard's Policy is causing ongoing irreparable harm.  Plaintiffs and other Harvard students are

enduring the stigma inflicted by Harvard's unlawful policy, are losing once-in-a-lifetime

opportunities that would otherwise be available to them, and—for the organizational Plaintiffs—

suffering ongoing harm to their ability to recruit and retain new members at Harvard.  In fact, the

irreparable harm will be more severe this year than ever before.  This academic year will be the

first in which the Policy applies to *every* undergraduate student at Harvard, including seniors.

Most athletic captains are seniors, as are students seeking Harvard's institutional endorsement to

apply for prestigious post-graduate fellowships like the Rhodes, Marshall, and Mitchell

Scholarships.  Absent injunctive relief, Harvard seniors will be forced either to hide their membership when pursuing a captainship or a fellowship, or step aside from consideration.

In addition, the uncertainty created by the Supreme Court's review of *Zarda* and other court of appeals decisions underpinning this Court's motion-to-dismiss ruling could have complicated any earlier preliminary injunction motion.  Now, just two weeks after the Supreme Court's decision in *Bostock* conclusively established that Plaintiffs are likely to succeed on the merits, Plaintiffs are promptly moving for preliminary (or permanent) injunctive relief.

Thus, the Court should reject any argument that Plaintiffs' "delay" weighs against them. There is no freestanding "delay" defense to a motion for a preliminary injunction; rather, delay is merely used to assess whether the asserted harms are in fact irreparable.  *See Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) ("[C]ourts are loath to withhold relief solely on [delay] ground[s]." (quotation marks omitted)); *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979) (There is no "general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for a preliminary injunction.").  Delay is especially disfavored as a ground for denying relief in cases like this one, where the conduct challenged is also causing harm to parties not before the Court.  *See Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 96 (D. Me. 2008).  And no amount of purported "delay" can overcome the fact that Harvard's Policy is obviously unlawful sex discrimination beyond any shadow of a doubt, based on controlling U.S. Supreme Court precedent from two weeks ago.

This Court and many others have granted preliminary injunctions in circumstances similar to this case.  *Women, Action & the Media Corp. v. Women in the Arts & Media Coal., Inc.,* No. CIV.A. 13-10089-RWZ, 2013 WL 3728414, at *11 (D. Mass. July 12, 2013) (11-month delay "[not] unreasonable"); *see also Cuviello v. City of Vallejo*, 944 F.3d 816, 833-34 (9th Cir.

2019) (no unreasonable delay when plaintiffs filed their complaint more than a year after becoming aware of the challenged law and sought a preliminary injunction roughly 5 months later); *Douglas*, 757 F.3d at 990-91 (putative delay of 2 years before filing suit, with the preliminary injunction motion filed well after commencement of the suit and after defendants moved to dismiss, was not likely to be probative on remand); *Mayson-Dixon Strategic Consulting, LLC v. Mason-Dixon Polling & Strategic Consulting, Inc.*, 324 F. Supp. 3d 569, 580-81 (D. Md. 2018) (ten-month delay did not undercut irreparable harm where there was no evidence of tactical maneuvering); *Puente Ariz. v. Arpaio*, 76 F. Supp. 3d 833, 860-61 (D. Ariz. 2015), *rev'd in part on other grounds, vacated in part on other grounds,* 821 F.3d 1098 (9th Cir. 2016); *Morris & Assocs., Inc. v. Cooling & Applied Tech., Inc.*, No. 5:09-CV-00023-BR, 2010 WL 4483412, at *4 (E.D.N.C. Oct. 20, 2010) (granting motion for preliminary injunction filed "over one year" after complaint).

In any event, if there is any concern about "delay," the Court can and should convert Plaintiffs' motion into one for final judgment and a permanent injunction on Counts I and II, because there is no genuine dispute of material fact as to those counts.  *See supra* p.5.

In sum, there is no doubt that Plaintiffs are likely to succeed on the merits, that they and numerous other Harvard students are suffering ongoing irreparable harm as a result of Harvard's unlawful, discriminatory Sanctions Policy, and that the balance of equities tips in their favor. The Court should therefore grant this motion.

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction barring enforcement of Harvard's Sanctions Policy pending final resolution of this case, or alternatively grant final judgment and a permanent injunction in favor of Plaintiffs on Counts I and II (after giving notice of consolidation with the merits in the notice of hearing on this motion).

Dated:  June 29, 2020

Respectfully submitted,

**ARNOLD & PORTER
 KAYE SCHOLER LLP**

By:   */s/ R. Stanton Jones*
      R. Stanton Jones (*pro hac vice*)
      John A. Freedman (BBO # 629778)
      Andrew T. Tutt (*pro hac vice*)
      Jayce Born (*pro hac vice*)
      601 Massachusetts Ave., NW
      Washington, DC 20001
      (202) 942-5000
      stanton.jones@arnoldporter.com
      john.freedman@arnoldporter.com
      andrew.tutt@arnoldporter.com
      jayce.born@arnoldporter.com

      Sara L. Shudofsky (*pro hac vice*)
      Ada Añon (*pro hac vice*)
      250 West 55th Street
      New York, NY 10019
      (212) 836-8000
      sara.shudofsky@arnoldporter.com
      ada.anon@arnoldporter.com

      *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the date of electronic filing.

*/s/ R. Stanton Jones*
R. Stanton Jones
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000
stanton.jones@arnoldporter.com