## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KAPPA ALPHA THETA FRATERNITY, INC.; KAPPA KAPPA GAMMA FRATERNITY; SIGMA CHI; SIGMA ALPHA EPSILON; SIGMA ALPHA EPSILON—MASSACHUSETTS GAMMA; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3, | : : : : : : : | |
| | : | Civil Action No.  18-cv-12485 |
| Plaintiffs, | : : | |
| v. | : : | |
| HARVARD UNIVERSITY; PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | : : : | |
| Defendant. | : : | |

### DECLARATION OF R, STANTON JONES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR PERMANENT INJUNCTION

I, R. Stanton Jones, hereby state under oath:

I am a member in good standing of the bar of the District of Columbia, admitted pro hac vice in this Court, and am a partner at Arnold & Porter Kaye Scholer LLP.  I am one of the counsel representing Plaintiffs in the above-captioned matter.  I submit this declaration in support of Plaintiffs' Motion for Preliminary or Permanent Injunction.

1.      Attached hereto as Exhibit 1 is a true and accurate copy of an email from Sheila Thimba to Rakesh Khurana, with subject line "RE: Final Club," dated March 8, 2015, HARV-F-00011512-11513.

2.       Attached hereto as Exhibit 2 is a true and accurate copy of an email from Sheila Thimba to Rakesh Khurana, with subject line "For Bill," dated September 1, 2015, HARV-F-00002211.

3.       Attached hereto as Exhibit 3 is a true and accurate copy of a document entitled "Social Groups Committee.docx," authored by Louis Menand, dated October 26, 2016, HARV-F-00001596.

4.       Attached hereto as Exhibit 4 is a true and accurate copy of a document entitled "Final Club Memo.11.26.15.rkedit.docx," dated November 26, 2015, HARV-F-00002328-2330.

5.       Attached hereto as Exhibit 5 is a true and accurate copy of an email from Drew Faust to Rakesh Khurana, with subject line "clubs etc.," attaching "Club Case.docx," dated March 2, 2016, HARV-F-00002383.

6.       Attached hereto as Exhibit 6 is a true and accurate copy of a document entitled "Club Case.docx," authored by Drew Faust, dated March 2, 2016, HARV-F-00002384-2385.

7.       Attached hereto as Exhibit 7 is a true and accurate copy of a document entitled "Nov 30 - Foundation SAC.docx," authored by Daniel Becton, dated November 30, 2016, HARV-F-00001703-1707.

8.       Attached hereto as Exhibit 8 is a true and accurate copy of a document entitled "Final Report of the Implementation Committee (02.17.2017).pdf," authored by Lauren Brandt, dated February 21, 2017, HARV-F-00003288-3344.

9.       Attached hereto as Exhibit 9 is a true and accurate copy of a document entitled "Final Club Corporation.pdf," from custodian Rakesh Khurana, dated January 25, 2016, HARV-F-00002350-2360.

10.     Attached hereto as Exhibit 10 is a true and accurate copy of a document entitled "Notes.Idea.docx," authored by Joan Rouse, dated September 17, 2015, HARV-F-00002257-2259.

11.     Attached hereto as Exhibit 11 is a true and accurate copy of an email from Lawrence Summers to Rakesh Khurana, with subject line "Re: Final Clubs," dated Apr. 24, 2016, HARV-F-00002456-2459.

12.     Attached hereto as Exhibit 12 is a true and accurate copy of a document entitled "Town Hall Talking Points (KKSedit10.13.16).docx," authored by David R. Friedrich, dated October 10, 2016, HARV-F-00003017-3019.

13.     Attached hereto as Exhibit 13 is a true and accurate copy of an email from Fareed Zakaria to Rakesh Khurana, with subject line "Re: Op-Ed in Crimson," dated May 12, 2016, HARV-F-00011645-1164.

14.     Attached hereto as Exhibit 14 is a true and accurate copy of an email from Rakesh Khurana to Papa Chakravarthy, with subject line "Re: Sanctions against single sex organizations," dated July 22, 2017, HARV-F-00011978-1197.

15.     Attached hereto as Exhibit 15 is a true and accurate copy of an email from Rakesh Khurana to Jane Rosenzweig, with subject line "Draft letter," dated November 26, 2018, HARV-F-00012382-12383.

16.     Attached hereto as Exhibit 16 is a true and accurate copy of an email from Rakesh Khurana to Jane Rosenzweig, with subject line "Re: thoughts," dated May 2, 2016, HARV-F-00002490-2491.

17.     Attached hereto as Exhibit 17 is a true and accurate copy of a document entitled "FacultyCouncil11-12-17.rkeditjredit.docx," authored by Rakesh Khurana, dated September 12, 2017, HARV-F-00004360-4361.

18.     Attached hereto as Exhibit 18 is a true and accurate copy of a document entitled "VC Letter of Transmittal, Harvard College - 2018.06.13.pdf," from custodian Rakesh Khurana, dated June 21, 2018, HARV-F-00010877-10924.

19.     Attached hereto as Exhibit 19 is a true and accurate copy of an email from Rachael Wagner to Rakesh Khurana, with subject line "Message from a Rhodes Scholar, Seneca Member, and former Cabot House resident," dated May 9, 2016, HARV-F-00011629.

20.     Attached hereto as Exhibit 20 is a true and accurate copy of an email from Daniel Becton to David Friedrich and Lauren Brandt, with subject line "Updated benchmarking report," dated December 2, 2016, HARV-F-00001724.

21.     Attached here to as Exhibit 21 is a true and accurate copy of a document entitled "Daniel - outline adds.docx," authored by Daniel Becton, dated December 16, 2016, HARV-F-00001810-1811.

22.     Attached hereto as Exhibit 22 is a true and accurate copy of a document entitled "USGSO.pdf," from custodian Rakesh Khurana, dated March 17, 2017, HARV-F-00003475-3480.

23.     Attached hereto as Exhibit 23 is a true and accurate copy of an email from Rakesh Khurana to Caroline Light, with subject line "Re: some USGSO thoughts (with apologies for the Saturday intrusion)," dated September 16, 2017, HARV-F-00012110-12111.

24.     Attached hereto as Exhibit 24 is a true and accurate copy of a document entitled "Final Report of the Committee on Unrecognized Single-Gender Social Organizations (USGSOs)," dated September 29, 2017, ALL00000909-933.

25.     Attached hereto as Exhibit 25 is a true and accurate copy of the Declaration of John Doe 1, Dkt.6-1, dated December 3, 2018, p. 1-4.

26.     Attached hereto as Exhibit 26 is a true and accurate copy of the Declaration of John Doe 2, Dkt.6-2, dated December 3, 2018, p. 1-4.

27.     Attached hereto as Exhibit 27 is a true and accurate copy of excerpts from Organizational Plaintiffs' Verified Responses and Objections to Harvard's First Set of Interrogatories, p. 1, 25-28, and accompanying Verifications.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, June 29, 2020.

/s/ R. Stanton Jones
R. Stanton Jones (*pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000
stanton.jones@arnoldporter.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the date of electronic filing.

/s/ R. Stanton Jones
R. Stanton Jones (*pro hac vice*)
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000
stanton.jones@arnoldporter.com

## EXHIBITS SUPPORTING PLAINTIFFS' MOTION FOR
## PRELIMINARY INJUNCTION OR PERMANENT INJUNCTION

### Documents

**Exhibit**                                                                        **Page(s)**

Ex. 1.   Mar. 8, 2015, Email from Sheila Thimba to
         Rakesh Khurana, "Fwd: Final Club" .....................................HARV-F-00011512-11513

Ex. 2.   Sept. 1, 2015, Email from Sheila Thimba to
         Rakesh Khurana, "For Bill" ............................................... HARV-F-00002211

Ex. 3.   Oct. 26, 2016, "Social Groups
         Committee.docx," Authored by Louis Menand ................................ HARV-F-00001596

Ex. 4.   Nov. 26, 2015, "Final Club
         Memo.11.26.15.rkedit.docx," Custodian is
         Rakesh Khurana .......................................................HARV-F-00002328-2330

Ex. 5.   Mar. 2, 2016, Email from Drew Faust to
         Rakesh Khurana, "clubs etc." Attaching "Club
         Case.docx" ............................................................ HARV-F-00002383

Ex. 6.   Mar. 2, 2016, "Club Case.docx," Authored by
         Drew Faust ...........................................................HARV-F-00002384-2385

Ex. 7.   Nov. 30, 2016, "Nov 30 - Foundation
         SAC.docx," Authored by Daniel Becton .................................HARV-F-00001703-1707

Ex. 8.   Feb. 21, 2017, "Final Report of the Implemen-
         tation Committee (02.17.2017).pdf," Authored
         by Lauren Brandt ....................................................HARV-F-00003288-3344

Ex. 9.   Jan. 25, 2016, "Final Club Corporation.pdf,"
         Custodian is Rakesh Khurana .................................................HARV-F-00002350-2360

Ex. 10.  Sept. 17, 2015, "Notes.Ideas.docx," Authored
         by Joan Rouse ........................................................HARV-F-00002257-2259

Ex. 11.  Apr. 24, 2016, Email from Lawrence
         Summers to Rakesh Khurana, "Re: Final
         clubs" ................................................................HARV-F-00002456-2459

Ex. 12.  Oct. 10, 2016, "Town Hall Talking Points
         (KKSedit10.13.16).docx," Authored by David
         R. Friedrich ...........................................................HARV-F-00003017-3019

i

Ex. 13.   May 12, 2016, Email from Fareed Zakaria to
Rakesh Khurana, "Re: Op-ed in Crimson" ............................HARV-F-00011645-11647

Ex. 14.   July 22, 2017, Email from Rakesh Khurana to
Papa Chakravarthy, "Re: Sanctions against
single sex organizations" ........................................................HARV-F-00011978-11979

Ex. 15.   Nov. 26, 2018, Email from Rakesh Khurana to
Jane Rosenzweig, "Draft letter".............................................HARV-F-00012382-12383

Ex. 16.   May 2, 2016, Email from Rakesh Khurana to
Jane Rosenzweig, "Re: thoughts" ...........................................HARV-F-00002490-2491

Ex. 17.   Sept. 12, 2017, "FacultyCouncil11-12-
17.rkeditjredit.docx," Authored by Rakesh
Khurana....................................................................................HARV-F-00004360-4361

Ex. 18.   June 21, 2018, "VC Letter of Transmittal,
Harvard College - 2018.06.13.pdf," Custodian
is Rakesh Khurana ..................................................................HARV-F-00010877-10924

Ex. 19.   May 9, 2016, Email from Rachael Wagner to
Rakesh Khurana, "Message from a Rhodes
Scholar, Seneca Member, and former Cabot
House resident" ....................................................................... HARV-F-00011629

Ex. 20.   Dec. 2, 2016, Email from Daniel Becton to
David Friedrich and Lauren Brandt, "Updated
benchmarking report" ........................................................... HARV-F-00001724

Ex. 21.   Dec. 16, 2016, "Daniel - outline adds.docx,"
Authored by Daniel Becton ....................................................HARV-F-00001810-1811

Ex. 22.   Mar. 17, 2017, "USGSO.pdf," Custodian is
Rakesh Khurana .....................................................................HARV-F-00003475-3480

Ex. 23.   Sept. 16, 2017, Email from Rakesh Khurana
to Caroline Light, "Re: some USGSO
thoughts (with apologies for the Saturday
intrusion)" ..............................................................................HARV-F-00012110-12111

Ex. 24.   Final Report of the Committee on
Unrecognized Single-Gender Social
Organizations (USGSOs) September 29, 2017...................................ALL00000909-933

**Declarations**

| Exhibit | | Page(s) |
|---|---|---|
| Ex. 25. | Declaration of John Doe 1, Dkt.6-1 | 1-4 |
| Ex. 26. | Declaration of John Doe 2, Dkt.6-2 | 1-4 |

**Discovery Responses**

| Exhibit | | Page(s) |
|---|---|---|
| Ex. 27. | Excerpts from Organizational Plaintiffs' Verified Responses and Objections to Harvard's First Set of Interrogatories and accompanying Verifications | 1, 25-28 |

# EXHIBIT 1

| From: | Thimba, Sheila [thimba@fas.harvard.edu] |
|---|---|
| Sent: | 3/8/2015 9:23:07 AM |
| To: | Khurana, Rakesh [rkhurana@hbs.edu] |
| Subject: | Fwd: Final Club |

Sorry for all the typos before!  Corrected version below.

And an additional thought for Drew:  use March being Women's history month to speak about gender issues and to give wings to the UC cause.  Urge her to use the bully pulpit!

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------
From: "Thimba, Sheila" <thimba@fas.harvard.edu>
Date: 03/08/2015 8:59 AM (GMT-05:00)
To: "Khurana, Rakesh" <rkhurana@hbs.edu>
Subject: RE: Final Club

Hi Rakesh,
I'm sorry for the delayed response...I just saw this email.  And the news that the party was cancelled!  Kudos.

I think the end game is b and a, in that order. Marginalizing the clubs as you've described means creating real competition for their brand of entertainment - better parties elsewhere where we have more control of the gender dynamics (and alcohol consumption).  I spent the evening with my Kenyan girls and they said that one problem for the Hoco's is still funding.  The Final clubs have angel investors for their parties that house committees don't.  So, maybe the Paul Finnegans of the world want to do something about that.  (They also pointed out that though they have tried and a couple are freshmen, and think they're attractive enough, they've never been able to get into a final club party...so call out the racial dynamics too!)

On reform, start as you laid out, by asking for some interim measures...no first year women, no hard alcohol, no sexist/racist/crude themes.

Next, ask about their mission...where do service and citizenship fit in? Call on them to exist for a higher purpose.

Back into the issue of membership...ask about class, for instance, before race and gender.  Just like the American experiment, perhaps the same integrationist trajectory works here...first the poor white guys are enfranchised, then the non-white guys, then the women.  I say that informed in part by Princeton ' s co-ed experiment in eating clubs that isn't a shining example of how women change the scene - sometimes, they are corrupted by the uneven power dynamics and the sexist culture gets worse in spite of their presence.  We see this in workplaces where women are unequally represented - they end up subordinated and muzzled by their participation in the enterprise.

I don't think shutting them down ought to be our goal.   It's too assailable and it'll harden the resistance.  I'm not sure what other dramatic actions there are.

BTW, I see lots of emails about OSAPR and AODS plans to dialogue with the clubs...should we coordinate the messaging?

HARV-F-00011512

Best,
Sheila

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------
From: "Khurana, Rakesh" <rkhurana@hbs.edu>
Date: 03/07/2015 4:58 PM (GMT-05:00)
To: "Thimba, Sheila" <thimba@fas.harvard.edu>
Subject: Final Club

Sheila,

Drew asked how she could further support this effort and what her next steps might be. I am not sure what to suggest. I think the question is what we think the end game is:

(a) Reform the Clubs (e.g. co-ed; better behavior; etc.)

(b) Marginalize their importance on campus

(c) More dramatic action

We would then need to work backwards or sequence the events. I let Joan know (before the Spee party invitation) that I was hoping she would soon have the summary of the ways schools have managed single gender social organizations ready so that we can start thinking where to go next. My sense is that she hasn't yet analyzed the articles or past final club reports yet and needs time.

Any thoughts?

RK

# EXHIBIT 2

| | |
|---|---|
| **From:** | Thimba, Sheila C. [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E48599A744574A4CBA69E43DAC9777B8-SCT125] |
| **Sent:** | 9/1/2015 11:34:49 AM |
| **To:** | Khurana, Rakesh [rkhurana@fas.harvard.edu] |
| **Subject:** | For Bill |

Hi,
Here are some talking points:

1.  This is our Bezos moment…there is clear, public knowledge of a culture at the College that is hostile to young women and detrimental to our stated goal of building an inclusive community in which all our students thrive.  I cannot ignore this any more than you might if presented with this kind of data about your organizations.

2.  The relationship between unequal gender dynamics and sexual misconduct has been established and underscored by the St. Paul's case most recently.  We need to address gender inequity as we work to reduce instances of sexual assault on our campus if we're to continue to attract the most talented students – male and female.

3.  We don't want a 'mattress' story (Columbia) or a suicide (Rutgers) or a rape (name your college) to drive our response to this issue.  We have the information we need and the opportunity to proactively lead the sector in dealing with this and we should seize it.  We can thus control our story.

4.  While the data show that 15% of assaults occur in Final Clubs, the outsize influence of Final Clubs on the culture of the College is the main reason I've engaged them about this over the last year.  Changing their practices, as they've voluntarily begun to, is an important signifier of the change we're seeking, and now that we have unfrozen their practices, we need to help move them to a new norm.

5.  This problem has multiple causes and manifestations, and will require multiple solutions.  We will see in the report from the Hyman committee a long list of recommendations and I've asked my team to begin to concretize these recommendations into action plans that we can put in place beginning this year.  Each intervention we make is a piece in a puzzle – it doesn't stand alone.

Other random thoughts…
--an opportunity to complete the Radcliffe merger project by bringing down remaining barriers to full equality of students
--a chance to remove an aspect of our competitive disadvantage among our peers who no longer have exclusive single-sex student organizations
--we have an obligation to re-educate both male and female students about appropriate sexual norms – neither sexual entitlement nor sexual compromise should be the default norm
--there are aspects of this problem, particularly having to do with people from outside our community and sexual violence between same sex individuals, that need particular attention
--landscape changed significantly in recent months – OCR's focus on Title IX's provision to equal access underscores our responsibility to address 'hostile environments'

Good luck,

Sheila

--
Sheila Thimba
Dean, Administration and Finance
Harvard College
617.495.7897

HARV-F-00002211

# EXHIBIT 3

Social Groups Committee
Subcommittee on Governance/Implementation

We understand the *rationale* for the policy on single-sex social organizations to be the enforcement of the principle of non-discrimination based on characteristics of "intrinsic identity," such as race and gender, that the College expects all undergraduates to respect. Such respect would include accepting the conditions the College sets on membership in discriminatory social organizations, including ineligibility for certain leadership positions and fellowships, as the price of that membership.

We understand the *goal* of the policy to be the creation of an institutional culture in which undergraduates regard gender- and race-neutral organizations as the norm, and in which peer expectations, rather than administrative sanctions, is the predominant influence on student choice. We would want the single-sex idea to wither away, rather than be stamped out.

We believe that the *means* of implementation should reflect the values of trust, honesty, and transparency. Implementation should be clear and consistent, but it is of fundamental importance that students not perceive it as intrusive or punitive. In the short run, we would rather err on the side of allowing some students to evade the restrictions than adopt processes that students might regard as inquisitional.

We understand the purpose of linking the policy of non-discrimination to leadership positions in student organizations and athletic teams and to fellowships requiring sponsorship from the College to be a way of stating that students who belong to discriminatory social organizations do not fully represent the College and its values.

Our task (assuming we are in agreement with the above) is therefore to:

- Define "leadership positions."
- Identify the fellowships affected by the policy.
- Devise a mechanism for students to attest or affirm their eligibility for leadership positions and/or fellowships.
- Propose administrative procedures for dealing with violations of the policy.

# EXHIBIT 4

For almost 30 years now, Harvard University has been concerned about the male Final Clubs, given their exclusionary recruitment practices and the reports of negative behaviors such as high-risk drinking, sexual and physical violence, and hazing of new recruits. While some have argued that the clubs are capable of internal reform, meaningful progress has been uneven, limited, and in some cases regressive by creating a context in which men dominate women by controlling access to valued social space. The all male final clubs create gender based inequities at Harvard College by reinforcing the stereotypic notion that men and women should have separate roles in society. Any asserted benefits they provide their members is significantly outweighed by the real harm they have inflicted on our broader Harvard College culture by institutionalizing gender inequities on campus, distorting student perceptions that University condones these organizations and fears offending the sensibilities of the alumni boards, and by undermining our mission to educate citizens for a diverse global society.

It is now clear that only with official pressure in an environment that threatens their survival is real change possible. Given the results of the sexual assault survey, the open Title IX Office of Civil Rights investigation facing the College , we now have an opportunity to substantively reform a problematic institution that threatens our students' safety and well-being, opposes the University's commitment to create a culture of belonging and inclusion, and actively defies the University's authority and responsibility to comply with the requirements of Title IX.

*History*
As we know, the Final Clubs ceased any official connection with the College in 1985 when the College insisted they adhere to the nondiscrimination practices that apply to other campus student organizations. In 2006, then Dean Benedict Gross, took additional substantive actions to require clubs to sign an anti-hazing statement and the introduction of an alcohol amnesty policy for getting students to medical care when two students nearly died from alcohol poisoning during a hazing ritual.

For almost three decades, these organizations have avoided accountability for their actions by claiming they are private organization, operating in accordance with the principles and laws of a private social organization. In practice, they have not acted as private organizations. They have had a harmful impact on student safety (2015, Sexual Assault Survey); create an inequitable gender experience at Harvard College (potentially putting us in violation of Title IX and threatening the University's federal financing); and their exclusionary membership policies and practices are in opposition to Harvard College's educational philosophy and residential House system.

**Analysis**
Last year we reached a cross-roads. During official Overseer and Corporation meetings, as well as in numerous one-on-one discussions with alumni, students, parents, and faculty, I was repeatedly told that the culture and behavior of Final Clubs threatened student well-being and safety, negatively impacted the Harvard College culture and the attitudes and values of its members, and that their exclusion of women was embarrassing, not only undermining Harvard College's educational philosophy, and was an obstacle to creating a culture of inclusion for all students and the status quo was no longer sustainable.

While we respect that people have a right to form their own social groups, these rights exist only when those social groups exist only for their members and do not impact the broader community. Whenever a group, even a private group, has an impact on the broader community within which it is embedded, especially when its activities undermine the safety and values of that broader community, the status quo is not sustainable. The many well-documented behaviors that the Final Clubs frequently evince (e.g., the exclusion and objectification of women, discrimination, law-breaking, violating Cambridge's noise

ordinances, lack of transparency, hazing, and a culture that encourages suppression of personal accountability as well as dangerous drinking and non-consensual sexual behavior) impact the broader community and therefore their impact is not limited to their members. The all male Final Clubs, insofar as they are steeped in these behaviors, many of which are now rooted in their culture, jeopardize safety and undermine the optimal intellectual and social environment for Harvard Students. As stewards and trustees of this institution, we cannot stand by while the behaviors and attitudes espoused at the Clubs are at odds with the aspirations of the 21st century society to which we hope and expect our students will contribute. As an institution, we must have the courage to protect our values and our students, even in the face of short-term criticism.

Last year, the College, with guidance and active participation of some members of the Corporation, Overseers, and University Leadership began to directly engage with final club members and their graduate boards. While we are encouraged by the fact that two male final clubs are now welcoming all genders, further progress cannot be achieved without a clear statement from the University and the Corporation about the consequences if these organizations continue to co-opt Harvard's student body, Harvard's global reputation and position in society, to further their own narrow interests while off-loading the costs on the larger College culture and student body.

**Action Plan**

The Corporation and University Leadership need to officially notify Clubs leadership and their governing boards that the status quo is no longer sustainable and that the University must be informed by April 1st that the clubs have a choice to remain single gender private clubs or become registered student social organizations (as distinct from recognized student groups). Two members of the Corporation, along with assistance from the Office of General Counsel, will be charged with delivering this notice.

1) *Private Club.* If a club chooses to remain a private club exclusively for its members, it must adhere to the legal, technical, and operating policies of a legitimate private social organization. Private organizations generally have the following characteristics:

   a. As a private club, clubs cannot recruit exclusively from our student body or make any representation that they are in any way linked or endorsed or condoned to Harvard University.
   b. Private clubs should make it clear to their recruits and membership that Harvard believes their joining the clubs undermines their educational experience at the College and is antithetical with Harvard's values of inclusion.
   c. Private clubs cannot engage in any kind of social events, parties, date nights that invite Harvard College students.
   d. Any violation of these rules should result in the graduate boards to shutdown the clubs and any Harvard College student members must immediately either resign their membership and participation in all club activities while they are active Harvard students or withdraw as active students while they remain members.
   e. If students violated Harvard College policies, they will also face disciplinary action from the College. In addition, the clubs must make an annual representation of their adherence to these rules.

2) *Registered Student Social Organization.* Registration of a Social Organization is not an indication that the University approves, endorses, supervises or controls the organization's goals, activities, or points of view. Social organizations eligible to register with Harvard College generally have the following characteristics:

    a.   Student/alumni-run organizations with a purpose that is primarily social
        i.   Own/lease property in the Cambridge/Boston area
        ii.   Non-discriminatory membership requirements
        iii.   Membership composed entirely of Harvard University students and/or alumni Local governance and autonomy
    b.   Registered Social Organizations are expected to maintain:
        i.   Membership policies that align with Harvard University's non-discrimination policy.  The organization's membership selection process may not discriminate based on "race, color, religion, creed, sex, sexual orientation, gender identity, national origin, ancestry, age, veteran status, disability, genetic information, military service, or other protected status."
        ii.   An active and engaged advisory/graduate board
        iii.   A clearly identified non-student adviser
        iv.   An open enrollment process in which all Harvard College students are eligible to participate
        v.   Clear and publicly available standards of behavior and the consistent enforcement of those standards
        vi.   Bystander intervention training including substantial, purposeful, and respectful engagement between membership and the Office of Sexual Assault Prevention and Response as well as the Office of Alcohol and Other Drug Services
        vii.   Party policies that prioritize inclusive social gatherings and safe social environments.

3) The University and College Leadership will issue an annual letter and a public statement by the Dean of the College, House leaders, and the deans of student life and undergraduate education that makes clear that we actively discourage students from joining social clubs that promote exclusionary values, attitudes, and behaviors

4) Harvard Graduate School Applications should include a question: While in college, were you a member of a social organization (e.g. fraternity, sorority, final club, etc.) that excluded members on the basis of race, gender, ethnicity, or religious beliefs? If so, please explain your reasons for membership.

HARV-F-00002330

# EXHIBIT 5

**From:**          Drew Faust ████████████████

**Sent:**          3/2/2016 10:35:14 AM

**To:**            Khurana, Rakesh [rkhurana@fas.harvard.edu]

**Subject:**       clubs etc.

**Attachments:**   Club Case.docx

Hi Rakesh-- I know we will meet soon to talk about Final Clubs etc.  I wanted to share with you a text I wrote more to work out my thoughts than with the intention of ever releasing it to an audience-- esp in this unvarnished form.  But I wanted to send it along because it represents where my head is at the moment and why--  See you soon!  And congrats on Gen Ed-- a good program peaceably arrived at!  D

HARV-F-00002383

# EXHIBIT 6

In the past several decades Harvard has transformed its undergraduate student body as it has over time welcomed women, minorities, international students and students of limited financial means as an increasing proportion of its population.  Harvard College is now close to being majority minority [chk #s]. But campus culture has not changed as rapidly as student demography.  In recent months we have been reminded that diversity is not equivalent to inclusion and belonging, and we have rededicated ourselves to achieving a campus where all members fully belong and thrive.

In this context the continuing hegemony of exclusive all male Final Clubs over undergraduate social life is deeply disturbing.  The empowerment of a group of overwhelmingly white and largely financially well-off men to control social occasions, to provide alcohol in a largely unsupervised and often unrestrained manner, and to decide, usually on grounds of physical attractiveness, which women may and may not participate has created an environment profoundly at odds with the values that define the mission of Harvard College.  That such settings, with their reinforcement of male privilege, social exclusivity and uncontrolled drinking have become environments that yield disproportionate numbers of sexual assaults is the product of the hierarchical, gendered assumptions that form the very basis for the clubs' existence.

These organizations and the attitudes their current structure - - all male, unsupervised access to alcohol, exclusivity of male membership - - inevitably encourages pose real dangers to the values of respect and inclusion that are at the heart of the Harvard College of the 21st century.  It is long past time for this to be addressed by all of us who care about student experience and student culture at Harvard.

Culture change is not easy, and different stakeholders—club members, club alumni, students and the university community more broadly - - will inevitably disagree about how to move forward.  And no action is likely to prove a perfect solution to the complex array of issues of gender equity, equality of student access to powerful social resources, freedom of associational choice, and fundamental physical safety that are at play here.  But we must and will act in a manner that we judge will be most effective in changing the clubs to make them both more equitable and more supervised and that will shift student social life away from its focus on the toxic current club environment.

We urge all single sex social organizations to become RSSOs.  This will require abandonment of gender restrictions, adoption of open application for membership, and public availability of membership lists. [financial aid availability requirement?]  Beginning in xxxx—thus grandfathering all current students - - - single sex social organizations that have not met these requirements will be considered "disapproved." While students may still elect to belong, those who do so will be considered to have made a choice inconsistent with the values of Harvard College.  For that reason, they will not be permitted to hold leadership roles in recognized student organization, nor will they usually be considered eligible for the endorsement of highest character required from the Dean of the College for applications for Rhodes, Marshall, Cambridge and other scholarships. [say something about no parties?  Not sure how that works here…]  Three years after this policy goes into effect, it will be reviewed to assess whether different or additional steps need to be taken.

HARV-F-00002384

HARV-F-00002385

# EXHIBIT 7

**The Harvard Foundation for Intercultural and Race Relations Student and Faculty Advisory Committee Meeting**
Implementation Committee outreach meeting
November 30

In attendance: Kay Shelemay, David Friedrich, Janet Browne, Tom Dingman, Roshnee Raithatha, Daniel Becton

*The group preceded introductions of the Implementation Committee by announcing a new initiative with OSAPR to combat sexual assault.*

In opening marks, the committee was welcomed by Dr. Counter.

KS announced our goal of gathering feedback. We have 37 people on the committee, 6 faculty on the steering. We are trying not only to creatively implement the policy but also to think about how we can make the social arena more inclusive, and what we can do to help the student] body have a more open and accessible social life. What opportunities would you like to see? What are your needs that are not filled?

-   (Lieb, Journal of Germanic Studies): What would be the ideal outcome? Is it that unrecognized single-gender orgs become more inclusive by standards of gender or other variables?

KS: We are seeking more inclusive life relating to expectations on gender but also other factors. Our formal charge is gender but our concerns go beyond that. We have a subcommittee focused on social life.

DF: The policy does focus on gender – there is a sense that is a visible and significant way discrimination is happening. But it's not expected that is going to solve exclusivity on our campus. Movement in a place there hasn't been is one goal, but this is also a chance to have conversations about inclusion on our campus. We want to be the best versions of ourselves as a campus community.

-   (Hilda, Fuerza Latina): A recurring plea is the presence of a cultural center. Is that a possibility? Single-gender organizations do serve as a place for many students, including students of color. So we see a limit in social opportunities for a number of students (who are involved in these orgs). There is no other social alternative that currently exists.

KS: We are taking account of concerns like yours because we understand the role that frats and sororities play. We are thinking generally about how to make space more available for affinity groups, but we don't have a formal (proposal) yet. We realize some orgs have been established from very early dates and they have all the resources, yet the policy affects orgs that are much more recently founded and trying to establish themselves on a more diverse basis.  We are trying to make sure there is no collateral damage.

-   Are there other steps being made related to sexual assault?

KS: Our formal charge is to address non-discrimination, not sexual assault.

TD: The college is looking at adding to Speak About It, the mandatory freshmen training, so conversations would be implemented in the houses. Funding from the UC and Foundation are also being linked to training on sexual assault. So this goes hand-in-hand.

KS: Although we have been asked to work on discrimination, we realize there is a slippery slope between discrimination and infractions relating to sexual assault.

- (Harvard Foundation): A school like Princeton's eating clubs, which are co-ed. Is there less of an issue of sexual assault? Have these clubs done anything about sexual assault?

TD: Our hunch is that the presence of women would change the dynamic in a club dramatically. Most sexual assault is happening on campus. We want to learn from other schools and be open.

- (OSAPR): Then why are the female unrecognized orgs that might serve as affinity spaces – there might be better ways to go about it – but do you see value in these spaces?

KS: All unrecognized orgs come under the purview of the policy; however there is an opportunity for orgs to change their (gender) policies. We're aware the sororities have developed in response to the Final Clubs and sometimes have very active social missions. So we are trying to bring them into the fold.

DF: What we've heard very clearly from students is there is value in those spaces. We have examples of orgs that have a gender focus without being gender exclusive. We are trying to be clear about that distinction because it can help bring down the gender binary. I think there is a way to have a mission and a purpose that supports the experience of specific communities without being exclusionary.

KS: We are not dealing with gender binaries anymore, but more of a continuum. We are trying to take into account a wide array of identities, needs, and be sure we can make this a more level playing field.

- Gender doesn't hit all questions of exclusivity/inclusivity. If a final club votes to go co-ed, then they get off scot-free.

JB: We were charged with looking at gender but we've uncovered a huge number of problems that we can alert everyone who needs to know, to what we've found. But I'm not sure our committee is able to do that. It does need to be expressed in our report that we've seen other issues that this one charge has raised.

TD: The policy is not just to be gender-neutral but would be an open admissions policy. It goes back to the earlier question of what do we want to see as an outcome. I want to see a huge investment in the house program, the return of social life to houses, and also to create alternative, appealing social spaces to take the game out of the final clubs.

KS: This feedback is how we learn. Class has emerged as a major issue. The big financial disparity between the final clubs and any other clubs is quite glaring. Part of the question about the policy – they won't be written in stone, but rather the implementation will begin and then there will be follow up. We will write into our report suggestions for follow-up. This is not the final word.

- (Russian speaker association): To touch on the point of token (men or women). I feel a lot of time the outcome is to have three token males in a woman-focused organization. While it says on paper the social norms or pressure guarantees that doesn't happen. How do you deal with that?

KS: Organizations that are mission-driven, such as women in careers, can exist as long as it is open to people of all genders. If it's only a social organization, it's a different feel.

DF: We are still in this larger historical trajectory of having been a school for men, and we can't pretend we need to treat everyone the same way. Creating opportunites for marginalized identities is important. It might look different for a historically male organization to become inclusive. Although there may not be an equal approach, we want to create a sense of equity.

- Final clubs have a big experience socially because they provide a place for underage drinking without supervision. I don't know what the solution would be but what do you think?

KS: We have faculty deans on the committee and it is coming up frequently. This may be beyond our purview but it clearly is one of the factors that shapes the lure of final clubs, who have their own spaces, which gives a certain degree of privacy.

- (Prof of German) – Are frats and sororities always single-sex? Are they coed? No, right? So my sense is the greatest problem is with final clubs, but that the policy will have a greater effect on fraternities and sororities. Many of them do a lot besides social things, and it seems like it will undermine those more than final clubs.

KS: We're aware of this hiccup in the policy and the possibility of collateral damage to other orgs with meritorious goals. We don't recognize Greek organizations at Harvard. We are going to try to protect against collateral damage to organizations that are trying to do good work. Some become Greek just to get funding and a place to meet, so there are interesting economic factors. What about your organizations? What could we do that would enhance your lives? How many have office space in Hilles? (around 5 hands raised)

- (Harvard Islamic Society): We meet in the basement in the only prayer space for Muslims on campus. There' s a lot of stigma related to being in the basement. A lot of religious groups have more visible space. Also, I want to second the need to have a space for intercultural and inter-religious space. We don't want a space we can rent out, but a (permanent space). There's a real problem with decentralization of our organizations. Your committee is trying to address a cultural problem, through a strange policy by attacking gender. But we know it's actually a problem of a culture that tolerates inequality and sexism. So we need to provide more spaces for people across racial and gender lines. Just providing spaces for religious life and intercultural conversations and relations – how the Foundation is supposed to be, but it's not – other campuses have a student union and we don't. You need to address the ways people are not able to speak to one another, and there need to be opportunities to culuturally enrich the campus. For my background, investing

in the religious realm allows me to be a more conscientious person. I want to be part of this campus in a way that creates greater access for all people, not just myself.

- (Journal of Germanic Studies): We have had a lot of issues with meeting spaces. We were able to rent some classrooms but we can't make regular commitments to. We are too small to get an office at the SAC. The space is limited though, so where do we go? We either have to book a room weekly and tell people to a different room every week.

- (Concilio Latino) I would like to third a multicultural center or space. Students have been pushing for decades. We are all interested in what happens with the Smith Center. The way funding works, cultural groups haven't been around as long, they don't have the Clifford Sponsorship that other groups have on campus. Our funds are limited, especially when we want to have social events. It makes it really difficult to hold big, exciting social events because we just don't have the money. It is unspoken, especially for those of us coming from under-resourced communities. There are definitely major economic barriers.

- (Harvard Middle Eastern Dance Company): At the recent open debate, Dean Khurana was unable to attend, and it was reported most people were older white men. It seems the committee is made of older white men who are out of touch with the students. I would love to hear from the undergrad representative who we haven't heard from yet? What else could we do?

RR: Being a student rep is interesting and there are many on all the subcommittees. To be honest, the students' voices have been heard and taken seriously because we have institutional knowledge and a different perspective. Also, these students are diverse and many are members of various orgs. There have been a lot of outreach and all kinds of different conversations. I think what's nice to hear is things being brought up today have been brought up many times. It helps that we are circling back on the same themes.

- (Middle Eastern Dance): I just think it would be good to have more transparency. It is hard to get students to attend open debates and that's a challenge for the committee, but it can also be somewhat worrisome for students to feel that governance over our social lives lies in the hands of such a committee.

RR: These conversations have been ongoing for years, even though the policy was announced in the spring. Regarding transparency, I hear you. The committee is proposing recommendations but it is unclear what will be accepted – so it is difficult (because you don't want to offer promises of what might not happen in the end).

KS: I can assure you students on the committee play huge role. Thank you for speaking to the transparency issue – we honestly don't know yet what we are going to recommend. We are still talking with each other and talking to other groups. All our subcommittees are having outreach events. We understand your concern.

Dr. Counter: I'm inclined to say while this is a new initiative, a lot of these questions have been raised for many years, and these things can be revisited so we can get it right. I think the issue of social spaces

should always be revisited. Harvard used to be all white male. Radcliffe was all white female. There were a number of changes when I was doing my doctoral work, and what we observed – Harvard looked at other Ivy League schools and decided what they were going to do. They saw that Yale created centers for black, Asian, Latino, and Jewish students. Princeton decided to create a "third world" center concept, and that worked for a while but it has now changed to the Carl Fields center for equality and cultural understanding. Brown has a center for people of color. The Center wants to bring people together, culturally and otherwise, during the 3.5 years they have together. We have hundreds of student organizations that have proliferated (relating to ethnic groups) – everyone would like to have a space. I appreciate that. Maybe the Smith Center will be that. But also now GBLTQ students, Sunni or Shia students, Buddhist students would all like a space. We are trying to serve that diversity for cultural enlightenment. But we do not discriminate, nor do we advocate for any group.

- (Muslim Society): A student-led teach-in on institutional Islamophobia taking place this Friday in the wake of the presidential election.

# EXHIBIT 8

Dear Rakesh:

On behalf of the Implementation Committee, we attach our final report.  We've tried to honor our charge while incorporating insights offered by committee members as well as individuals and groups with whom we've met to discuss issues along the way.

 Please let us know whether you plan to release the report to the public and how you would like to handle communications with the press.

 We also want to let you know that David and Lauren have been nothing short of heroic in their support of our work.  But we would also like to emphasize that we take full responsibility for the content of the report.

 With best regards,

 Kay and Doug

HARV-F-00003288

Final Report of the Implementation Committee for the
Policy on Membership in Single Gender Social Organizations
February 17, 2017

HARV-F-00003289

Table of Contents

I.      Executive Summary
II.     Introduction
            a.  Committee Formation and Charge
            b.  Definitions
            c.  The Subcommittees
            d.  Summary of the Committee's Work
            e.  Complications of the Committee's Work
            f.  Peer Institutions
            g.  Initial Findings
III.    Recommendations
            a.  Transitioning Social Organizations
            b.  Governance
            c.  Communications and Benchmarking
            d.  Campus Community
IV.     Conclusion
V.      Appendices

2

# I.   Executive Summary

Harvard College is a very selective community; the admissions process for higher education has become increasingly competitive, resulting in lower and lower rates of acceptance across the Ivy League. Simultaneous with its increased selectivity, the College has made a commitment to diversity, reaching out to and accepting students from a vast array of backgrounds in terms of their ethnicity, race, class, or gender. Our recommendations for the implementation of the policy regarding unrecognized single-gender social organizations reflect an awareness of the College's historical evolution and our understanding of the University's principle of non-discrimination.

The work of this committee has been shadowed by numerous tensions that exist within an institution that has one foot in the past and one in the present – stability vs. flexibility, tradition vs. change, belonging vs. exclusion. We are immensely proud of and grateful to the students who devoted hours of time and energy to the committee, both those who served as members of the various subgroups and those who reached out to participate in focus groups or to provide frank, honest feedback and insight into the dynamics of the College's social scene. Without their work, this report would not exist.

Before we move to the recommendations, we offer words of caution. Our charge was narrow in scope, but in many of our discussions, we touched upon the nature and intent of the policy we were being asked to implement. Our recommendations reflect optimistic conclusions and, if accepted, the committee members feel that the recommendations would free the members of the College to work towards a more welcoming and inclusive community. Each recommendation is part of a larger whole, one piece of a broader vision of what the College could be. Our recommendations would support the College's commitment to non-discrimination and further encourage the work already undertaken by unrecognized single-gender social organizations to reevaluate their practices and seek new approaches. We believe that failure to act on these recommendations will have a devastating effect in our community because the social dynamics could become even more divisive and have a negative impact on current and future students. What is clear is that the previous status quo is untenable and that the College has the responsibility to articulate and act upon its values and its expectations. We suggest that our College, FAS, and University leaders take this opportunity to write a letter to the student body, clarifying the intent of the policy and the collective commitment to non-discrimination it represents.

With these concerns in mind, our recommendations are summarized here:
1. We outline expectations, guidelines, and assessment mechanisms for social organizations interested in transitioning from their current status towards one more aligned with the College's mission, tentatively named "Provisional Student Organization."
2. Mindful of the history of women's groups at the College, we recommend a bridge program specifically aimed at their concerns.
3. We recommend that the Dean limit the ability of USGSOs to recruit Harvard students, especially shielding freshmen and other incoming students.
4. We recommend mechanisms for governance be based on transparency and engagement with the individual student, namely that expectations about the policy be integrated into existing application processes for leadership positions and fellowships.

3

HARV-F-00003291

5. We recommend a list of fellowships and awards that should fall within the scope of the policy, focusing on those that include criteria for serving as a representative of Harvard College.
6. We recommend that the College consider an amendment to the policy, namely that students affirming compliance will not have been members of the specified social organizations for at least one year before they sign and must not become members or resume membership for at least one year after their tenure.
7. We recommend the College consider questions of equity in exercising the policy and apply it to leadership positions in all existing recognized student organizations.
8. We recommend the production of various forms of media for communicating information and positive messages about the policy and its implementation, with a particular emphasis on the incoming freshmen class, as the first class affected by the policy.
9. We recommend on-going and continuous engagement with the various stakeholders who are affected by the policy.

Our discussions touched upon several concerns beyond the scope of our charge, but pertaining the larger issue of improving the social life on campus. In response to those concerns, we include supplemental recommendations as follows:

10. We recommend that the College pilot a new program of inter-house dining societies.
11. We recommend that the College repurpose or renovate existing social spaces for new social purposes.
12. We recommend that the College expand the inter-house intramural program beyond sports and involve freshmen in this program as a way of developing opportunities for freshmen to connect with upperclassmen in the Houses.

Sincerely,

The Members of the Implementation Committee

4

HARV-F-00003292

## II.    Introduction

Harvard College offers its students the opportunity to participate in a unique educational and residential community, one devoted to the liberal arts and sciences as a means of intellectual, social and personal transformation. Students have access to exceptional faculty and researchers in the classrooms, labs and in the Yards and Houses and abundant resources in extracurricular, professional, and cultural organizations and offices on campus. Equally important, students have intelligent, determined, diverse and enthusiastic peers, and work together as students, colleagues and friends. All of these factors build towards the personal transformation of each and every student as the College works to educate global citizens and leaders of the next generation.

We, the members of the Implementation Committee, take this articulation of the College's purpose as the guiding rubric for our work on the College's policy with regard to unrecognized single-gender social organizations. We view the committee's recommendations as an effort to ensure that all members of our community are able to access and benefit from these resources, and as members of Harvard, share the responsibility of guarding, maintaining and passing along these resources to the students to come. Specifically, we understand the policy as endorsing the principle of non-discrimination based on characteristics of "intrinsic identity" that the College expects all members of the College community to respect as an integral part of the College's values and priorities.

We take a long view of Harvard's community: our recommendations reflect a commitment not just to our current students, but to those yet to matriculate. It is our hope that current students, faculty and staff will join us to create a better Harvard, one that aspires to be an example for inclusive, non-discriminatory communities across the globe. To paraphrase Pericles: we do not aim to imitate, but to serve as a model for others.

### a.  Committee Formation and Charge

On May 6, 2016, President Faust accepted Dean Khurana's recommendations for changes in the College's policies regarding expectations around eligibility for certain leadership opportunities and fellowship endorsement letters from the Danoff Dean of Harvard College. In September 2016, Dean Khurana appointed a committee charged with implementing the policy. The recommendations from spring 2016 stated that students matriculating in the fall of 2017 and thereafter may not simultaneously hold leadership positions in recognized student organizations or athletic teams at Harvard, and be members of unrecognized single-gender social organizations (USGSOs).

The recommendations also noted that students matriculating in the fall of 2017 and thereafter who are members of unrecognized single-gender social organizations would not be eligible to receive endorsement letters from the Danoff Dean of Harvard College for those fellowships that require such endorsements.

The implementation committee charge outlined the task at hand:

> "Harvard College brings together bright and talented students from all walks of
> life to form a community of learning that facilitates their intellectual, personal,
> and social transformation. By exposing students to new ideas, to people whose
> backgrounds and experiences differ from their own, Harvard fosters the ability
> to see the world through the eyes of others,"[1] to echo the Report of the
> College Working Group on Diversity and Inclusion. To advance the mission of

5

HARV-F-00003293

educating leaders and responsible citizens who are prepared to serve a global and diverse society, the College works to embody an inclusive and non-discriminatory community of learning, one described in the FAS's Resolutions on Rights and Responsibilities as "ideally characterized by…respect for the dignity of others" as well as "openness to constructive change."[2]

"In light of this educational and service mission and in recognition of the new policy related to leadership of recognized student organizations and athletic teams and those students who receive an endorsement from the Danoff Dean of Harvard College, the implementation committee will consult broadly with undergraduate students, staff, and faculty at the College to examine and recommend ways to define the contours and implementation of the policy set forth by the College. This committee's work may include town halls, focus groups, or solicitation of information from various community stakeholders. Specifically, the committee's work will aid the College in advancing its commitment to promoting an inclusive social environment aligned with the mission of the College."

"The committee will address the following questions:

1.  What leadership roles and endorsements are affected by the policy;
2.  How organizations can transition to fulfill the expectations of inclusive membership practices; and
3.  How the College should handle transgressions of the policy."

"The committee will also be responsible for recommending best practices to communicate the implementation of the policy to the College community. Finally, the committee will recommend ways to provide support to student organizations to foster an inclusive social environment. The committee will present its recommendation to the Danoff Dean of Harvard College in spring 2017."

The membership of the Implementation Committee was established in October 2016 and is listed in Appendix A.

### b. Definitions

We define the following terms in the context of the policy as outlined above. We note in particular the term "inclusive social organizations" which was suggested by committee members as a means of providing a framework for current and future student organizations to appreciate the goals of the policy.

1.  "Unrecognized Single Gender Social Organizations (USGSO)"

An Unrecognized Single Gender Social Organization is any selective-membership, single-gender organization, whose primary purpose is social, including but not limited to final clubs, fraternities and sororities, that has a membership that is comprised entirely of Harvard students and/or Harvard alumni. This definition does not include Harvard Recognized

HARV-F-00003294

Independent Student Organizations (ISOs), Sponsored Student Organizations (SSOs), see below, or other non-Harvard entities whose membership draws from individuals beyond the Harvard community such as city-wide chapters of national organizations. There are over 400 different student organizations at Harvard and these groups are classified in Appendix B.

2.   "Recognized Student Organizations"

*Independent Student Organizations (ISOs)*

Recognition of an Independent Student Organizations (ISO) is intended to support students who wish to pursue interests and talents in ways that are separate from their formal courses of study. Recognition of an ISO is not an indication that the University approves or endorses the ISO's goals, activities, or points of view.

ISOs receive designated benefits from the College, are responsible for meeting filing requirements with the OSL (Office for Student Life), and are accountable to the College for responsible use of those benefits. The College expects ISOs to comply with all applicable regulations. If the Committee on Student Life determines that an ISO has failed to do so, it may revoke the ISO's charter.

*Sponsored Student Organizations (SSOs)*

SSOs are led, organized or sponsored by University departments, offices, or units and thus do not meet the definition of recognized Independent Student Organizations. SSOs also receive designated benefits afforded to ISOs and file with the OSL to obtain access to those benefits.

3.   "Inclusive Social Organizations"

A definition of the characteristics and expectations for inclusive social organizations should guide efforts for existing organizations and any new organizations – should new ones be approved – to positively contribute to the life of the campus community. The student members of the Implementation Committee developed specific guidelines regarding expectations for inclusion and transparency in membership information, which are included here and in section III.a.2 below.

- Substantive changes that demonstrate adherence to Harvard's commitment to non-discrimination in policies, practices, governance, and membership;

- Organizations should aim to operate transparently, publicly affirming a commitment to non-discrimination and:
  - operate new member selection and recruitment processes that are open to all students;
  - eliminate financial barriers to membership;

HARV-F-00003295

        o  maintain diversity, in particular, significant gender inclusion, in membership and governance of the organization.

The role of social organizations in the context of Harvard's distinctive residential Yard and House system requires further comment. The Implementation Committee members suggest that existing organizations that seek to become inclusive must be sensitive to and aware of intersectionality of identities across class, race, gender, sexual orientation, and religion; otherwise positive changes will not evolve in the social climate of the campus. All recognized organizations must uphold the institution's core values of inclusion and non-discrimination. Furthermore, a majority of the Committee suggests that when considering the role that any new social organizations might play on campus, those that align with College priorities to re-center student life in the Houses should be given preference.

### c.  *The Subcommittees*

The implementation committee divided into smaller sub-groups to address specific areas related to implementation. These subgroups focused on three areas: governance, communications and benchmarking, campus community and social group alternatives. Each subgroup met separately and performed its own outreach and research with regard to its particular issues. A fourth group, the steering committee, coordinated activities across all subgroups and undertook outreach activities of its own with other organizations and Harvard committees that cut across individual sub-committee concerns. A brief summary of the specific questions examined by each subgroup follows.

1.  The Governance subcommittee addressed the following issues:

    - Define principles and guidelines for identifying student eligibility for certain leadership positions and College endorsements and the organizations and endorsement opportunities affected by this policy;
    - Propose possible approaches to enforcement of the policy, both in terms of individual students and recognized student organizations.

2.  The Communications and Benchmarking subcommittee addressed the following concerns:

    - Advise on the development of a comprehensive communications and outreach plan regarding the policy for students and identify any other constituencies and their outreach needs;
    - Research similar policies at other schools with an eye towards anticipating possible concerns.

3.  The Campus Community subcommittee was asked to:

    - Recommend resources and processes within Harvard College to assist unrecognized single-gender social groups (SGSOs) in transitioning to non-discriminatory membership practices and inclusion in a possible new category of student groups;

8

HARV-F-00003296

- Outline the expectations and principles that would characterize a formal relationship between private, gender-inclusive social organizations and Harvard College. Leaving open the possibility of defining a new category, these principles and expectations could include: expectations for non-discrimination policies, governance structures, membership eligibility, open and transparent new member programs, and annual registration requirements;
- Recommend best practices for inclusive group membership and providing an equitable experience for all members of an organization. While some organizations that adopt gender-inclusive policies and practices may elect not to participate in a formal relationship with Harvard College, the committee's recommendations will endeavor to establish successful practices as resources for all organizations.

In addition, this group also discussed ideas for the development of social alternatives to the existing system.

4. The Steering Committee

   In addition to coordinating the activities of the subgroup and holding their own meetings and sessions with a cross-section of constituencies (as noted below), the Steering Committee took primary responsibility for reviewing and evaluating recommendations, prioritizing the work of the subgroups, and writing and producing the final report. It also considered questions that arose as the report took shape.

### d. *Summary of the Committee's Work*

The Implementation Committee met frequently during the fall semester to gather information, address the issues raised by the charge, and deliberate over its recommendations. The membership of the Implementation Committee consisted of students (including some members of USGSOs), faculty and staff from the College. What follows is not an exhaustive list, but is meant to give a sense of the different types of outreach, research and feedback performed by committee members.

*Committee Meetings*

1. The full Committee met 4 times on October 31, November 14, December 6, 2016, and February 6, 2017.
2. The Steering Committee met 7 times between October 25, 2016 and December 12, 2016, and again on Tuesday, January 31, 2017.
3. The Governance and Implementation subgroup met 5 times and hosted outreach events with fellowship tutors, athletic coaches, team captains, and recognized student organizations.
4. The Communications and Benchmarking subgroup met 5 times and performed outreach to the Title IX Office, the Office of Admissions and Financial Aid, the Freshman Dean's Office, the Advising Programs Office, and the Office of Academic Integrity and Student Conduct.
5. The Social Groups and Campus Community subgroup met several times and conducted targeted outreach with freshmen and sophomores.

9

*Outreach Activities*

1) October 13, 2016 – Town Hall Open to the Harvard Community
2) Steering Committee
   a. October 20, 2016 – Committee on Student Life
   b. November 8, 2016 – Office of BGLTQ Student Life staff and interns
   c. November 13, 2016 – Student-facilitated conversation with USGSO leadership
   d. November 28, 2016 – Women's Cabinet of the Harvard College Women's Center
   e. November 29, 2016 – House Committee Co-Chairs
   f. November 30, 2016 – Foundation for Intercultural and Race Relations Student and Faculty Advisory Council
3) Governance and Implementation
   a. Wednesday, November 30, 2016 - Undergraduate Research and Fellowships Office
   b. Tuesday, November 29, 2016 – Focus Group with Recognized Student Organizations
   c. Thursday, December 1, 2016 - Varsity Athletic Coaches
   d. Monday, December 5, 2016 - Varsity Athletic Captains
4) Communications and Benchmarking
   a. November 1, 2016 – Meeting with Tom Dingman, Dean of Freshmen, Freshman Dean's Office
   b. November 15, 2016 – Meeting with W. Fitzsimmons, Dean of Admissions and Financial Aid
   c. November 22, 2016 – Meeting with Dr. Brett Flehinger, Associate Dean of Academic Integrity and Student Conduct, Office of Academic Integrity and Student Conduct
   d. December 7, 2016 – Phone Conversation with Brooks Lambert-Sluder, Assistant Director, Advising Programs Office
   e. December 7, 2016 – Phone Conversation with Alexandria Masud, Department Administrator, Title IX Office
5) Social Groups and Campus Community
   a. Freshman Study Break
   b. Sophomore Study Breaks

### e. *Complications of the Committee's Work*

The Implementation Committee members shared a strong sense of responsibility when approaching their work, both in terms of gathering information and insights from current students and anticipating the needs and goals of future undergraduates. The members also encountered numerous challenges, some of which highlight issues that will remain as the policy is rolled out. We review these challenges next.

First, it was clear to the Implementation Committee that the announcement of the policy in the spring had a chilling effect on community discussion. Some Faculty members complained about the lack of prior consultation and raised issues of governance and this continued most pointedly in the discussions in the fall Faculty meetings. The Committee members were aware of these concerns, but also noted that the Dean of the College traditionally had the authority to implement policies specific

HARV-F-00003298

to the undergraduate social experience. Examples of past decisions include changes to the residential lottery systems (the existence of linkmates and Neighborhoods, randomization) as well as regulations related to the formation of extracurricular student groups.

Similarly, the lack of clarity about the intent, scope, and timing of the policy led many to engage in speculation, incorrect assumptions, and miscommunication within the undergraduate community. The press reports were not helpful in this regard. Implementation Committee members, without fail, reported widespread confusion when they met with students, staff and faculty who may be affected by the policy. A more open communication about the policy as well as a broader opportunity to engage in discussion prior to its announcement might have alleviated some of these concerns and eased the path for more productive discussions in the fall.

Some especially unfortunate aspects of the roll-out were the press reports and claims by students and members of USGSOs that the intent of the policy was to address sexual assault. While that behavior and the environment that encourages it are wholly unacceptable, they are not the sole nor even the primary reason for the policy.

Another troubling aspect for the Implementation Committee members was the perception that the policy consists solely of punitive measures, i.e. "sanctions." On the contrary, Committee members view the policy as an affirmation of one of the central values of the University, the principle of non-discrimination. As one of our members stated at a recent faculty meeting, "discrimination on the basis of race is wrong. So is discrimination on the basis of gender. Especially at a school that calls itself co-ed." Furthermore, the term "sanctions" implies that current students will be affected; that is clearly not the case. Any student affected by this policy will have chosen to enroll in the College fully aware of the values and principles that it holds as central to being a leader within the community.

Finally, as noted by student members of the committee, the lack of clarity as well as the events of the past month, namely the formation of a new faculty committee to review this policy, have had a particularly negative effect on conversations with numerous existing stakeholders in the College's social scene. These events have fostered skepticism about the intent and commitment to the policy, discouraged those students who are supportive of efforts to transform the nature of the clubs, and undermined the confidence and progress of those groups who have already made difficult decisions to move in a more inclusive direction. Momentum towards greater inclusivity was stalled by lack of clear leadership and legitimate concerns as to whether institutional support was unstable. The Committee members feel it is imperative for the College and the University to engage more clearly and directly with the students on these questions.

The Implementation Committee members believe the policy should be understood and described as a balanced approach towards affirming non-discrimination principally with respect to the broadest continuum of gender identities. The policy aims to improve the sense of inclusion among our diverse community members. In the best light, the policy challenges Harvard College to become a better version of itself.

We aim to help foster a College community that offers vibrant opportunities for social interaction, but not via exclusionary or discriminatory systems based on gender. We therefore state our shared belief that any implementation of the policy needs to be accompanied by strong fiscal and logistical commitments to further improve the social life of the College.  The Committee feels it is important that recognized student organizations are also held to community standards of inclusion.  While these organizations are not addressed specifically in this policy, concerns have been raised about the

HARV-F-00003299

culture that is created by exclusive practices of currently recognized groups.  For example, the practices and culture of comping should be examined to develop approaches that enhance positive aspects while eliminating the negatives of such an approach to membership selection.  The Committee on Student Life should endeavor to review recognized student organizations to assess their contributions to the campus community.

Our recommendations reflect this balanced approach, seeking to shift the existing culture via multiple interventions.

### f. Peer Institutions

As part of its work, the Committee sought examples from peer institutions who have dealt with similar issues. For example, liberal arts colleges including Amherst, Bowdoin, Williams and Middlebury, have generally decided to ban fraternity and sorority life. Princeton also banned Greek life recruitment during freshmen year. Overall, these institutions have consistently viewed social life organized by gender as incompatible with creating an inclusive campus. Those institutions that have had the most success addressing the influence of single gender social organizations and fraternity systems did so by taking bold steps to implement policies that eliminated the presence of such organizations combined with significant investment in alternatives including re-organizing their residential systems to promote and institutionalize inclusive social communities.  Those that took half measures or changed course did not realize the same level of positive change in the undergraduate experience. (See Appendix C).

### g.    Findings

The most encouraging result of the committee's outreach efforts on campus was the clear consensus regarding the misalignment between the values of Harvard College and the existing status quo. The oftentimes toxic atmosphere engendered by the current orientation of student life around unrecognized single-gender social organizations is evident. Students noted their desire for a more inclusive experience along a broad range of axes, ranging from issues of gender identity to socioeconomic background to race and ethnicity. It is clear that our community members understand inclusivity as a truly radical commitment to diversity and non-discrimination. Viewed in that light, this policy represents one step towards aligning the College's articulated values with that understanding. Furthermore, although we listened to concerns from a very wide range of students, faculty, and staff, we did not hear convincing arguments for maintaining the status quo. Harvard students are diverse and socially conscious, and they openly critique the elitism and discrimination that characterizes the single-gender social organizations.

What students and faculty have said, however, is that they do not understand how a policy which they view as discriminatory can operate to address discrimination. In response, we echo the words of one of our members, who said that "of course we can be intolerant of intolerance, and of course we can discriminate against people who discriminate. That's what liberal societies do. Even if you are skeptical about the Dean's policy, please, let us not endorse what amounts to a pledge to abdicate our responsibility to see that everyone in our community is treated equally."

Our conversations and research revealed that the current social scene at the College revolves around deeply entrenched systems of power. Men's final clubs in particular can leverage the historical dominance of gender, class, and race, to preserve that power. And when alcohol enters the picture, violence, hazing and sexual violence are sometimes used to assert their position. The simple reality is

HARV-F-00003300

that this social system facilitates highly asymmetrical power dynamics. Because these systems are historical, they must be intentionally subverted to "advance our shared commitment to broadening opportunity and making Harvard a campus for all of its students." (Dean Khurana's letter to student body, May 6)

The committee has heard and acknowledges the positive experiences that certain students have had in USGSOs and further recognizes important distinctions to be made among final clubs, fraternities, and sororities. While the overarching concerns remain regarding the role of USGSOs in perpetuating exclusive practices in the campus culture, the importance of understanding the conditions that gave rise to the current social system, and the differential effects on various types of USGSOs is essential to the implementation of the policy.

One aspect of these historical conditions is that male final clubs have greater resources in terms of property, finances and alumni support.  However, the traditionally female clubs and sororities, which grew up in response to exclusion from the male clubs and a desire for social experiences controlled by women for women, lack property, have substantially fewer resources and emerging alumni networks.

The committee found it challenging to implement the policy in a fair-handed way, given these historical conditions and their outcomes.   For example, the committee repeatedly heard from students about a need for spaces and organizations that support the experiences of women at Harvard College.

It is the hope of the committee that USGSOs will evolve.  The committee discovered through its consultation and deliberation that there can be neither a continuation of the status quo nor partial steps toward inclusion.  Efforts should be made to support those organizations that want to transition to inclusive policies and practices and to creatively develop new social structures. Knowing that the loss of spaces specifically for women will have an impact on the gender equity of the campus in the short term, a one-size-fits-all approach will not work.

The committee heard extensively from the 25% of students currently invested in USGSOs, but is concerned not to lose sight of the 75% of the students for whom opportunities for support systems, community, and connection are equally important.  The recommendations from the subcommittee on campus community include further considerations of the broader student experience and underrepresented minorities.

*Freedom of Association*

The committee heard the concerns that this policy interferes with students' rights of freedom of association.  A full exposition on the case law and efforts to prohibit discrimination by private social organizations is beyond the scope of this report.  However, it is clear that courts have upheld decisions by private colleges and universities to take strong stances based on their educational missions and prohibit student participation in private selective membership social organizations.  A summary of the approaches taken by a number of private liberal arts colleges and universities is included as an addendum to this report. Some of these institutions have implemented what appear to be stronger and more extreme actions compared to the Harvard policy. It is important to note that the Harvard policy allows students to participate in USGSOs and remain in good standing with the College.  New students will elect to matriculate at Harvard with a full understanding of the

HARV-F-00003301

institution's commitments to non-discrimination.  Limits placed on leadership and endorsements affect privileges and do not withhold educational rights.

*Athletics*

With 42 Division I intercollegiate teams, Harvard Colleges is committed to academic excellence through athletics.  In the course of engagement with varsity athletic coaches and captains, the Implementation Committee learned that there is significant overlap between varsity student athletes and USGSO membership (roughly 2/3 of a group of thirty-five captains).  Many student athletes claim that opportunities to participate in extracurricular and social opportunities are limited by their demanding practice schedule, competition, and travel schedules. They also claim that USGSOs provide spaces that are consistently available for socializing at times and with more flexibility than spaces to which they might otherwise have access.

It is observed that some of the athletic teams are already quite segregated from the rest of the student body.  This new policy may provide an incentive for them to incorporate into more inclusive activities and spaces, extending their social activities beyond their team. We also note that the athletes' time commitments are not unlike those of some musicians, researchers working in labs, or students heavily committed to PBHA or other civic groups.

Members of the Implementation Committee found their discussions touched on themes that were not directly part of the official charge, but that shaped students' experience of the social environment at the College. We were encouraged that the policy has led to broader conversations about inclusion on Harvard's campus, and note that the University is already seeking ways to examine this issue through the Presidential Task Force and the College Committee on Inclusion and Belonging. Some issues raised by students reach across both groups, for example, the social experience of freshmen in the Yard, opportunities for freshmen to connect with upperclassmen, integration of sophomores into the House community, concerns about physical space, social events and the overall fragmentation of College social life. The report from the Campus Community subcommittee addresses some of these issues.

# III.   Recommendations

The Implementation Committee requested each subcommittee to formulate recommendations addressing its specific focus. These recommendations were reviewed and finalized by the Steering Committee members. Each category of recommendations is outlined below:

## a. Transitioning Social Organizations

As part of its charge, the Implementation Committee was asked to propose how unrecognized social organizations can transition to fulfill the expectations of inclusive membership practices. Here we provide guidelines for the transition process.

In an earlier section of this report on "Definitions," we enumerated essential aspects of inclusive social organizations. In accordance with this definition, unrecognized social organizations desiring to transition to a recognized status must make substantive changes to meet Harvard's policy of non-discrimination in their organization's policies, practices, governance, and membership.

HARV-F-00003302

Each social organization seeking to transition should submit a written request to the Harvard College Office of Student Life providing details in the following areas:

- Plans to achieve diversity, particularly gender inclusion across a full spectrum of gender identities, in membership and governance of the organization;
- Processes for open new member selection processes;
- Removal of financial barriers to membership and participation;
- Detailed standards of behavior for all who participate in the organization's activities.

Following acceptance of the transition plan, the organization must implement the plan and publicly affirm Harvard values of non-discrimination, noting the changes in organizational policy on their websites, Facebook pages, and other promotional materials. Following the model of Harvard College's Honor Code, the head of the organization must also sign the following document on its behalf:

"On behalf of _____, I affirm my organization's awareness of the College's policy regarding the principle of non-discrimination in our policies, practices, governance, and membership and our compliance with that policy in all its aspects.

Signed by _____

This document is regarded as an agreement between the organization and Harvard College. Should the organization not meet the College's expectations in all areas detailed here, recognition may be revoked. Compliance may be monitored by the Committee on Student Life and/or an appointee from the OSL by the Dean.

To accommodate organizations in transition, the Implementation Committee recommends creating a temporary category of "Provisional Social Organizations (PSOs)". This new transitional category of organizations must meet the standards of non-discrimination to which all recognized Independent Student Organizations (ISOs) currently adhere in order to be eligible for access to Harvard. Organizations within this new category might be transitioning from among current final clubs or Greek organizations. Whether or not these new social clubs will be considered for designation as ISOs in the future is a decision that cannot be taken now. PSO status should be time-limited, offering a bracketed, transitional period in which an existing group can reconstitute itself with new characteristics and new goals. This new PSO category is intended to support the transition of those organizations that currently exist in an unrecognized state, and does not offer the opportunity for the creation of numerous other social organizations beyond those that may be considered as part of pilot programs suggested in Appendix G. We propose the following definitions and guidelines.

HARV-F-00003303

"Provisional Social Organization (PSO)"

1. Social organizations eligible to register with Harvard College generally have the following characteristics:
   a. Student/alumni-run organizations with a purpose that is primarily social
   b. Non-discriminatory membership requirements
   c. Membership composed entirely of current Harvard College students and/or alumni
   d. Local governance and autonomy
2. PSOs are expected to maintain in both policy and practice:
   a. Membership policies that align with Harvard University's non-discrimination policy. The organization's membership selection process should be open to all Harvard undergraduates, in other words, it may not discriminate on the basis of "race, color, religion, creed, sex, sexual orientation, gender identity, national origin, ancestry, age, veteran status, disability, genetic information, military service, or other protected status."
   b. A designated non-student adviser to serve as the liaison between the PSO and University (e.g. Harvard alumnus/a, faculty, or staff)
   c. Bystander intervention training including substantial and purposeful engagement between membership and the Office of Sexual Assault Prevention and Response as well as the Office of Alcohol and Other Drug Services
   d. Publication of the demographic breakdown of the organization's membership
   e. A program that reduces financial barriers to participation and makes information about financial aid readily available to prospective membership.

The standards outlined above hold social clubs on campus to higher expectations than other currently existing recognized groups. For example, the College does not request the demographic breakdown of existing ISOs; most of the committee supports this request, but some do not. The Implementation Committee views the nature of social groups as fundamentally distinct from that of an ISO in that they neither select auditioning members for a skill/talent nor do they provide a guiding purpose or mission other than that of being social. Given these two factors, explicit organizational values, open new member processes aligned with those values, and transparency in publicly available information about the organization will help avoid situations in which transitioning social clubs choose their members on the basis of factors inherent to identity (i.e. sex, class, race, etc.) while operating under the guise of "group personality" or "group community." The mechanisms outlined above are recommended to hold social groups accountable to the degree of inclusivity and non-discrimination outlined by the mission of Harvard College.

PSO Rights and Responsibilities

PSOs that meet the standards outlined above may enjoy the following benefits based on their registration with Harvard College:

1. Ability to reserve campus spaces for meetings, social events, and other gatherings
2. Ability to recruit on campus at designated times and through approved means
3. Ability to apply for funding for organizational activities

HARV-F-00003304

4. Ability to sponsor and co-sponsor events on campus
5. Access to training and other College administrative advising resources

The Implementation Committee thinks it important to offer incentives to currently unrecognized organizations to encourage their transition to inclusive social organizations. However, providing benefits to PSOs requires careful consideration and accountability. It is advisable to proceed with care to avoid preserving a social system that resembles the existing culture rather than building a new one. Furthermore, the College must balance incentivizing change in existing organizations with avoiding growth in a new category of student organizations, one that might slow College efforts to prioritize Yard and House Life as central to the undergraduate experience.

## *Assessment*

Considering the temporary and transitional nature of the PSO status, the Committee on Student Life should review PSOs after 3 years to assess their influence on the residential and social environment. While several metrics may prove useful, the chief question to be answered should be: How have PSOs contributed positively to an inclusive social climate at Harvard College?  Those organizations that are contributing positively to the community may be considered for recognition as an ISO or some other status. The Committee on Student Life should establish corrective measures for those that are not.

## A Special Note on Transition of Traditionally Female Clubs and Female Greek Organizations

The USGSOs at Harvard are a disparate group, comprised of male Final Clubs, female Final Clubs, fraternities, sororities, and at least one feminist service organization, The Seneca. We noted above that the traditionally female clubs and sororities were established in the last quarter century in response to the exclusion of women from the long-standing male clubs. Given the late entry of women into Harvard College and the fact that they have not had access to the same financial support or facilities for social life, we suggest introducing a longer, and substantially-supported five-year "bridge period" for the existing traditionally female clubs and sororities beginning when the new policy goes into effect for freshmen in fall 2017. Some traditionally female groups in particular have asked for help in finding physical spaces to meet, while others have expressed interest in obtaining acknowledgment that their organization is in compliance with the policy. The committee supports the idea of continuing to allow the female final clubs and sororities to operate with gender focused missions, with the understanding that the positive contributions of those organizations to the campus community would be assessed in three to five years.

We intend that this bridge period enable these groups to make the transition to an open social status as PSOs entirely unconnected from the typical Greek system. In the view of our committee, The Seneca, which has already declared a gender- neutral membership policy and considers social service to be an integral part of its mission, should be considered for ISO status in 2017.

With regard to organizations that choose to continue to function as USGSOs, we further suggest that the Dean institute mechanisms to constrain or limit the ability of organizations to recruit Harvard students on campus. This suggestion is inspired by reports of very strong concerns by House Committee leaders that engaging sophomores in USGSO punch season diverts their attention away from House Life.

HARV-F-00003305

## b. Governance

The recommendations from the Governance subcommittee define the scope of the policy and recommend a process for enforcement, recognizing that the goal of the policy is to help create an institutional culture in which undergraduates regard inclusive organizations as the norm, and in which peer expectations operate as the predominant influence on student choice. The recommendations are based on the understanding that the core of the policy is the enforcement of the principle of non-discrimination.

We believe the means of implementation should reflect the values of trust, honesty, and transparency. Implementation should be clear and consistent. It is of fundamental importance that students not perceive the policy as intrusive or punitive. In the short run, we would rather err on the side of allowing some students to evade the restrictions than adopt processes that students regard as inquisitional.

We understand the purpose of linking the policy of non-discrimination to leadership positions and to fellowships, provided by or requiring sponsorship from the College, to be a way of affirming the value of non-discrimination and ensuring that those who represent the College at these levels represent the community and its stated values.

A list of unrecognized single-gender social organizations that would be covered by the policy is provided in Appendix E.

Our recommendations follow for the three areas named in the policy:

### 1) Fellowships and other awards

Harvard College students can apply for at least fourteen national/international awards requiring limited selection and endorsement, and fifteen Harvard awards requiring limited selection. Given that these awards present the recipients as representatives of the entire College, we believe that candidates should fully reflect the principle of non-discrimination. We recommend that undergraduates affirm their compliance with the policy before being considered for all such awards, whether internally or externally funded.

It would be inconsistent for the College to prohibit members of unrecognized single-gender social organizations from applying for awards funded by outside bodies, such as the Rhodes or Marshall, while allowing them to be candidates for equivalent awards funded by Harvard. In addition, those fellowships which extend to post-graduate years include support services provided by Harvard during the term of the fellowship.

A list of fellowships and awards that would currently be covered by the policy is provided in Appendix D.

### 2) Leadership positions in recognized student groups and with regard to captains of athletic teams

Harvard College currently has 20 sponsored student organizations, 407 independent student organizations recognized by the College, and 72 programs run by the Phillips Brooks House

HARV-F-00003306

Association. We recommend that students be required to affirm their compliance with the policy before they may assume a leadership role in all of these organizations, and any other organization subsequently recognized by the Committee on Student Life.

This recommendation recognizes that leaders of student groups model the College's broader values for both group members and outside audiences. We define a "leader" as a person understood by those external to the group to be the representative, or "face," of the organization. This person would normally carry a title such as president, vice-president, secretary, treasurer or director, but he or she may have a different designation. The policy does not prevent students who belong to unrecognized single-gender social organizations from participating in a recognized student organization; it covers only positions identified with leadership of the organization. A list of organizations that would be currently covered by the policy is provided in Appendix B.

Harvard College has 42 varsity sports teams. Varsity teams compete with teams from other colleges, and all varsity athletes are therefore representatives of Harvard and its values. With regard to team captains, we view captains of intercollegiate sports teams to be both leaders of their teams and representatives of Harvard to people beyond the campus. Moreover, Ivy League principles specify that "athletes should be students first and representative of a school's overall student body" and affirm that Ivy League athletics share the "essential educational purposes" of the institutions with which they are affiliated. (See http://www.gocrimson.com/General/Core_Values/20160112_Ivy_Principles .) We recommend that captains of all varsity athletic teams be required to affirm their compliance with the policy concerning membership in unrecognized single-gender social groups. We also recommend that the coaches of all 42 teams formally recognize this policy and explain it clearly to team members and potential recruits.

While the policy does not address club sports directly, in keeping with the idea of equitable application of the policy, we recommend that the College consider including them in this expectation.

A list of varsity athletic teams that would currently be covered by the policy is provided in Appendix F.

### 3)  Creation of an enforcement mechanism

The basic enforcement mechanism applies to all students covered by the policy in every category. Individual students who are applying for fellowships and awards, registering as leaders of recognized student organizations, or assuming the captaincy of a varsity athletic team will be asked to sign the following document.

> One of the shared values on which Harvard College is based is nondiscrimination on the basis of characteristics of "intrinsic identity," including gender. As leaders of student organizations and varsity athletic teams, and as holders of fellowships funded by or endorsed by the College, individual students represent the College and its values both to their peers and to people outside Harvard. As such, they are expected to abide by, safeguard, and respect the core principle of non-discrimination.

> In pursuance of this principle, the following is Harvard College policy:

19

HARV-F-00003307

1. For students matriculating in the fall of 2017 and thereafter: any such students who are members of unrecognized single-gender social organizations will not be eligible to hold leadership positions in recognized student organizations or athletic teams. Students seeking those positions must not have been a member of an unrecognized single-gender social organization for at least one year prior to becoming an organization leader or team captain and must remain unaffiliated with such organizations for at least one year after their tenure as leader or captain. Currently enrolled students and those who matriculated in the fall of 2016 will be exempt from these new policies.

2. For students matriculating in the fall of 2017 and thereafter: any such students who are members of unrecognized single-gender social organizations will not be eligible to receive the Dean's endorsement letters for those fellowships that require such endorsements, or to receive Harvard-funded limited selection fellowships or awards. Students seeking those awards must not have been a member of an unrecognized single-gender social organization for at least one year prior to application, and must remain unaffiliated with such organizations for at least one year after their tenure as holder of the fellowship or award. Currently enrolled students and those who matriculated in the fall of 2016 will be exempt from these new policies.

To be signed by the student:

I affirm my awareness of the College's policy regarding the principle of non-discrimination, particularly with regard to membership in unrecognized single-gender social organizations. In taking a leadership position in a student organization/applying for a sponsored grant or fellowship/becoming a varsity athletic team captain, I affirm my compliance with that policy.

This document should be regarded as an agreement between the individual student and the College, as represented by the relevant office. We consider compliance with the policy to be a matter between the individual student and the College. Other parties—faculty, faculty deans and tutors, athletic coaches, fellow organization members, teammates—should not be responsible for policing the policy or ensuring that it is complied with. It is up to the student to meet the College's expectations in this area.

In the case of fellowships and awards: the Office of Undergraduate Research and Fellowships will require a signed document as part of all applications for the awards specified in the policy.

In the case of leadership positions in recognized student organizations: the Office of Student Life (OSL) will ask for a signed document (or some form of electronic acknowledgment) from all students seeking to register as leaders of those organizations. We note that the leadership structures of student organizations differ widely, and we recommend that OSL take steps to clarify what positions count as leadership positions, and to require organizations seeking approval to ensure that all leaders of the organization are registered with OSL and affirm their compliance with the policy.

In the case of captains of varsity athletic teams: team captains are chosen by peers without the participation of coaches, although members of the Department of Athletics staff may be present when captains are chosen to make sure that team members understand the procedures. We do not recommend changing that practice; such a change would be a matter for the Department of Athletics. However, the new policy will add one more step to the existing process. That is to have students chosen to be team captains submit a signed document to the Department of Athletics.

HARV-F-00003308

We recommend that violations of the policy—to wit, falsely affirming compliance—be considered a violation of the Honor Code and fall under the jurisdiction of the Honor Council. In recommending that the Honor Council be the administrative body to deal with violations of the policy, we are aware that the Council's mandate concerns issues of academic integrity. We recommend either that the mandate be expanded to include violations of this policy or that the policy be defined in such a way that violations fall within the category of academic integrity. Our thinking is that a false affirmation is a violation of the expectation of honesty, and should be adjudicated as any other such violation would be.

*Anticipated Challenges*

Our recommendations incorporate two changes to the stated policy. First, we include all postgraduate fellowships and awards involving limited selection that are endorsed or funded by Harvard, not just those requiring the Dean's endorsement. Second, we have added the requirement that students affirming compliance will not have been members of the specified social organizations for at least one year before they sign and must not become members or resume membership for at least one year after their tenure. This was to meet the concern that students may suspend their membership in these organizations, or take a leave, and then return. It also allows for students who join these organizations to decide they no longer want to be members without permanently penalizing them. The change does not absolutely prevent students from rejoining single-gender social organizations later on, but it raises the cost of doing so.

The response to the policy among athletic teams, recognized student groups and student sponsored organizations varies. Some groups have embraced the core principle of non-discrimination and are already talking about ways to reinforce and nurture this in their membership practices, others are more tentative. The names of two groups recurred in our conversations with questions about whether or not the policy would apply to them, namely the Undergraduate Council and the Harvard *Crimson*. Since the *Crimson* uses the Harvard name and enjoys all the prerogatives of a recognized student group, such as the right to reserve room on campus, students may regard its exclusion from the policy as anomalous. Leadership positions on the *Crimson* are highly prestigious in the outside world, and the newspaper is identified by everyone with Harvard. Similar concerns were raised with regard to the Undergraduate Council, whose president and vice president are elected by the entire student body. The general feeling among the committee members was that these groups should be covered by the policy and held to the same standards of accountability as recognized student groups.

Although the policy as formulated refers to the Dean of the College in the singular, we note that Harvard College also has Faculty Deans as well as other College Deans, who in their roles as the heads of residential academic communities or groupings, play a central role in endorsing or recommending students for various opportunities or privileges. We also note above that Harvard offers many fellowships comparable to the Rhodes and Marshalls in amount if not prestige, as discussed above. They may consider following the spirit of this policy in their own decisions.

### c. Communications and Benchmarking

It is vital to communicate the new policy to the full Harvard community in order that all understand the policy's broad aspirations as well as its detailed guidelines. The subgroup strongly recommends a dissemination of a positive narrative around the new policy, emphasizing its historic nature, its origins in appeals to inclusion in the broadest sense, and its emphasis on student agency. In particular, the committee recommends presenting the policy as an effort to maximize students'

HARV-F-00003309

opportunities for building inclusive community and the expression of the ways in which students occupy a multiplicity of identities and are simultaneously members of raced, classed, gendered, and sexed communities. This would align with the College's pedagogical emphasis on intellectual, personal and social transformation. Recognizing that the primary audience for any communication is prospective and incoming students, our specific recommendations regarding the communication of the policy are as follows:

1) *A letter from University officials to incoming students and their families*
   a. This letter would be sent prior to matriculation, and would communicate the University's goals of an inclusive and diverse educational community and its position with regard to unrecognized social groups.
   b. It would also direct students and parents to a website with more information, including definitions of unrecognized social groups.
   c. With respect, we suggest a template for such a letter in Appendix G.
2) *Production of various forms of media for communicating information about the policy.*
   a. Map out all virtual touchpoints with the College (The Harvard *Crimson*, social media, brochures to incoming students, website, etc.) and add links to policy FAQ's as appropriate.
   b. Invest in the creation of clear/concise, professional brochures articulating the new policy (modeled on materials created by Honor Code and Title IX Office).
   c. Consider "door drops" in the Yard early fall semester and during recruitment seasons of materials (see above) about the new policy, including links to FAQs and where to go with questions.
3) *Particular emphasis on the incoming freshmen class, as the first class affected by the policy.*
   a. Secure time during Opening Week and space for FAQs and links in the materials that reach incoming students.
   b. Coordinate with Admissions and Financial Aid Offices, including the Admissions blog where current students may write about the implications of the new policy.
   c. Educate proctors, PAFS, and tutors about the new policy. Send representatives (e.g. one administrator and one student) to PAF, Proctor, and Tutor training sessions to ensure that all understand and can communicate the new policy to new students.
   d. Reach out to student leaders of pre-orientation programs. More than half of our students participate in pre-orientation programs, and they perceive their upperclassmen student leaders as a vital source of information about campus culture.
4) *On-going and continuous engagement with the various stakeholders who are affected by the policy.*
   a. Alert House Offices, sophomore advisers, and fellowship tutors to advise students about the policy and the enforcement process at the beginning of the sophomore year.
   b. Outreach to coaches and captains to alert athletes to the policy each fall.
   c. Outreach to Harvard Alumni Association to provide language, materials and resources for concerns.
   d. Outreach to Faculty regarding questions they might have about fellowships, awards and other intersections of the policy with their support of students.
   e. Coordinate with the group overseeing Smith Campus Center construction/organization.

HARV-F-00003310

The policy must be communicated effectively to current students, who serve as mentors and informal sources of information for incoming students and freshmen, as well as to all student social organizations on campus. We suggest holding additional Town Halls to communicate the new policy and appointment of a group of students to speak about the policy with current and incoming students for the 2017 calendar year. It is also important to hold smaller sessions for some of these discussions so that questions can be raised and answered effectively. There remains a need to meet with sorority members/leaders to discuss the implications of the new policy due to the imminent spring recruitment season. The subcommittee also urges that on-going efforts be made to meet with and listen to detractors of the new policy, and to engage as many students as possible in efforts to create new social opportunities.

## d. Campus Community

The work has been guided by the understanding that the chief aim of this policy is to promote an equitable social climate and provide inclusive social opportunities for all Harvard students. To that end, implementation of the policy will ideally spur change among organizations that currently discriminate based on gender and limit the influence of those organizations that choose not to adopt inclusive policies and practices that align with the mission of Harvard College. This first step toward greater inclusion should not be seen as the ultimate solution to issues of gender inequality, discriminatory practices of student organizations, or problems of sexual assault. Rather, this policy should make room for new venues, particularly in the first and second years of the student experience, to provide welcoming and inclusive opportunities for social life at Harvard.

As the committee grappled with how to best implement the specifics of the policy itself along with strategies to communicate it effectively, it became clear that those efforts will only be effective if substantial investment is made in creating social alternatives. Investment is needed not only in terms of financial support but also creativity in imagining a new social reality. This process will be well-served by engaging current students who can contribute based on their experiences in the current social environment and by engaging new students who can bring fresh approaches to crafting a new social scene.

Communities of scale are important to student social life. Students have emphasized that while House Life is positive, it does not evidently address all social needs. Randomization and diversity within the Houses are valued aspects of the student experience, but Houses do not provide smaller-scale affinity-based communities. House populations with average sizes of 400 students are too large, and students were vocal in expressing the value of social communities that range in size from 40-100 members. Access to social space is also important. Students want both community spaces for casual gatherings as well as spaces for parties. It is important to note that the idea of "space" provided by social groups is also about the environment and experience of the group; it does not necessarily require ownership of dedicated spaces.

The following recommendations seek to balance efforts to prioritize House Life while also offering ideas to pilot the creation of inclusive social alternatives. The subcommittee on Campus Community worked extensively with students to provide suggestions for new programs. Mindful of the fact that this was beyond the immediate charge of the Implementation Committee, and well aware of the important work and ideas coming from the College Committee on Belonging and Inclusion, as well

HARV-F-00003311

as the Committee on Student life, the Campus Community recommends the following for consideration:

1. *Pilot a new program of inter-House dining societies.*
   a. These proposed dining societies would constitute a new type of inclusive social organization on campus, open to all who wish to participate. These would be small groups of about 40 students that would alternate between two Houses for a regular meal each week. See Appendix H for more details.

2. *Improving access to, repurposing or renovating existing social spaces for new social purposes.*
   a. We suggest several initiatives including re-purposing the Cambridge Queen's Head pub, and locating social space for freshmen comparable to what was lost in the move from the Freshman Union, investigating the use of Loeb House for high-end undergraduate student events, and transforming the SOCH into a venue for student weekend social events. We also recommend that the College explores ways to improve access to existing social spaces in the Houses. See Appendix H for more details.

3. *Expand the interhouse intramural program beyond sports; involve freshmen in this program.*
   a. We recommend broadening the current intramural program to include non-sports oriented forms of friendly competition between Houses. This may also include a broader effort to incorporate freshmen into House communities earlier in their time at the College. See Appendix H for more details.

4. *Explore the possibility of strengthening ties between existing student groups and Harvard Alumni Association and the systems of Harvard Clubs.*
   a. We recommend strengthening ties with the existing alumni groups. Many students valued the intergenerational aspects of smaller-scale affinity groups that maintain strong connections to College alumni, both older and more recent. These connections are often seen as facilitating professional networking and career development. Expanding these networks beyond social clubs would be the goal. Another approach would be to provide support to existing recognized student groups who maintain connections with alumni already.

## IV.   Conclusion

Harvard University celebrated its 375th Anniversary in 2011. As the oldest school within the University, the College has traveled a long historic arc towards its present incarnation. Over those four centuries, both Harvard and its students have continued to evolve, moving towards an increasingly inclusive vision of a community of learning open to all genders, ethnicities, races, and socio-economic classes. By affirming the importance of non-discrimination, the policy embodies both the ethical vision of the College in the 21st century and its long-standing commitment to the transformative power of a liberal arts and sciences education. Our students come to Harvard to learn how best to operate as global citizen-leaders; many depart saying that they have learned the most from their peers and fellow students. This policy seeks to support that dynamic by encouraging students to engage with their peers in the broadest possible manner, to participate in critical and

HARV-F-00003312

thoughtful dialogue around difference, and to work productively together to accomplish a shared goal.

The Implementation Committee recognizes that many students may feel ambivalent or uncertain about the nature of the policy, or doubt the efficacy of its approach. Others have expressed concern about the perceived gap between rhetoric of inclusion and actual practice, not just in terms of unrecognized single-gender social organizations but recognized student groups as well. For this reason, and recognizing that our student population completely replaces itself every four years, we recommend that the Committee on Student Life review the policy and the recommendations periodically to assess its efficacy.

What is clear to us is that this policy offers an unambiguous message about the principle of non-discrimination for all members of our community and an opportunity for all of us to think creatively about issues of inclusion on our campus. The success of the policy, and, ideally, its positive effect on undergraduate social life, will depend on the good faith of the students and administrators involved. While some groups may choose another path, we hope that many will take up the challenge and the invitation to be part of a diverse, inclusive and ever-renewed Harvard as it enters its fifth century.


Appendices

A. Implementation Group Membership
B. List and classification of Social Groups and Clubs at Harvard College
C. Findings on Peer Institutions
D. List of Fellowships
E. Unrecognized Single-Gender Social Organizations
F. List of Athletic Teams
G. Letter for incoming students
H. Three new ideas for improving Campus Community

HARV-F-00003313

**Appendix A: Implementation Group Membership**

**Steering Committee**

*Chairs*

Kay K. Shelemay, *G. Gordon Watts Professor of Music and Professor of African and African American Studies*

Doug Melton, *Xander University Professor and Faculty Dean of Eliot House*

*Members*

Janet Browne, *Aramont Professor of the History of Science*

Tom Dingman, *Dean of Freshmen*

Katie O'Dair, *Dean of Students*

Shaiba Rather, *Class of 2017*

Roshnee Raithatha, *Class of 2017*

Nick Barber, *Class of 2017*

*Staff to Committee*

David Friedrich, *Associate Dean of Students*

**Governance/Implementation**

*Chair*

Luke Menand, *Anne T. and Robert M. Bass Professor of English*

*Members*

Greg Llacer, *Director of the Office of Undergraduate Research and Fellowships*

Nathan Fry, *Sr. Associate Director of Athletics*

Jasmine Waddell, *Resident Dean of Freshmen*

Daniel Tartakovsky, *Class of 2017*

Yesenia Jimenez, *Class of 2017*

Jason Mills, *Class of 2017*

Gemma Collins, *Class of 2018*

HARV-F-00003314

Nina Srivastava, *Class of 2018*

Jackie Kellogg, *Class of 2019*

*Staff to Committee*

Lauren Brandt, *Assistant Dean for Academic Integrity and Student Conduct*

## Communications/Benchmarking

*Chair*

Caroline Light, *Director of Undergraduate Studies and Lecturer on Studies of Women, Gender, and Sexuality*

*Members*

Jane Labanowski, *Class of 2017*

Michael Kikukawa, *Class of 2017*

Sam Green, *Class of 2017*

*Staff to Committee*

Rachael Dane, *Associate Director of Communications, Harvard College*

## Campus Community

*Chair*

Anne Harrington, *Franklin L. Ford Professor of the History of Science and Faculty Dean of Pforzheimer House*

*Members*

Caitlin Casey, *Allston Burr Assistant Dean of Harvard College, Lowell House*

Alex Miller, *Assistant Dean of Student Life*

Naisha Bradley, *Director of the Harvard College Women's Center*

Alina Acosta, *Class of 2017*

Layla Stahr, *Class of 2017*

Megan Mers, *Class of 2017*

Benjamin Sorkin, *Class of 2020*

27

Ethan Reichsman, *Class of 2019*

Tim Haehl, *Class of 2018*

Danny Banks, *Class of 2017*

## APPENDIX B

### Sponsored Student Organizations
BWISE: BSC Fellows for a Whole Integrated Student Experience
College Events Board
Consent Advocates and Relationship Educators (CARE)
Contact Peer Counseling
CrimsonEMS
Drug and Alcohol Peer Advisors (DAPA)
Eating Concerns Hotline and Outreach
First-Year Outdoor Program (FOP)
First-Year Social Committee
Food Literacy Project
Harvard Undergraduate Council
HealthPALs - Health Peer Advisors & Liaisons
Honor Council
Indigo Peer Counseling
Response
Room 13
Senior Class Committee
Sexual Health and Relationship Counselors (SHARC)
Student Mental Health Liaisons (SMHL)
The Lowell House Opera Society

### Independent Student Organizations*
*(Leaders of these organizations in the class of 2021 and following subject to the policy)*
\* List accurate as of Fall 2016 and subject to change based on recognition of groups by the
Committee on Student Life

Advocating Success for Kids
An Evening with Champions
Asian American Brotherhood
Asian Baptist Student

Koinonia  Association of Black Harvard
Women
Australian Undergraduate Society at Harvard

HARV-F-00003316

College (AUS)
Bach Society Orchestra
Ballet Folklorico de Aztlan
Black Community and Student Theater
Brattle Street Chamber Players
Catholic Student Association
Christians on Campus
CityStep
Colombian Students Association at Harvard
College
Concilio Latino de Harvard
Convrgency - Harvard College VR
Crimson Commons
Crimson Key Society
Cuban-American Undergraduate Student
Association
Dharma: Harvard's Hindu Students
Association
Digital Literacy Project
Directing through Recreation, Education,
Adventure, and Mentoring
Dreamporte
Eleganza
Episcopal Students at Harvard College
European Business Group
Expressions Dance Company
Fallen Angels
Foundation for International Medical Relief
of Children - Harvard College
Friends of Project Sunshine
Fuerza Latina
FUSIAN
G-Chat: First-Year Discussion Group
Gender Inclusivity in Math
Green Medicine Initiative
HackHarvardCollege
Harvard African Students Association

Harvard Anime Society
Harvard Asian American Dance Troupe
Harvard Association Cultivating Inter-
American Democracy
Harvard Ballet Company
Harvard Ballroom Dance Team
Harvard Black Men's Forum
Harvard Black Students Association
Harvard Book Review
Harvard Breakers Organization
Harvard Bulgarian Club
Harvard Canadian Club
Harvard Cancer Society
Harvard Caribbean Club
Harvard Chemistry Club
Harvard Chess Club
Harvard Christian Impact
Harvard Classical Club
Harvard College Code Orange
Harvard College Access Health
Harvard College Act On A Dream Club
Harvard College Africa Business and
Investment Club
Harvard College Alpha Omega
Harvard College Anscombe Society
Harvard College Applied Mathematics
Society
Harvard College Association for the
Promotion of Interplanetary Expansion
Harvard College Association for U.S. - China
Relations
Harvard College Association of Practice and
Learning of Yan Xin Life Science &
Technology
Harvard College Astrophysical Society
Harvard College Baha'i Association
Harvard College Baroque Chamber

HARV-F-00003317

Orchestra
Harvard College Bhangra
Harvard College Biomedical Engineering
Society (BMES)
Harvard College Bisexual, Gay, Lesbian,
Transgender, Queer & Allied Students in the
Sciences (HBASIS)
Harvard College Black Pre-Law Association
Harvard College Bolivian Association
Harvard College Bowl
Harvard College British Club
Harvard College Candela Dance Troupe
Harvard College China Forum
Harvard College Chinese Music Ensemble
Harvard College Coaches
Harvard College Coalition for East African
Peace
Harvard College Community of Humanists,
Atheists, and Agnostics
Harvard College Conservation Society
Harvard College Consulting Group
Harvard College Crunch Magazine
Harvard College Cube Club
Harvard College Data Ventures
Harvard College Debating Union
Harvard College Deepam
Harvard College Democrats
Harvard College Developers for
Development
Harvard College Development Think Tank
Harvard College DirecTutor
Harvard College Disability Alliance
Harvard College Ecomarathon Team
Harvard College Economics Review
Harvard College Effective Altruism
Harvard College Electronic Music Collective
Harvard College Engineering Society

Harvard College Engineers Without Borders
Harvard College Entrepreneurship Forum
Harvard College eSports Association
Harvard College European Society
Harvard College Faith and Action
Harvard College Film Festival
Harvard College First Generation Student
Union
Harvard College Francophone Society
Harvard College Friends of the Red Cross
Harvard College Future Surgeons
Harvard College Geological Society
Harvard College Global Health and AIDS
Coalition
Harvard College Go Club
Harvard College Half Asian People's
Association
Harvard College Healing Thoughts
Harvard College Health Advocacy Program
Harvard College Health Policy Review
Harvard College Healthcare Associates
Harvard College Hellenic Society
Harvard College Human Rights Review
Harvard College iGEM
Harvard College Impact Investing Group
Harvard College in Asia Program
Harvard College Interfaith Forum
Harvard College International Negotiation
Program
Harvard College International Women's
Rights Collective
Harvard College Iranian Association
Harvard College Italian Society
Harvard College Japan Initiative
Harvard College KeyChange: A Black
Acapella Experience
Harvard College Korean Adoptee Mentorship
Program

HARV-F-00003318

Harvard College Korean International Student Association
Harvard College Latino Men's Collective
Harvard College Latinos in Health Careers
Harvard College Law Society
Harvard College Magicians' Society
Harvard College Manifesta Magazine
Harvard College Medical Humanities Forum
Harvard College Meditation Club
Harvard College Mentors for Urban Debate
Harvard College Model Congress Middle East
Harvard College Naturalist Club
Harvard College Nigerian Students Association
Harvard College Ocean Sciences Club
Harvard College Opera Society
Harvard College Organization for Open Philosophy
Harvard College Palestine Solidarity Committee
Harvard College Pan-African Dance and Music Ensemble
Harvard College Partners in Health Engage
Harvard College Photography Club
Harvard College Piano Society
Harvard College Polish Society
Harvard College Pre-Veterinary Society
Harvard College Progressive Jewish Alliance
Harvard College Quantitative Trading Club
Harvard College Queer Students and Allies
Harvard College Review of Environment and Society
Harvard College Rootstrikers Association
Harvard College Rural Health Association
Harvard College Russian Speakers Association
Harvard College School of Rock
Harvard College Science Club for Girls

Harvard College Scientista
Harvard College Seventh-day Adventist Fellowship (HCSDAF)
Harvard College SHADE
Harvard College Social Enterprise Association
Harvard College Social Innovation Collaborative
Harvard College Society for the Cinematic Arts
Harvard College SoulFood Christian Fellowship
Harvard College South Slavic Society
Harvard College Speak Out Loud
Harvard College Special Olympics
Harvard College Sports Analysis Collective
Harvard College Sports Marketing Club
Harvard College Stand-Up Comic Society
Harvard College Stem Cell Society
Harvard College Stories for Orphans
Harvard College Students for Scholars at Risk
Harvard College Students for the Exploration and Development of Space (SEDS)
Harvard College Syrian Humanitarian League
Harvard College TEATRO!
Harvard College Tuesday Magazine
Harvard College Turkish Student Association
Harvard College Undergraduate Research Association
Harvard College US-India Initiative
Harvard College Vegetarian Society: Vegitas
Harvard College Ventures
Harvard College Video Game Development Club
Harvard College VISION
Harvard College Voice Actors' Guild
Harvard College Wine Society

31

Harvard College Wireless Club

Harvard College Wisconsin Club

Harvard College Writers' Workshop

Harvard Community Garden

Harvard Composers Association

Harvard Computer Society

Harvard Debate Council

Harvard Egyptian Students Association

Harvard Financial Analysts Club

Harvard Friends of Chabad

Harvard Glee Club

Harvard High-Tech & Business Group

Harvard Hillel

Harvard Hong Kong Society

Harvard Intercollegiate Model United Nations

Harvard International Relations Council

Harvard International Relations on Campus

Harvard International Review

Harvard Investment Association

Harvard Islamic Society

Harvard Japan Society

Harvard Korean Association

Harvard Latter-day Saint Student Association

Harvard Libertarian Forum

Harvard Mock Trial Association

Harvard Model Congress

Harvard Model Congress Asia

Harvard Model Congress Europe

Harvard Model Congress San Francisco

Harvard Model United Nations

Harvard Mountaineering Club

Harvard National Model United Nations

Harvard Opportunes

Harvard Organ Society

Harvard Organization for Latin America

Harvard Outing Club, Inc.

Harvard Philippine Forum

Harvard Political Review

Harvard Pops Orchestra

Harvard Pre-Medical Society

Harvard Program for International Education

Harvard Project for Asian and International
Relations

Harvard Radio Broadcasting, Inc

Harvard Republican Club

Harvard Reserve Officer Training Corps
Association

Harvard Review of Philosophy

Harvard Right to Life

Harvard Romanian Association

Harvard S.T.A.G.E. - Student Theater
Advancing Growth & Empowerment

Harvard Science Review

Harvard Society for Mind, Brain, and
Behavior

Harvard Society of Arab Students

Harvard Society of Black Scientists and
Engineers

Harvard South Asian Association

Harvard Story-Time Players

Harvard Student Agencies

Harvard Students for Israel

Harvard Taiwanese Cultural Society

Harvard Thai Society

Harvard Undergraduate Association of
Pediatric Pals

Harvard Undergraduate Beekeepers

Harvard Undergraduate BGLTQ Business
Society (HUBBS)

Harvard Undergraduate Bioethics Society

Harvard Undergraduate Biotechnology
Association

Harvard Undergraduate Brazilian
Association

Harvard Undergraduate Consulting on

HARV-F-00003320

Business and the Environment
Harvard Undergraduate Dancing to Heal
Harvard Undergraduate Economics
Association
Harvard Undergraduate Fellowship
Harvard Undergraduate Global Health Forum
Harvard Undergraduate High School
CityServe
Harvard Undergraduate History Club
Harvard Undergraduate Humanities Initiative
Harvard Undergraduate Mathematics
Association
Harvard Undergraduate Mirch
Harvard Undergraduate Robotics Club
Harvard Undergraduate Students for
Myanmar
Harvard Undergraduate Taiwan Leadership
Conference
Harvard Undergraduate Women In Business
Harvard Undergraduate Women in Computer
Science
Harvard Undergraduates for Human Rights in
North Korea
Harvard Undergraduates Raising Autism
Awareness!
Harvard University Band  Harvard University
Choir
Harvard University Flute Ensemble
Harvard Vietnamese Association
Harvard Wind Ensemble
Harvard World Model United Nations
Harvard Yearbook Publications, Inc.
Harvard-Radcliffe Asian American
Association
Harvard-Radcliffe Asian American Christian
Fellowship
Harvard-Radcliffe Asian American Women's
Association
Harvard-Radcliffe Chado Society
Harvard-Radcliffe Chinese Students

Association
Harvard-Radcliffe Collegium Musicum
Harvard-Radcliffe Dramatic Club
Harvard-Radcliffe Gilbert & Sullivan Players
Harvard-Radcliffe Modern Dance Company
Harvard-Radcliffe Orchestra
Harvard-Radcliffe Science Fiction Association
Harvard-Radcliffe Society of Physics Students
Harvard-Radcliffe Veritones
Harvard-Radcliffe Women's Leadership
Project
Harvard's Under Construction
Hasty Pudding Theatricals
Health Leads
Holoimua O Hawaii
House and Neighborhood Development
Hyperion Shakespeare Company
IDENTITIES Fashion Show
Immediate Gratification Players
Institute of Politics
Israel Public Affairs Committee at Harvard
College
Kidney Disease Screening and Awareness
Program
La Organizacion de Puertorriquenos en
Harvard
Latinas Unidas de Harvard College
Leadership Institute at Harvard College
Lowell House Society of Russian Bell Ringers
at Harvard College
Mariachi Veritas de Harvard
Model Congress Latin America (MCLA)
Model Security Council
Music in Hospitals and Nursing Homes Using
Entertainment as Therapy
Native Americans at Harvard College
On Harvard Time
On Thin Ice

HARV-F-00003321

Organization of Asian American Sisters in Service

Orthodox Christian Fellowship of Harvard College

Passus: Harvard College Step Team

Phillips Brooks House Association

Quad Sound Studios

Radcliffe Choral Society

Radcliffe Union of Students

Recreational Experience and Arts Creativity with Harvard

SACH: Harvard Undergraduate Sikh Student Association

Satire V

Science Theater at Harvard College (ST@HC)

Sexual Health Education & Advocacy throughout Harvard College

Simplicissimus: The Harvard College Journal of Germanic Studies

Singapore, Indonesia and Malaysia Association

Smart Woman Securities

South Asian Dance Company

South Asian Men's Collective

South Asian Women's Collective

Springboard: The Harvard College Design Club

Student Astronomers at Harvard-Radcliffe Synthesis

TAMID Israel Investment Group

TAPS

Task Force on Asian and Pacific American Studies at Harvard College

Team HBV at Harvard College

TEDxHarvard College

Tempus: The Harvard College History Review

Texas Club of Harvard

The Food Lab for Kids @ Harvard College

The Franklin Fellowship

The Happiness Project

The Harvard Advocate

The Harvard Callbacks

The Harvard College Armenian Students Association

The Harvard College Ecdysis: A Journal for the Artistic Expression of Science

*The Harvard Crimson  (see note in the report)

The Harvard Din & Tonics

The Harvard Ichthus

The Harvard Independent

The Harvard Krokodiloes, Inc.

The Harvard LowKeys

The Harvard Undergraduate Drummers (THUD)

The Harvard Undergraduate Research Journal

The Harvard University Jazz Bands

The Inside Voices Step Team

The John Adams Society: A Harvard College Debating Society

The Kuumba Singers of Harvard College

The Noteables: Harvard's Broadway Beat

The Radcliffe Pitches

The River Charles Ensemble

Three Letter Acronym

United World Club at Harvard College

Veritas Financial Group

Woodbridge International Society

Writing and Public Service Initiative (WPSI) at Harvard College

Youth Alliance for Leadership and Development in Africa

HARV-F-00003322

**PBHA Programs**

PBHA Mission Hill Afterschool Program

PBHA's Connelly Center Youth Prison Tutoring Program

PBHA's EnviroEd

PBHA's Student Labor Action Movement

PBHA's Boston Refugee Youth Enrichment Term

PBHA's Committee on Deaf Awareness

PBHA's Harvard Small Claims Advisory Service

PBHA's Refugee Youth Summer Enrichment

PBHA's Native American Youth Enrichment Program

PBHA's Cambridge Youth Enrichment Program

PBHA's Roxbury Youth Initiative Term

PBHA's Keylatch Summer Program

PBHA's Boston Refugee Youth Enrichment Extension

PBHA's Chinatown ESL Program

PBHA's Boston Refugee Youth Enrichment Teen

PBHA's Boston Refugee Youth Enrichment Tutoring

PBHA's Roxbury Youth Initiative

PBHA's HARMONY Mentoring

PBHA's 1-2-1 Boston Refugee Youth Enrichment

PBHA's Franklin Teen Mentoring Program

PBHA's Y2Y (Young Adults Uniting to End Homelessness)

PBHA's Undergraduate Legal Committee

PBHA'S Summer CIVICS

PBHA's Recent Immigrant Term-Time

Enrichment

PBHA's Harvard Square Homeless Shelter

PBHA's Kids with Special Needs Achievement Program

PBHA's The Athena Program

PBHA's CIVICS

PBHA's Keylatch Afterschool Program

PBHA's Suffolk Prison Education

PBHA's Chinatown Afterschool Program

PBHA's Franklin After School Enrichment

PBHA's Strong Women, Strong Girls

PBHA's Franklin I-O Summer Program

PBHA's Mission Hill Summer Program

PBHA's Experimentors

PBHA's Harvard Emerging Literacy Project

PBHA's Harvard Artists for Alzheimer's

PBHA's Cambridge After-School Program

PBHA's Native American Youth Education Mentor Program (NAYEP Mentor)

PBHA's Mission Mentor

PBHA's CHANCE

PBHA's Partners Empowering Neighborhoods

PBHA's Women's Empowerment and Prison Education Program

PBHA's Keylatch Mentor Program

PBHA's Pets as Therapy

PBHA's Chinatown Teen Program

PBHA's Best Buddies

PBHA's Harvard Habitat for Humanity

PBHA's Environmental Action Committee

PBHA's Chinatown Adventure

PBHA's Summer Harvard Square Homeless Shelter

HARV-F-00003323

PBHA's South Boston Afterschool Program
PBHA's Harvard College Alzheimer's Buddies Program
PBHA's Chinatown Citizenship Program
PBHA's Summer HARMONY
PBHA's STRIVE
PBHA's Cambridge 1-2-1
PBHA'S Alternative Spring Breaks
PBHA'S Summer Science
PBHA's LEADERS!
PBHA's South Boston Big Sibling Program
PBHA's Youth Recreation Program-HOOPs
PBHA's Chinatown Big Sibling Program
PBHA's David Walker Scholars Program
PBHA's Elderly 1-2-1
PBHA's South Boston Outreach Summer
PBHA's LEADERS! Summer Program
PBHA's Harvard College Youth Leadership Initiative
PBHA's Peer Health Exchange
PBHA's Boston Refugee Youth Enrichment Summer Program

HARV-F-00003324

APPENDIX C

## A Survey of Peer Institutions' Responses to Greek Life
CONFIDENTIAL: FOR INTERNAL HARVARD USE ONLY

Daniel Becton

**Executive Summary**: Liberal arts colleges such as Amherst, Bowdoin, Williams and Middlebury have generally decided to ban fraternity and sorority life. Although this has been effective with regard to gender integration, students tend to push back against the schools' attempts to "micro-manage" the social scene.[1] Princeton recently banned participation in Greek life by first year students, and has continued to invest in their residential college system. Well-established gender inclusive Eating Clubs offer dining and social life for juniors and seniors at Princeton. Dartmouth created a house system this year that includes all students as part of their Moving Dartmouth Forward initiative. This new house system creates new opportunities for intellectual and social engagement even as there continues to be a strong fraternity and sorority system.

Overall, institutions surveyed identified that the role of social organizations organized by gender has been viewed as incompatible with creating an inclusive campus. Those institutions that have had the most success addressing the influence of single gender social organizations and fraternity systems did so by taking bold steps to implement policies that eliminated the presence of such organizations combined with significant investment in alternatives including re-organizing their residential systems to promote and institutionalize inclusive social communities. Those that took half measures or changed course did not realize the same level of positive change in the undergraduate experience.

## Full Report

Harvard's decision to address single-gender social organizations follows precedents set by a number of peer institutions. The data from schools who have enacted similar reforms points to the threefold problem of allowing student social life to organize itself around a hyper-emphasis on gender, heterosexuality, and alcohol. The efforts of these schools to reduce the impact of single-gender social organizations show that a thriving social life can be achieved without orbiting around off-campus, single-gender social structures. The last section of this report expands the focus to include observations about how issues of gender exclusivity intersect with fluid gender identities. It explores how traditionally female colleges and Greek organizations have addressed trans identity. Generally speaking, the gender binary is preserved and affirmed whenever gender is the organizing principle for an institution.

### A.  Amherst

### History[1]

The school created a Fraternity Policy in 1984 that blocked College resources and buildings from use by "any fraternity, sorority or other social club, society or organization." The school clarified

---

[1] Zach Schonfeld, "Inside the Colleges that Killed Frats For Good," *Newsweek*, March 10, 2014, http://www.newsweek.com/inside-colleges-killed-frats-good-231346.

HARV-F-00003325

that, although it permits off-campus membership in Greek life (the Board of Trustees did not want to limit students' rights to free association), it would impose disciplinary action for on-campus pledging, recruiting, meetings, social events and use of College facilities by these groups.

In 2014, the College extended the policy to prohibit all "student participation in off-campus fraternities and sororities and fraternity-like and sorority-like organizations."

The policy is enforced by monitoring off-campus housing requests among the sparse student body, and encouraging on-campus parties.

### Amherst College's Party Policy[2]

The policy is "designed to help students host safe, successful, and respectful parties" and relies on "responsible party management on the part of student Party Sponsors."

Students can register to host a small (<99) or large party, with or without alcohol. These parties are not allowed to have hard liquor (college policy, section f). The Student Life Office staff provides support and resources for Registered Student Organizations (RSOs) planning an event or party.

### Samples of Student Reactions

In April 2016, the editorial board of the school newspaper criticized "current glaring lack of diverse options" and "heavily-enforced noise regulations." The piece argued these "restrictive regulations and confrontational encounters only further provoke dangerous behavior that make students look for creative solutions to evade strictness."

Furthermore, it claimed that students lack "a clear understanding of the direct goals and details of the College's party policy." "There are gaps between student and administrator perceptions when it comes to partying, which result in misunderstandings when it comes to actual implementation."

The piece acknowledged that the College and local police intended to act on the side of safety, but in spite of these perceived obstacles, "students are making an effort to forge a more inclusive and diverse social scene." Students will party in large, accessible spaces if they are available, but they are "hyper-controlled," forcing "gatherings (to) become smaller, and thus more exclusive." [3]

### B. Bowdoin

Bowdoin announced a fraternity ban in 1997, including a ban on all "similar selective-membership social organizations."[4] This coincided with changes to their housing system described below.

### *Housing*

---

[2] Amherst College, "Amherst College Party Policy," accessed November 28, 2016, https://www.amherst.edu/campuslife/our-community/keefe/registering-an-event/partypolicy/node/531769.
[3] *The Amherst Student* Editorial Board, "Our Changing Social Climate," *The Amherst Student*, Issue 146-5, October 4, 2016, http://amherststudent.amherst.edu/?q=article/2016/10/04/our-changing-social-climate.
[4] Bowdoin College, "Fraternity Membership Policy," accessed November 28, 2016, https://www.bowdoin.edu/studentaffairs/student-handbook/college-policies/fraternity-membership-policy.shtml.

HARV-F-00003326

In their social housing program, Bowdoin affirms that "an inclusive and dynamic living community is a central element of the Bowdoin experience."[5] Their residence halls are a "vibrant living environment."

All first year students will live in one of eight first year residence halls, also known as "bricks," on the central campus.[6] Each floor of these eight buildings has an upper-class student proctor and one or two upper-class student RAs. These are chosen randomly.

Bowdoin founded its house system in 1998 to be "a cornerstone of the Bowdoin residential experience."[7] The school says the houses, which sponsor events and parties, are referred to as the "living rooms" of the campus. The website reads: "House residents are selected through an application process with input from faculty, deans, students, and staff. Successful selection is based on creative programming ideas and willingness to contribute to an energetic, cooperative team."

All incoming first-year students are affiliated with a House based on their floor in the first-year bricks. As affiliates, they have full access to space and to the privileges of the House as well as the opportunity to apply to live in the house as Upperclassmen.

Upperclass students either participate in an annual "housing lottery" to choose from a variety of on-campus room and apartment configurations or apply to live in one of the eight College Houses.[8] Housing is guaranteed for first-year and sophomore students; historically the school has also accommodated any junior or senior who desired on-campus housing.

A conversation with Senior Associate Dean of Student Affairs at Bowdoin College Kim Pacelli[9] provided more details regarding the different class experiences.

After freshmen year, about half of sophomores live in the Houses (95 percent of House residents are sophomores). The rest of students can enter a housing lottery or live off campus – about 90% of all students live on campus.

In terms of house affiliations, preferential consideration for housing is given to students for their affiliated house (from first year) but there is plenty of switching. Many students just go to a house based on one or two friends. Students maintain their affiliation all four years, but also may pick up a different affiliation (due to interests) but "membership is not meaningful."

In terms of social events on campus, students can host parties in houses or residence halls (halls can accommodate about 50 people). In campus parties, the school does not heavily enforce underage drinking. If it is an over-21 party, the college approves the amount of alcohol based on number of people.

---

[5] Bowdoin College, "Residential Life," accessed November 28, 2016, http://www.bowdoin.edu/reslife/index.shtml.
[6] Bowdoin College, "First-Year Housing," accessed November 28, 2016, http://www.bowdoin.edu/reslife/first-year-housing/index.shtml.
[7] Bowdoin College, "The College House System: An Overview," accessed November 28, 2016, http://www.bowdoin.edu/reslife/college-houses/index.shtml.
[8] Bowdoin College, "Housing Overview," accessed November 28, 2016, http://www.bowdoin.edu/reslife/housing/index.shtml.
[9] D. Becton, personal communication with Kim Pacelli, Senior Associate Dean of Student Affairs at Bowdoin College, December 2, 2016.

HARV-F-00003327

In terms of off-campus parties, students find these appealing because they are unsupervised, but the appeal for hosts suffers due to having to deal with the police instead of the college. Notably, the town passed a disorderly property ordinance and has started to report noisy homes, increasing the pressure on students. Bowdoin had some success when it started providing large, quality spaces for parties. Since the Houses are filled with sophomores, upperclassmen don't want to have parties there – they tend to be more interested in house parties or bars. (However, recently, one "cool/popular" house of seniors, which usually has men's rugby players, hosted a "throwback" party at a House.)

## History recounted in 2011[10]

A research project entitled "Forty Years: The History of Women at Bowdoin" asserts, "Women in the first coeducational classes were presented with the task of creating spaces for themselves within an already-established social scene. […] Although many women had positive experiences with Greek societies, there were some allegations of gender-based harassment and hazing." It also notes that the fraternities were an integral (albeit occasionally problematic) part of Bowdoin's social scene, but the Board of Trustees' 1997 decision to phase them out was, in part, because of their incompatibility with coeducation."

### C.  Middlebury, Williams, Colby, and Wesleyan

## Middlebury

Middlebury ended fraternities after an infamous 1988 incident when a battered woman mannequin displayed at a fraternity house. In 1990, their Board forced the fraternities to become coed or dissolve. Resistance (fraternities met in secret off campus) sputtered once the existing students graduated.[11]

Middlebury established a housing system in 1991 to offer new, diverse, safe spaces.[1] "I think Middlebury student culture is a lot more balanced and inclusive than it would be with the presence of Greek life," wrote recent graduate Luke Whelan. "The people who would be in frats and sororities are still there for sure, but they don't dominate the social scene." Whelan was a member of The Mill, a social house largely associated with hipsters and which Whelan says fosters community "without the exclusivity and entitlement associated with frats." Notably, Whelan said the school's sensitivity about its Greek past and the "micromanaging" of the social scene, including a vaguely "Kafkaesque" party-registering system, was a point of frustration among students — but not one worth trading for fraternities.

## Williams

---

[10] Bowdoin College, "Social Life and Fraternities," accessed November 28, 2016,
https://research.bowdoin.edu/forty-years-the-history-of-women-at-bowdoin/social-life-and-fraternities/
[11] "Fraternities Go Underground to Defy College Ban," *The New York Times*, August 29, 1994,
http://www.nytimes.com/1994/08/29/us/fraternities-go-underground-to-defy-college-ban.html

HARV-F-00003328

Williams banned fraternities in the 1960s, and faced approximately 2.5 years of opposition but this died down after the school began to admit women. Former president John Chandler wrote a manuscript about fraternities, arguing they effectively are a caste system[12] and even the addition of working-class white men to fraternity brotherhoods preserved gender and racial exclusion. Chandler argued high achieving prospective students began to choose Williams specifically because there were no fraternities.

Chandler was also president at Hamilton College and said the school botched their efforts at reform of Greek life by opting to maintain fraternities and sororities and simply ban their members from dining or living together.

**Colby**

Colby established a Trustee Commission in 1983 after student behavior got out of hand.[1] This Commission "voted unanimously to eliminate the system" of fraternities.

A fraternity member who served on the commission stated:  "If you have roughly a third of the campus in all-male housing that can self-select, you've already set up a little bit of a conflict on gender. Not having that seems to be an improvement from the start."

"There are redeeming qualities of fraternities, I'm sure, but there's nothing that can't be replicated in different ways," said Earl Smith, secretary of the commission. "It certainly was a better place for women, and a better place all around, I think." Smith said after implementation, the number of women in campus leadership positions swiftly rose.

Cal Mackenzie, alum and current fundraiser for the College affirmed: "Life is much better. … Women can go wherever they want to go. The social life at Colby is much healthier than it used to be."[13]

**Wesleyan**

In September, 2014, Wesleyan ordered all fraternities with on-campus housing to become co-educational within the next three years.[14]

This order took place as the school was reeling from news about sexual assault violations and after a female student fell three stories at a fraternity party in 2014.[15] Wesleyan allows students to live in fraternity houses as part of its "program housing" system, which also allows students to live together off campus if they share common interests, culture or identities. The fraternity does not currently have program housing status at Wesleyan.

---

[12] John W. Chandler, *The Rise and Fall of Fraternities at Williams College: Clashing Cultures and the Transformation of a Liberal Arts College*. Williamstown, MA: Williams College, 2014.

[13] All quotes taken from Zach Schonfeld, "Inside the Colleges that Killed Frats For Good," *Newsweek*, March 10, 2014, http://www.newsweek.com/inside-colleges-killed-frats-good-231346.

[14] Associated Press, "Wesleyan Fraternities Ordered To Go Coed," CBS Connecticut, September 22, 2014, http://connecticut.cbslocal.com/2014/09/22/wesleyan-fraternities-ordered-to-go-coed/.

[15] Alaine Griffin and Shawn R. Beals, "Records Shed Light On Wesleyan Student's Frat House Fall," *Hartford Courant*, April 12, 2015, http://www.courant.com/news/connecticut/hc-wesleyan-fraternity-student-fall-20150411-story.html.

HARV-F-00003329

"We have lost confidence in the ability of the fraternity members to manage social and residential activities at the house and abide by university policies," university President Michael Roth and Vice President for Student Affairs Michael Whaley said.

Currently, all undergraduates, Greek and otherwise, must live in university-approved housing. This means the university can exert more control over Greek life than many other colleges.[16] The university allowed one fraternity to become co-ed but rejected another's attempts to become a composite entity with the school's only sorority.

Of note, Wesleyan has a history of co-ed fraternity organizations with one voluntarily integrating in 1972, splitting with its national organization to do so freely.

## D. Princeton

### Policy on fraternities and sororities[17]

Princeton's policy prohibits freshmen from affiliating with fraternities and sororities, and prohibits those groups from soliciting freshmen. For the purpose of the policy, it defines prohibited groups as any "student organization" with "a primarily social purpose and an exclusive membership." The policy is introduced with an assertion that these organizations "do not add in positive ways to the overall residential experience" due to "social exclusiveness and … an excessive emphasis on alcohol."

Specifically, the policy prohibits freshmen from affiliating and defines affiliating as: membership; pledging; rush; attending or participating in any activity sponsored by a fraternity or sorority; or contributing funds to a fraternity or sorority.

It also prohibits groups from solicitation of freshmen, which it defines as: conferring membership on a freshman; inviting a freshman to pledge; including a freshman in rush; inviting a freshman to attend or participate in an activity or event; soliciting or accepting funds from a freshman on behalf of a fraternity or sorority.

This policy applies to activities that occur both on and off campus. It includes a qualifying paragraph to give students the benefit of the doubt regarding potential cases of solicitation.

Enforcement:

1) Sororities and fraternities are not permitted to use any University resources or participate in University-sponsored events (e.g., Student Activities Fair, Princeton Preview Program, etc.).
2) A student who engages in solicitation, as defined above, should expect to be suspended.
3) A freshman who joins, pledges, or rushes a fraternity or sorority should expect to be suspended.

---

[16] Margaret Barthel, "Where All the Frats Are Coed," *The Atlantic,* March 31, 2015, http://www.theatlantic.com/education/archive/2015/03/wesleyan-coed-frats/389177/.
[17] Princeton University, "Regulations Concerning Specific Aspects of Student Life: Hazing," accessed November 28, 2016, http://www.princeton.edu/pub/rrr/part2/index.xml#comp227.

HARV-F-00003330

4) A freshman who attends or participates in any other activity or event sponsored by a fraternity or sorority may be subject to a lesser penalty (e.g., disciplinary probation).

**Princeton's eating clubs**[18]

There are six selective eating clubs at Princeton. On most Thursday and Saturday nights, the Street is the primary social venue for Princeton students, and each club will have music and parties. Friday nights are much more low-key at Princeton, and clubs that are open are usually open only to members. Each club also has semiformal events and formal dinners and dances.

The six selective eating clubs pick new members in a process called "bicker." Bicker begins each spring semester during the week following intersession break, when interested sophomores come to the club they would like to join.

These clubs were mentioned in the press this year, when student from one of the clubs mass-e-mailed a vulgar photo of a female student. "Like fraternities, eating clubs have a history of being hostile to women."[19]

In 1990, the supreme court of New Jersey decided that Princeton's elite fraternity-like eating clubs, Ivy Club and Tiger Inn, had so much contact with the public that they did not qualify as private organizations, and had to allow women to join. Now, all of Princeton's eating clubs are coed.[20]

More information about the eating clubs can be found here: http://princetoneatingclubs.org/.

E. **Dartmouth**[21]

Historically, a strong Greek life has dominated the social scene at Dartmouth. After other reforms launched as part of a broad "Moving Dartmouth Forward" initiative (including a hard alcohol ban), Dartmouth launched a house system in September 2016. All Dartmouth students, including those who live in Greek letter houses, are members of one of six house communities, each of which is based in a cluster of residential buildings with an affiliated faculty residence.

The college asserts the new house plan will provide a home base for students throughout their time at Dartmouth. In addition, it will provide the setting to enable students to better integrate their social, academic, and creative lives.

Even though they will be assigned to house communities, first-year students will continue to live in designated first-year housing during their freshman year. After that, Dartmouth students will continue to have other choices within the residential system—including living learning communities,

---

[18] Wikipedia, "Eating Clubs at Princeton University," accessed November 28, 2016, https://en.wikipedia.org/wiki/Eating_clubs_at_Princeton_University.
[19] Natalie Kitroeff, "Princeton Has a Shadow Fraternity System Nobody Controls," *Bloomberg,* December 4, 2014, https://www.bloomberg.com/news/articles/2014-12-04/princeton-has-a-shadow-fraternity-system-nobody-controls.
[20] Katie Van Syckle, "Pledging Change: The Transgender College Students Integrating Greek Life," *The Guardian,* September 25, 2016, https://www.theguardian.com/society/2016/sep/25/transgender-students-fraternities-and-sororities.
[21] Dartmouth College, "Learn About Dartmouth's Brand New Housing System!" Dartmouth Direct, July 7, 2016, https://www.dartmouth.edu/~dartmouthdirect/2016/07/learn-about-dartmouths-brand-new-housing-system/.

HARV-F-00003331

academic affinity programs, senior apartments, Greek letter organizations and societies, and off-campus apartments—while maintaining the affiliation with their house community.

The College's messaging promotes a perception already created by Harvard: "Think of it like your Hogwarts House, in real life!"

Currently, Dartmouth College extends official recognition to fifteen all-male fraternities, eight all-female sororities, and three coeducational Greek houses.[22] Dartmouth recognizes two non-Greek undergraduate societies: Panarchy and Amarna. Both societies are co-ed, open, non-exclusive, and do not conduct "rush" activities.

Student literary or fraternal societies of Dartmouth College date back to 1783. Starting in the late nineteenth century, students began creating societies for each of the four class years. Only the senior societies survive from those early class societies, and new ones have been added in recent years. Approximately 25% of the senior class members are affiliated with a senior society today.

**Reaction to Reforms**

The school newspaper *The Dartmouth* has criticized the alcohol ban as ineffective.[23]

> College President Phil Hanlon announced major changes to student life at Dartmouth in late January, including a ban on all hard alcohol on campus, a new residential cluster system, a mandatory four-year sexual violence prevention program, a code of conduct and an increased focus on academics and grade inflation.

> Most students surveyed said that they continued to utilize hard alcohol and that the ban had little impact on their drinking habits. Experts on alcohol policy interviewed by The Dartmouth for a series of articles throughout the 2014-15 academic year indicated that hard alcohol bans, which are already in place at numerous colleges, are generally ineffective at curbing high-risk drinking and instead can drive drinking underground, making it more dangerous.[24]

Meanwhile, a reporter for *Time*[25] offered the school's perspective, while acknowledging the continued widespread consumption of alcohol:

> A spokeswoman for Dartmouth said the school doesn't have enough data to draw conclusions about the impact of its 2015 ban on the possession and consumption of hard alcohol on campus and at off-campus events hosted by student organizations. The spokeswoman said Dartmouth saw an increase in alcohol-related incidents with campus security and an increase in Good Samaritan calls to the Department of Safety and Security

---

[22] Wikipedia, "Dartmouth College Greek Organizations," accessed November 28, 2016, https://en.wikipedia.org/wiki/Dartmouth_College_Greek_organizations.

[23] Parker Richards, "'Moving Dartmouth Forward' and Other Reforms Shape 2014-15," *The Dartmouth*, August 21, 2015, http://www.thedartmouth.com/article/2015/08/moving-dartmouth-forward-and-other-reforms-shape-2014-15/

[24] http://www.thedartmouth.com/article/2015/08/moving-dartmouth-forward-and-other-reforms-shape-2014-15/

[25] Katie Reilly, "Why Banning Hard Alcohol on College Campuses May Not Be the Answer," *Time*, August 24, 2016, http://time.com/4463227/stanford-hard-liquor-ban/

HARV-F-00003332

after the ban was implemented, but a decrease in alcohol-related medical incidents on campus.

"A survey published in March by The Dartmouth, the school's student newspaper, found that 85% of students said they had consumed hard alcohol since the ban took effect.[26]

## F.  The exception: Trinity College

In 2015, Trinity rescinded plans to force fraternities to become co-ed.[27] The school president "concluded that the coed mandate is unlikely to achieve its intended goal of gender equity" because no man joined a sorority and no woman joined a fraternity. The groups "reached out to the opposite gender" but continue to organize themselves around gender as a variable.

The school decided to abandon the plans after the president said "community-wide dialogue concerning this issue has been divisive and counterproductive." A student who was president of a fraternity noted: "Deadlines kept going by and nothing ever happened." A history professor said the coed mandate was "stupid" and "never should have been passed in the first place." "I knew when they passed it that it was never going to happen because there was no real reason for it," he said.[28]

## G.  Interrelation of gender, sexuality and alcohol

Consistently, the troubles colleges face in navigating community life point to social systems with three chief organizing principles: group concentration of binary gender performance, heteronormative pressures due to that binary space (gender extended to sexuality), and excessive focus on alcohol. This hyper-emphasis on gender performance relates to the combination of group concentration and a lack of oversight. The ratio of adults-students is less than 20:1 in most residential life but it is 750:1 in fraternities.[29]

a) Group performance of gender binary
   a. emphasizes and radicalizes difference of man/woman
   b. large groups amplify policing of gender
   c. lack of adult supervision
   d. high likelihood of violent hazing

b) Gender separation affirmed/enforced through heteronormative social spaces
   a. gender binary is conflated onto hetero binary
   b. pressure to perform gender by engaging in heterosexual activity

---

[26] Katie Reilly, "Why Banning Hard Alcohol on College Campuses May Not Be the Answer," *Time*, August 24, 2016, http://time.com/4463227/stanford-hard-liquor-ban/
[27] Kathleen Megan, "Trinity President Decides To Drop Plan To Make Fraternities Coed," *Hartford Courant*, September 4, 2015, http://www.courant.com/news/connecticut/hc-trinity-abandons-coed-fraternities-0905-20150904-story.html.
[28] All quotes from: Kathleen Megan, "Trinity President Decides To Drop Plan To Make Fraternities Coed," *Hartford Courant*, September 4, 2015, http://www.courant.com/news/connecticut/hc-trinity-abandons-coed-fraternities-0905-20150904-story.html.
[29] Eliza Gray, "3 Ways to Fix Fraternities," *Time*, March 27, 2015, http://time.com/3760153/fraternity-reform-alcohol-greek-life/.

HARV-F-00003333

      c.  masculinity and hetero violations manifest through misogyny

c)  Excessive focus on alcohol
    a.  increases likelihood of sexual assault (Harvard 2004 study)
    b.  Hard alcohol bans at Dartmouth, Stanford, Colby, Amherst, Bates, Bowdoin, Williams, Swarthmore, Colgate, Notre Dame, Wash U, at frat parties for Purdue, Missouri, Kansas

*Trans identity at women's colleges and in Greek life*

Even when gender-based social organizations attempt to become more inclusive, it is generally through a more expansive notion of "man" or "woman" rather than identities that reject the binary. Mt. Holyoke is the only historically women's college that accepts all genders apart from cis men.[30] A pivotal argument in favor of Harvard's policy is that its gender-nonconforming students are virtually always excluded from spaces built on reified notions of "brotherhood" and "sisterhood."

Similarly, trans inclusion in Greek life preserves the gender binary, only opening itself to trans women and trans men who adequately perform their "new" gender identity.[19] "I struggle with the idea of a cis-gender female in this organization, and I don't have a very good reason," said Ben Ross, president of an inclusive fraternity. "But the justification I can provide for now, is that a similar but not the same experience is open for female-identified individuals through sororities."[31]

Locally, students at Tufts have started drawing attention to this issue. According to an article in The Boston Globe, students have organized a movement to prohibit Greek life because the system is "exclusionary and violent in practice."[32]

---

[30] Campus Pride, "Women's Colleges with Trans-Inclusive Policies," accessed November 28, 2016, https://www.campuspride.org/tpc/womens-colleges/.
[31] Katie Van Syckle, "Pledging Change: the transgender college students integrating Greek Life," *The Guardian*, Sunday, 25 September 2016 accessed via *https*://www.theguardian.com/society/2016/sep/25/transgender-students-fraternities-and-sororities
[32] Samantha Gross, "Former Sorority sisters urge eradication of Greek life at Tufts," *The Boston Globe* (December 19, 2016) accessed online.

HARV-F-00003334

**APPENDIX D**

**National and International awards requiring limited selection/endorsement**
The Beinecke Scholarship Program
The Carnegie Endowment Junior Fellowship
Churchill Foundation Scholarship
Fulbright U.S. Student Program
Barry M. Goldwater Scholarship
The Keasbey Memorial Foundation
The Marshall Scholarships
The Mitchell Scholars Program
The Rhodes Scholarships
The Schwarzman Scholars Program
The St. Andrew's Society Scholarship Program
The Harry S. Truman Scholarship Foundation
The Udall Scholarships
The Yenching Academy Scholarship at Peking University

**Harvard awards requiring limited selection**
The Artist Development Fellowships
The Alex G. Booth Fellowship
The British Teaching Fellowships
The Eben Fiske Studentship
The Harvard-Cambridge Scholarships
Harvard-Cambridge Postgraduate
The Harvard – UK Fellowships (including the Henry, the Frank Knox, the Michael Von Clemm, the Paul Williams, the Herchel Smith [non-science])
The Herchel Smith Fellowship In Science
Laura Houghteling Memorial Scholarship
William Lyon Mackenzie King Harvard Scholarship
The Patterson Traveling Fellowship to Italy
The Postgraduate Public Service Fellowships (including the Pforzheimer and Richardson Fellowships)
The Postgraduate Traveling Fellowships (including the Gardner, Shaw, Sheldon, and Trustman fellowships)
The Michael C. Rockefeller Memorial Fellowship
The John Thouron Prize

HARV-F-00003335

**APPENDIX E**

**Unrecognized Social Clubs With Gender-Neutral Policies (as of the publication of this report)**

Hasty Pudding-Institute of 1770

The Spee Club*

The Oak Club*

The Sabliere Society**

The Seneca**

*Traditionally all male final/ social clubs whose policies are now gender inclusive*

**Traditionally all female final/ social clubs whose policies are now gender inclusive*

**Unrecognized Single Gender Social Organizations**

*(Members in the class of 2021 and following are subject to the policy)*

**Unrecognized Female Final Clubs**

La Vie Club Inc.

The Bee Club

The IC Club

The Pleiades Society

**Unrecognized Male Final Clubs**

A.D. Club

Delphic Club

The Fox Club

Phoenix S.K. Club

The Fly Club

The Owl Club

The Porcellian Club

**Unrecognized Fraternities**

Alpha Epsilon Pi Fraternity

Delta Kappa Epsilon

Kappa Sigma

Sigma Alpha Epsilon

Sigma Chi Fraternity

**Unrecognized Sororities**

Alpha Phi

Delta Gamma

Kappa Alpha Theta- Zeta Xi Chapter

Kappa Kappa Gamma

48

HARV-F-00003336

**APPENDIX F**

*Varsity athletic teams*

| | |
|---|---|
| Men's Cross Country | Men's Swimming & Diving |
| Women's Cross Country | Women's Swimming & Diving |
| Field Hockey | Men's Volleyball |
| Football | Wrestling |
| Women's Rugby | Baseball |
| Men's Soccer | Men's Crew (Heavy) |
| Women's Soccer | Women's Crew (Heavy) |
| Women's Volleyball | Men's Crew (Light) |
| Men's Water Polo | Women's Crew (Light) |
| Men's Alpine Skiing | Men's Golf |
| Women's Alpine Skiing | Women's Golf |
| Men's Basketball | Men's Lacrosse |
| Women's Basketball | Women's Lacrosse |
| Men's Fencing | Coed Sailing |
| Women's Fencing | Women's Sailing |
| Men's Ice Hockey | Softball |
| Women's Ice Hockey | Men's Tennis |
| Men's Indoor Track | Women's Tennis |
| Women's Indoor Track | Men's Outdoor Track |
| Men's Nordic Skiing | Women's Outdoor Track |
| Women's Nordic Skiing | Women's Water Polo |
| Men's Squash | |
| Women's Squash | |

*Club Sports*

| | | |
|---|---|---|
| Aikikai | Billiards | Curling |
| Archery | Bowling | Cycling |
| Badminton | Boxing | Fencing |
| Ballroom Dance | Broomball | Field Hockey |
| Baseball | Capoeira | Figure Skating |
| Men's Basketball | Cheerleading | Futsal |
| (Crimson Classics) | Climbing | Golf |
| Men's Basketball | Cornhole | Hapkido |
| (Harvard Hoopsters) | Cricket | Men's Ice Hockey |
| Women's Basketball | Crimson Dance | Women's Ice Hockey |

HARV-F-00003337

Jiu Jitsu
Kendo
Krav Maga
Men's Lacrosse
Women's Lacrosse
Nordic Skiing
Pistol
Polo
Powerlifting
Project SWIM
Quidditch
Men's Rugby
Running

Scuba
Shooting
Shotokan Karate
Skiing
Men's Soccer
Women's Soccer
Spikeball
Squash
Swimming
Table Tennis
Taekwondo
Men's Tennis
Women's Tennis

Triathlon
Tough Mudder
Ultimate Frisbee
(Men)
Ultimate Frisbee
(Women)
Volleyball (Men)
Volleyball (Women)
Water Polo
Wushu
XFit

CONFIDENTIAL DRAFT – NOT FOR DISTRIBUTION

**APPENDIX G**

DRAFT LETTER TO INCOMING CLASS

Dear member of the Harvard College Class of 2021,

Congratulations! We are eager to welcome you to campus and are excited that you are joining the Harvard community. Harvard is a place rich in resources, opportunities and people, and we hope that your time here will be a challenging and transformative experience.

I am writing to you today to express our hope for you and what Harvard can be. As a member of the community, you are partly responsible for helping us articulate and cultivate shared values, whether in the classroom, in the lab, on the stage, on the field, or in the world outside its gates. Our pedagogical mission is a transformative one, rooted in the belief that learning from each other is essential to a liberal arts education, and that a multiplicity of voices, backgrounds and opinions can serve us better in that regard than a single, unified dictum. Through scholarship, public service, and in other ways, our students work towards a respectful and inclusive experience along a broad range of axes, ranging from issues of gender identity to socioeconomic background to race and ethnicity. Our community understands inclusivity as a deep commitment to diversity and non-discrimination.

Like any community, Harvard is not perfect; it has its shortcomings and challenges. There exist in close proximity to campus several social clubs that base their membership on exclusion and segregation, often gender-based. While only a minor percentage of students belong to these organizations, their influence can be harmful and far-reaching. From our perspective, these groups are both out—dated and discriminatory, too often engaging in practices that repeat troubling social and cultural hierarchies that existed during a previous era in American history. Over the past few years, we have engaged in dialogue with these groups to encourage them to embrace the principle of non-discrimination. Some have chosen not to do so, and as such, they operate in ways incompatible with the College's mission. You can find more information about these groups and our policy with regard to them on this website:

When you arrive at Harvard, you may be faced with a choice of whether or not to join one of these social organizations. While the choice is yours, I want to strongly urge you to consider what you want your time at Harvard to be. Will it be a time when you truly engage with all of your peers and learn from them? Will it be a time of openness, growth, and curiosity? Students come to Harvard to learn how best to operate as global citizen-leaders; many depart saying that they have learned the most from their peers and fellow students. The choice will be yours – I hope you will join me in "making Harvard a campus for all of its students."

Sincerely…

CONFIDENTIAL DRAFT – NOT FOR DISTRIBUTION

**APPENDIX H**

1. *Pilot a new program of Inter-House Dining Societies*

We recommend that the College undertake a three-year pilot program of inter-house dining societies, followed by an assessment. These proposed dining societies would build on programs the college is already supporting, such as linkage groups that promote inter-house friendships. The program we are proposing would also incorporate freshmen into their membership from the outset, giving them an opportunity to build friendships with upperclassmen and develop a sense of comfort with House life.  Taken as a whole, these societies would all aim to model a new kind of inclusive social organization on campus, open to all who wish to participate. While each society might well develop its own "personality" and special traditions (much as different Houses do), each would also be committed to cultivating an internal culture welcoming of all students.  This is a commitment that would require regular renewal and vigilance, and so we recommend that the leadership of these societies all undertake a yearly retreat together to reconnect to a shared sense of purpose, and to talk through issues and concerns.

Here is how the program as a whole could work. Each society would be "adopted" or hosted by (generally) pairs of Houses, ideally with contrasting physical amenities. Each society would then meet (generally) weekly for a group meal in one or the other of its two host Houses (generally rotating between them). The dinners would be organized by each House administrator in ways similar to what is already being done for recognized programs like the Franklin Fellowship.  And while the food for the meals would come from HUDS, each society will be encouraged to work creatively to make its weekly meal an "event." Societies might set special themes for some of their meals, purchase special desserts, invite special guests, eat in elegant attire, read Chaucer out loud, or anything else they enjoy.

In addition to regular meals, together, each society would also develop a calendar of independent social activities, and would have a budget and leadership to facilitate this. Some might want to venture off campus in pursuit of other "food"-y activities (e.g., a visit to a cheese cellar and cheese tasting), or to plan other occasional excursions. We expect, though, that many will want to throw and host parties. To facilitate this, we recommend that each dining society be allowed to book (using normal procedures) all party spaces available in its "adopted" Houses, or possibly across the House system as a whole. As the societies get established, they may also sometimes decide to co-sponsor events with the House Committees of one or another of their "adopted" Houses.

Over time, it is recommended that each dining society choose a name for itself, and identify itself with a loose theme that is social, inclusive, and consistent with College values and mission -- travel, mental health advocacy, philanthropic service, international cuisine, and so on. The theme would be informal, and might change every year, as interests change within its membership. The approach taken here could be modelled after a social program that the Harvard Alumni Association has developed to facilitate ongoing friendships and manageable small group connections within its own large pool of graduates.

We recommend that each society be assigned a faculty advisor with interests also in the theme in question and a commitment to the well-being of the students in the society. These advisors might

HARV-F-00003340

be selected from the SCRs of the host Houses, thus providing a new avenue for faculty involvement in House life

The societies as a group might also develop a calendar of signature collective events. For example, they might all gather together in early September in a gala mixer at the Harvard Club of Boston. They might then all work together to put on a formal dance party in the spring in Loeb House. Or they might decide to chip in to rent a cruise boat on the Boston harbor. The possibilities here are extensive.

To populate these societies, we imagine having a place at the activities fair in the fall, and then a process by which students sign up for their top three choices. Individuals would then be put in one of their choices according to an algorithm perhaps similar to that used for putting people into sections in a large class.  The leadership for these societies, especially in the first years, might come from students with previous experience organizing social events on behalf of their House Committees, from students transitioning out of sororities or fraternities, or with leadership experience in Final Clubs, or from students who had previously not been involved in any of Harvard's older social organizations, but are attracted to the opportunity now to contribute to the task of building a new set of more inclusive campus social groups.

The idea is that this would be a scalable program, with a place for everyone who wished to participate. If, at peak capacity, the College supported 24 societies, each with about 40 members, that would accommodate around 1,000 students. In this pretty generous model, the Houses would each be responsible for co-hosting four societies, which would add up usually to a mere two meals a week

Finally, for this program to work, the leadership of the Houses need to feel they understand the implications for their functioning, and that they be given adequate support, including staffing support. This might take the form of a dedicated part-tine coordinator who assigned to each pair of host Houses, and who is responsible for keeping track of all the dinner bookings, trouble-shooting issues that may arise, creating and maintaining new web pages in the House websites about the affiliated societies, representing the societies at staff meetings, and anything else that the Houses deem important.  As an early step in moving forward, therefore, the ideas being proposed here need to be fully discussed by the Faculty Deans.

## 2. *Repurpose or Renovate Existing Social Spaces for new Social Purposes*

*A multicultural "Agora":*  We feel that the time is right -- now, more than ever -- to move forward on the long-standing recommendation from the Walton Report on Diversity and Inclusion to develop a dedicated multicultural space for students. The proposal we are making, however, is not for a "center" where different affinity groups would have office space. Instead, we envision a flexible and intellectual expansive social space -- an "agora" -- that is aligned with the mission of the Foundation (though perhaps institutionally independent of it).

The space we are envisioning might consist of an attractive lounge, one or two work and discussion spaces, and a kitchen area. Students involved in different affinity groups or passionate in different ways about diversity and inclusion issues could come there to relax, to work, to meet, to build friendships and to discover new kinds of solidarity and empathy for the issues they

CONFIDENTIAL DRAFT – NOT FOR DISTRIBUTION

HARV-F-00003341

variously face. We recommend that a committee be created with students and administrators to develop this idea, and that vigorous and creative efforts are made to identify space possibilities. The *Smith Center* would be ideal, but we wonder also about repurposing space in Philip Brooks House, which is centrally located and in many ways has the right "vibe."

**Renew and repurpose the Cambridge Queen's Head Pub:**  Loker Commons was renovated 10 years ago to create a pub based on the success of "Pub Nights" that provided inclusive social alternatives for undergraduates students.  The pub is operated by students for students with the primary goal of serving the College student population.  Yet over the past 10 years, the CQH has become a popular space for graduate students, which at times has made it feel less welcoming to undergraduates.  Furthermore, the focus on alcohol as a pub has created barriers to use by first year students despite proximity to Annenberg Dining Hall.

The College should pursue a program to return the CQH to a social space specifically for undergraduates in the College.  Goals should include:
1) Making it more welcoming to first year students by de-emphasizing the service of alcohol and by giving it an aesthetic that resonates with our undergraduates.
   a. This may mean changing the name, reorienting the bar and beer taps, and rethinking the decor and furniture.
2) Creating a space that draws students from all class years for welcoming, inclusive, and fun social events and gatherings.
   a. This may mean focusing the space on a specific use such as live performances on a stage and enlivening areas of it for subsidiary uses such as games or food service.

These two goals will need to work well together to give students a destination to meet friends and to be seen while also inviting them to try new and different ways to socialize in inclusive ways across their class years, races, genders, and other demographic differences.  Ultimately the renewed space needs to be conceived and run by students for students.

The College should begin as early as this spring by piloting new approaches to use of that space by partnering with USGSOs that are transitioning to PSO status, the UC, FYSC, CEB, and other student organizations that provide inclusive social events on campus.  The name should also be changed to better reflect the new purpose of the space.  And ultimately, a renovation to the space that better suits the new programmatic uses of the space should be considered.

**Loeb House as event space:** We recommend that Loeb House be investigated as an occasional high end event/party space for Harvard undergraduates, and perhaps especially for the new inter-house Dining Societies.

**Annenberg Freshman hang-out space:** We recommend that the new renovations being planned for the Queens Head pub aim to create significant and generously-sized "freshman friendly" hang-out space.

**SOCH as party central:** We recommend renovating and re-opening the rooftop space of the SOCH as a more attractive and more easily bookable weekend event and party space for all students. We further recommend that students be given a leadership role in overseeing the booking and safe use of the spaces. As a corollary to this, we recommend thinking about ways

HARV-F-00003342

to improve access to social spaces in the Houses as well, along these lines.

***Transition specific administrative offices housed in prime real estate into new spaces for students***. There currently exist a number of College offices that see relatively low student foot traffic and are instead largely programmatic and administrative; some of these currently occupy prime real estate in the Square. These include the Office of International Education and the Office of Undergraduate Research and Fellowships, both based in impressive frame wood houses on Dunster Street. We recommend transitioning these houses into student-accessible spaces, and moving the offices that currently occupy them either into the Smith Center or the SOCH. The spaces in question could then be multi-function, and maintained by elected student managers who report to the OSL and/or the UC. The buildings might function as a quasi-student union, with accessible study and hang-out spaces during the day and bookable space for student organizations and perhaps the dining societies to book for meetings and social gatherings in the evenings and/or on weekends.

### 3. Expand the Inter-House intramural program beyond sports; involve freshmen in this program

We recommend broadening the current intramural program to include non-sports oriented forms of friendly competition between Houses. Some examples here might include an intramural spelling bee competitions, trivia night competitions, improvisational theater competitions, and debating competitions.

Beyond strengthening House life, this proposed broader intramural program -- open to all – addresses a concern we have heard from students about the ways in which Harvard's intense "comping" culture often shuts out students who have an interest in theater or debate for example, but no relevant experience.

We also recommend that, if the decision is made (currently under consideration) to assign freshmen to their upper-class Houses earlier than currently, that the Houses leverage this vision of an expanded set of intramural activities as a primary way to involve this cohort in House life.

Finally, we recommend recruiting students to develop this idea (including how coaching for the various new events would work) and then work with the HoCo leadership in the different Houses to roll it out.

CONFIDENTIAL DRAFT – NOT FOR DISTRIBUTION

HARV-F-00003343

CONFIDENTIAL DRAFT – NOT FOR DISTRIBUTION

HARV-F-00003344

# EXHIBIT 9

# Final Club

HARV-F-00002350

- History and Context

- Sexual Assault Prevention Task Force

- Parameters

- Recommendations

- Next Steps

HARV-F-00002351

# History and Context

- Emerged in the 1850s after Harvard banned fraternities

- Originally only for seniors ("final" club)

- Current status

  - 6 all male clubs (A.D., Delphic, Fly, Owl, Phoenix, S-K, Porcellian)

  - 5 all female clubs (Bee, Isis, Pleiades, Saliere, La Vie)

  - 2 co-ed (Spee, Fox (currently shutdown))

- Undergraduate membership of ~40/club (10% of eligible males; 5% eligible women)

HARV-F-00002352

# History and Context

- 1984 Harvard severs relations with clubs for discrimination against women

- Harvard issues occasional reports/statements about the clubs

  - Unsafe environment

    - "During the past several years, we have seen a disturbing increase in the reports of inappropriate behavior occurring at various final clubs. We have made continuous efforts, through conversations with the inter-club council (graduate board) and through discipline of individual students, to address the problems, with mixed results." (Epps, 1997)

  - Sexual assault and gender inequity

    - "The unequal status of women at the Clubs—unwelcome as members, but welcomed for the amusement of the male members at their parties—continues to be of great concern at the College…One club member went so far as to explain to me that the Clubs are doing the women a favor, since women enjoy all the benefits of membership without any of the costs. Fortunately, our students are smart enough to figure out that nothing is ever truly free, though every year some first-year women learn this lesson in discomfiting and even dangerous ways." (Lewis, 1998)

  - Undermines Institution's Values

    - "In the Houses, we seek to model many values, including excellence, collegiality, free thinking, honesty, fairness, openness, inclusiveness, and caring and respect for the humanity and dignity of each member of our community. Values such as these are at the core of our institution, and they are important as we prepare our students to become responsible citizens and to shape our society's future.  After careful due diligence, combined with documented commentary from prior administrations, we have reached the inescapable conclusion that Final Clubs contradict these core values and also encourage and endorse risky behaviors that are antithetical to our commitment to protecting our students' physical welfare and well-being." (House master statement (2011) not publicly released but given to Dean of the College).

# Sexual Assault Survey

- Quantitative Evidence

  - 17% of all sexual assaults in all-male final clubs

  - Of women associated with clubs, 50% experienced sexual assault

- Qualitative Evidence

  - Culture of sexual discrimination and entitlement negatively impacts women's status on campus

  - Exclusionary and secretive practices negatively impacts Harvard College's culture and antithetical to its values

  - Interpretation that University tacitly approves of behavior or fears alums

HARV-F-00002354

# Principles

- Foster safe and respectful environments for social interactions

- Respond to Title IX goals of creating gender equity

- Eliminate sexual assault and culture of harassment

- Support inclusivity

- Strengthen Harvard College mission and philosophy of a diverse educational experience

HARV-F-00002355

# Parameters

- Targeted

- Evidence based

- Creates a clear choice for clubs and students

- Considers "association rights"

- Creates a culture of student accountability

- Creates a greater sense of inclusivity

- Provides path for further actions as warranted

- Supports stated principles

HARV-F-00002356

# Alternatives

| Approach | Description | Pros | Cons |
|---|---|---|---|
| **Prohibit student membership in all-male social orgs.** | Male final clubs only—go co-ed or grandfathered out (no new students can be recruited after the class of 2021). As a member of an RSSO, students can join and serve as leaders of recognized student organizations or as captains of varsity sports. | Clear message about university and College's expectation; allows prospective applicants to understand the change; no objection from current students; mitigates risk; opportunity to address a problematic organization in a direct way with a clear timetable | Final clubs feel like there is no choice and therefore coercive; free association; public relations blowback from "nanny school" |
| **Prohibit student membership in single-gender social orgs.** | Apply gender equity to all unrecognized, single-sex social organizations (includes female final clubs, fraternities, sororities) | Clear message that single gender social organizations inconsistent with College's long-term vision and mission; addresses broad goal of gender equitable experience; public relations: "University committed to gender equity" | Perceived as over-reaching and overly-broad; many organizations believe they are not the problem for rape and sexual assault; will lose the support of a larger group of students who don't belong to final clubs but are members of frats and sororities; public relations: "nanny school" and "politically correct." |
| **Student leaders cannot belong to all-male social orgs.** | Male final clubs—go co-ed and become (Registered Student Social Organization) RSSO or single-gender private organizations stay private w/o parties or impact on broader campus. In RSSO, students can join and as leaders on recognized student organizations or as captains of varsity sports. In single gender private organizations, students can join but not serve as leaders on recognized student organization or as captains of varsity sports or endorsed by dean for fellowships. | Targeted approach, final clubs given choice to become RSSO or PSO; students are free to join, but must recognize that choices have consequences; sends clear message about the College and university's values; aligned with existing narrative bout he responsibilities of the student leader and with the espoused values in the student handbook; work to make final clubs more of a neutral to positive force on campus; first (leaves room for further steps); public relations: "College has values that are important for our future citizens and citizen-leaders." | Some single gender social organizations will continue to exert impact on campus; does not address issue of gender equity at a broader level (e.g. female final clubs, fraternities, and sororities); public relations: "school trying to impose values and character development in students." |
| **University does not recognize single-gender social organs** | Complete disassociation with final clubs (Cambridge Police Departments, students are dealt with through the criminal system, no resources provided to aid students in final clubs; no HUPD involvement). Noise complaints etc. are managed through the police. | Becomes a matter for police; university claims no responsibility for private organization | Students likely will face arrest, some may get criminal records; alumni/parents will be upset, underage drinking students attending parties may face problems, completely unregulated spaces for parties and drinking; possible student injury and death; this has largely been our approach and it has not worked; will appear that the school is unwilling to deal directly with a difficult issue creating negative image; deep institutional liability |

HARV-F-00002357

# Considered choices

|  | Target Male Final Clubs | Option for final clubs | Freedom of association | Culture of student accountability | Greater inclusivity | Further actions if necessary | Supports Stated Principles |
|---|---|---|---|---|---|---|---|
| Approach 1 | ✓ | | | | ✓ | | ✓ |
| Approach 2 | | | | | ✓ | | ✓ |
| Approach 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Approach 4 | | ✓ | ✓ | | | ✓ | |

HARV-F-00002358

# Next Steps

- Task Force Recommendations (Forthcoming)

- University Response (Forthcoming)

- Consult with stakeholders (Underway)

- Develop plan for registered student social organizations (Near Completion)

- Inform communities

HARV-F-00002359

# Questions

- What class should we begin with (Class of 2020 or 2021)

- Where should the message be communicated from?

- Who should be the messenger?

HARV-F-00002360

# EXHIBIT 10

**Thursday Meeting**:

**Introductory Remarks**
- Mission Statement

- We know that alumni, like faculty, understand our campus and are stewards of its development through time.  Our challenge as each successive generation of students enroll is to be a place that is welcoming, safe, and inclusive for our all of our students even as they, and indeed our nation, are challenged by enormous changes.

- We know this is a heavy responsibility, helping shape students. We don't take it lightly, and I see that you also take it very seriously. I'm sure you all experience sleeplessness, when you are thinking about the challenges our students face. In this way, all of us here are educators. That value is emphasized. Is there learning going on? What kind of learning is it? Is the right kind of developmental experience? What values are being inculcated?

- While we may at times have tension as we steward this institution, at the end of the day, what is important are our students, their wellbeing and education. We want to get it right. It is our <u>obligation</u> to provide social environment which is safe and inclusionary.

- I want to thank you for being here and engaging in the process.  I want to thank those of you who are working with the College and leaders from the University's governance and leadership.

**Context**
- Our campus is in the middle of a deep set of changes, many which reflect societal changes and all of which are part of the higher education landscape. External factors are and will continue to be more involved now.  The national conversation about gender equity, Title IX, alcohol abuse, sexual entitlement, etc., heavily implicates Colleges.  More importantly, the College conversation about these issues is swelling up and has gained momentum (Side by Side, Our Harvard Can Do Better, social life on campus, my own commitment to lead the College to greater inclusivity, etc.)

- Harvard's values and ideals are about leading the way in the 21st century by providing a transformative educational and social experience where all students flourish. We have an opportunity to make progress and indeed to reassert our leadership by our response to these changes. **At a place as old and storied as Harvard, there is always juxtaposition between change and tradition. Between moving forward and staying true to our founding values. We know that such moments can feel uncomfortable. Yet, we can look proudly to how history unfolds (ie Radcliffe) and while it seems muddy in the middle,**

HARV-F-00002257

**we can see in hindsight more clearly the importance of these changes. Further some of the changes we are making are more about level setting, such changes were made long ago by our peers (Yale/Princeton) and we are overdue to consider what is right for Harvard.**

- I've spoken to many of you. I think there is among most of us here a shared sense that given the direction of the University, our professional schools, the larger national conversation there is an inevitable and desired outcome that our institution should reflect the highest of values and be a model for higher education.

  In many quarters, there is a strong sentiment against exclusion and privilege. Right now I've convinced many people that we need to give the clubs a chance to be better aligned with the university. We are soon going to run out of time.. I want to work with you to **consider productive roles clubs can play in the future. The status quo is not tenable** I am not at liberty to talk about upcoming events or potential decisions, but there are currents that will change the landscape and compel action against the clubs.  Right now we can <u>co-direct the future </u>of the clubs mutual interests In a few weeks we will not have as much control as we currently do to shape events.

- I think the clubs can play a constructive role on our campus.  I think they serve some of our students well.  For that reason, I want to work with you to save them.  There will be different strategies that get us there.  This is the time to do this – now is the moment. We need your leadership. We need your help.


**Next Steps**

- We have a short window, until the 21st of September, to act

- I am asking you to conclude your internal discussions about this soon. Determine how you can move towards the desired outcome in a timely way.

- I need to hear from each of you what strategy you are choosing for your club before that date.  I am happy to talk to you individually as I've been doing.

- After that, I will be meeting with the various governance bodies of the College at the end of month and I will need to tell them if I see movement from the clubs.
- .
- There is a public opportunity for clubs and Harvard to capture a joint leadership role in this very visible and controversial space.

HARV-F-00002258

<u>Notes</u>

- Hit the nail on the head about the inevitability of things going co ed and remind them of civil rights movement and same sex marriage.
- Acknowledge that there is a need for public spaces that students can socialize in.  And the university is working on that and that the clubs have to some extent shouldered the burden and served that purpose.
-  Timing - we are soon going to be out of time and decisions may be made for us without our oversight.  <u>Need time lines</u>.
-  Save the clubs - we want to <u>co-direct the future</u> of the clubs mutual interests.
- It is our <u>responsibility</u> to provide social environment which is safe and inclusionary.
- We'll immediately be following up with clubs on an individual basis.
- Leadership - public opportunity for clubs and Harvard to capture a joint leadership role in this very visible and controversial space.
- Inclusion has always been important but at this moment the focus is on the issue.

HARV-F-00002259

# EXHIBIT 11

| | |
|---|---|
| **From:** | LHS ███████████ |
| **Sent:** | 4/24/2016 3:50:30 PM |
| **To:** | Khurana, Rakesh [rkhurana@hbs.edu] |
| **CC:** | lhsoffice ███████████ |
| **Subject:** | Re: Final clubs |

Maybe too late but I'm now free st ████████

Sent from my iPhone

Please direct all scheduling inquiries to my office at: ██████████████████████

Follow me on twitter @lhsummers
www.larrysummers.com


On Apr 24, 2016, at 11:48 AM, Khurana, Rakesh <rkhurana@hbs.edu> wrote:

Dear Larry,

It was great to see you at Henrietta's. I guess it has become the alternate faculty club.

Are you available to chat today? Let me know what is the best time/number to call you on. Today is Yardfest and it begins ~4:00 p.m., so something earlier in the afternoon would be easiest.

Warm best,
Rakesh


On Apr 19, 2016, at 8:01 AM, LHS <███████████████████> wrote:

U r being very thoughtful here.

Sent from my iPad

Please direct all scheduling inquiries to my office at:████████████████████
████████████

Follow me on twitter @lhsummers
www.larrysummers.com

On Apr 19, 2016, at 7:56 AM, Khurana, Rakesh <rkhurana@hbs.edu> wrote:

Dear Larry,

This is very helpful. We've been doing a lot to improve social spaces and have spent hundreds of thousands of dollars a year. There is actually quite a vibrant social space and activities now going on campus. There are numerous articles in the Crimson that have covered this. We are not going to be a party school. From my perspective, there is already too much distraction from academics with extracurriculars.

The only students who feel pressure here are the final club students who want to keep their prestige or the mystique of it. You can probably guess who the vast bulk of these students are and where they come from. As these organizations become co-ed and/or members only and see that they are not immune from the norms that we expect of our students, this will continue to shift perception in a way that highlights that they are not so special and basically frats and minimize them. I think the sustained pressure and scrutiny they are under will continue to get them to evolve.

As you know getting data on unrecognized organizations is difficult and given the grade inflation on campus, I think it would be difficult to establish a link.

It is a free country, but the Office of Civil Rights (which I will take as a representative of the country and assuming that the next President will likely be from the Democratic Party) insists that we have a responsibility for students--for all our students--including when they are in private spaces that are not controlled by the university. This is why Amherst, Wesleyan, and others have made the decisions they have regarding eliminating fraternities in one case or having them go co-ed in the latter case. Right now, we have an allegation that one of our students who is on leave for having beaten up his girlfriend (5 witnesses) is staying at one of the final clubs while he awaits his trial. His understanding is that this is "free association" in private space. Right now it is easy for these private organizations to invoke freedom of assocaition when the benefits are privatized and the costs have been socialized.

We are actually making very good progress with individual clubs. There is really only one club that wants to continue its free for all with no regard to responsibility. They are the one making all the noise about freedom of association.

I really appreciate the offer to set up a time to meet and will reach out to your your office to set it up.

Warm best,
Rakesh


One potentia
On Apr 18, 2016, at 11:26 PM, LHS <█████████████████> wrote:

I hate all of it.

I'd improve on campus social life in a serious way, express regret about exclusive gathering places, try to ramp up law enforcement re eg underage drinking at the clubs, try to get coaches to discourage atheletes, analyze link between clubs and academic performance if u can get data, put some it's a free country but we think clubs are bad for kids language into letters to parents.

Sent from my iPad

HARV-F-00002457

Please direct all scheduling inquiries to my office
at █████████████████████████
████████████

Follow me on twitter @lhsummers
www.larrysummers.com

On Apr 18, 2016, at 11:20 PM, Khurana, Rakesh <rkhurana@hbs.edu> wrote:

> That is helpful. In particular, both the male and female clubs
> operate in an exclusionary and exclusive way. What are your
> thoughts regarding the unrecognized fraternities and sororities that
> have appeared in recent years?
>
> RK
> On Apr 18, 2016, at 11:04 PM, LHS
> <██████████████████████> wrote:
>
> See what commentary and WSJ are saying.
>
> Not sure I advised focus on single sex aspect.  Think I said
> opposite.  Noxious feature of final clubs is exclusivity not single
> sex.  Mistake to dignify them.
>
> Sent from my iPad
>
> Please direct all scheduling inquiries to my office
> at██████████████████████
> ██████████
>
> Follow me on twitter @lhsummers
> www.larrysummers.com
>
> On Apr 18, 2016, at 11:00 PM, Khurana, Rakesh
> <rkhurana@hbs.edu> wrote:
>
>> Dear Larry,
>>
>> It is great to hear from you.
>>
>> I am not aware of any plans that will interfere with
>> the right of the clubs to be co-ed or single gender.
>> That will be up to the private clubs.
>>
>> The task force put out a clear recommendation and
>> the clubs are in the midst of reforming themselves
>> as they contemplate what it means to them. During
>> my meetings with them, I just spend my time
>> listening to them in meetings and don't offer any
>> opinion. I am essentially following the plan you
>> suggested in November when we met. If I recall,
>> you suggested that the focus of our attention be on

unrecognized, single-gender, social clubs (not any other student organization). In so far as the co-ed organizations, we don't see the numbers in sexual assault problems in the co-ed, unrecognized social organizations that we see in the final clubs. For example, the survey did not find problems at either the Lampoon, Signet, Crimson, or Hasty Pudding.

I'm glad to chat.


On Apr 18, 2016, at 10:45 PM, LHS
< ██████████████████ > wrote:

I think u all are way out over your skis on this.

Freedom of association is a pretty fundamental value.

Is Hillel allowed to be for Jewish students?

I'd be careful here. The Harvard Corp for many years even after drew was president had members who were members of all male clubs!

Are faculty allowed to be part of all female clubs? Do we think less of nan Keohane for having served as president of an all women s club?

I do not think you can muster serious social science in support of the theory that making the clubs coed will reduce assault. I suspect it would have opposite effect.

Sent from my iPad

Please direct all scheduling inquiries to my office at ██████████████████████
██████████

Follow me on twitter @lhsummers
www.larrysummers.com

# EXHIBIT 12

**Talking Points**
**Implementation Committee Town Hall**
Thursday, October 13, 2016
3pm-3:30pm
Tsai Auditorium, CGIS South

**Rakesh**
- Mission of Harvard College
  - The mission of Harvard College is to **educate the citizens and citizen-leaders for our society.** We do this through our commitment to the **transformative power of a liberal arts and sciences education**.
  - Harvard's history of **expanding the notion of who we are** as a community
  - Beginning in the classroom with exposure to new ideas, new ways of understanding, and new ways of knowing, students embark on a journey of **intellectual transformation**. Through a diverse living environment, where students live with people who are studying different topics, who come from different walks of life and have evolving identities, intellectual transformation is deepened and conditions for **social transformation** are created. From this we hope that students will begin to fashion their lives by gaining a sense of what they want to do with their gifts and talents, assessing their values and interests, and learning how they can best serve the world.
- Commitment to non-discrimination
  - Harvard College brings together **bright and talented students from all walks of life to form a community of learning** that facilitates their intellectual, personal, and social transformation. By exposing students to new ideas, to people whose backgrounds and experiences differ from their own, "Harvard fosters the ability to see the world through the eyes of others," to echo the Report of the College Working Group on Diversity and Inclusion.
  - To advance this mission of educating leaders and responsible citizens who are prepared to serve a global and diverse society, the **College works to embody an inclusive and non-discriminatory community of learning**, one described in the FAS's Resolutions on Rights and Responsibilities as "ideally characterized by…respect for the dignity of others" as well as "openness to constructive change."
- Overview of Policy
  - Harvard College students matriculating in the fall of 2017 and thereafter who join Unrecognized Single-Gender Social Organizations (USGSOs) will not be permitted to hold leadership positions in recognized student organizations and College athletic teams. These students will also not be eligible to receive the Danoff Dean of Harvard College's endorsement letters for fellowships that require such endorsements. *All currently enrolled students including those who matriculated this fall will be exempt from these new policies for the entirety of their time at Harvard.*
- Intent of the Policy

HARV-F-00003017

- o It is **unfortunate that the policy has been seen as an effort to address sexual assault.**
- o In fact, the policy is **an extension of Harvard's commitment to non-discrimination.**
- o In the 1970s, Harvard College grew increasingly concerned that the **gender-exclusive membership practices of male final clubs were undermining students' intellectual and social environment and jeopardizing students' safety**. In 1984, the College formally disassociated itself from the final clubs in light of their refusal to open their membership to all of our students in compliance with the University's non-discrimination policy.  Since that time, the College has sought dialogue with these groups, encouraging communication with the Office of Student Life (OSL) administration and working on a voluntary basis with leaders of the groups to identify best practices and to encourage shifts in membership norms. In the intervening 30 years, very little progress has been made, while the **role of the USGSOs on campus life has grown significantly – with negative consequences to College aspirations for a more inclusive campus, depriving students of experiences solely as a result of their gender and other aspects of identity**, and raising increasing concerns about students' safety.
- o Conversations began with unrecognized organizations (particularly final clubs) two years ago.  Organizations were asked to **adopt non-discriminatory membership practices and better align with the mission** of Harvard College.
- o **Town halls on inclusion and belonging open to all students** have been held over the past two years
- Implementation Committee Scope and Charge
  - o In light of Harvard's educational and service mission and in recognition of the new policy, the implementation committee **will consult broadly** with undergraduate students, staff, and faculty at the College to examine and **recommend ways to define the contours and implementation of the policy** set forth by the College.
    - ▪ May include town halls, focus groups, or solicitation of information from various community stakeholders.
  - o Specifically, the committee's work will aid the College in advancing its commitment to promoting an inclusive social environment aligned with the Mission of the College.
  - o The committee will address the following questions:
    - ▪ What **leadership roles and endorsements** are affected by the policy;
    - ▪ **How organizations can transition** to fulfill the expectations of inclusive membership practices; and
    - ▪ How the College should **handle transgression**s of the policy?
  - o The committee will also be responsible for **recommending best practices** to communicate the implementation of the policy to the College community.
  - o Finally, the committee will recommend ways to provide **support to student organizations to foster an inclusive social environment**.

HARV-F-00003018

- o The committee will present its **recommendation to the Danoff Dean of Harvard College in spring 2017**.
- Off the Record Conversation
  - o The **conversation today is off the record** and a **chance to engage deeply** on how best to advance the work of this committee as it works to guide the implementation the new policy.

**Kay and Doug**

- Introductory Remarks by Kay Shelemay and Doug Melton regarding roles as chairs of the committee
  - o Structure of the Committee
    - ▪ Steering Committee: Will provide **direction to the work of the various subcommittees** on governance/implementation, communication, and alternative social groups/campus community.
    - ▪ Governance/Implementation subcommittee: Will focus on recommendations regarding the **leadership roles and fellowships** that will be affected, **how the policy will be enforced**, and other matters relating to implementation of the policy.
    - ▪ Communication/Benchmarking subcommittee: Will focus on recommendations to **ensure that students are aware of the policy** throughout their time at the College both as they consider fellowship opportunities and participate in student groups and research best practices as a means of **benchmarking**.
    - ▪ Social groups/campus community subcommittee: Will develop recommendations for **how organizations can fulfill the expectations of inclusive membership practices**, and recommend ways to **support student organizations in fostering an inclusive social environment**.
  - o The **scope** of the committee is **focused on implementation** of the policy decision that has been made.
  - o Committed to **listening and consulting broadly**
  - o We would like to open up for comments and ask for the following:
    - ▪ This town hall will be **"characterized by free expression, free inquiry, intellectual honesty, respect for the dignity of others, and openness to constructive change"** as outlined in the FAS Resolution on Rights and Responsibilities
    - ▪ Individuals will **line up at each microphone** in order to make remarks
    - ▪ We will **alternate** between each microphone
    - ▪ We want to get to as many speakers s as possible so appreciate efforts to be **succinct when speaking**
    - ▪ Please **introduce yourself with your name and Harvard affiliation**
    - ▪ If needed, request that people ensure that they are…
      - Limiting time to allow for as many speakers as possible
      - [Actually posing a question]

EXHIBIT 13

| | |
|---|---|
| **From:** | Zakaria, Fareed (CNN) ▮▮▮▮▮▮▮▮ |
| **Sent:** | 5/12/2016 10:12:55 PM |
| **To:** | Khurana, Rakesh [rkhurana@fas.harvard.edu] |
| **Subject:** | Re: Op-ed in Crimson |

This will help with the students but it's a bit too lefty for the alumni.
Drew called today and we had a long talk. I think she will need to get out and write/say something publicly about this. Not right now but soon. And you might also need to. Otherwise your position is being defined by your opponents.

On May 12, 2016, at 9:59 PM, Khurana, Rakesh <rkhurana@fas.harvard.edu> wrote:

# Harvard Heard Women, Alright

The Harvard administration's recent decision to sanction unrecognized single-gender social organizations—including sororities and women's final clubs—is not the result of Harvard somehow not listening to women.

It is the result of the Harvard administration after decades—after centuries—finally hearing feminist critique.

For generations, Harvard feminists and activists have advocated for the sanctioning or disbanding of final clubs. Now that we have it, new debates on gender and inclusiveness have come to the fore.

This debate recently took to the streets—or the Yard, where around 200 students, mostly women, protested the recent decision under the banner #hearherharvard. These women claim that sororities and female final clubs are spaces of female empowerment, and that pressuring them to go co-ed along with their male counterparts will exacerbate the problems of sexism the administration is trying to combat.

To many of us who have long been part of the struggle against clubs, these arguments are wrong-headed, to say the least, and at worst blatantly reactionary. Let's walk through a couple of them to come to a deeper understanding of gender and of what it means to create inclusive spaces. I'm confident that when we do, we'll find that this decision can only improve women's and marginalized people's experiences on campus.

First: Nobody is against female spaces.

The argument that the Harvard administration is somehow targeting women's spaces is disingenuous. Far from the denial of female voices, these changes are the result of decades of protest and troublemaking from women, from boycotts to ersatz invitations to guerilla tactics—which the admin has finally listened to. This decision is meant to seriously overhaul a system that is not only deeply hostile to women and queer people, but incredibly classist and exclusionary.

Sororities and female final clubs are far from the only spaces on campus oriented toward female solidarity and community, and they are the least accessible. Spaces like the International Women's Rights Collective, the

HARV-F-00011645

Association of Black Harvard Women, Radcliffe Union of Students, the Athena Program, the Women's Center, and Latinas Unidas are fully recognized by the College, do not demand dues, do not require an arduous punch or rush process, do not depend on heteronormative correspondences with male clubs, and are open to all.

Second: Female spaces are not inherently progressive.

We are not, as I said, against female spaces; we are against female spaces that exclude. We are against female spaces that exclude trans people, gender-non-binary people, and cisgender men whose identification with femininity may encourage them to seek out a progressive female space. We are against female spaces that perpetuate elite class norms, that have an inherently heterosexist structure, and that rely on exclusionary membership policies—all of which Harvard's female and male clubs and Greek organizations display.

Both final clubs and Greek organizations depend in structure on competitive admissions processes which evaluate students on arbitrary social criteria. In the Harvard context, these often rely on elite social norms favoring those with access to gender, sexual, racial, and class capital. Even with financial aid, the requirements that students pay dues, have clothes for events, and comport themselves according to club specifications often spell class discrimination.

These groups further depend on a binary and presumedly heterosexual gender structure—including events like date nights and mixers with male clubs—which severely limit space for gender-non-binary and trans students and put queer students in a bind.

Just because we are women does not mean we can't be classist, homophobic, transphobic, racist, and exclusionary.

Third: Just because a space includes marginalized people does not mean that it is progressive.

Arguments against Greek organizations and final clubs often erase those marginalized members who have found friends and homes within the system. As women who experience multiple forms of marginalization—queer women, trans women, women of color, women from low-income backgrounds, women with disabilities—we make complex negotiations within complex systems to seek spaces of support.

However, we should understand Harvard's Greek and final club systems as marginalizing at a structural, rather than always at an individual, level.

We're dealing, here, with two inherently different visions of what it means for a space to be socially just. In one definition, offered by a number of club members, the inclusion of members from marginalized backgrounds proves that a system is progressive.

In the definition offered by critics of the system, however, we can understand the very *structures* of Harvard's fraternities/sororities and final clubs—the reliance on often elite networks; social norms which draw on heterosexist and classed histories; binary men's/women's spaces— as inherently exclusionary.

HARV-F-00011646

We have a chance now to address the structural injustice of these systems. We ought to take it.

Fourth: If your group is actually progressive, it will come out of this all the better.

If you truly believe that your sorority or female final club stands for the empowerment of gender-marginalized people, this decision is only good news.

What, actually, is the threat of a gender-neutral membership policy to a progressive women's organization? Recognized feminist and women's cultural organizations on campus are open to students regardless of identity. These spaces have not somehow been flooded with anti-feminist cisgender men intent on ruining our female solidarity. This probably won't happen to your club or sorority if you adopt a gender-neutral policy, because anti-feminist cis men hate progressive women's spaces more than anything. Just look at the tantrums of the male final clubs.

If you insist that your club identity inherently depends on an exclusionary membership policy, then your club is nonsense and is rightly targeted by the new sanctions.

But if you're willing to accept this as an opportunity to become a more just organization, we can look forward to a number of exciting changes. Your club will come to a deeper understanding of gender, sexuality, and inclusion; will be more open to students across the broad spectrum of gender; and will revolve less around events like date nights and mixers with male clubs and fraternities.

The transition won't be easy, and it won't be comfortable. Sororities may have to disaffiliate from national-level groups, and final clubs will be forced to overhaul the exclusionary reality of the punch process. The College, on its end, will need to drastically increase support and funding for those student organizations that provide direly needed space for marginalized people, such as cultural groups, women's groups, and queer groups.

The rest of us won't be off the hook. We must all confront the contradiction inherent in discussing inclusiveness at one of the world's most powerful and elitist institutions. We must consider how we can take the power we have as Harvard students and alums to enact change not only on campus but in the world.

It is not going to be easy. Progress never is. It is worth it.


*Reina A.E. Gattuso '15 is a former Crimson columnist and a current Fulbright fellow at Jawaharlal Nehru University in Delhi, India.*

Read more in Opinion

Honesty is Painful

HARV-F-00011647

# EXHIBIT 14

| From: | Khurana, Rakesh [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E89F84CC1F404BB2A36CB8D9DFB79860-RKHURANA] |
|---|---|
| Sent: | 7/22/2017 4:48:21 PM |
| To: | Papa Chakravarthy ████████████████ |
| Subject: | Re: Sanctions against single sex organizations |

Dear Papa,

We did not issue a comment because as a committee we all agreed to keeping our comments in confidence in order to encourage open and honest exchange. That an individual chose to violate this commitment and not honor it insults the entire committee. It is dishonorable. Our entire academic process—from Ad Boards, to protecting student information and privacy, to tenure and promotion discussions depends on people upholding this promise of confidentiality.

Papa—I want to ask you a question: do you think this controversy is enjoyable for me or anyone at the College? We are pursuing it because we need to create a culture that is respectful and dignified for the long term health of our culture and in order to attract the best students and faculty. Harvard's culture of belonging and inclusion needs to be improved in order to attract the best students and faculty. What exactly do you think is my motivation? I ask you to consider the following: two faculty led committees have now examined this issue in depth and suggested the same recommendation. They both proposed recommendations that went further than the current policy. Both committees were comprised of some of Harvard's finest and most dedicated faculty and student leaders. Both committees processes were fact driven and guided by the College's educational philosophy. Particular attention was paid to the specifics of the Harvard situation and the committees received a diverse set of perspectives. Both committees reasoned through a number of ideas and suggestions, including looking at how peer schools have approached these issues. The faculty on these committees were diverse on numerous dimensions, including skepticism about the original policy, and moved toward a general (though not unanimous) consensus toward the end of the process. Both reports were made public. No one believed that the status quo was acceptable and a number of alternatives were considered. This is a complex issue and people of good conscience can have different perspectives and yet we see an emergent direction and consensus. In addition, there are 35 years of internal reports, visiting committee reports, regarding the single-gender social organizations.

I believe your concerns are coming from a place of deep care for the long-term well-being of the students and the institution. I have never questioned the motivations of the people who might disagree with the policy. I want to assure you that those of us who live with the students (as I do) and have devoted our lives to education share the same goals. I have tried to live my life with integrity. I am not perfect. My students and colleagues know me as a candid and trustworthy person. I am glad to engage you on substance, but would appreciate you leaving out the ad hominem accusations about my motivations. I would like to again underscore that the committee's report is both preliminary and only offers recommendations for institutional consideration.

Respectfully,
Rakesh Khurana

On Jul 21, 2017, at 9:11 PM, Papa Chakravarthy < ████████████████████ > wrote:

Dean Khurana,
After reviewing the article in the Crimson (linked below) I am very confused as to why you didn't issue comment to help reconcile the the report to the Crimson piece. I, and I would assume many others, am deeply troubled by this inconsistency. I find myself questioning your motive in this situation, though I obviously wouldn't want to rush to judgment without complete information.

That reservation of conclusion without complete data, incidentally, is a quality I learned from my fellow students at Harvard. Based on the dissenting opinion of provided in your report, that seems like a lesson the committee could afford to learn.

Respectfully,
Papa

http://www.thecrimson.com/article/2017/7/22/inside-social-ban-committee/

On Thu, May 25, 2017, 11:13 AM Papa Chakravarthy <████████████████████> wrote:
Dean Khurana,

I hope this message finds you well. I am an alumnus from Pfoho, and I graduated in 2012. I am writing to express my disagreement with the announced policies on single sex organizations. I should note that I have a great deal of respect for your willingness to challenge the status quo on issues you find important and, our disagreement on this particular issue notwithstanding, wish you the best in your role - I do not doubt your motivation in trying to improve the College.

I also want to convey that I am not donating to the Harvard College Fund or any University sponsored organizations this year. It appears, admittedly as an outsider, that the administration is unwilling to recognize the response from students and alumni to the proposed policy. Therefore, I, along with several classmates, are withholding donations, which would seem to be the only form of communication left to us which the school may recognize. I want to ensure you're aware the reason donation rates may be lower for the 2012 class than the school might expect.

If your thinking on these issues has changed from what I have read in the Crimson, or if you suspect I am missing part of your argument, I would love to hear your thoughts. Similarly, I am happy to discuss my views in more detail, if you like, but I suspect you've heard most of these arguments already.

Regards,
Papa Chakravarthy
Harvard College '12

HARV-F-00011979

# EXHIBIT 15

| From: | Khurana, Rakesh [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E89F84CC1F404BB2A36CB8D9DFB79860-RKHURANA] |
|---|---|
| Sent: | 11/26/2018 9:15:45 AM |
| To: | Rosenzweig, Jane [jrosenzw@fas.harvard.edu] |
| Subject: | Draft letter |

Jane,

Could you give this a quick look? It is in response to a final club

RK

Dear George,

I hope you had a great Thanksgiving break. I'm glad we all had time to meet and were able to find common ground around creating a safe, inclusive and fun environment for our students. I am also glad that we were able to talk about where we had differing perspectives. Thank you for giving me the opportunity to have a deeper understanding of the values and concerns you raised. Please know I respect you and those differences. I want to honor those values and acknowledge their importance to you and others, even when we may not agree on how to weigh them against other values that we also believe are important and should guide our decisions.

I am happy that you and John also had a chance to see the Smith Center. Thanks for your thoughtful feedback on the space. I'm reminded that all new physical spaces take time to become places. A place comes into existence over time when ritual, routine, symbols, and meaning are given to it by those who inhabit it. The Smith Center is not a panacea but in just a few short months it is already having a profound and positive impact on the type of inclusive culture we want to create.

I also appreciate your concern for our female students and those who identify as female. A common thread in our work at Harvard is to create a gender inclusive environment. By this we mean to be open to everyone. From a gender perspective, we want all our spaces to be welcoming of all individuals regardless of their gender identity and expression. Over the break, I watched a documentary with my family called RBG. It is about Justice Ruth Bader Ginsberg and her path to the Supreme Court. If you haven't seen it, I highly recommend it. The documentary highlights the perniciousness of gender discrimination, especially what she faced at Harvard. A particularly poignant moment is when the dean of Harvard Law School called the 9 or so women at HLS into his office and asked them how they felt taking the place of a man who deserved to be there. Thankfully we have made progress. But given that for most of Harvard's history women and other groups were treated as second-class citizens, including not being allowed in Lamont Library or to avail themselves of everything Harvard has to offer, I recognize we still have a long way to go. Gender expectations and messages still bombard us that tell people what they can do and what they can't do. You have my commitment that we will advocate for non-discrimination on this campus and that we will aspire to model the culture of respect and dignity that each member of our community deserves. We want every student to have the opportunity to feel welcome, included, and thrive at Harvard. I know you want the same and look forward to working with you and other alums to make sure every room at Harvard is everyone's room.

I also appreciate your concern for out students' social life. We are working with our students to create a healthy and fun social life that aligns with their values and interests. You may know that the College introduced a new student-activity funding model this year which has significantly increased resources for student social events. This year we implemented a new student-led governance model that has empowered the College Events Board (student-led), the Undergraduate Council (student-led), and the House Committees (student-led) with significant resources to initiate and lead student events. We think this empowerment model is best suited for us since student leadership in designing and creating events gives them the type of events that meet their particular needs. The Student Engagement Office (populated with lots of student interns) sends out a weekly newsletter of events. I've attached two recent ones. Additionally, all Houses now have extra resources for student-initiated parties and events. As someone who lives with students, I can assure you that there are many parties on campus each weekend.

At the same, we are also committed to working with our students to create healthy environments in which dangerous behaviors are discouraged. Our students' health and well-being is our first priority. College students have always been inclined to drink and engage in risky behaviors, but there is a significant amount of research that more students are doing so today with dangerous binge drinking and with the intention of blacking out. There has also been an increased use of mixing dangerous drugs with alcohol along with an increase in related dangerous behaviors. In some cases, these situations are a form of self-medication and intertwined with mental health issues. I love our students. I don't want to lose anyone. Over the past five years, I've seen too many close calls. I want to do everything I can to prevent the worst thing that can happen to a parent from

HARV-F-00012382

happening. Each night I go to sleep worrying about our students' health and well-being. Each morning I am thankful when the unthinkable has not happened.

We are continuing to work with students to create the type of Harvard College culture we can all be proud of and are so appreciative of your support, especially as we work with our students to create an environment in which everyone is thriving.

Please stay in touch and let me know if I can be helpful in any way.

Warmly,

HARV-F-00012383

# EXHIBIT 16

| From: | Khurana, Rakesh [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E89F84CC1F404BB2A36CB8D9DFB79860-RKHURANA] |
|---|---|
| Sent: | 5/2/2016 12:35:31 PM |
| To: | Rosenzweig, Jane [jrosenzw@fas.harvard.edu] |
| Subject: | Re: thoughts |

Exactly the point we would like to make. I don't want to institutionalize "separate but equal."

On May 2, 2016, at 11:57 AM, Rosenzweig, Jane <jrosenzw@fas.harvard.edu> wrote:

Rakesh,
I think this is a good point and a tricky one—the idea that these women's organizations will see themselves as collateral damage has been on my mind as we've worked through this.

I think one way of approaching this would be a few sentences in which you acknowledge that these groups emerged in reaction to a male-dominated culture and that you know the male-dominated culture won't go away overnight--but that you don't think it is consistent with our values to support normalizing that male dominated culture by creating organizations that attempt to compensate for the fact that they haven't been given access to these more powerful organizations. In other words, yes, it makes perfect sense that women found value in these organizations while they were shut out of access to others, but there is something wrong with the fact that they had to do this in the first place.

This doesn't deal with the larger argument that there may be value in single sex organizations (women's colleges, etc.). I'm not sure anything you could say here would satisfy those who object on those grounds.

I have student conferences all day today so I don't have time right now to craft potential language—but I could try to do it later, or I'd be happy to look at what you have if you do something sooner.

Jane
----------------------------------------
Jane Rosenzweig
Director of the Writing Center
Harvard College
(617)496-6861
jrosenzw@fas.harvard.edu

writingcenter.fas.harvard.edu

From: <Khurana>, Rakesh <rkhurana@fas.harvard.edu>
Date: Monday, May 2, 2016 at 11:10 AM
To: Jane Rosenzweig <jrosenzw@fas.harvard.edu>
Subject: thoughts

Jane,

I wanted to share a comment from one of our colleagues and was wondering if you have any thoughts or suggestions.

**Thank you for sharing this.  My only comment is whether it makes sense to be explicit about the unique situation of the women's clubs and sororities, specifically toward the end of the 3rd paragraph?  While we have a consistent stance on single gender organizations, alumnae and students have described their value in terms of creating supportive communities for women in a social scene and culture dominated by men.  They have noted that how this transition to a more equitable**

social environment happens will matter for women and these women's organizations that find themselves in a precarious place.  Is there a way to acknowledge this without softening the message?

HARV-F-00002491

# EXHIBIT 17

I know that everyone expressing a point of view in this discussion does so from a place of deep commitment to Harvard College, and I am grateful to be part of a discussion in which we can respectfully disagree from this common ground. I also recognize the importance of the principle of freedom of association that my colleagues have invoked. While we should respect that individuals have the right to form their own social groups, such a principle has to be balanced against other principles, such as maintaining a non-discriminatory environment and a college academic and social environment that is aligned with our educational ~~philosophy~~mission and philosophy.

Facts must inform our perspective. And the facts are that the final clubs have had a significant impact on our community that extends far beyond their membership. And while this debate has focused on the distinction between on campus and off campus "freedom of association" we need to admit/recognize that in the case of these clubs, this is effectively a meaningless distinction. They are comprised exclusively of Harvard students, they have a disproportionate role in campus social life, they identify themselves with Harvard, the media, tour guides, identity them with Harvard, and to ignore this is to engage in a social and legal fiction. They are physically embedded on our campus. They are, for better or worse, entangled with Harvard students, Harvard's identity, and Harvard's history.

As a faculty dean, I live with our students and I am responsible for 360 souls. As the dean of the College, ~~I am~~we are responsible for more than 6000 lives. Our students' lives are not abstractions. I cannot in good conscience ignore the real problems these organizations create by saying that these groups exist independently of Harvard College.

And because the~~sey~~ are effectively Harvard organizations, and the male final clubs in particular have such a long history at Harvard, ~~for almost 35 years,~~Harvard University and Harvard College have long been concerned about ~~the undergraduate male final clubs, primarily due to~~ their perpetuation of gender-based exclusion and to the reports of negative behaviors such as high-risk drinking, sexual and physical violence, and hazing of new recruits.

Our work on USGSOs will not solve every problem with social life or inclusion on this campus. Rather, it is a necessary first step to spark change on this campus that is long overdue. ~~Part of the goal was be a catalyst to spark change on this campus that is long overdue.~~ Inclusion and integration do not happen on their own. With the number of organizations going co-ed and final clubs changing their membership policies, we are making a significant amount of progress. Extraordinary efforts and changes are going on to re-center social life in the Houses, to increase inclusive and safe social choices.

The current policy may be the right way to proceed. Or calling for the elimination of exclusionary social clubs entirely might be right. Another approach might be right. This is something that should be debated and discussed by the faculty. But this motion

**Comment [RJ1]:** Here, would it make sense (I'm not sure) to elaborate on how this is relevant? As in, given that we have this policy of non discrimination, we are already balancing freedom of assofciation with important values of our community?  It seems like the (rhetorical) problem you keep running into is that Lewis et al want to make a distinction between on and off campus—and you are arguing that there is a blurred line. So Harry Lewis might say (an I think has said) that these comparisons are flawed because we don't punish students for lying off campus. And so your strongest argument is that the final clubs are effectively on campus organizations in all but technicality.

**Comment [RJ2]:** "Admit" is probably the more combative of these two options, whereas recognize would be the gentler option.

**Formatted:** Highlight

**Formatted:** Highlight

**Comment [RJ3]:** Do you want to mention they are funded by Harvard alumni? Or otherwise bring in the alumni point here?

**Comment [RJ4]:** Grammatically, this either needs to be "I am" or the sentence could be rewritten to just say

"At the College, we are responsible for more than 6000 lives."

**Formatted:** Highlight

**Formatted:** Highlight

**Comment [RJ5]:** Maybe say "pretending" here?

**Comment [RJ6]:** I tried to edit this a bit to make the move from "all single gender" to "male are the main problem" smoother. But I don't know the best way to deal with that particular critique (that this is really about a handful of male clubs that have parties and not about all the groups).

**Comment [RJ7]:** When I read this with my Harry Lewis hat on, I guess the main counterargument would be that you are engaged in some kind of nefarious social engineering ("progress"). When I read with my "anti-final club" hat on, I think the main counterargument is that making these clubs coed but still exclusive doesn't really contribute to inclusion. I'm not sure if there is a way around those objections here. You could just cut that whole sentence so that y...

will prevent that discussion. As written, this motion would mean that we could not govern groups exclusively made up of Harvard students.  This puts us at odds with the obligations a contemporary university has for governing and managing student organizations. It not only creates something unworkable by preventing the college from being able to manage and govern student organizations of any type. It puts us out of the boundaries of generally accepted practices and policies for managing student organizations and student life. If something goes wrong with student organizations—unrecognized or recognized-- the reality is that we are responsible and we will be held responsible. It is not outside our practical and ethical obligations. I urge you to reject the motion. Let us develop our policies as we do ordinary ways through faculty discussion. Let the faculty committee continue to do its work so that the faculty can have an informed discussion. Let us debate whether Harvard College should reverse course on its commitment to anti-discrimination as its guiding philosophy.

If Harvard is to attract the best students and faculty, we must create an environment where one's intrinsic identity—whether that is gender, race, ethnicity, sexual orientation-- cannot be a limitation. We must be an institution that promises a level playing field where anyone can fulfill their potential and be given a fair shot. We must create an environment where each person's dignity is respected. Achieving our academic mission requires an environment of respect for rights, differences, and recognizing the dignity of others.

**Comment [RJ8]:** Is this the agreed upon interpretation of the motion? That as written, we wouldn't be able to require undergraduate organizations not to discriminate? Or will this be seen as distortion by anyone of the original motion?

Formatted: Highlight
Formatted: Highlight

**Comment [RJ9]:** Will it be clear to everyone what work you are saying should continue? The work of recommending whether this policy should be kept, leading to discussion by faculty?

Formatted: Highlight
Formatted: Highlight

**Comment [RJ10]:** Would you want to add another sentence here that brings it back to the usgsos? Like, "making an honest assessment of how these social organizations contribute to that environment is long overdue"

You don't need it for this to make sense, but the "overdue" seems like a key point here to distinguish the single gender clubs from the present day reality.

# EXHIBIT 18

# Faculty of Arts and Sciences
## Office of the Dean
Distribution list for Dean Smith's incoming mail

Date received: _6/21/2018_ _____

FYI:

| | | |
|---|---|---|
| ☐ Allen Aloise | ☐ Laura Fisher | ☐ Chris Kruegler |
| ☐ Mahzarin Banaji | ☐ Pat Fitzgerald | ☐ Heather Lantz |
| ☐ Beverly Beatty | ☐ Zoe Fonseca-Kelly | ☐ Mike Lichten |
| ☐ Jeremy Bloxham | ☐ Claudine Gay | ☐ Susan Lively |
| ☐ Bob Cashion | ☐ Jay Harris | ☐ Anne Margulies |
| ☐ Chris Ciotti | ☐ Jay Herlihy | ☐ Russ Porter |
| ☐ Nina Collins | ☐ Robin Kelsey | ☐ Mathilda van Es |
| ☐ Emma Dench | ☐ Rakesh Khurana | ☐ Nancy Weidner |
| ☐ Frank Doyle | ☐ Leslie Kirwan | ☐ Nina Zipser |

_____ : Please Draft Reply

_____ : Please Circulate

_____ : Please Handle

NOTES:

# HARVARD UNIVERSITY
## THE BOARD OF OVERSEERS

OFFICE OF THE GOVERNING BOARDS
TELEPHONE: 617-495-1534
FAX: 617-495-8819

LOEB HOUSE, 17 QUINCY STREET
CAMBRIDGE, MA 02138

June 13, 2018

Dear Mike:

At its meeting on December 3, 2017, the Standing Committee on Schools, the College and Continuing Education discussed the report presented by Valerie Smith, Chair of the Committee to Visit Harvard College, and a response by Rakesh Khurana, Dean of Harvard College. On behalf of the standing committee, I am pleased to transmit the report and response with our comments.

Harvard College is a vibrant community of students, faculty, and staff, animated by the transformative power of a liberal arts and sciences education. The impact of the College extends well beyond preparing Harvard students for lives of service and leadership – its efforts also influence the direction of undergraduate education in the United States and abroad. Under Dean Khurana's thoughtful and energetic direction, the College has sharpened its sense of mission and purpose, and strengthened its commitment to fostering a culture of inclusion and belonging. At the same time, the visiting committee report and our discussion suggested some areas worthy of focused attention.

One of these areas is the "preparation gap" that is apparent among entering students, especially as the College attracts more people from different backgrounds, including those from socioeconomically disadvantaged backgrounds. This gap is twofold and relates to students' preparation for embarking on college academics and to their preparedness for navigating the complexities of college life more broadly. Though the College is still studying these issues and how best to address them, there have been notable recent advances. For example, efforts are underway to ensure that gateway courses do not inadvertently exclude talented students who were not lucky enough to have attended a well-resourced secondary school. There are also initiatives to help first-generation college students as they navigate their way through Harvard. We look forward to following developments in this area, and urge the College to remain attentive to unexpected ways this preparation gap may manifest itself over time.

The College is taking a proactive approach to supporting the mental health and well-being of individuals who are experiencing some measure of distress in their lives. This entails a greater focus on trying to understand, through the best available research, what can be done to strengthen the services offered to the Harvard College community. Considering the recent rash of natural disasters and tumultuous political events, it is not surprising that heightened distress is being experienced not only by students, but also by those whom students naturally look to for help. This situation should be monitored, but it was clear that Dean Khurana is keenly aware of this important set of issues.

# Redacted - Substantial Need

**Redacted - Substantial Need**

**Redacted - Substantial Need** The second is the standing committee's wish to reiterate its support for Dean Khurana's inclusive vision for the College and to underscore our hope that the considerable progress underway on various aspects of undergraduate education and student life not be obscured by the controversy over the policy on unrecognized single-gender social organizations.

In conclusion, we recommend attention to the following:

- persevering in the commitment to foster a culture of inclusion and belonging;

**Redacted - Substantial Need**

## REPORT OF THE COMMITTEE TO VISIT HARVARD COLLEGE

*March 16-17, 2017*

The Committee to Visit Harvard College met March 16-17, 2017, approximately two years after the previous visit to campus. Committee leadership worked closely with the Office of the Dean of the College to plan a two-day meeting that included extensive discussions with faculty, staff, and students. The Committee appreciated the opportunity to engage in wide-ranging conversations with Dean of the College Rakesh Khurana both days and focused conversation with FAS Dean Michael Smith and Provost Alan Garber on the second day. The Committee is grateful to Dean Khurana and his staff, and to the Office of the Governing Boards, for organizing such a productive and informative meeting.

As Dean Khurana emphasized in his remarks to our committee, Harvard finds itself at a moment of extraordinary change. The University, and by extension the College, seeks to understand and respond to the current and future impact of increased racial, ethnic, cultural, and socioeconomic diversity upon the institution. Furthermore, the College seeks to prepare for the impending expansion of the University into Allston, which will pose logistical challenges to the idea of a unified and coherent Harvard culture. Beyond these changes on campus, Harvard seeks to navigate the current period of heightened national and global political and economic volatility.

These factors require the College, and the University, to be both responsive and visionary. Dean Khurana displayed these qualities in abundance; he and his staff provide thoughtful, insightful, collaborative leadership during these turbulent times. In our discussions, members of the Committee observed that the challenge to be both idealistic and strategic is similar to the kinds of challenges the College poses to its students. Just as the College encourages students to move beyond their academic safety zones and take intellectual risks, so might the College seize the opportunity to reflect even more deeply on its goals and experiment with programming and curricular initiatives. In so doing, the College might model for students the habits of mind they seek to cultivate in them.

Before moving to the substance of this Report, the Committee wished to make two prefatory procedural comments. First, several members of the Committee expressed disappointment that key recommendations in the 2015 report went unaddressed in any scheduled portion of the Visit. For instance, the 2015 report concludes by expressing the wish to see "COFHE (Consortium on Financing Higher Education) data as the Visiting Committee has in the past" (2015 Report, page 19). We of course understand that our recommendations cannot always be accommodated. However, in those instances, it would be helpful to receive an explication of why a matter will not be addressed (as was the case, for example, when Dean Khurana stated that the pending admissions lawsuit made it inadvisable to share admissions data during this visit).

HARV-F-00010880

On a more positive note, the Committee applauded the decision to lower the number of Committee members from twenty (in 2015) to fourteen (in 2017). Individuals who had served on both committees noted that the smaller number made for more engaged and focused discussion.

As in 2015, the 2017 committee has chosen to organize this report along the lines of the dean's priorities for undergraduate education: intellectual transformation; social transformation; and personal transformation.

HARV-F-00010881

**INTELLECTUAL TRANSFORMATION**

**Highly Confidential - Attorneys' Eyes Only**

*General Education*

**Redacted - Substantial Need**

HARV-F-00010882

# Redacted - Substantial Need

HARV-F-00010883

# Redacted - Substantial Need

*Communication Across the Curriculum*

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010884

*Freshman Seminars*

**Highly Confidential - Attorneys' Eyes Only**

*Academic Support*

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010885

**Highly Confidential - Attorneys' Eyes Only**

*Honor Code and Council*

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010886



**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010887

# Highly Confidential - Attorneys' Eyes Only

HARV-F-00010888

**Highly Confidential - Attorneys' Eyes Only**

*The Allston Campus*

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010889

**Highly Confidential - Attorneys' Eyes Only**

*The Question of Intellectual Mission*

**Highly Confidential - Attorneys' Eyes Only**

**SOCIAL TRANSFORMATION**

Harvard College has enhanced its commitment to its students' intellectual transformation with an equally strong commitment to its students' social transformation—a commitment that has focused on establishing and strengthening a culture of campus inclusivity while simultaneously providing a broader range of off-campus co-curricular opportunities to expand service learning options. In both his written report to Committee members as well as in his presentation on campus,

HARV-F-00010890

Dean Khurana noted the importance of this work and the unique moment in the College's history as well as the externalities of the current national and international political environment that have provided the context for this on-going commitment:

> We are in a moment of exceptional change in the world and in higher education. Political polarization, inequality, and distrust in institutions are part of our national context.  Higher education is in flux, with calls for greater access, lower tuition costs, and increasing student services. . . .  As we adapt to a changing higher education landscape and welcome ever more diverse cohorts of students to the College, we continue to embrace new opportunities to inspire talented young minds with new ways of seeing the world and to offer them the intellectual experiences that they will draw upon throughout their lives.

The Visiting Committee welcomed Dean Khurana's eloquence and commitment to the goal of student social transformation at Harvard College and was encouraged by the range of efforts and progress to date.  The student body has changed significantly over the last decade and a half, and Harvard College has gone a long way under Dean Khurana's leadership to recognize and address the changes by fostering a community that welcomes diversity and supports inclusion.

*Creating Inclusive Community*

In the context of Dean Khurana's definition of the transformational effect of a college education on students' lives, the Committee received updates on various efforts to enhance a diverse living and learning experience for Harvard College students.  Dean Khurana summarized the import of these efforts with his reflection on student engagement: "They own the community.  They belong here.  We must create an experience that counters students from just gathering with people like themselves."

Noting the significant progress in Admissions to admit diverse incoming classes, the Committee lauded recent efforts to bolster a sense of belonging among students during their time at Harvard.  The importance of the House renewal effort and prioritization of the student residential experience was discussed formally and in conversations with students over dinner.  The committee also took note of class-wide events organized to build collective spirit and engagement as organized by the Office of Student Life in partnership with student groups, as well as of a range of events—from Fall Festival; Harvard-Yale weekend activities; Collaboration and Innovation Grants; Live @ Sanders Theatre; College Nights at the Cambridge Queen's Head; Mardi Gras Party and Yardfest—all of which provide opportunities for building community and fostering a greater sense of inclusion.

The Visiting Committee was also impressed by the Dean's work to provide food and housing options during Spring and Winter break for students unable to

HARV-F-00010891

leave campus, a policy that recognizes the realities of an international twenty-first century institution as well as the economic challenges faced by students who cannot leave campus during such "breaks." Conversations that Committee members enjoyed during dinner affirm the importance of this initiative for students.  The Committee commends Dean Khurana for these initiatives designed to make sure "Harvard works for everyone."

The Committee also commends the ongoing efforts to recruit and attract a diverse faculty and staff as a significant part of effectuating the goal of a truly inclusive campus community.  The Committee shares the Dean's view that this commitment leads to better research and teaching.

Finally, the Committee appreciated the reports of an engaged campus dialogue through ongoing discussions on the topic of inclusion and belonging.  Dean Khurana admirably acknowledged that while Harvard aspires to support all student needs, interests and commitments, it must be judicious in the use of funds and cannot provide financial support for every student-led initiative.  With his impressive leadership, matched with the new social opportunities and structural enhancements to the residential House system as well as the newly created Office of Diversity, Equity and Inclusion, the Visiting Committee believes Harvard College is well positioned to set a standard for an inclusive campus community in the twenty-first century.

*Final Clubs/Title IX*

An inclusive campus depends on the university and affiliated institutions doing all they can to ensure equal access of opportunity for all students.  As part of these efforts, Dean Khurana updated the Committee about the new policy he and President Faust issued regarding unrecognized single-gender social organizations (USGSO) and the importance of ending gender discrimination in the Final Clubs. Because Harvard withdrew recognition from the male Final Clubs more than 30 years ago, this issue has been chronically difficult to address, and the problem has been compounded by the intercession of the Alumni of some of the Clubs who are reluctant to change long-standing policies.

At the time of the March visiting committee meeting, the College's new policy with respect to the Finals Clubs had just been issued.  Since the March meetings, the debate and complexity surrounding these issues has escalated.  We recognize and appreciate these seemingly intransigent issues and support the Dean's ongoing efforts to ameliorate and strengthen the climate and culture of Harvard's campus.

The Committee strongly supports efforts to end gender discrimination in these Clubs and was pleased that some of the Clubs have already become coed.  We of course acknowledge the freedom of association claims so strongly asserted by the clubs. Yet the principle of gender equality cuts strongly in favor of gender integration and is the more important value in this particular context.

HARV-F-00010892

At the same time, the Committee remains concerned that even integration on the basis of gender will not be a panacea, given that the Clubs may still support an elitist culture that fosters a separation between members and students from lower socio-economic groups.  Given that the process implementing the new mandate should and likely will continue to evolve, the committee offers the following suggestions and questions for Dean Khurana and his team:

- Though most certainly any strong measure to deter the Clubs' single sex club membership would have been met with resistance, it seems that the decision to implement sanctions without having first gained support from the Faculty led to a more difficult path to acceptance.  Given the importance of faculty buy-in for major policy decisions affecting all aspects of student life, the Committee urges Dean Khurana to partner with faculty allies on this and other initiatives (such as fostering support for the Honor Code) to help spearhead his initiatives.

- The question arose of whether the new sanctions unduly punish single sex female clubs.  Although some may have formed as a reaction to the male clubs, they do also serve a function of providing women extra support in a still unequal environment.  The Committee hopes that the Dean of the College will consider how best to support female students on Harvard's campus to ensure they have spaces in which to flourish and thrive.

- The problem of not having enough social space where students can gather continues to factor into the popularity of the Final Clubs, which points to the ever-present necessity of providing more social space to better equalize social experiences. When the data exists, it would be informative to see whether students who live in the renovated houses feel that increased common areas in those houses begins to address the sense of "not belonging." If not, perhaps upcoming renovations should be reviewed with this question in mind.

- While the Committee understands the university leadership's concern with sexual assault across campus and therefore its instinct to hold the Clubs accountable for problems with assault at their parties and events, the Committee felt the key issue in this instance was one of gender equality (the Clubs being hardly unique as campus spaces in which sexual assault is perpetrated).  The Committee thus hopes that the University leadership will fight sexual assault strenuously *across campus* while justifying its policy towards the Final Clubs on the grounds of gender equality.  Indeed, it was noteworthy that neither Title IX nor sexual assault was substantially addressed on this visit. In light of the continuing problems with sexual assault and the strongly expressed desire to create an inclusive and safe campus, it would be helpful for the Committee to hear more on this topic

next time as well as how the Final Clubs and others are addressing these
issues.

*Athletics*



**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010894

**Highly Confidential - Attorneys' Eyes Only**

*Social Transformation through Engaged Scholarship*

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010895

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010896

# Highly Confidential - Attorneys' Eyes Only

**PERSONAL TRANSFORMATION**

# Highly Confidential - Attorneys' Eyes Only

HARV-F-00010897

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010898

**CONCLUSION**

      The Committee is grateful for all of the work that went into planning for the visit and appreciated the opportunity to engage in thoughtful conversation about some of the most pressing issues that concern Harvard College and higher education more broadly.  For the next meeting the Committee makes the following recommendations:

- The next Committee should receive more data in advance of the meeting. Having that information in advance would allow members to analyze it in advance and devote time on campus to more in-depth conversation that will be more useful to the College.

# Redacted - Substantial Need



# HARVARD
## COLLEGE

**CVC Response Memo**

**Executive Summary**

The CVC asked if the College might be encouraged to seize the opportunity to reflect on its goals and experiment with programming and curricular initiatives, and we agree that we now have an exceptional opportunity to build and grow.

**INTELLECTUAL TRANSFORMATION**

*General Education*

# Redacted - Substantial Need

*Communication across the Curriculum*

# Highly Confidential - Attorneys' Eyes Only

*Freshman Seminars*

# Highly Confidential - Attorneys' Eyes Only

*Academic Support*



**Highly Confidential - Attorneys' Eyes Only**

*Honor Code and Council*

**Highly Confidential - Attorneys' Eyes Only**

*The Role of Arts and Humanities at Harvard College*

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010901

*The Allston Campus*

# Highly Confidential - Attorneys' Eyes Only

**SOCIAL TRANSFORMATION**

The Office of Student Life (OSL), under the leadership of Dean O'Dair, has made it a priority to further a student-centered and learning-focused environment on campus. We are seeking ways to give students a greater voice in matters related to their campus experience. The OSL will increase its partnerships with the Office of Undergraduate Education and FAS faculty to further efforts to integrate the co-curricular and curricular lives of students. Two new staff have joined the OSL: an Associate Dean for Diversity and Inclusion and a Director of Diversity Education and Support. With House Renewal, more social spaces are becoming available, and we intend to create opportunities for more students to use these new spaces.

*Social Transformation through Engaged Scholarship*

# Highly Confidential - Attorneys' Eyes Only

*Final Clubs/Title IX*

The policy announced in May 2016 regarding Unrecognized Single Gender Social Organizations (USGSOs) has led to several new initiatives. An FAS faculty committee issued a report in September 2017 stating the widespread view among faculty that the College must take action to address the pernicious effect of USGSOs on our community. Instead of issuing a single final recommendation, the committee sought to summarize all of the options available to our community to address the USGSOs. In tandem with this report, discussions at several faculty meetings this fall have weighed how to best respond to the challenges posed by USGSOs. As a result of such ongoing deliberations not just on the part of faculty, but amongst students and staff as well, several USGSOs have become gender-inclusive over the past year. The College welcomes the opportunity to work under a formal policy with them.

**PERSONAL TRANSFORMATION**

# Highly Confidential - Attorneys' Eyes Only

# Highly Confidential - Attorneys' Eyes Only

*Athletics*

# Highly Confidential - Attorneys' Eyes Only

HARV-F-00010903




November 20, 2017

Committee To Visit the College
c/o Marc Goodheart
Office of the Governing Boards
Loeb House, 17 Quincy Street
Cambridge, MA 02138

Dear Members of the Committee to Visit the College:

Thank you for your candid assessment of the state of Harvard College. The faculty and administrators who met with the CVC last March are keenly aware of the rare expertise CVC members bring and the value your candor provides. It is with respect for that honesty that we respond to the report.

Reviewing both the 2015 and 2017 reports, we start with two points of agreement with the CVC:

1) The structure of intellectual, social, and personal transformation that has provided the College's guiding principles since 2014 is an appropriate and durable mission.
2) Harvard College is attempting to fulfill this mission during a period of dramatic and far-reaching change, one in which institutions of higher education are facing challenges unlike any seen since the late 1960s.

As a liberal arts college centered in a research university, we provide our students with unique opportunities, and we are committed to the goal of educating leaders for our society in a globally interdependent world. You ask if the College might be encouraged at this precarious juncture to reflect on its goals and experiment with programming and curricular initiatives, and we agree that this particular moment presents an exceptional opportunity to build and grow. We hope that this response reflects that sense of opportunity, and we have tried to illustrate our commitment to experiment and pilot in this new environment.

Finally, the CVC requested that we provide more detailed COFHE data. We are committed to providing that data wherever possible, and we will follow up with the committee to make sure we understand what information is being requested.

HARV-F-00010904

I also want to take this moment to acknowledge a very valued member of our Harvard College community for over 45 years, and one who managed and influenced a lot of the programming and initiatives addressed in the following report - Tom Dingman, Dean of Freshmen, will be retiring at the end of this academic year. Attached in the appendices, I share with you the message I delivered to all students, announcing his departure.

**INTELLECTUAL TRANSFORMATION**

*General Education*

# Redacted - Substantial Need

*Communication Across the Curiculum*

# Highly Confidential - Attorneys' Eyes Only

HARV-F-00010905



**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010906

*Freshman Seminars*

**Highly Confidential - Attorneys' Eyes Only**

*Academic Support*

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010907

**Highly Confidential - Attorneys' Eyes Only**

*Honor Code and Council*

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010908

**Highly Confidential - Attorneys' Eyes Only**

*The Role of Arts and Humanities at Harvard College*

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010909

**Highly Confidential - Attorneys' Eyes Only**

*The Allston Campus*

**Highly Confidential - Attorneys' Eyes Only**

**SOCIAL TRANSFORMATION**

We thank the visiting committee for their comments and reflections about Harvard College students' experience on campus, on topics ranging from issues of diversity, to the residential experience, to co-curricular activities. As we think about our structures and programs for meeting the needs of today's students, the Office of Student Life (OSL), under the leadership of Dean O'Dair, has made it a priority to further a student-centered and learning-focused environment on campus. The diversity noted in the CVC report is a significant strength that we want to incorporate into all aspects of a student's experience. To this end, we are seeking ways to give students a greater voice in matters related to their campus experience, e.g., through departmental advisory boards, committee representation, or the like.

HARV-F-00010910

The OSL will also increase its partnerships with the Office of Undergraduate Education and FAS faculty to further efforts to integrate the co-curricular and curricular lives of students. Efforts are already underway to leverage the expertise in student life with faculty members in order to enrich the classroom experience. Two new staff have joined the OSL: Associate Dean for Diversity and Inclusion Roland Davis and Director of Diversity Education and Support Robin Johnson. This semester, Ms. Johnson has partnered with Expos and Math faculty to discuss ways to make the classroom experience more inclusive. In a time of transition in the status of unrecognized single-gender student organizations (see below), students are seeking resources—most notably space and funding—for social life in the College.

With House Renewal, more social spaces are becoming available, and we intend to create opportunities for more students to use these new spaces. And while we appreciate the Committee's acknowledgment of our efforts to enhance campuswide programs for students, we also know that student diversity means that we need to provide for a broad range of student interests. We look forward to sharing updates with the Committee at the next visit.

*Social Transformation through Engaged Scholarship*

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010911

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010912

# Highly Confidential - Attorneys' Eyes Only

***Final Clubs/Title IX***

Harvard College agrees with the Committee's assessment that "an inclusive campus depends on the university and affiliated institutions doing all they can to ensure equal access of opportunity for all students." The policy announced in May 2016 regarding Unrecognized Single Gender Social Organizations (USGSOs) has moved Harvard College forward by fostering a culture of respect for the rights and dignity of all students. It has also had an undeniable effect in intensifying the campus debate on how best to ensure our students live out the College's commitment to inclusivity and nondiscrimination.

Indeed, since the Committee visited campus, several initiatives have followed on the May 2016 policy. In October 2016, a committee was formed to examine implementation of the May 2016 policy. In February of 2017 it released its final report in support of the College's commitment to

10

HARV-F-00010913

nondiscrimination, a report that further encouraged the work already undertaken by USGSOs to reevaluate their practices and seek new approaches. In addition, a separate Faculty Committee was charged by Dean Smith with examining whether the May 2016 policy itself is the most effective means of advancing the College's mission of social transformation, and to identify alternatives that might also effectively ensure our commitment to nondiscrimination and inclusivity. The committee released a *Preliminary Report* in July 2017, which spurred extensive and substantive feedback from faculty, students, and alumni. The Faculty Committee then spent the summer and early fall seeking additional faculty and community input through a dedicated e-mail address, the creation of a wiki page, and dedicated drop-in consultation sessions open to all faculty.

The Final Report of the Faculty Committee, issued in September 2017, noted that the common thread woven throughout the feedback the Faculty Committee received was that the College must take action to address the pernicious effects of USGSOs on our community. Instead of issuing a single final recommendation, the Faculty Committee sought to summarize the most significant options available to our community for addressing the USGSOs. It listed three such alternatives: 1) a ban on students belonging to exclusive and discriminatory social groups; 2) the May 2016 policy, which reserved select privileges to those students who do not belong to social groups which practice discrimination based on gender; 3) addressing the toxic effect of these groups through means such as education or advertising specific instances of bad behavior. In tandem with the Faculty Committee's work, proposed Faculty legislation that would have restricted the College's ability to enforce its anti-discrimination policy was voted down at the November meeting of the FAS Faculty.

The thoughtful and, at times, challenging conversations this issue has prompted among students, staff, administrators, and faculty has not just led to reflection on how our community must live out our values—it has engendered social change. Several USGSOs have become gender-inclusive over the past year as a result of these discussions. The College welcomes the opportunity to work under a formal policy with them, and with all of our students, to ensure that every student can thrive inside and outside of the classroom regardless of their identity.

**PERSONAL TRANSFORMATION**

# Highly Confidential - Attorneys' Eyes Only

HARV-F-00010914

**Highly Confidential - Attorneys' Eyes Only**

*Athletics*

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010915

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010916

instruments to assess its programs and our students' athletic experiences. With the aid of this smartphone-enabled technology, the department hopes to more quickly and easily assess the culture of Harvard Athletics, and to do so on a regular basis, to improve and continue its longstanding positive contribution to Harvard College.

Finally, we wish the Committee to understand that Athletics has its own Visiting Committee on Athletics, and that Harvard also has a Faculty Standing Committee on Athletics and a Faculty Fellows program to help guide our Athletics program from a Faculty perspective.

**CONCLUSION**

I am proud of the work our team has accomplished these past three years. It has made a real difference in the lives of our students and could not have been accomplished without the guidance and support of the visiting committee.

As both the visiting committee and we at the College recognize, however, we have more to do. In our nation and around the world, we are seeing the forces of integration and connectedness also contributing to divisiveness and the widening of fault lines. In our nation, citizens are increasingly seeing their fellow citizens as "the other." Our campuses are not isolated from these forces. Those of us on the Harvard faculty and in the administration are responding to needs such as defending undocumented students, addressing campus racism and sexism, and ensuring we create an environment that allows for critical thinking, conversation, and debate. When we talk about inclusion, we mean inclusion for students from different backgrounds, experiences, and perspectives.

We are ready to continue taking advantage of the opportunity presented by the challenges we face. We can set a tone for our community, and perhaps for higher education more broadly, that helps create the conditions for social change. At our foundation is a commitment to the search for truth, an appreciation for evidence and reason, a critical perspective that challenges taken-for-granted assumptions, and respectful dialogue. We have a chance to show that the intellectual and social vitality of a learning community founded on a commitment to truth is strengthened through inclusion, and that a commitment to the liberal arts and sciences uniquely prepares our students to participate and lead in our interconnected society. Beyond the academy, we can be a model of bridging differences and bringing larger numbers of people into critically important conversations. I believe that no other institution of higher education has as much responsibility to do this as Harvard does. So we will do it.

Warmly,

Rakesh Khurana
Danoff Dean of Harvard College

14

HARV-F-00010917

**APPENDIX A**

**ATHLETICS LETTER TO THE COMMUNITY**

# Highly Confidential - Attorneys' Eyes Only

HARV-F-00010918

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010919

**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010920



**Highly Confidential - Attorneys' Eyes Only**

HARV-F-00010921

# Highly Confidential - Attorneys' Eyes Only

HARV-F-00010922

 **HARVARD**
COLLEGE

Dear Harvard College Students,

I write today to share with you that after 45 years of outstanding service to Harvard College and its students, Dean of Freshmen Tom Dingman '67 has decided to step down from his role at the end of the 2017-2018 academic year.

Dean Dingman has influenced the lives of countless students during their time at the College. Those of us who have had the pleasure of working with Dean Dingman have come to value his integrity, the calming presence that he brings to all situations, and the passion he has for helping students make the transition from home and high school to Harvard College. His leadership and mentorship will be truly missed.

Dean Dingman has held numerous roles in his time at Harvard. He began his career in the Admissions office, later serving as the Allston Burr Senior Tutor (now Resident Dean) of Leverett House and Dudley House. In addition to his House service, he was also Assistant Dean and Associate Dean of Harvard College. In each of his roles, Dean Dingman created environments to ensure students could flourish. In his role as dean of freshmen, in particular, Dean Dingman was responsible for reorganizing the office's staff, putting new emphasis on students' ethical development, and launching – with the help of the entire FDO staff - initiatives to heighten a sense of belonging, like Convocation. He was also responsible for initiatives designed to create the conditions for students' personal

20

HARV-F-00010923

transformation, like the series entitled *Reflecting on your Life*. Under Dean Dingman's leadership, more opportunities have been created for informed student-faculty interaction and for taking a break from the intellectual rigor to relax and enjoy the company of peers.

During my time as Dean of the College, Dean Dingman has been my valued partner and friend. Given his deep commitment to the stewardship of Harvard College, I have asked Dean Dingman to stay on in a limited capacity after his retirement as a Special Adviser to me, as Dean of the College. In this capacity, Dean Dingman will assist me with various special projects, including in the College's fundraising efforts to support the student experience. I am grateful for his continued service to Harvard College.

We will announce plans for the search for Dean Dingman's replacement in the near future.

Warmly,

Dean Khurana

*Danoff Dean of Harvard College*

HARV-F-00010924

# EXHIBIT 19

| | |
|---|---|
| **From:** | ██████████████ ███████████████ |
| **Sent:** | 5/9/2016 10:35:05 AM |
| **To:** | Khurana, Rakesh [rkhurana@hbs.edu] |
| **Subject:** | Message from a Rhodes Scholar, Seneca Member and former Cabot House resident |

Dear Rakesh,

By now you must have been inundated with responses to your recent announcement that, among other sanctions, members of single-sex organizations will not be eligible for the College's endorsement for fellowships such as the Rhodes and Marshall Scholarships. My perspective is probably somewhat unique, in that I was both a member of the Seneca and a Rhodes Scholar (as well as a resident of Cabot House, coincidentally). So your recent announcement struck me particularly close to home.

By now, plenty of other people have made the point that the male final clubs' undue influence on the Harvard social scene comes from their ownership of private spaces in which they can host parties. I was pleased to see that Cabot recently renovated its common room to make it a "party space" available for students to put on their own social events. The way to win the battle against the male final clubs (and against sexual assault, since isn't that really what you're trying to prevent?) isn't to infringe on students' rights to associate with whomever they like, especially when they are doing so on their own time with their own resources, but rather to provide a more attractive supply of social spaces and social events that will make the all-male final clubs' parties less appealing by comparison.

As for single-sex organizations, I can assuredly say that without my participation in the Seneca, I may not have had the confidence to compete for and win a Rhodes Scholarship. When I was an Economics concentrator 15 years ago, all but one of the tenured faculty were men, and most of my classmates were men. Even my athletic team – the Alpine Ski Team – was co-ed. Being a member of the Seneca opened my mind to an amazing group of supportive, dynamic women – women who cheered me on when I was having trouble coming up with a Rhodes essay topic, and who helped me study current events for my eventual Rhodes interviews.

Even to this day, the Seneca alumnae are some of my closest friends from Harvard, and I connected with them in a way that went beyond my relationships with my female roommates, because, like me, the women in the Seneca were all outgoing, engaging, people with a view towards advancing the position of women in leadership roles at Harvard and beyond. In fact, I was incredibly pleased to find that the one other senior woman at my private equity firm happened to be an older alumna from the Seneca, and she has helped mentor me and encouraged me to flourish at my firm, in an industry that is roughly 90% male once you hit the Managing Director level (where I am today).

I am incredibly disappointed that you and President Faust have chosen to lump all single-sex organizations together in your recent policy, and I would urge you to reconsider applying your restrictions only to those organizations that have preferential access to private party space, as that factor – not whether the groups are co-ed – is the real source of a power imbalance in the social scene at Harvard. (And btw, since the Task Force's survey showed that most sexual assaults occur in Harvard dorm rooms, why not just install a panic button in each dorm room? That is probably a very cost effective solution given today's wireless technologies.)

Thanks,
Rachael A. Wagner
Class of 2004

HARV-F-00011629

EXHIBIT 20

| | |
|---|---|
| **From:** | Daniel Becton [daniel_becton@mail.harvard.edu] |
| **Sent:** | 12/2/2016 7:22:00 AM |
| **To:** | Friedrich, David R [david_friedrich@harvard.edu]; Brandt, Lauren Elizabeth [lbrandt@fas.harvard.edu] |
| **Subject:** | Updated benchmarking report |
| **Attachments:** | Peer institution summaries ver2.docx |

Hi David,

I addressed the areas you mentioned and updated the report. I did reach out to Kim Pacelli at Bowdoin but didn't hear from her. However, I hope the added substance is useful regarding residence at Amherst and Bowdoin, eating clubs at Princeton, and drinking at Dartmouth.

Reviewing your guiding principles in light of the Princeton research, I am particularly interested in social capital. The NYT described final clubs as "if not the hub, the apex of social life."

Obviously Harvard wants each house to be able to develop its own "character." Student investment and uniqueness will generate pride, healthy competition, and internal growth.

Although they do generate these things, Princeton's eating clubs are criticized as "outdated, elitist institutions" (wiki), and "have a history of being hostile to women" (Bloomberg). Even if they evade other concerns, the Princeton model relies on pride in these histories, necessitating continuity with elitist traditions.

On the other hand, Harvard deliberately wants to break from the traditions that are invoked and reperformed every weekend when the apex of social life is final clubs -- that is, heterosexist patriarchy with a binge-drinking focus.

Harvard is rich with history and traditions that don't have anything to do with posh frat parties. There is a rich culture and school pride is tied to a sense that greatness fills the campus's history. If the College can create continuity with positive elements of its tradition that are exciting to students (see admissions essays), then pride can be instilled in the houses in a way that correlates with the College's values.

Happy Friday to you both,
Daniel

HARV-F-00001724

# EXHIBIT 21

*1. Trends in higher ed – Daniel Becton's research (benchmarking document) ; our policy relatively more restrained*
*2. Need to take decisive and strong action and not pull back from it*
    *a. Corresponds to the input from student members on the implementation committee as demonstrated below*

**Executive Summary**: Liberal arts colleges such as Amherst, Bowdoin, Williams and Middlebury have generally decided to ban fraternity and sorority life. Although this has been effective with regard to gender integration, students tend to push back against the school "micro-managing the social scene." Princeton also banned Greek life, and now filters social life through its own, well-established Eating Clubs. Meanwhile, Dartmouth created a house system this year that includes the whole campus and is a housing option, but one that exists alongside off-campus possibilities including fraternity or sorority houses. Overall, these institutions have consistently viewed social life organized by gender as incompatible with creating an inclusive campus. However, they have struggled to displace traditional forms of social life, and, occasionally, to address elitism within the student body.

*4. Findings - Broader aspects from students and other stakeholders*
*a. Positive aspects of policy – never heard a compelling defense of SGSOs; no person who objects to policy ever came forward and said that I want to maintain the status quo*
    *i. Discrimination – as a principle vs. as a type of action*
    *ii. Elitism, discrimination, concerns re: sexual assault , hazing – gendered-and problematic power dynamics*

**4a.** The most encouraging result of the committee's outreach efforts was the clear consensus regarding the misalignment with the values of Harvard College and the status quo. The toxic atmosphere engendered by the current orientation of student life around SGSOs ("if not the hub, the apex," according to the *New York Times*) is easily diagnosed. Although we listened to concerns from a very wide range of students, faculty, and staff, no person who objects to the policy ever came forward and said they wanted to maintain the status quo. Harvard students are diverse and socially conscious, and they openly critique the elitism and discrimination that characterizes those spaces.

4a. i. Discrimination – as a principle vs. as a type of action

**4a. ii. Power Dynamics** – The social scene at the College revolves around deeply entrenched systems of power. Men's final clubs in particular leverage the historical dominance of gender, class, and race, in order to preserve that power.  When gender is explicitly used as the separating principle for social life, compulsory heterosexuality maps onto that system, and there is a tremendous pressure on every student to perform their roles. And when alcohol is a third focus, especially, violence is often used to discipline those performances (hazing), to compensate for worries of underperformance (misogyny), and to assert/exploit dominance (sexual violence). The simple reality is that this social system facilitates highly problematic power dynamics. Because these systems are historical, they must be intentionally subverted in order to "advance our shared commitment to broadening opportunity and making Harvard a campus for all of its students." (Dean Khurana letter to student body, May 6)

HARV-F-00001810

HARV-F-00001811

# EXHIBIT 22

# USGSO

HARV-F-00003475

As noted in your report, these realities have informed the College's recommendations. They are also central to my decision to accept them. **A truly inclusive community requires that students have the opportunity to participate in the life of the campus free from exclusion on arbitrary grounds.** Although the fraternities, sororities, and final clubs are not formally recognized by the College, they play an unmistakable and growing role in student life, in many cases enacting forms of privilege and exclusion at odds with our deepest values. **The College cannot ignore these organizations if it is to advance our shared commitment to broadening opportunity and making Harvard a campus for all of its students. Nor can it endorse selection criteria that reject much of the student body merely because of gender. As reflected by the University's decision to withdraw recognition of the male final clubs in 1984, those practices are inconsistent with the educational environment the College seeks to create.** They encourage a form of self-segregation that undermines the promise offered by Harvard's diverse student body. And they do not serve our students well when they step outside our gates into a society where gender-based discrimination is understood as unwise, unenlightened, and untenable.

**I join you in urging the unrecognized social organizations to discard their gender-based membership practices, to adopt an open application process, and to establish greater overall transparency. I recognize, however, that not all the organizations will accept our call for reform and that some Harvard College students will still seek membership in those organizations.**

Drew Faust,
May 6, 2016

HARV-F-00003476

In light of the College's mission and in recognition of the new policy related to leadership of recognized student organizations and athletic teams and those students who receive an endorsement from the Danoff Dean of Harvard College, **the implementation committee will consult broadly with undergraduate students, staff, and faculty at the College to examine and recommend ways to define the contours and implementation of the policy set forth by the College. This committee's work may include town halls, focus groups, or solicitation of information from various community stakeholders. Specifically, the committee's work will aid the College in advancing its commitment to promoting an inclusive social environment aligned with the mission of the College.**

## Charge to Implementation Committee

HARV-F-00003477

**The most encouraging result of the committee's outreach efforts on campus was the clear consensus regarding the misalignment between the values of Harvard College and the existing status quo. The oftentimes toxic atmosphere engendered by the current orientation of student life around unrecognized single-gender social organizations is evident.** Students noted their desire for a more inclusive experience along a broad range of axes, ranging from issues of gender identity to socioeconomic background to race and ethnicity. It is clear that our community members understand inclusivity as a truly radical commitment to diversity and non-discrimination. Viewed in that light, this policy represents one step towards aligning the College's articulated values with that understanding. Furthermore, although we listened to concerns from a very wide range of students, faculty, and staff, **we did not hear convincing arguments for maintaining the status quo. Harvard students are diverse and socially conscious, and they openly critique the elitism and discrimination that characterizes the single-gender social organizations.**

What students and faculty have said, however, is that they do not understand how a policy which they view as discriminatory can operate to address discrimination. In response, we echo the words of one of our members, who said that "of course we can be intolerant of intolerance, and of course we can discriminate against people who discriminate. That's what liberal societies do. **Even if you are skeptical about the Dean's policy, please, let us not endorse what amounts to a pledge to abdicate our responsibility to see that everyone in our community is treated equally."**

Our conversations and research revealed that the current social scene at the College revolves around deeply entrenched systems of power. Men's final clubs in particular can leverage the historical dominance of gender, class, and race, to preserve that power. And when alcohol enters the picture, violence, hazing and sexual violence are sometimes used to assert their position. **The simple reality is that this social system facilitates highly asymmetrical power dynamics. Because these systems are historical, they must be intentionally subverted to "advance our shared commitment to broadening opportunity and making Harvard a campus for all of its students." (Dean Khurana's letter to student body, May 6).**

**Implementation Committee February, 2017**

HARV-F-00003478

**The Fabric of the Institution & the Lived Experience of Belonging**

Across and within its twelve Schools, Harvard offers its students, faculty, and staff many different experiential pathways but also elements of a common culture. What are the defining characteristics of Harvard's common culture? That is, what is the lived experience of diversity, inclusion, empowerment, and belonging among students, staff, and faculty? How can we transform that culture to achieve not just inclusion but full belonging and empowerment for all members of our community? What are the social, academic, or other structural barriers that may inhibit full membership and participation? Can we identify the critical junctures where opportunities to leverage diversity as a positive benefit for all go untapped? How do we effectively teach and create a dynamic learning environment in an increasingly diverse community? How do we help the entire community understand that the work ahead is a collective opportunity and responsibility?

University Belong and Inclusion Task Force
February, 2017

HARV-F-00003479

**Committee Charge:**

**In February 2016, the Faculty of Arts and Sciences reaffirmed the University's "long-held and oft expressed view" that student body diversity is essential to Harvard College's pedagogical objectives and institutional mission. That report recognized that we take intentional steps not only in the classroom but also through attention to the structures and institutions in which our students spend their time at Harvard. "We want our students to engage with each other not only in their classes but where they eat, play, dance, sing, act, debate, write, throw, catch, relax, and, of course, study. We seek to achieve this goal through very deliberate choices in the way in the College is structured."**

The College adopted, in May 2016, a new policy regarding unrecognized single-gender social organizations (USGSO) with the explicit goal of ending the gender segregation and discrimination of these organizations in a manner that is consistent with our educational mission, non-discrimination principles, and applicable law. **For more than 30 years – since Harvard withdrew recognition from the male Final Clubs out of a belief that students should not be excluded from structured campus activities and organizations solely on the basis of their gender -- the USGSOs have grown to be an outsized part of student social life. As reflected in survey comments, these organizations directly and negatively influence the undergraduate experience for many students who are not themselves members of these organizations. The discriminatory practices of these organizations undermine our educational mission and the principles espoused by this Faculty and distance their members from their College experience.**

**Today, the importance of inclusion and belonging, of nondiscrimination and acceptance, and of respect and tolerance for others cannot be gainsaid. The work of this committee – and ensuring that our students have non-discriminatory access to social opportunities that help define a Harvard College experience -- is an integral part of our ongoing efforts to prepare our students to join in the fellowship of educated people and be leaders and examples for this world.** The current USGSO policy addresses the complex issues that surround these organizations and the challenges they have posed for decades to our efforts to provide an inclusive and safe intellectual and social environment for our students. Further input from the faculty may strengthen our commitment to this approach or may yet uncover other approaches that are equally or even more effective at achieving our stated objectives.

HARV-F-00003480

# EXHIBIT 23

| From: | Khurana, Rakesh [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E89F84CC1F404BB2A36CB8D9DFB79860-RKHURANA] |
| --- | --- |
| Sent: | 9/16/2017 3:44:46 PM |
| To: | Light, Caroline [clight@fas.harvard.edu] |
| CC: | Clark, Suzannah [sclark@fas.harvard.edu] |
| Subject: | Re: some USGSO thoughts (with apologies for the Saturday intrusion) |

Dear Caroline,

Thank you for your wonderful and thoughtful note. You put into words feelings I've had but didn't have language for. It is almost as if they are that the way inequality works is through a nexus of structure and process and roles. What I appreciate about your email is that attempts at change often reveals what is otherwise invisible. Moreover, it suggests that even well meaning interventions are structured along gen

On Sep 16, 2017, at 9:36 AM, Light, Caroline <clight@fas.harvard.edu> wrote:

Dear Suzie and Rakesh – I'm so sorry for contributing to the email deluge you're no doubt facing, and on the weekend no less. None of this is really urgent but I wanted to share my thoughts before I lose courage or forget. I apologize too for not raising these points in yesterday's meeting, but I worried I might make things more difficult or antagonistic than we need them to be while we're trying to produce a concise and coherent set of recommendations. First of all, I remain convinced that *most* of our committee's detractors are governed by generous intentions. They have invested untold energy and time contributing their thoughts and participating in open debate about Harvard's social life, and as much as I disagree with them, I've also developed sense of gratitude for their efforts to advocate for what they perceive as an improved campus culture. However, in (re)reading and listening to these faculty detractors, I found a set of patterns I find concerning. Rakesh, you alluded to these in yesterday's meeting when you noted that some folk's well-intentioned efforts to advise female students (first-years in particular) to avoid final clubs or to attend parties with trusted friends smacks of victim-blaming, where the women themselves are complicit in their own assaults. Jason took offense at your point, and I wanted to respond to him, but I didn't know how to craft a response would not come off as condescending or lecture-y, or just plain incoherent. I'm writing after the fact in case these insights might be of use in the process of crafting our recommendations.

Here's the pattern I noticed while pouring over the email messages and pondering the personal testimony delivered in our open meetings: I noticed that some faculty detractors, often white men who have spent significant time at the institution, express concern for women's sexual violation in final clubs while describing their own efforts to intervene (usually through guidance and moral suasion) on behalf of female students' safety. Not only does this gesture depend upon and reinforce victim-blaming, it is part of a deeply problematic historical genealogy of chivalric rescue by which (white, propertied) men are the protectors of (white) women's virtue. The racial and heterosexist implications are often lost to those people who invoke this logic of protection, which is in part why they are perniciously influential. These same faculty tend also to be the ones urging us not to infringe on students' rights of free association in favor of leaving things to the Cambridge police. They tend to label the committee's interventionist (or punitive, or even "authoritarian") stance towards final clubs as paternalistic without directing a similarly critical lens on their own indignation about female chastity-in-danger. The racial (not to mention heteronormative) implications of this narrative are invisible to them because they do not personally experience its manifold harms, which is how they can (1) invoke female safety-as-chastity in one breath, (2) castigate the committee's paternalism in another, and (3) suggest enlisting CPD without considering the racial/ethnic/sexual/gendered implications of criminalization for our male students of color. This solipsistic thinking frames the logic of using criminal law to address other, related urgent campus culture issues, like sexual assault, which you also addressed in the meeting, Rakesh. I couldn't help but think of Betsy DeVos's statement last week about protecting "both sides" – accused as well as accuser – in cases of sexual assault, how

HARV-F-00012110

it echoed the president's ascription of blame to "both sides" in Charlottesville, and the inadequacy of legal remedies to address entrenched structures of inequality.

When considered this way, the cruel irony and wrong-headedness of our detractors' logic becomes rather stark… "women" in need of chivalric protection are to be gently persuaded not to attend the final club parties, those who do attend have only themselves to blame when/if they are assaulted, and the police are to be enlisted when those holding the parties step over the line of legality. It seems so simple until you peel back the layers of historical violence and exclusion in which these appeals to legality and sexual propriety are based.

Finally, and this is perhaps the most important take-away for the purposes of our committee: the binaristic critique of "single-gender" organizations at the heart of "USGSO" is outmoded and inaccurate for our contemporary circumstances. We need a policy that draws from our students' more nuanced and intersectional critiques of inequality, where "gender" is not lived separately from other vectors of identity – like class, race, ethnicity, religion, sexuality, etc – and where simply adding a few women to the formerly men-only clubs will neither civilize those groups' "baser instincts" nor generate the kinds of social transformations we seek.

I'm sorry for such a long tirade and applaud/thank you both for all the energy and time you've poured into this effort. Please let me know if I can help in the crafting of new recommendations, or if it would help to discuss/explain/document in more detail what I've described above.

Gratefully yours,
Caroline

# EXHIBIT 24

**Final Report of the Committee**
**on Unrecognized Single-Gender Social Organizations (USGSOs)**
**September 29, 2017**

## 1. Introduction

We begin our final report by asserting what our committee has heard repeatedly throughout our deliberations and from multiple sources: **The College must take action to address the detrimental impact of the unrecognized single-gender social organizations (USGSOs).**[1] In recognizing this consensus, we do not wish to elide significant differences of opinion about which approach the College should take, but rather to underline that, in spite of disagreeing on approach, the consistent message has been that it is imperative for the College to take action.

Since the *Preliminary Report of the Committee on Unrecognized Single-Gender Social Organizations (USGSOs)* was issued in July 2017, the committee has sought feedback through multiple channels. We established a dedicated e-mail account and wiki page where faculty could engage with the committee and each other about the *Preliminary Report*. E-mails and letters also came from students and alumni. We are grateful to all who took the time to share their thoughts.[2]

The committee held drop-in sessions for faculty consultation during the week of September 11, 2017. The drop-in sessions generated substantive conversations, with almost all faculty members staying for at least 45 minutes and some for more than an hour to engage in frank and open discussion with members of the committee. Representatives of the committee also visited the Faculty Council, Administrative Board, Education Policy Committee, a meeting of the Faculty Deans of the undergraduate House system, and select members of the Committee on Student Life and the Presidential Task Force on Inclusion and Belonging.[3] Any faculty members who were not able to attend these sessions were encouraged to share feedback with the committee through other means.

The opinions of faculty, students, and alumni ranged from full support for the preliminary recommendations to preference for the May 2016 policy to strong disagreement with both approaches. Several offered suggestions for alternatives. Feedback was anonymized and shared with the full membership of the committee.

---

[1] This statement reaffirms the following statement from the *Preliminary Report*: "It is important to note that no one has suggested doing nothing" (p. 8). The USGSOs include male and female final clubs, fraternities, and sororities. They are listed in Appendix 2 (p. 17) of the *Preliminary Report*.

[2] Some feedback pointed the Committee to pertinent articles and even a senior thesis related to Harvard's USGSOs.

[3] We met with select members of the Committee on Student Life and the Presidential Task Force on Inclusion and Belonging in specially arranged meetings outside of their regular schedule. The final draft of this report was delayed from its intended deadline in order to incorporate their feedback into our report.

1

ALL00000909

We want to acknowledge here that for some members of our community, especially those who have belonged to Harvard's historically male final clubs, the USGSOs have positive qualities. They noted that these organizations foster a sense of collective identity, engendering strong feelings of loyalty, camaraderie, and pride in being connected with centuries of tradition. Members shared how these organizations provide a space where they develop lifelong friendships. They expressed appreciation for the ritual, tradition, and status these clubs offer. Many praised the relaxed atmosphere of the final clubs, and the devoted alumni of the clubs, who support their members' social and career interests over a lifetime. Others noted that, in a setting where real estate and space is scarce, the control of prominent physical spaces is experienced as empowering: clubs are well-appointed, and several offer meals and events for their members. People also shared how belonging to such organizations creates social capital, connecting them to opportunities and alumni.

As one graduate and fraternity member put it (echoing sentiments in the correspondence that the Committee received from many alumni of the male and female final clubs, fraternities, and sororities): "[my fraternity] provided me with some of my best friends and greatest memories at Harvard. It made me a better person. [My fraternity]—and other Greek organizations on campus—have had an immeasurable, positive impact on the lives of Harvard women and men, through philanthropy, the creation of social space (which Harvard lacks), and positive interaction between genders." A member of a female final club wrote: "Residential life is important, but it can't be the only social outlet at Harvard for everyone. My final club helps me to escape the seemingly crushing stress, pressure, and perfectionism that pervades every space at Harvard and provides me a space where I can feel relaxed, myself, and part of a supportive community."

Ideally, the committee would like the College to be able to extract the best experiences of the USGSOs and make them available to all future Harvard students. The vision for Harvard College's student social experience should become one where everyone on campus has the opportunity to form cherished friendships anywhere that Harvard students tend to go and have their best memories anywhere their peers socialize, without experiencing a grueling and lengthy punch process as part of friendship formation, and without creating fractured and segregated social opportunities that only cater to a few.

***

Members of the university hold different reasons for their desire to address the challenges posed by the USGSOs. Understandably, the proposed solutions vary depending on one's starting point, frame of reference, principles, and philosophies. Indeed, our *Preliminary Report* sought to capture this diversity of opinion that existed within the committee itself. In addition to the recommendation regarding the USGSOs, the report contained a section called "Other Points of View" (pp. 8–10), as well as a dissenting opinion that was included verbatim with permission of its author (Appendix 4). **In order to reflect this diversity of opinion, together with the collective wisdom gained from our deep analysis of the issues involved, this *Final Report* does not present a single recommended course of action regarding the USGSOs. Instead, we present three main options that have emerged through our deliberations and engagement with the**

2

ALL00000910

**Harvard community.** Additionally, we reaffirm our recommendation regarding the recognized Independent Student Organizations (ISOs) as put forward in the *Preliminary Report* (pp. 10–11). Because the ISO recommendation has been overshadowed by the interest in the USGSOs, we present it in more detail in this report (pp. 9–10), especially as it helps to frame the committee's understanding of the uniquely problematic aspects of the USGSOs.


## 2. Methodology

In producing our final report, we were motivated to find common ground. Our community shares the goal of providing an environment that will continue to draw the best faculty and students from around the world together in our classrooms, sections, labs, and Houses. At the same time, as a committee, we did not reach consensus about the path forward. Therefore, we decided that, rather than present a single recommendation, we would present what we discovered during our deliberations and through the extensive feedback we received from the community.

We therefore drafted this final report by characterizing the possible courses of action. Then, each committee member was invited to contribute directly to the document by adding or editing the bullet points which illuminate the ramifications of each path forward, as well as contributing to other parts of the document. The final report collates these responses, edited for clarity and circulated back to the full committee membership for approval. Our aim is to present a nuanced picture of the issues involved in order to spark a response by the university community that best addresses the substantive concerns posed by USGSOs.


## 3. Framework & Feedback:
## The Committee's Deliberations and Reactions to the *Preliminary Report*

As we stated in our *Preliminary Report* (p. 1), our work throughout this process has been guided and animated by Harvard College's commitment to non-discrimination, inclusion, and a healthy social climate. Some members of the Harvard community have suggested that the arguments for addressing the USGSOs have shifted over time. They have pointed to reports produced by other committees that have presented student conduct as a primary reason for action. This sense of shifting sands is understandable, given the over three decades of concerns that have arisen around such organizations.[4] While our committee

---

[4] The College first decided to withdraw recognition of the final clubs in 1984 owing to their refusal to adhere to the College's non-discrimination policies. Subsequent relevant reports include: the Report on the Final Clubs (1997); the Report of the Committee on Social Clubs (2007); the 2008–2009 Academic Year Report by the Hazing Outreach Coordinator; the reaction by the Standing Committee on Schools, the College, and Continuing Education to a Report on the College (2011); Memo to the Fellows of the

3

ALL00000911

has acknowledged the long-standing and persistent concerns regarding student conduct (see *Preliminary Report*, p. 2 fn. 6 and especially p. 12), we maintain that issues pertaining to the conduct of Harvard students, as identified in previous reports, need to be addressed comprehensively no matter where they take place.

Whatever concerns we may have about student conduct, this committee's focus was determined by our original charge: "to consider whether there are other means of achieving [FAS's] stated goals [for the College], including and especially that of fully advancing the non-discrimination objectives reflected in the current [May 2016] policy."[5] Discriminatory practices must also be understood in connection with practices of inclusion and exclusion. When this report refers to exclusion and inclusion we do so not in the colloquial sense, but in direct relation to the Faculty of Arts and Sciences affirmation in February 2016 that non-discrimination is essential to the College's pedagogical objectives. As Harvard's student body has become increasingly diverse, it is even more imperative for the College to ensure that it provides an inclusive intellectual and social environment for all its students. One student article described it as follows:

> My case is that final clubs are bad because they *don't do good* – because they exist in this community and yet never give back to it; because they have resources and yet work only for themselves; because they don't try to make this school (or this world) a better place.
>
> In other words, final clubs don't break the *rules* of our community; they violate its *spirit*. To quote from the student handbook: "By accepting membership in the University, an individual joins a community ideally characterized by free expression, free inquiry, intellectual honesty, respect for the dignity of others, and openness to constructive change." Final clubs disgrace the premise of Harvard community. They reject our togetherness: their resources are spent helping themselves or aggressively excluding others. And they reject some of our most basic shared values as an educational institution – values like openness, merit, diversity and public-spiritedness.[6]

Despite acknowledging the problems that occur, especially in the male final clubs, many critics of the committee's recommendation in the *Preliminary Report* or the May 2016 policy still believe in the unfettered freedom of association of both the students who are club members and those who attend their parties. Critics have also argued that the clubs are "off campus" and therefore Harvard should not seek to interfere with students' private activities or what they wish to do in their spare time. The premise that these groups are "off campus" misrepresents the problem. The effect of the final clubs is not confined to the spaces in which they hold parties or the properties they own. They impact the broader student body and undermine the College's educational philosophy.

---

Corporation by the Dean of Student Life (2012); Final Report on the Task Force on the Prevention of Sexual Assault (2016).

[5] The charge to the committee can be found in Appendix 1 of the *Preliminary Report*.

[6] Max Novendstern, "Not Victims: Another Case Against the Clubs," *Harvard Political Review* (May 3, 2010).

4

ALL00000912

The clubs, while comprising only a minority of the student body,[7] reinforce hierarchies and power structures between male and female students and amongst male students beginning with the punch process and sustained in their social events. Students note that these hierarchies inflect how they relate to each other as interlocutors in class and in sections. The clubs exert an outsized and chilling effect on students' sense of belonging, constantly reminding students of their exclusion from the most prized sites of social capital.[8] This exclusionary impact permeates campus. Indeed, the clubs' proximity to campus (most are closer to the Yard than any of the undergraduate Houses save Adams) means students pass these buildings as they go from class to class or their dorm to class and back again. Day in day out, they walk past buildings that have become symbols of exclusion, where it is widely known that women are being evaluated by their peers based primarily on physical attributes, an assessment which is both hidden behind closed doors and made explicit when women are invited to parties.

Feedback from students, faculty, alumni, and parents suggest a widespread awareness of this culture of peer assessment and objectification. Multiple faculty members who were critical of the committee's initial recommendation conceded that the clubs are "toxic," particularly for female students. Some faculty shared their own efforts to persuade female students not to attend final club parties or to attend only with trusted friends. But as well-intentioned as these efforts may be, they are couched in what the committee sees as an inside-out effort to shape the behavior of those targeted by gender inequity and other harms, rather than those responsible. The committee and many critics alike acknowledge that the final clubs are not the only sites of sexual danger for undergraduate women. Our proposals are based not on where specific individual harms

---

[7] Estimates vary but the College estimates ca. 1600 students are involved in USGSOs generally, of which approximately 700 are members of fraternities and sororities. The clubs don't publicize their membership names and numbers.

[8] Students have written numerous articles pointing out these problems. For one characteristic example see Daniel E. Herz-Roiphe, "Long Overdue: a club member argues that the system is simply incompatible with what final club members should—and in fact mostly do—believe about gender and justice," *The Harvard Crimson* (April 15, 2010):

> Telling women (or men) who are sick of segregation to just go somwhere [sic] else doesn't cut it because there really isn't anywhere else at Harvard quite like the final clubs. With House life under close administrative scrutiny and most of the student body under the legal drinking age, final clubs are in a position of unique power.
>
> Therefore, as long as final club injustices exist, they can't simply be written off as irrelevant to the larger Harvard social community.
>
> And injustices abound. At the most basic level, all-male final clubs distribute resources in strange and unfair ways. Membership comes with perks—mansions, dinners, alumni networks—none of which go to women. It is dubious to give men privileged access to all of these important benefits, and because of the dynamics of social space at Harvard, this inequity spawns many others.
>
> All-male final clubs carve out a corner of the social world that revolves around the preferences of men, and men alone. Men plan the parties. Men decide who gets in and who does not. Women are left to suffer the consequences.

ALL00000913

occur, but on the premise that we must address head on a campus culture where discrimination based on gender spreads into other areas of Harvard due to the final clubs scripting campus social life.

Multiple students also addressed the culture of peer assessment and objectification that is perpetuated by these clubs. The *Preliminary Report* (Appendix 3) included a letter from a graduating senior who was a member of a final club explaining the toxic effect such peer assessment and objectification has. Further feedback from other students in response to the *Preliminary Report* echoed the sentiments expressed in his letter. For example, one male student who experienced the punch process wrote:

> I have constantly heard libertarian arguments about liberty and freedom of association. It is entirely ironic because I would argue students are not free to associate with these clubs. I cannot associate with the [club] and simply show up to use their space. I have to go through a grilling process that deems me worthy of being accepted into an exceptionally exclusive space that surely looks at the color of my skin, my chances of having good "bro talk" over a Super Bowl watch party, or my sexuality and whether I can give another member tips on how to make someone's love life more fun.

Female students of color reported stories of insults and epithets said to them as they were denied entry to a club. One male student, affected by this treatment of his female friends, wrote "these examples hurt to even type out." In response to the objection that the *Preliminary Report*'s proposal to ban these groups is a breach of students' rights, one male student of color wrote that everyone should ask, "is the right to exclude based on class, gender or race one of these 'supposed' rights?" As cited in the *Preliminary Report* (p. 2), a faculty member once remarked, "the final clubs are where Harvard students learn to discriminate." As our student body becomes increasingly diverse, it is more imperative than ever that questions of rights must be asked from multiple vantage points.

Other critics of the preliminary report argued that selective membership is a common phenomenon at Harvard and runs the gamut of classes and extracurricular activities. Students, they argue, need to learn to cope with rejection as a fact of life. Such a position, however, focuses not on the perpetrators of discrimination but its victims. Coping with rejection is, of course, an important life skill—but with respect to the USGSOs, this committee has always focused on the behavior of those doing the rejecting and on their selection processes, which, as exemplified by the letter in Appendix 3 of the *Preliminary Report* and illustrated in plentiful other accounts from recent and current students, is inimical to a healthy campus atmosphere. While the larger issue of selective membership on campus is worth further discussion, our committee's charge was to address those groups whose members and leadership are committed to practicing discrimination against their fellow students on such bases as gender, race, and class. Such practices are in contravention to our mission and at direct cross-purposes to our obligation to foster an educational environment where, regardless of one's intrinsic identity, students can flourish academically, socially, and personally in our classrooms, our Houses, and on our campus.

To be sure, there are lots of counterexamples: a number of faculty who are also alumni told the committee that the final clubs had very little influence when they were students in the College, and they therefore perceive the committee's recommendation in

6

ALL00000914

the *Preliminary Report* to be a disproportionate response to what they take to be a fairly small problem. Many alumni described the clubs as tranquil spaces that allowed them to escape from the pressures of College. Some alumni who had never been members noted that the clubs seemed to them innocuous to non-members; they said they were even unaware of which buildings the clubs inhabited. These descriptions by alumni members and non-members are a far cry from the present-day nature of the clubs and the dominant role they play in the life of the Harvard community. While we took all feedback seriously, we did note that alumni experiences of the effects of the final clubs varies by the decade in which they attended the College.

That conclusion is confirmed by the alarmed feedback we received from alumni whose children are currently students at Harvard. They report that their children are now experiencing the effects of Harvard's final clubs that are very different from what they themselves experienced. Based on all of these accounts, we have observed that different generational experiences of the role of the final clubs correspond to several monumental shifts in social life on campus: for example, the rise in the legal drinking age from 18 to 21, the randomization of the Houses, and the increased diversity of the student body. We wish to emphasize that, while our *Preliminary Report* described many of the various problems faced—and solutions sought—in previous decades with respect to the final clubs, we are trying to address the problems that have grown in today's campus community and we seek to create conditions for Harvard's current and future students to flourish.

We have also been asked why this committee did not focus solely on the final clubs instead of focusing on all USGSOs. We were also asked why other single-gender organizations, such as the Black Men's Forum and the Asian American Women's Association were not also under the purview of the preliminary recommendation.[9] The answer to the latter question is straightforward: the purpose of affinity groups such as the BMF and AASA is to lift up a group, not to form a power hierarchy of inclusion versus exclusion, as currently practiced by the final clubs and to some extent the other USGSOs. As explained in the *Preliminary Report*—and addressed more explicitly below—there is also a critical difference between the expectations and requirements for non-discriminatory practices and inclusivity of the Recognized Independent Student Organizations (ISO) to which the Black Men's Forum and Asian American Women's Association belong—as well as the over 400 other ISOs on campus—compared with the practices of gender segregation and selective-membership of the USGSOs. Judging from the feedback, many faculty seem to be unaware of these facts; we will therefore address requirements of the ISOs in greater detail below (see section "Reaffirmation of the Recommendation regarding the ISOs," pp. 9–10).

Additionally, there is a difference between the governance structures of the USGSOs and the ISOs. The USGSOs have a governance structure of graduate boards or national chapters. This means that current undergraduate members are not entirely free to make their own choices about membership and organizational practices. In one much publicized case, the current student members of the Fox voted to go co-ed and even admitted women provisionally, but the decision was reported to have been overturned by

---

[9] These two groups are mentioned in this report because they were mentioned repeatedly by individuals providing feedback.

ALL00000915

their graduate board. Likewise, it is reported that in 1993 the undergraduate membership of the Fly voted unanimously to go co-ed only for the decision also to be reversed later.[10] Similarly, the fraternity Alpha Epsilon Pi reports that, when they asked their national chapter if they could become gender inclusive, their request was refused and therefore they disaffiliated from their national chapter. These examples illustrate the importance of the College's ISO regulations on student autonomy in student groups. In ISOs, students are free to make their own decisions, while the Office of Student Life and faculty advisors provide guidance without governance. Local autonomy leads to more organic changes to student organizations, many of which have also existed for a long time with cherished traditions. Traditions survive when they evolve to remain relevant.

Some of the feedback the committee received made the case that the formation of women's clubs can counter the influence of the all-male clubs. We believe that this "separate but equal" approach is problematic. Many of the male clubs have buildings, endowments, and alumni networks that have been accumulated over centuries. The property that these clubs control does not come onto the market. But even independent of those issues, these clubs institutionalize problematic gender and class dynamics. Such dynamics will not be ameliorated by adding more discriminatory groups in which students do not engage with each other as equals. They, too, run counter to the College's educational and residential philosophy.[11]

Finally, the fraternities and sororities are a relatively recent phenomenon at Harvard. Harvard never chose to become a Greek school; rather, chapters have been established in spite of the fact that Harvard has not and does not recognize Greek life. The College surely ought to be an active participant in the decision of whether or not it wishes to become a Greek school. Such a decision should be made explicitly and carefully, rather than made for us by outside influences and parties that do not share our interests and educational philosophy. If, as a community, we examine the issue and determine that Greek life or Greek-like organizations would be a positive addition to the Harvard undergraduate experience, we must, in support of our students and our educational mission, provide the necessary institutional infrastructure to support them.

This fall, we welcomed the most diverse class in Harvard College's history, and a record-high 84% yield on accepted students. For Harvard fully to reap the rewards of this diversity, attention to inclusion is critical. We must take steps to ensure that all undergraduates can thrive in a healthy environment. Students today are very savvy about the choices they make in selecting their college. Research on work in educational spaces increasingly shows that "diversity" and "inclusion" are not the same thing. While diversity is representation and is easily quantifiable, inclusion, which is behavioral and

---

[10] Daniel E. Herz-Roiphe, "Long Overdue: a club member argues that the system is simply incompatible with what final club members should—and in fact mostly do—believe about gender and justice," *The Harvard Crimson* (April 15, 2010).

[11] Moreover, as a current female student wrote in her feedback: "reappropriation of the term 'safe space' to apply to sororities and female final clubs is cynical in the extreme. These are not what safe spaces look like for me, for my lesbian friends, for my trans friends, for my poor friends, for my friends of color. They are not even safe spaces for the white women inside them. Physically, emotionally, psychologically, politically these spaces put us at risk."

ALL00000916

cultural, is key to unlocking each student's innovative potential.[12] What steps are we going to take to ensure that all undergraduates on campus feel equally at home, where they can all learn in a healthy environment?

### 4. Reaffirmation of the Recommendation regarding the Recognized Independent Student Organizations (ISOs)

The College currently has over 400 "Recognized Independent Student Organizations" (ISOs). In exchange for certain privileges, the College requires the ISOs meet certain criteria, which include the following:[13]

- ➢ Compliance with all applicable Harvard policies.
- ➢ Local autonomy (all policy decisions must be made without obligation to any parent organization, national chapter, or charter).
- ➢ At least ten undergraduate members.
- ➢ All officers and a majority of the members must be enrolled undergraduates of Harvard College.
- ➢ Adherence to the University's non-discrimination policy.
- ➢ Demonstrated benefit to the members, campus, and/or wider community.

Additionally, the constitutions of all Independent Student Organizations are required to include the following two provisions, word-for-word:

- ➢ Article III, Item 1: Membership in this organization shall be open to all students in good standing currently enrolled in Harvard College, regardless of race, creed, color, sex, gender identity, sexual orientation, or physical disability.
- ➢ Article IV, Item 2: All officers shall be registered undergraduates at Harvard College.

As indicated in the *Preliminary Report*, the Committee "found it impossible not to draw comparison between the practices of the USGSOs and ISOs" (p. 10). To be sure, the committee recognizes that the USGSOs claim they are independent of Harvard and cannot be required by Harvard to follow any particular set of guidelines. However, the College comprises one student body and there is a vast gulf between the expectations of students belonging to ISOs and USGSOs.

Students who lead and belong to ISOs may not discriminate against their fellow students and these organizations must be open to all students; meanwhile, students in USGSOs regularly discriminate against their fellow students. This difference creates a schism between expectations of student behavior within the same undergraduate community.

Moreover, ISOs that fail to meet the standards outlined in the *Harvard College Handbook for Students* may have their status revoked. As stated in the *Handbook* under

---

[12] See *Draft Report of the Harvard Presidential Task Force on Inclusion and Belonging* (Discussion Draft: September 19, 2017) and Laura Sherbin and Ripa Rashid, "Diversity Doesn't Stick Without Inclusion," *Harvard Business Review* (February 1, 2017).

[13] The privileges and full list of criteria may be found on https://handbook.fas.harvard.edu/book/regulations-independent-student-organizations.

ALL00000917

the section *Regulations for Independent Student Organizations*, "ISOs also are expected to abide by the regulations of the Office of Student Life available online at the OSL website. The College expects ISOs to comply with all applicable regulations. If the Committee on Student Life determines that an ISO has failed to do so, it may revoke the ISO's charter." While, students of ISOs that fail to meet these requirements may see their organizations placed on probation and lose all privileges given to recognized ISOs, there are no ramifications for similarly situated students in USGSOs.

While many of the ISOs are skill-based and therefore involve selection processes (referred to as the "comp" process for showing "competency"), the committee heard concerns of the ISOs adopting some of the negative selection practices of the USGSOs, especially when the leadership overlaps. This further illustrates the impact of USGSOs on our campus. The committee reasserts its belief that all members of our campus community must abide by the same high standards as outlined in the *Harvard College Handbook for Students*. The recommendation in the *Preliminary Report* regarding the ISOs (pp. 10–11) is therefore reasserted here. *The committee recommends that Dean Michael Smith charge the College to look into the ISOs to ensure that they continue to follow best practices and demonstrate their robust compliance with the College's shared values as outlined in the Handbook.*

If going forward the ISOs are to serve as the model for how student organizations on campus should operate, now is the moment to review the regulations in order to ensure they are transparent and consistent and are practiced by all ISOs. The purpose behind this recommendation is to effect change and shape campus culture by encouraging and supporting model ISOs. The current policy, which governs ISOs and upholds our community's dedication to non-discrimination, is one that we should ensure our students adhere to. We expect their behavior to reflect the paramount importance of a campus climate free from discriminatory practices based on identity.

### 5. Outcome of the Committee's Deliberations regarding the USGSOs

The committee immersed itself in the work of understanding the USGSOs and their relationship with the College and its non-discrimination principles. The problem of gender-, race- and class-based discriminatory practices in the USGSOs is widely acknowledged. The USGSOs are not in line with the broader educational mission of the College, nor do they represent the civic capacities, practices, and values that we want to advance when students graduate and represent Harvard in the world. **We assert here once again that there is widespread agreement that the current practices of most, or many, of the USGSOs are broadly damaging the social life of the campus and putting the health and well-being of Harvard students at risk. Taking no action is untenable.** The point of contention, in the community and within the committee, remains how exactly we should solve this problem.

Rather than collapsing the complexity of our deliberations, we instead wish to present to the Faculty of Arts and Sciences the broadest possible spectrum of responses to the areas of overlapping concern that the USGSOs engender in many members of our community. We therefore present 3 options, which are spelled out in detail on pp. 12–17.

ALL00000918

Options 1 and 2 are designed to bring about a fast pace of change, while Option 3 allows for a slower pace. Option 1 phases out the USGSOs by 2022. However, since the possibility of becoming an ISO has always been available to these kinds of organizations, they may apply to become an ISO by conforming to the ISO regulations. The purpose of Option 2 (May 2016 policy) is to incentivize the USGSOs to become gender inclusive. It reserves certain privileges—serving as a team captain, holding leadership positions in an ISO, and receiving endorsement for certain fellowships from the Dean—for students who uphold our standards of non-discrimination.

Despite agreeing on the problems of the USGSOs, many faculty—including some members of the committee—expressed their objection to Options 1 and 2. Option 3 gather together their suggestion for other avenues to take. It contains various interventions to address illegal activity within the USGSO spaces. However, it avoids interventions that would force students who belong to USGSOs to meet the same standards as students who belong to ISOs. Instead it emphasizes suasion as a method to achieve such change. If the university community agrees that neither Option 1 or Option 2 is appropriate for the task of eliminating the discriminatory practices and outsized influence of USGSOs, then a formal policy would need to be carefully built from one of the starting points listed in Option 3.

As our report was being finalized, we met with the Committee on Student Life (CSL) outside of their regular meeting schedule. Several of the members present, all of whom were students, directly spoke to their perspective on the pace of change. First, one CSL member felt that much of the discussion of USGSOs and the criticism that has arisen around the recommendation of the *Preliminary Report* and the May 2016 policy (Options 1 and 2 respectively) has been carried out by a small group of vocal individuals, but that most students in the campus community feel there must be reform of the USGSOs (though debate exists on the best way to bring it about). CSL members reported that USGSOs that have already taken steps to comply with the May 2016 policy (Option 2) were distressed by the recommendation of the *Preliminary Report* (Option 1). This distress is owing to their perception that the existing policy (Option 2) is already prompting positive change.

Another student raised their concern that discussion of the next steps—should change happen—might presume that the College would itself be obligated to create the social scene for students if USGSOs are substantially diminished. Instead, CSL members expressed a strong opinion that the creation of social life should rest on student engagement. There were also several related concerns raised by CSL members currently active in their respective House Committees (HoCos). HoCos are run by students and plan social programming that fosters a sense of community in each House. These students worry about the bandwidth required of HoCos, as currently constituted, if they are to provide all or most of Harvard's social events in the future. In addition, they spoke to concerns about space limitations and approaches to party regulations, which vary House by House. In fact, almost all of our feedback meetings raised the issue of Harvard's chronic lack of space for student social events. The students also mentioned that if the HoCo mission were to expand significantly, funding would need to increase commensurately—otherwise students with financial resources would find social outlets unavailable to many of their peers. This would continue to fragment the social life of our community.

11

ALL00000919

Each of these considerations should be thoughtfully considered as our community charts its response to the USGSOs, and the committee is grateful to the CSL for raising them. Students are eager for change and there is widespread recognition of the need for reform.[14] The question is how do we bring it about and how quickly do we do so.

**Option 1. Phase out the USGSOs by 2022 and/or transition USGSOs to comply with current independent student organization (ISO) policies and expectations.** *"Harvard students may neither join nor participate in final clubs, fraternities or sororities that are exclusively or predominantly made up of Harvard students, whether they have any local or national affiliation, during their time in the College."[15]*

➤ This policy deals with all USGSOs uniformly. See Appendix 2 of the *Preliminary Report* for full list of USGSOs to which this policy would apply.

➤ This policy is not designed anew, but is one with similarities to policies at Williams and Bowdoin Colleges that we studied.

➤ This policy addresses both the exclusivity and discriminatory practices of the unrecognized social organizations.

➤ This policy inserts the value of freedom from discrimination into the equation and achieves a necessary balance with freedom of association. We considered the importance of allowing our students to select their own social spaces and friends. Invoking what some have called "free association" as if it were an absolute value often disproportionately favors groups with historical access to power and privilege over equity. Here at Harvard College, all principles must be balanced with other principles, such as inclusiveness and equality. In striving to balance freedom of association and non-discrimination within the Harvard community, we in fact build on norms and standards that are already long-established in American society.

➤ This policy removes the negative effect of historically contingent accumulation of resources and social capital not available to women and minorities until recently.

➤ This policy prevents the proliferation of final clubs, fraternities, and sororities and eliminates their influence on campus culture (in and out of the classroom).

---

[14] Just as the ink was drying on this final report, the *Crimson* published an op-ed on its view of the the *Preliminary Report*, "A Stand Against Exclusivity," *The Harvard Crimson* (September 27, 2017): "[the recommendation in the *Preliminary Report*] importantly expands the discourse beyond issues of gender inequality and sexual assault to the role exclusionary social organizations play in perpetuating outdated notions of elitism, classism, and exclusivity on campus. The report rightfully highlights how these organizations impact students' sense of belonging at Harvard, especially those who come from lower socioeconomic backgrounds. Given the serious influence of final clubs on the daily social life of Harvard undergraduates, we see this recommendation as necessary."

[15] As noted in the *Preliminary Report* (p. 7), the wording of this policy is offered as guide. The Committee recognizes that its wording may need fine-tuning. Appendix 2 was provided in the *Preliminary Report* to make clear which USGSOs were being referred to; see also the gloss to the draft of the proposed policy on *Preliminary Report*, p. 7.

ALL00000920

➢ This policy shifts the focus of student social life from USGSOs to the Houses and other College-supervised spaces, while placing more responsibility on the College to explore ways to expand opportunities for student social life elsewhere on campus.

➢ In dealing with all USGSOs uniformly, we are aware that some faculty have argued that this policy is a blunt instrument that impacts female groups disproportionately. This policy would apply to all groups listed in Appendix 2 of the *Preliminary Report,* as well as groups that have recently gone gender inclusive. The logic behind treating all groups listed in Appendix 2 of the *Preliminary Report* the same is that it rejects the notion that we can apply a policy based on institutional preferences for some USGSOs over others. The College did not choose to have fraternity and sororities, and final clubs have long been unrecognized.

➢ This policy would phase out all USGSOs in their current form by 2022. It also aims to establish social life on a solid and equitable foundation moving forward.

➢ This policy leaves open the possibility that USGSOs may transition to ISOs, as first indicated in Dean Khurana's May 2016 Letter to President Faust, item 4, page 2 and outlined in detail in *Final Report of the Implementation Committee for the Policy on Membership in Single-Gender Social Organizations*, pp. 14–17. (For more on this in this report, see below, pp. 17–18).

➢ This policy addresses concerns expressed by some that the May 2016 policy may not be strong enough to ensure mitigation of the toxic social environment. Some have viewed Option 1 as a logical next step to Option 2 (see below), which in serving as a modest catalyst for change amongst USGSOs to become co-ed, encouraged the kinds of internal student debates that have led to positive change.

➢ This policy applies only to future students, who have yet to apply to Harvard College, and who would choose to attend this school understanding the policy.

➢ Critics argue on the grounds of freedom of association that it is not Harvard's business to interfere with students' social life or what they choose to do in their spare time. By contrast, others believe students have plenty of opportunity and freedom to conduct their own affairs as they wish, but not when it has a detrimental effect on the rest of the student body. In addition, the goal of the House system, dating back to the 1930s, has been to create a transformational living-learning environment. There are other models available today at other institutions, but Harvard's distinctive vision for almost one hundred years has been marked by the centrality of its residential system and the importance of community in shaping the undergraduate educational experience. This distinctive vision of residential life and the opportunities it provides for learning is not new, and indeed is precisely what our students sign up for when they matriculate. USGSOs compromise this vision. Eliminating their influence would align with Harvard's pedagogical and residential priorities.

**Option 2) May 2016 Policy on Unrecognized Single-Gender Social Organizations.**
*"Students who are members of unrecognized single-gender social organizations will not be eligible to hold leadership positions in recognized student organizations or athletic*

ALL00000921

*teams nor will they be eligible to receive the Dean's endorsement letters for those fellowships that require such endorsements."[16]*

> ➢ This policy attempts to balance freedom of association with freedom from discrimination.
> ➢ This policy has the explicit goal of ending the gender segregation and gender discrimination of USGSOs.
> ➢ This policy encourages USGSOs to become gender inclusive. As of September 2017, some USGSOs have already gone co-ed in order to come into good-faith compliance with this policy (where relevant, we shall refer to such groups that have started the process of going co-ed as "USOs," for "unrecognized social organizations"). Some USOs report having used the May 2016 policy as inspiration to reflect on their organization's values, and they report having outlined principles for the future that follow modern practices of social responsibility and reflect more closely the University's policies. The committee hopes that this policy would in fact serve as a stepping-stone for USOs to move voluntarily towards both the inclusive and non-discriminatory practices that align more closely with the requirements of the ISOs and University policy.
> ➢ In order to become co-ed, fraternities and sororities are likely to have to disassociate themselves from national chapters, which is a positive step towards USOs gaining local autonomy. In these cases, they would no longer be subject to external governance, which interferes in the pedagogical relationship between Harvard College and its student body. In this way, some USOs would come closer to meeting the requirements for all ISOs. It should be noted that fraternities and sororities were founded in our community despite repeated attempts to ask these organizations to not "colonize" Harvard.
> ➢ This policy allows USGSOs to continue to exist as single-gender organizations, while asking members to consider their priorities with respect to belonging to USGSOs or seeking leadership roles in their Harvard community or endorsement from the Dean for certain fellowships.
> ➢ This policy applies only to students in the Class of 2021 and beyond, who applied to Harvard College and chose to attend after this policy was instituted.
> ➢ This policy does not address the issue of exclusivity/inclusivity.
> ➢ This policy does not deal with issues relating to student conduct, such as sexual assault, hazing, and underage drinking. Any incidents that occur with alleged links to the USGSOs or USOs will continue to be dealt with through the Ad Board, as relevant. Separate efforts must be made by Harvard to address issues of conduct in USGSOs and USOs, as part of efforts to address these across the College. However, despite longstanding concern about student behavior associated with the USGSOs, it must be noted that the College has had limited success in holding students accountable for their behavior. Given the social pressures involved, students have shown themselves to be very reluctant to provide details that would identify specific clubs or individuals who have harmed

---

[16] For the full context of this policy, see the *Final Report of the Implementation Committee for the Policy on Membership in Single Gender Social Organizations* (February 17, 2017).

14

ALL00000922

them or created unsafe situations. This difficulty can be expected to persist as long as the USGSOs and USOs operate on privately-owned property and refuse oversight by the College.

➢ Objections to this policy are similar to those given for Option 1.

**Option 3) This option outlines some other possible solutions to the problems of the USGSOs. These suggestions were made by faculty and some members of the Committee who oppose the measures proposed in Options 1 and 2. This option is therefore a collection of thoughts; it is not intended to form a cohesive whole or outline a specific policy.**

➢ Both male and female students report finding a sense of community in the USGSOs. Some faculty argue that they do not see the fact that the organizations are single-gender as the problem, and they are skeptical that making sororities and female social organizations (sometimes referred to as the female final clubs) go co-ed is a rational response to the larger problem of Harvard's role in American patriarchy. They argue that the sororities should be protected so that women can have "safe spaces" to de-stress off campus and can have opportunities to network in a manner similar to the opportunities available to the male clubs.[17] On the specific issue of selectivity on the basis of gender, many female students express the value of women-only spaces. Some of those who oppose Options 1 & 2 call on the College to respect this preference, and for consistency, they argue that the College should not reject the existence of male-only spaces while allowing female-only spaces to exist.

➢ Some have asked whether Harvard College has exhausted all avenues of addressing the long-standing problems with the USGSOs.

➢ Opponents of Options 1 and 2 argue that suasion is always better than sanctions. As one member of the committee put it: "If members of the faculty or student body disagree with students' choices then they should attempt to change the students' hearts and minds by reasoned argument. Changes of behavior from changes of mind are in the long run more effective than coerced changes of behavior." Therefore, proponents of this view suggest increasing the training offered to leaders and members of the USGSOs to educate and engage them on inclusive and non-discriminatory practices and effect a change in campus culture through suasion.

▪ ***Background information:*** For over a decade, Harvard has worked with the USGSOs to bring them more in line with the College's mission. Until very recently, representatives from the College would meet once a semester with the student leaders of each of the USGSOs—final clubs, female social organizations, fraternities, and sororities. These voluntary meetings involved numerous representatives from the College, including the Dean of the College, Dean of Students, Equity, Diversity, and Inclusion, Associate Dean of Students, and representatives from the Harvard

---

[17] See also footnote 11.

ALL00000923

University Police Department (HUPD), Office of Sexual Assault Prevention & Response (OSAPR) and Office of Alcohol & Other Drugs Services (AODS). Meetings were also held with the alumni/graduate boards of the USGSOs. Further, many USGSOs invited AODS and OSAPR to meet with their full undergraduate memberships. Yet while such efforts may have had an impact in mitigating some harmful behaviors, they have neither reduced the outsized role of these groups within the social life of the College, nor impacted the gender exclusivity of the USGSOs.

➢ If negative behavior persists, there should be a dedicated campaign by the College to inform students and their parents about the risks of joining USGSOs or attending their events, by documenting and sharing the data on the dangerous activities of the USGSOs, and naming them by name.

▪ ***Background information:*** The *Preliminary Report* (pp. 12–13) outlined steps that have been taken in the past to increase students' awareness of incidents in the USGSOs, including at one time the College issuing reports listing incidents involving individual clubs by name.

➢ Harvard College should create alternative social spaces on campus that draw students away from the clubs and towards more supervised spaces—but don't kill the fun with overregulation.

➢ In order to address the illegal (and harmful) behavior of the clubs, Harvard should bring in the Cambridge Police Department with the goal of holding the clubs accountable for any violations of the law owing to activities connected with them (e.g. noise disturbances, underage drinking, etc.). Many faculty expressed their worry about the impact such illegal behavior has on our community and on our students and believe that those responsible should be held to account. The following characterizes some of the obligations of the University with respect to student conduct, health, and safety and supplies relevant background information pertaining to this suggestion.

▪ ***Background information:*** Harvard has certain legal obligations to protect equity of access to educational opportunities. Even when some types of criminal behavior (e.g. sexual assault/harassment) happen off-campus, for example, Harvard cannot entirely off-load its obligations to the police. For example, in terms of gender-based harassment, Harvard must sometimes follow up with an investigation of student behavior or provide support (for example, Office for Dispute Resolution (ODR)/Title IX).

▪ This approach does not address the critical role emergency management teams, the Secretary of the Ad Board, and our Resident Deans and Faculty Deans play in responding to police actions which involve our students. This proposal would need to address explicitly whether and how we would continue to hold this same relationship with our students were we to endorse police enforcement of an issue arising from and intertwined with the history of Harvard College.

16

ALL00000924

- This approach would likely discourage students from seeking help when facing danger due to fear of arrest, etc. The College has an alcohol amnesty policy where students are not disciplined by the College for seeking help for fellow students regarding drinking. The amnesty policy was developed as a response to two near-fatal incidents involving alcohol approximately a decade ago. The committee was informed this is indeed a critical harm-reduction strategy that saves lives (though data on this point is confidential owing to the terms of the amnesty policy).

- Students of color expressed concern at the disproportionate impact such a move is likely to have on them.

- We do not believe this is a sound policy-response to the challenges these groups pose. First, members of the community—including the Harvard community—are always free to call the police department to report criminal behavior. This would continue to be the case whatever option the university adopts. The question of why such apparent illegal activity does not elicit a response from civic authorities is beyond the scope of this report. What we must address is the relationship between these groups and the Harvard community. (The same limits mentioned in Option 2 regarding the College's ability to sanction harmful student behavior also apply here.)

***

We also wish to draw attention to an alternative proposal we received after we issued our *Preliminary Report*. We held a special meeting on September 1, 2017 to consider the proposal that the College reverse its 1984 decision to "un-recognize" USGSOs and thereby declare them recognized.[18] From there, the College would require the USGSOs to follow the same rules as the current ISOs. The problem with this proposal is that the College is not at liberty to pronounce these organizations recognized and then compel them to comply with ISO or similar procedures. This is why the College has always had to rely on the USGSOs taking voluntary steps in response to any College policies. The full proposal is provided in Appendix A.

In response to this proposal, we note that pathways to recognition for these organizations have long existed. USGSOs and USOs have always been free to apply to become ISOs, with the proviso that they comply with the College's non-discrimination and autonomous governance requirements, as well as open membership regulations. The

---

[18] It is important to note the original action to withdraw recognition from the clubs extended only to the male final clubs as female social organizations (sometimes referred to as "female final clubs") did not exist at the time. The faculty took action against secret societies and fraternities well over a century earlier and has long held the view that third-party organizations should not interfere with the relationship between the College and its students.

17

ALL00000925

May 2016 policy explicitly leaves a similar pathway open for groups willing to commit to the College's non-discrimination policy:

> *The College will work with those currently unrecognized single-gender social organizations transitioning to gender inclusive and open membership to identify opportunities to engage and support their positive functions of providing more inclusive social events, student leadership experiences and professional mentoring opportunities for their members. In all these cases, support may include access to and use of certain Harvard facilities, among other possibilities to be determined by the advisory group. The College will also continue to create and invest in programs to support gender equity on campus through existing organizations and centers.*[19]

During the September 1, 2017 meeting, we also considered another proposal by a faculty member. The proposal was to develop a policy that "requires clubs consisting mainly of undergraduates to allow Harvard officials (or their deputies) to enter club premises at will and monitor possible illegal activities." It would be difficult to establish procedures to around pursuing this idea. Moreover, the committee felt it leaves the central problem of discrimination unaddressed.

---

[19] Dean Khurana's May 2016 Letter to President Faust, item 4, page 2.

18

**FINAL REPORT APPENDIX A**

**Potential Proposal for Substitute Motion on Student Organizations
January 2017; modified September 2017**

by Danielle Allen

Whereas the Faculty of Arts and Sciences, by virtue of the University statutes (Exhibit A), has authority to impose, at their discretion, all proper means of discipline;

Whereas Harvard University currently bears responsibility for much of what occurs in Final Clubs and sororities without concomitant and necessary authority;

Whereas the Final Clubs depend for their existence on resources supplied by Harvard University (namely, a membership base all of which is supported by Harvard's endowment; Harvard's brand; and Harvard's transportation, communications, and health services);

Whereas the State of Massachusetts and Harvard University have recognized that student organizations, whether they have been formally recognized by a College or University or not, are required to comply with State and University policies and standards for student organizations with regard to anti-hazing (General Laws, Part IV, Title 269, Sec 19);

Whereas since 1989, the State of Massachusetts and Harvard University have recognized Final clubs as student organizations under the authority of the Massachusetts State Statute against hazing (General Laws, Part IV, Title 269, Sec 19; Harvard Student Handbook, See Exhibits B and C) and have made them subject to the College's rules and regulations pertaining to this conduct;

Whereas student organizations that are subject to any of the FAS rules and standards for conduct should be subject uniformly to all of the FAS rules and standards for student organizations;


Be it resolved that:

The Faculty of Arts and Sciences hereby recognize the Final clubs;

The Faculty of Arts and Sciences affirm that all student organization policies apply to all student organizations, whether recognized or unrecognized;

The Faculty of Arts and Sciences affirm that, through the appropriate channels, the College should impose, on student organizations and on officers of student organizations, all appropriate penalties for non-compliance with those policies;

The Faculty of Arts and Sciences delegate to the Dean of FAS, Dean of the College, Student Life Committee, and Implementation Committee the further work of determining whether to recognize or ban student organizations affiliated with national organizations.

19

ALL00000927

*(Final Report, Appendix A cont'd)*

FAQ:

Q: What discipline would be appropriate for officers of groups that don't comply with the gender non-discrimination policy?

A: Suspension or expulsion.

Q: What if the clubs say they have no officers or won't say who the officers are?

A: Then members would become subject to penalties.

Q: What if the grad board takes on the responsibility of filling all officer roles?

A. As per the recommendations of the Association of Governing Boards for dealing with emergent affiliate entities (see Exhibit D), the Corporation should draft policy guidance for emergent affiliate entities that are fulfilling university functions (e.g. maintaining a student organization); such policy guidance should equip the University to, if necessary, sue for breach of trust.

ALL00000928

***Chairs and Members of the Committee***

Suzannah Clark, *Co-Chair, Professor of Music; Chair of the Department of Music*
Rakesh Khurana, *Co-Chair, Danoff Dean of Harvard College*

*Daniel Banks, *Harvard College 2017*
Paul Barreira, *Director of Harvard University Health Services*
Theodore Bestor, *Reischauer Institute Professor of Social Anthropology; Director, Reischauer Institute of Japanese Studies*
Naisha Bradley, *Director, Harvard College Women's Center*
Shub Chhokra, *Harvard College 2018*
Nathan Fry, *Senior Associate Director of Athletics*
Kacey Gill, *Harvard College 2020*
David Haig, *George Putnam Professor of Organismic and Evolutionary Biology*
*Alison Johnson, *Professor of History*
*Moses Kim, *Harvard College 2018*
James Kloppenberg, *Charles Warren Professor of American History*
Luke Leafgren, *Allston Burr Assistant Dean of Harvard College for Mather House and Lecturer on Near Eastern Languages and Civilizations*
Brigitte Libby, *Allston Burr Assistant Dean of Harvard College for Pforzheimer House and Lecturer on the Classics*
Daniel Lieberman, *Edwin M. Lerner II Professor of Biological Sciences*
Caroline Light, *Lecturer on Studies of Women, Gender, and Sexuality*
Yukio Lippit, *Professor of History of Art and Architecture*
Greg Llacer, *Director of the Office of Undergraduate Research and Fellowships*
Jason Mitchell, *Professor of Psychology*
Sandra Naddaff, *Senior Lecturer on Comparative Literature; Former Master of Mather House; Dean of Harvard Summer School*
Katherine O'Dair, *Dean of Students*
David Pilbeam, *Henry Ford II Professor of Human Evolution*
Yasmin Sachee, *Harvard College 2018*
Mariano Siskind, *Professor of Romance Languages and Literatures and of Comparative Literature; Chair of the Department of Romance Languages and Literatures*
Latanya Sweeney, *Professor of Government and Technology in Residence; Faculty Dean of Currier House*
Caroline Tervo, *Harvard College 2018*

*David Friedrich, *Staff to the Committee, Associate Dean of Students*
Christopher Gilbert, *Staff to the Committee (for Fall 2017 only), Director of Special Projects*
Ara Gershengorn, *Staff to the Committee, Office of General Counsel*

The Committee on Unrecognized Single-Gender Social Organizations was convened by Dean Michael D. Smith. Members were selected to represent students who were both members and non-members of USGSOs and faculty and administrators from across the FAS and College community. * Names marked with an asterisk were members of the committee during the Spring 2017 semester only.

ALL00000929

## Minority Report to the Final Report of the Committee on Unrecognized Single-Gender Social Organizations (USGSOs)

29 September 2017

In its Final Report, the Committee on Unrecognized Single-Gender Social Organizations (USGSOs) has modified its preliminary recommendation of June 2017, which would bar undergraduates from joining Final clubs, fraternities, sororities, or similar off-campus single-gender organizations (such as the Hasty Pudding). In lieu of a single policy, the Final Report considers a variety of strategies for addressing the USGSOs, which range from the sanction policy of May 2016 to calls for engagement with students to more aggressive police enforcement of underage drinking and noise statutes. The choice to adopt such a "multiple recommendation" approach reflects the continuing deep divisions within our community about how best to address the USGSOs. In discussions with many colleagues and students—and over many hours of debate within the Committee itself—it has become obvious that these issues do not admit to any straightforward solution, and that colleagues who start from the same goal of making Harvard the best place it can be may nevertheless arrive at very different end points. The purpose of this note is to offer an analysis of the main sources of these differences. As such, it is not intended as a dissent *per se*, but as a formal attempt to clarify some of the principles and conceptual distinctions that seem to matter most to my colleagues and students.

As I see it, when members of our community disagree about how to address the all-male Final clubs and other USGSOs, we may be disagreeing about either of two distinct questions. The first of these asks, "What problem are we trying to solve?"; the second, "What is the best way to solve it?" The Committee's Final Report makes clear that a range of answers exists to the latter—thus, its "multiple recommendations" strategy. But, likewise, different members of our community provide very different answers to the question of what problem we are, in the first place, trying to solve. These differences have been reflected in the seemingly different ways that the problem of Final clubs has been framed for the Faculty over time and in different documents—many colleagues feel that the rationale for sanctioning USGSO membership has morphed from an initial focus on sexual assault, to later concerns about gender-based discrimination, and most recently, to issues of inclusion, belonging, and privilege. Indeed, the Committee spent a good deal of time discussing not only these problems, but also additional ones, such as the distorting effects of Final clubs on student social life and the health and safety concerns they pose for our students.

Some of my colleagues have decided that these shifts in rationale reflect some form of political expediency ("let's keep making different arguments until the Faculty buy one of them"). But we may do better to conclude instead that the problem of the all-male Final clubs is—as psychoanalysts and philosophers of science would say—overdetermined. That is, we should not disavow the all-male Final clubs because they increase the incidence of sexual assault *or* because they discriminate against women *or* because they advance the prerogatives of a few individuals at the expense of many others *or* because the undermine student life *or* because they encourage unsafe drinking. We should repudiate them because they do all of these things. Perhaps any one such aspect of the clubs would be sufficient to make the case against them; together they lead, as the Final Report notes, to our community's shared sense that we cannot afford to do nothing about them.

Note that I have restricted the point above to all-male Final clubs, and this is with intent. Many of us believe firmly that despite its shifting rationales, the College is "really" trying to address problems specific to the all-male Final clubs. After all, these are the only groups that own property adjacent to campus and

ALL00000930

that host the parties outside of which female undergraduates queue in the hopes of being admitted. These are the groups that perpetuate privilege most perniciously.  And these are the groups that our colleagues have uniquely identified as important loci of sexual assault.  Indeed, it is hard not to perceive a direct line connecting the Final Report in March 2016 of President Faust's Task Force on the Prevention of Sexual Assault to the announcement two months later of the first sanctions policy.  That Task Force repeatedly makes the case that it is the all-male Final clubs that pose serious concerns with regard to sexual assault, and that this is mainly possible because they control the space in which many undergraduates socialize (unlike other USGSOs).

My sense is that our current divide has emerged, in part, because of a continual choice to first select one or another of the specific problems caused by the all-male Final clubs and to then develop policies designed to address that problem broadly throughout undergraduate life.  This impulse is understandable—we are, after all, a community that values first articulating our principles and then developing policies that serve them.  When our goal is to achieve a particular outcome (say, the end to all-male Final clubs) we naturally want to start by defining the principles at stake, such as an opposition to gender-based discrimination, and then allow our policies to flow from that principle.  But thus far, this approach has created something of a dragnet, which threatens to sweep in student groups that many of us feel are not much of a problem (or, at least, not nearly as much of a problem as the all-male Final clubs); fraternal organizations or without houses in which to host parties and womens' Final clubs, not to mention the Hasty Pudding, do not really seem to be at the root of campus ills.  It is my own belief personally—and I think the sentiment of many faculty colleagues—that we would have done better to clearly identify what we are trying to achieve, which is an end to the noxious, distorting, and often abhorrent influence of the all-male Final clubs on undergraduate life.  This is surely the point on which the greatest number of us agree; if for no other reason, it would serve well as the starting point for discussions about what policies best achieve our goal.

Which brings us squarely to the second major source of disagreement within our community: regardless of how one answers the question of what goal we ought to be aiming for, there remains an open—and very contentious—question of how best to go about achieving it.

To date, much of the debate around this issue has been cast a clash between competing values.  On the one hand, our community is committed to inclusion, we fight against discrimination in all its pernicious forms, and we have rightly begun to identify and dismantle the many structures that prevent members of our community from feeling that they belong at Harvard (and that it belongs to them).  On the other hand, we recognize that this set of values is one among many that progressive, well-intentioned individuals espouse.  Another set of such values includes notions of free expression, of individual autonomy, and of the right to free association.  One frame on the current faculty debate concerns how to adjudicate between these values when they conflict with one another.  The choice of some students to socialize off-campus with only certain people acts as a barrier to inclusion and belonging for other students; to whom do our responsibilities lie?  Each of us recognizes that rights (even those enumerated in the law) are not absolute but must be balanced against our responsibilities to one another—thus, the restrictions on free expression that enjoin us from shouting "fire!" in a crowded faculty meeting or the like.  One way of thinking about our current state of division is as a disagreement about whether the hazards posed by the all-male Final clubs and other USGSOs warrants a similar abrogation of (some of) our students' rights

ALL00000931

(such as to free and lawful assembly).  [I am, of course, glossing over many nuanced aspects of this point of view, but only because I wish to make the observation below.]

This way of framing the debate tends to bottom out in the question of *whether* we should intervene against the all-male Final clubs and other USGSOs.  But another way we might have this discussion is by instead asking the question of *how* we ought to intervene.  What I mean is this: For much of the past 16 months, we have been led to think in binary terms—either we take the extraordinary step of patrolling the off-campus social lives of students, or we wave a white flag of surrender to the *status quo* and acquiesce as the Final clubs continue to exert an adverse effect on our community.  What is missing from this duality is any substantive discussion of how we might effect meaningful change on the Final clubs through more *ordinary* means.  The policies of sanctioning USGSO membership surely comprise *extraordinary* measures: they make extraordinary and unprecedented claims on the private, off-campus lives of our students; implementing them will require a radical reimagining (for many of us) of the relationship between the faculty and its students' private lives; and they seem (to many of us) to contravene other values that ought to characterize a liberal institution committed to free inquiry and personal transformation.  One index of just how extraordinary these policies seem is the amount of time spent by the USGSO Committee on the question of whether the various sanctions policies are even *legal*.  Such policies will take us into uncharted places.

Is there nothing short of such extraordinary measures that can bring change to our campus?  The USGSO Committee's Final Report tells us the answer to this question is no, that we have tried in vain for years to rein in the Final clubs through normal channels.  But a look at what is described suggests that the College's ordinary attempts have been limited to various forms of "moral suasion," mainly comprising various meetings between administrators and club leaders and alumni boards.  If the College's efforts have indeed consisted mostly of an occasional stern talking-to, then we have little reason for surprise at their failure.  Social scientists—economists, sociologists, those in psychology departments and business schools—have learned a great deal about how to change people's behavior, and we know that "moral suasion" is probably the least effective ways of going about it.  This is why when public health officials aim to decrease cigarette smoking, they do not simply tell people, "Cigarette smoking is bad, you shouldn't do it."  Instead, they have waged a sustained campaign to inform consumers of the dangers of smoking; they make it harder for young people to obtain cigarettes; they have worked relentlessly to transform cigarette smoking from something with social cachet into something that borders on shameful and "uncool"; and so on.  No, this has not proven straightforward, and yes, it has taken time and real effort.  But walk around Harvard Square on a Saturday night, and you will struggle to find an (American) student smoking a cigarette, an absence that would have leapt out for its strangeness not all that long ago.

So we might then ask ourselves: Can we use these kinds of techniques to change student behavior regarding the all-male Final clubs and other USGSOs?  Are there no such ordinary means by which to drain these clubs of their vitality (or to "shrivel" them, as a colleague has colorfully put it)?  Again, we have been led to believe not.  But many of us are skeptical of this claim.  Thus, my sense that when we look past the legislative motions and parliamentary maneuvers, the blog posts and leaks to The Crimson, a good deal of opposition to the sanction policies flows from a desire to try—seriously for the first time—to rein in the Final clubs through a full suite of methods that we ordinarily use to change social behavior.[1]

---

[1] As a side note, I object to the Final Report's characterization that opponents of the sanctions policy "argue that suasion is always better than sanctions" (p. 14).  That statement does not reflect my understanding of the discussion within the Committee, nor do I know any colleagues who traffic in such

ALL00000932

That is, we have not had—but should be having—a full-throated conversation about whether we can reach our shared goals in ways that do not require us to compromise other core institutional values.  I am not convinced we can, but many of us believe it is worth first trying.

However, any serious attempt to use such "ordinary" measures to undermine the Final clubs' influence on campus needs to start from an analysis of why exactly they play such an outsized role in campus social life in the first place, and thus what the College must do to drain their vitality.  During the USGSO Committee discussions, we heard, in every meeting, that the Final clubs dominate undergraduate social life precisely because few good on-campus alternatives exist.  A similar point was made manifest in the Implementation Committee's report: that if the College wants to rob the Final clubs of their appeal, it must start by creating attractive alternative social spaces for undergraduates.  Many of our students want a place to "have fun"—which we would do well to acknowledge means drinking alcohol, acting in mildly transgressive ways, and being out from under the watchful eye of tutors and resident deans.  Wonderful as they are, the Houses do not—and perhaps cannot ever—fully serve that desire.  And although I resist the notion that Harvard College is somehow obliged to administer its students an appropriate dosage of fun (surely, something somewhere in the Boston area caters to the needs of college students?), we should acknowledge that the (real or) perceived lack of alternative spaces for "letting loose" remains a powerful draw of the Final clubs for our students.  Thus, draining energy away from the Final clubs will require that we direct it elsewhere.

Finally, it is impossible not to comment on the current campus morass without also noting the deep and abiding concerns of the Faculty regarding its role in informing College policy.  The implementation of either sanctions policy will permanently reshape the relationship between the faculty and our students (perhaps for the better, perhaps not).  At the same time, however, the specific way in which these policies have been advanced threatens at theh same time to alter the relationship between the Faculty and its Administration.  Many of us—including many of us who would otherwise not be opposed to taking extraordinary measures against the USGSOs—are deeply disturbed by what we view as unprecedented administrative overreach, including the widespread perception that our Administration is committed to avoiding a faculty vote on the proposed policies.  From my conversations with many colleagues, it is hard to overstate how divisive and demoralizing this posture towards the Faculty has been, not least because it could have been avoided in the first place.  In many ways, it is this aspect of our current situation that troubles me most.

One final note, this one of appreciation for my fellow committee members—students, staff, and faculty alike—for their unfailing civility, eloquence, and clarity of thought throughout our discussions; you have been a continual reminder of the things that make Harvard great.  Suzannah Clark deserves special recognition for her thoughtful leadership of the Committee, and for her truly herculean efforts on our behalf.


Jason Mitchell
Professor of Psychology

---

absolutes.  A more accurate statement might be to suggest that some opponents of the sanction policies are arguing that suasion (or other ordinary measures) are *in this instance* a better course of action *right now* than the sanction policies as formulated.

ALL00000933

EXHIBIT 25

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| KAPPA ALPHA THETA FRATERNITY, INC.; KAPPA KAPPA GAMMA FRATERNITY; SIGMA CHI; SIGMA ALPHA EPSILON; SIGMA ALPHA EPSILON—MASSACHUSETTS GAMMA; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3, | : : : : : : : : | Civil Action No.  18-cv-12485 |
| Plaintiffs, | : : | |
| v. | : : : | |
| HARVARD UNIVERSITY; PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | : : : : | |
| Defendants. | : : | |

_____ :

## <u>DECLARATION OF JOHN DOE 1</u>

John Doe 1, pursuant to 28 U.S.C. § 1746, declares the following:

1.　　I am a man over eighteen years old and of sound mind, who has never been convicted of a felony, is capable of making this declaration, and is fully competent to declare as to matters stated herein.

2.　　I am a student at Harvard College.  I am a member of an all-male organization that Harvard considers an "unrecognized single-gender social organization."

3.　　I am subject to Harvard's policy that punishes students who join certain single-sex organizations (the "Sanctions Policy").  Because of my membership in an "unrecognized single-gender social organization" I may not captain an athletic team, hold a leadership position in any of Harvard's "recognized" student organizations, and I am ineligible to compete for the Rhodes and Marshall Scholarships, and other prestigious postgraduate scholarships and fellowships.

4.      The Sanctions Policy has harmed my access to professional opportunities.  Before joining a single-sex organization, I was a member of a Harvard-recognized student organization, "Club A."  I was considering applying for a leadership position in Club A.  At the same time, however, I decided that I wanted to join a single-sex organization.  I thought it would help me feel more at home at Harvard (and so far it has).  In making the decision, however, I felt like I could not further pursue a leadership position in Club A.  The Sanctions Policy forced me to choose between membership in a group that would help me to feel at home at Harvard, and a leadership position in Club A, another organization that I cared about.

5.      The Sanctions Policy has also eliminated at least one of the benefits of my Harvard education.  In addition to my membership in Club A, I was also an active member of a different Harvard-recognized student organization, "Club B."  It was a club I had a sincere and strong passion for.  Unfortunately, the president of our club graduated.  I would have taken over, but I worried that if I became president while also a member of a single-sex organization, I would be punished under the Sanctions Policy.  As a result, no one took over Club B's leadership and Club B has not been active on campus since.  It seems likely that it will continue to be inactive.  It hurts me that Club B disappeared because of the Sanctions Policy.  Club B was one of the best parts of my Harvard education.

6.      The Sanctions Policy has also harmed my personal reputation.  Through the Sanctions Policy, Harvard College has singled me out for social stigma and embarrassment.  Harvard's justifications for the Sanctions Policy, that men's organizations are responsible for sexual assaults at Harvard and perpetrate various forms of bigotry, are widely known in the Harvard University community.  Other students and members of the Harvard Community think

2

less of me because I am subject to the Sanctions Policy. The Sanctions Policy has caused me serious emotional and psychic harm.

7.  I am bringing this lawsuit to reverse the Sanctions Policy and thereby remove the professional barriers and social stigma it causes. I believe that Harvard College has unfairly discriminated against men and women who wish to be part of organizations that consist solely of men and women. Being a member of a single-sex organization is tremendously valuable to me. I view the requirement that I give up my membership in such an organization as the price of obtaining the full and equal benefits of a Harvard University education to be deeply wrong and unlawful.

8.  I understand that the position I am advocating in this lawsuit is disfavored by many people, including Harvard administrators, faculty, other students, and members of the public at large. I am aware that many people support Harvard's Sanctions Policy, both at Harvard and beyond. I am aware that plaintiffs in other high profile lawsuits against colleges and universities have been subject to harassment and threats.

9.  When I brought this lawsuit, I hoped that my identity and involvement would remain confidential, which was important to my decision to get involved. The prospect that my identity would remain confidential made me feel safe in asserting my rights in this lawsuit despite the unpopularity of the position I am asserting.

10.  I have kept my participation in this lawsuit strictly confidential. No one knows about my participation except my counsel and an extremely close circle of individuals with a need to know.

11.     I do not want the public to know about my involvement in this lawsuit.  If it becomes public that I am bringing this lawsuit, I fear that it could seriously damage my reputation and future professional opportunities.

12.     I also do not want anyone at Harvard to know that I am involved in this lawsuit.  I plan to be a student at Harvard College for the next several years, during which time I hope to have members of the Harvard University community, such as professors and administrators, provide support and recommendations for future professional opportunities.  I also would potentially like to attend one of Harvard's graduate schools in the future.  I fear that if Harvard knew that I had sued to reverse the Sanctions Policy it might retaliate against me by denying me support for my future endeavors or denying me admission to its graduate schools.

13.     For the foregoing reasons, if it is determined that my identity must be disclosed in order to participate in this lawsuit, I will not go forward with this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, December 3, 2018.

/s/ John Doe 1
John Doe 1

# EXHIBIT 26

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KAPPA ALPHA THETA FRATERNITY, INC.; KAPPA KAPPA GAMMA FRATERNITY; SIGMA CHI; SIGMA ALPHA EPSILON; SIGMA ALPHA EPSILON—MASSACHUSETTS GAMMA; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3, | : : : : : : : : | |
| Plaintiffs, | : : | Civil Action No.  18-cv-12485_____ |
| v. | : : : | |
| HARVARD UNIVERSITY; PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | : : : : | |
| Defendants. | : : | |

## DECLARATION OF JOHN DOE 2

John Doe 2, pursuant to 28 U.S.C. § 1746, declares the following:

1.      I am a man over eighteen years old and of sound mind, who has never been convicted of a felony, is capable of making this declaration, and is fully competent to declare as to matters stated herein.

2.      I am a student at Harvard College.  I am a member of an all-male organization that Harvard considers an "unrecognized single-gender social organization."

3.      I am subject to Harvard's policy that punishes students who join certain single-sex organizations (the "Sanctions Policy").  Because of my membership in an "unrecognized single-gender social organization" I may not captain an athletic team, hold a leadership position in any of Harvard's "recognized" student organizations, and I am ineligible to compete for the Rhodes and Marshall Scholarships, and other prestigious postgraduate scholarships and fellowships.

4.      The Sanctions Policy has harmed my access to professional opportunities.  I am a member of at least one Harvard-recognized student organization.  I would like to hold a leadership position in that organization.  There is a strong likelihood that I would obtain a leadership position if I were allowed to hold one.  But because of the Sanctions Policy, I am categorically ineligible to hold a leadership position.  The inability to hold a leadership position in that student organization has materially harmed my access to future professional opportunities.

5.      The Sanctions Policy has also harmed my personal reputation.  Through the Sanctions Policy, Harvard College has singled me out for social stigma and embarrassment.  Harvard's justifications for the Sanctions Policy, that men's organizations are responsible for sexual assaults at Harvard and perpetrate various forms of bigotry, are widely known in the Harvard University community.  Other students and members of the Harvard Community think less of me because I am subject to the Sanctions Policy.  The Sanctions Policy has caused me serious emotional and psychic harm.

6.      I am bringing this lawsuit to reverse the Sanctions Policy and thereby remove the professional barriers and social stigma it causes.  I believe that Harvard College has unfairly discriminated against men and women who wish to be part of organizations that consist solely of men and women. Being a member of a single-sex organization is tremendously valuable to me.  I view the requirement that I give up my membership in such an organization as the price of obtaining the full and equal benefits of a Harvard University education to be deeply wrong and unlawful.

7.      I understand that the position I am advocating in this lawsuit is disfavored by many people, including Harvard administrators, faculty, other students, and members of the public at large.  I am aware that many people support Harvard's Sanctions Policy, both at

Harvard and beyond. I am aware that plaintiffs in other high profile lawsuits against colleges

and universities have been subject to harassment and threats.

8. When I brought this lawsuit, I hoped that my identity and involvement would

remain confidential, which was important to my decision to get involved. The prospect that my

identity would remain confidential made me feel safe in asserting my rights in this lawsuit

despite the unpopularity of the position I am asserting.

9. I have kept my participation in this lawsuit strictly confidential. No one knows

about my participation except my counsel and an extremely close circle of individuals with a

need to know.

10. I do not want the public to know about my involvement in this lawsuit. If it

becomes public that I am bringing this lawsuit, I fear that it could seriously damage my

reputation and future professional opportunities.

11. I also do not want anyone at Harvard to know that I am involved in this lawsuit. I

plan to be a student at Harvard College for the next several years, during which time I hope to

have members of the Harvard University community, such as professors and administrators,

provide support and recommendations for future professional opportunities. I also would

potentially like to attend one of Harvard's graduate schools in the future. I fear that if Harvard

knew that I had sued to reverse the Sanctions Policy it might retaliate against me by denying me

support for my future endeavors or denying me admission to its graduate schools.

12. For the foregoing reasons, if it is determined that my identity must be disclosed in

order to participate in this lawsuit, I will not go forward with this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, December 3, 2018.

/s/ John Doe 2
John Doe 2

# EXHIBIT 27

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| KAPPA ALPHA THETA FRATERNITY, INC.; KAPPA KAPPA GAMMA FRATERNITY; SIGMA CHI; SIGMA ALPHA EPSILON; SIGMA ALPHA EPSILON—MASSACHUSETTS GAMMA; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3, | : : : : : : : : | |
| Plaintiffs, | : : | Civil Action No.  18-cv-12485 |
| v. | : : : | |
| HARVARD UNIVERSITY; PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | : : : : | |
| Defendants. | : : | |

**ORGANIZATIONAL PLAINTIFFS' RESPONSES AND OBJECTIONS TO
DEFENDANT PRESIDENT AND FELLOWS OF HARVARD COLLEGE'S FIRST SET
OF INTERROGATORIES TO PLAINTIFFS SIGMA CHI, SIGMA ALPHA EPSILON
AND SIGMA ALPHA EPSILON—MASSACHUSETTS GAMMA**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and the corresponding

Local Civil Rules of the District of Massachusetts ("Local Rules"), Plaintiffs Sigma Chi, Sigma

Alpha Epsilon, and Sigma Alpha Epsilon—Massachusetts Gamma (collectively, the

"Organizational Plaintiffs"), by and through their undersigned counsel, hereby respond and object

to Defendant President and Fellows of Harvard College's First Set of Interrogatories (the

"Interrogatories").

**PRELIMINARY STATEMENT**

1.      Organizational Plaintiffs' responses to this First Set of Interrogatories ("Responses" or

"Responses and Objections") do not constitute admissions that such Responses are relevant to the

**INTERROGATORY NO. 11:**

State the basis for your contention, in paragraph 11 of your Complaint, that "Harvard's pressure campaign against students who join single-sex organizations has caused several single sex organizations to close and intimidated many students who favor single-sex organizations into silence."

**RESPONSE TO INTERROGATORY NO. 11:**

Due to the fact that discovery is ongoing in this Action, Organizational Plaintiffs object on the grounds that this contention interrogatory is premature, and specifically reserve the right to supplement their Responses as appropriate.

**Combined Response of All Organizational Plaintiffs**

Subject to and without waiving their objections, Organizational Plaintiffs that the basis of this contention is as follows:

- The chapter of Alpha Epsilon Pi serving Harvard students disaffiliated from its national organization and formed a new, gender neutral social group "following the announcement of Harvard's historic penalties n members of unrecognized single-gender social organizations." Graham W. Bishai & Hannah Natanson, *Alpha Epsilon Pi to Go Gender Neutral*, The Crimson (Apr. 5, 2017), ALL00000681–ALL00000687.  In its statement, Alpha Epsilon Pi noted that the "announcement of the sanctions certainly spurred our decision." *Id*.

- When the chapter of Kappa Kappa Gamma serving Harvard students disaffiliated from its national organization, moreover, its president Tiana M. Menon "directly attributed the group's decision to go co-ed to the College's penalties" and "wrote that College administrators played a significant role in pushing the group to adopt gender-neutral

membership practices."  Michael E. Xie, *Kappa Kappa Gamma Now Gender-Neutral Club 'The Fleur-de-Lis'*, The Crimson (Jan. 8, 2018), ALL00001022–ALL00001026.

- In an official statement, Kappa Alpha Theta announced that the "disestablishment of Zeta Xi [Kappa Alpha Theta's chapter serving Harvard students] is a direct result of sanctions placed by Harvard administrators on single-gender Greek organizations."  "By forcing women to make an impossible choice— between holding leadership positions and applying for scholarships and fellowships or being members of communities specifically designed to support and empower college women to have those aspirations—Harvard's administrators placed our chapter in an untenable situation."  Mandy Burgett Wushinski, *A Path We Would Not Have Chosen*, Kappa Alpha Theta (July 23, 2018), ALL00001086–ALL00001088.

- Delta Gamma closed, "explicitly cit[ing] the sanctions as the impetus for the decision."  Caroline S. Engelmayer & Michael E. Xie, *Delta Gamma Becomes First Social Group to Close in Response to Sanctions*, The Crimson (Aug. 5, 2018), ALL00001089– ALL00001098.

- When Alpha Phi's chapter serving Harvard students closed, Alpha Phi International wrote in a press release that "[the] decision was made in direct response to the sanctions placed by Harvard University administration on members of single-gender organizations."  Caroline S. Engelmayer & Michael E. Xie, *Harvard's Last Sorority Disappears as Alpha Phi Buckles to College Pressure, Goes Co-Ed*, The Crimson (Aug. 19, 2018), ALL00001099–ALL00001110.

Organizational Plaintiffs specifically incorporate in this Response each of the above-cited documents in their entirety.

### Sigma Alpha Epsilon—Massachusetts Gamma

Further, subject to and without waiving its objections, Sigma Alpha Epsilon—Massachusetts Gamma states that its members have been intimidated into silence.  More specifically, they recruit in secret now, conducting anonymous door drops and having prospective members meet them out of the public eye.  They also feel uncomfortable putting up posters for the chapter around campus, or even wearing their Greek letters on campus without fear of having the Sanctions Policy applied to them for supporting a single-gender organization.

### INTERROGATORY NO. 12:

In connection with your contention, in paragraphs 39 and 45 of your Complaint, that Sigma Chi and Mass Gamma have been "harmed financially by Harvard's . . . Policy because [they] must spend more resources recruiting and ha[ve] fewer dues-paying members than [they] otherwise would," identify the specific financial harm that you claim was caused by the Policy and the number of additional dues paying members that you claim Sigma Chi and Mass Gamma each would have had but for the Policy, and state the basis for your response.

### RESPONSE TO INTERROGATORY NO. 12:

In addition to and specifically incorporating the foregoing General Objections, Organizational Plaintiffs object to this Interrogatory on the grounds that, as used in this interrogatory "identify," "specific financial harm," and "caused" are vague and overly broad.

### Sigma Chi

Subject to and without waiving its objections, Sigma Chi states that a typical recruitment cycle prior to the Sanctions Policy for its Kappa Eta chapter would see more than 300 eligible men seek membership.  This number has dwindled to just a little more than half of that number since the Sanctions Policy went into effect.  It is difficult to quantify the total damages incurred

by the chapter and Sigma Chi as there have been potentially hundreds of individuals who may have become a member of Sigma Chi's Kappa Eta chapter if it were not for the Sanctions Policy. Sigma Chi's Response to Interrogatory No. 6 provides just a few examples quantifying the financial harm, and that Response is incorporated herein.

**Sigma Alpha Epsilon—Massachusetts Gamma**

Subject to and without waiving its objections, Sigma Alpha Epsilon—Massachusetts Gamma states that its membership has significantly decreased since the Sanctions Policy, which has led to reduced membership fees and, in turn, a reduced budget for the chapter. The membership list for Sigma Alpha Epsilon—Massachusetts Gamma will be produced and provided as Appendix C to these Responses, and Plaintiffs hereby designate Appendix C and the information it contains as Highly Confidential—Attorneys' Eyes Only under the Protective Order.

**INTERROGATORY NO. 13:**

Identify each person who has knowledge of the circumstances surrounding the allegations in your Complaint and describe in detail each such person's knowledge.  If you intend to call any such person as a witness at the trial of this matter, identify the person and describe the expected testimony.

**RESPONSE TO INTERROGATORY NO. 13:**

In addition to and specifically incorporating the foregoing General Objections, Organizational Plaintiffs object to this Interrogatory on the grounds that the terms "knowledge," "circumstances," and "surrounding" are vague, overly broad, unduly burdensome, and not proportional to the needs of the case.  Organizational Plaintiffs further object to this Interrogatory to the extent it seeks information that is publicly available, that is equally available

## **VERIFICATION**

I, Michael Church, state as follows:

On behalf of Plaintiff Sigma Chi International Fraternity ("Sigma Chi") and in my capacity as Executive Director of Sigma Chi, I have read the foregoing Responses to Defendants' First Set of Interrogatories, and they are true and correct to the best of my knowledge. I am authorized to make this verification on behalf of Sigma Chi. The foregoing responses represent a corporate response, based on records and information currently available, and assembled by Sigma Chi employees and representatives. Because these are corporate responses, I do not necessarily have direct personal knowledge of every fact contained herein, nor does any single individual. Sigma Chi reserves the right to make changes in or additions to any of these answers if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available. I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Signed this **26** day of March, 2020.

Michael Church

## **VERIFICATION**

I, John Perkins, state as follows:

On behalf of Plaintiff Sigma Alpha Epsilon ("SAE") and in my capacity as the Chief Operating Officer for SAE, I have read the foregoing Responses to Defendants' First Set of Interrogatories, and they are true and correct to the best of my knowledge.  I am authorized to make this verification on behalf of SAE.   The foregoing responses represent a corporate response, based on records and information currently available, and assembled by SAE employees and representatives.  Because these are corporate responses, I do not necessarily have direct personal knowledge of every fact contained herein, nor does any single individual. The response was prepared with the assistance of SAE employees and representatives.  SAE reserves the right to make changes or additions to any of these answers if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available.  I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Signed this ⟨29⟩ day of March, 2020.

_____
John Perkins

## **VERIFICATION**

I, ███████████, state as follows:

On behalf of Plaintiff Sigma Alpha Epsilon — Massachusetts Gamma ("Mass Gamma") and in my capacity as Chapter President of Mass Gamma, I have read the foregoing Responses to Defendants' First Set of Interrogatories, and they are true and correct to the best of my knowledge. I am authorized to make this verification on behalf of Mass Gamma.  The foregoing responses represent a corporate response, based on records and information currently available, and assembled by Mass Gamma members and representatives.  Because these are corporate responses, I do not necessarily have direct personal knowledge of every fact contained herein, nor does any single individual. Mass Gamma reserves the right to make changes in or additions to any of these answers if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available.  I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Signed this 28th day of March, 2020.